

# ARIZONA SUPREME COURT

STATE OF ARIZONA,

               APPELLEE,

    vs.

CLARENCE WAYNE DIXON,

               APPELLANT.

No. CR08–0025 AP


MARICOPA COUNTY
SUPERIOR COURT
NO. CR 2002–019595

## APPELLANT'S OPENING BRIEF

BRUCE PETERSON
LEGAL ADVOCATE
FIRM STATE BAR NO. 441200

CONSUELO M. OHANESIAN
DEPUTY LEGAL ADVOCATES
ATTORNEY FOR APPELLANT
3800 NORTH CENTRAL AVENUE, SUITE 1500
PHOENIX, ARIZONA 85012
TELEPHONE (602) 506-4111
legaladvocateappeals@mail.maricopa.gov
AZ BAR NO. 009232

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE............................................................................. 1

STATEMENT OF FACTS.................................................................................. 10

ISSUES PRESENTED FOR REVIEW ............................................................. 17

ARGUMENT I.................................................................................................. 19

THE PROSECUTOR COMMITTED MISCONDUCT WHEN HE INTRODUCED RULE 404(C) EVIDENCE BECAUSE HE KNEW HIS MEDICAL EXPERT WOULD NOT TESTIFY THAT THERE WAS ANY EVIDENCE THAT THE VICTIM HAD BEEN RAPED. THE RULE 404(C) EVIDENCE WAS ADMITTED FOR THE IMPROPER PURPOSE OF SHOWING THAT APPELLANT WAS ACTING IN CONFORMITY THEREWITH, AND THAT DEANA MUST HAVE BEEN RAPED BECAUSE THERE WAS EVIDENCE THAT SHE AND APPELLANT HAD HAD SEXUAL INTERCOURSE, WHICH MUST HAVE BEEN NONCONSENSUAL BASED ON APPELLANT'S ABERRANT SEXUAL PROPENSITY.

ARGUMENT II ................................................................................................ 30

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED APPELLANT TO BE SHACKLED WITH A LEG RESTRAINT AND A STUN BELT DURING TRIAL BASED SOLELY ON THEIR BEING REQUIRED BY JAIL POLICY, WITHOUT FIRST CONDUCTING A HEARING TO DETERMINE THE NECESSITY FOR SUCH RESTRAINTS.

**ARGUMENT III** ................................................................................ 43

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED A MEDICAL EXAMINER OTHER THAN THE ONE WHO CONDUCTED THE AUTOPSY OF THE VICTIM TO TESTIFY ABOUT THE REPORT'S FINDINGS AND TO TESTIFY ABOUT HIS CONCLUSIONS BASED ON THAT INFORMATION.

**ARGUMENT IV** ................................................................................ 54

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DENIED APPELLANT'S REQUEST FOR ASSISTANCE IN EXAMINING THE DNA EXPERT BASED ON ITS MISTAKEN LEGAL CONCLUSION THAT ARIZONA LAW PROHIBITS HYBRID REPRESENTATION.

**ARGUMENT V** ................................................................................. 59

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S MOTION FOR A CONTINUANCE BASED ON THE INCOMPLETENESS OF THE MITIGATION EVIDENCE.

**ARGUMENT VI** ................................................................................ 68

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S ATTEMPT TO INTRODUCE PASSAGES FROM DEANA'S DIARIES THAT STATED SHE WOULD FIGHT BACK IF SOMEONE ATTEMPTED TO SEXUALLY ASSAULT HER AGAIN.

**ARGUMENT VII** ............................................................................... 74

IN ITS INDEPENDENT REVIEW, THIS COURT SHOULD FIND THAT APPELLANT'S SENTENCE OF DEATH IS EXCESSIVE AND DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES.

**ARGUMENT VIII** ................................................................................ 81

      ISSUES PRESERVED FOR FEDERAL REVIEW

**CONCLUSION** ..................................................................................... 88

**CERTIFICATE OF RULE 31.13(b) COMPLIANCE** ...................................... 91

**CERTIFICATE OF SERVICE** ...................................................................... 92

# TABLE OF CITATIONS

## UNITED STATES SUPREME COURT CASES

*Crawford v. Washington,*
    541 U.S. 36, 124 S. Ct. 1354 (2004) ................... 44–46, 47, 48, 49, 50, 52, 53

*Deck v. Missouri,*
    544 U.S. 622, 125 S. Ct. 2007 (2005) ................................. 30, 31, 38, 39, 42

*Davis v. Washington,*
    547 U.S. 813, 126 S. Ct. 2266 (2006) ........................................................ 48

*Donnelly v. DeChristoforo,*
    416 U.S. 637, 94 S. Ct. 1868 (1974) ......................................................... 20

*Eddings v. Oklahoma,*
    455 U.S. 104, 102 S. Ct. 869 (1982) ......................................................... 63

*Faretta v. California,*
    422 U.S. 806, 95 S. Ct. 2525 (1975 ......................................................... 56

*Gregg v. Georgia ,*
    428 U.S. 153, 96 S. Ct. 2909 (1976) ..................................................... 82, 83

*Hitchcock v. Dugger,*
    481 U.S. 393, 107 S. Ct. 1821 (1987) ....................................................... 63

*Johnson v. Zerbst,*
    304 U.S. 458, 58 S. Ct. 1019 (1938) ..................................................... 56–57

*Lockett v. Ohio,*
    438 U.S. 586, 98 S. Ct. 2954 (1978) ......................................................... 63

*Melendez-Diaz v. v. Massachusetts,*
    ___ U.S. ___, 129 S. Ct. 2527 (2009) ............................................... 48

*Monge v. California,*
    524 U.S. 721, 118 S. Ct. 2246 (1998) ............................................... 62

*Ohio v. Roberts,*
    448 U.S. 56, 100 S. Ct. 2531 (1980) ................................................. 48

*Palmer v. Hoffman,*
    318 U.S. 109, 63 S. Ct. 477 (1943) ................................................... 46

*Pointer v. Texas,*
    380 U.S. 400, 85 S. Ct. 1065 (1965) ................................................. 44

*Sullivan v. Louisiana,*
    508 U.S. 275, 279, 113 S. Ct. 2078 (1993) ....................................... 28

*Walton v. Arizona,*
    497 U.S. 639, 110 S. Ct. 3047 (1990) ............................................... 87

*Woodson v. North Carolina,*
    428 U.S. 280, 96 S. Ct. 2978 (1976) ................................................. 81

## OTHER FEDERAL CASES

*United States v. Aponte,*
    591 F.2d 1247 (9th Cir.1978) ........................................................... 54

*Ghent v. Woodford,*
    279 F.3d 1121 (9th Cir. 2002) ......................................................... 38

*Gonzalez v. Pliler,*
    341 F.3d 897 (9th Cir. 2003) ........................................................... 30

vi

*Kubat v. Thieret,*
    867 F.2d 351 (7th Cir. 1989)............................................................... 63

*Rhoden v. Rowland,*
    172 F.3d 633 (9th Cir. 1999)............................................................... 38

*Turner v. Calderon,*
    281 F.3d 851 (9th Cir. 2002)............................................................... 63

*United States v. Blevins,*
    555 F.2d 1236 (5th Cir.1977)............................................................. 20

*United States v. Durham,*
    287 F.3d 1297 (11th Cir. 2002)..................................................... 40, 41

*United States v. Reyes,*
    18 F.3d 65 (2nd Cir. 1994)........................................................... 52, 53

*United States v. Weinstein,*
    762 F.2d 1522 (11th Cir.1985)........................................................... 20

## ARIZONA SUPREME COURT CASES

*Parker v. Territory,*
    5 Ariz. 283, 52 P. 361 (1898)............................................................. 38

*Robinson v. Hotham,*
    211 Ariz. 165, 118 P.3d 1129 (2005)................................................. 56

*State v. Amaya-Ruiz,*
    166 Ariz. 152, 800 P.2d 1260 (1990)................................................. 59

*State v. Anderson,*
    210 Ariz. 327, 1 P.3d 369 (2005)....................................................... 82

*State v. Andriano,*
 215 Ariz. 497, 161 P.3d 540 (2007)............................................................ 87

*State v. Atwood,*
 171 Ariz. 576, 832 P.2d 593 (1992)............................................................ 20

*State v. Beaty,*
 158 Ariz. 232, 762 P.2d 519 (1988)............................................................ 84

*State v. Bible,*
 175 Ariz. 549, 858 P.2d 1152 (1993)............................................ 27–28, 74

*State v. Boag,*
 104 Ariz. 362, 453 P.2d 508 (1969)............................................................ 31

*State v. Bocharski,*
 200 Ariz. 50, 22 P.3d 43 (2001)............................................................ 62–63

*State v. Bocharski,*
 218 Ariz. 476, 189 P.3d 403 (2008)............................................................ 86

*State v. Bolton,*
 182 Ariz. 290, 896 P.2d 830 (1995)...................................................... 28, 75

*State v. Brewer,*
 170 Ariz. 486, 826 P.2d 783 (1992)............................................................ 75

*State v. Carreon,*
 210 Ariz. 54, 107 P.3d 900 (2005)........................................................ 82, 85

*State v. Clabourne,*
 142 Ariz. 335, 690 P.2d 54 (1984)............................................................ 59

*State v. Cornell,*
    179 Ariz. 314, 878 P.2d. 1352 (1994) ................................................ 54, 57, 83

*State v. Cromwell,*
    211 Ariz. 181, 119 P.3d 448 (2005) ................................................ 83

*State v. Davolt,*
    207 Ariz. 191, 211, 84 P.3d 456 (2004) ................................................ 31

*State v. Djerf,*
    191 Ariz. 583, 959 P.2d 1274 (1998) ................................................ 75

*State v. Ellison,*
    213 Ariz. 116, 140 P.3d 899 (2006) ................................................ 44, 85

*State v. Finch,*
    202 Ariz. 410, 46 P.3d 421 (2002) ................................................ 83

*State v. Fulminante,*
    161 Ariz. 237, 778 P.2d 602 (1988) ................................................ 84–85

*State v. Garza,*
    216 Ariz. 56, 163 P.3d 1006 (2007) ................................................ 86

*State v. Glassel,*
    211 Ariz. 33, 116 P.3d 1193 (2005) ................................................ 87

*State v. Gomez,*
    211 Ariz. 494, 123 P.3d 1131 (2005) ................................................ 39, 42

*State v. Gonzalez-Gutierrez,*
    187 Ariz. 116, 927 P.2d 776 (1996) ................................................ 44

*State v. Greenway,*
    170 Ariz. 155, 823 P.2d 22 (1991) ................................................ 85

*State v. Gulbrandson,*
    184 Ariz. 46, 906 P.2d 579 (1995).......................................... 81, 84

*State v. Harrod,*
    200 Ariz. 309, 26 P.3d 492 (2001)............................................ 82

*State v. Harrod,*
    218 Ariz. 268, 183 P.3d 519 (2008)........................................... 86

*State v. Hinchey,*
    181 Ariz. 307, 890 P.2d 602 (1995)........................................... 86

*State v. Hoskins,*
    199 Ariz. 127, 14 P.3d 997 (2000)............................................ 75

*State v. Hughes,*
    193 Ariz. 72, 969 P.2d 1184 (1998)......................................... 20–21

*State v. Hyde,*
    186 Ariz. 252, 921 P.2d 655 (1996)........................................... 44

*State v. Johnson,*
    212 Ariz. 425, 133 P.3d 735 (2006)......................................... 85–86

*State v. Kayer,*
    194 Ariz. 423, 984 P.2d 31 (1999)...................................... 74, 75, 76

*State v. Kiles,*
    175 Ariz. 358, 857 P.2d 1212 (1993)......................................... 77

*State v. Knapp,*
    114 Ariz. 531, 562 P.2d 704 (1977).......................................... 77

*State v. Lee,*
    189 Ariz. 608, 944 P.2d 1222 (1997)..........................................................20

*State v. Lundstrom,*
    161 Ariz. 141, 776 P.2d 1067 (1989)....................................................50, 51

*State v. McCray,*
    218 Ariz. 252, 183 P.3d 503 (2008)......................................................78–79

*State v. McGill,*
    213 Ariz. 147, 140 P.3d 930 (2006)..........................................................81

*State v. McKinney,*
    185 Ariz. 567, 917 P.2d 1214 (1996)........................................................31

*State v. Medina,*
    193 Ariz. 504, 975 P.2d 94 (1999)............................................................81

*State v. Miles,*
    186 Ariz. 10, 918 P.2d 1028 (1996)..........................................................87

*State v. Milke,*
    177 Ariz. 118, 865 P.2d 779 (1993).........................................................75

*State v. Murray,*
    184 Ariz. 9, 906 P.2d 542 (1995)..............................................................57

*State v. Pandeli,*
    200 Ariz. 365, 26 P.3d 1136 (2001)..........................................................85

*State v. Ramirez,*
    178 Ariz. 116, 871 P.2d 237 (1994).........................................................75

*State v. Roseberry,*
    210 Ariz. 360, 111 P.3d 402 (2005)..........................................................87

*State v. Salazar,*
 173 Ariz. 399, 844 P.2d 566 (1992)........................................ 78, 79, 82, 83, 84

*State v. Sansing,*
 200 Ariz. 347, 26 P.3d 1118 (2001)........................................................ 83, 84

*State v. Smith,*
 203 Ariz. 75, 50 P.3d 825 (2002)................................................................... 84

*State v. Spreitz,*
 190 Ariz. 129, 945 P.2d 1260 (1997)............................................................. 75

*State v. Starks,*
 122 Ariz. 531, 596 P.2d 366 (1979)............................................................... 38

*State v. Stewart,*
 139 Ariz. 50, 676 P.2d 1108 (1984)............................................................... 38
*State v. Stokley,*
 182 Ariz. 505, 898 P.2d 454 (1995)............................................................... 84

*State v. Terrazas,*
 189 Ariz. 580, 944 P.2d 1194 (1997)............................................................. 28

*State v. Trostle,*
 191 Ariz. 4, 951 P.2d 869 (1997).................................................................. 77

*State v. Tucker,*
 215 Ariz. 298, 160 P.3d 177 (2007)................................................... 43, 69, 79

*State v. Van Adams,*
 194 Ariz. 408, 984 P.2d 16 (1999)................................................................. 86

*State v. West,*
 176 Ariz. 432, 862 P.2d 192 (1993)............................................................... 84

## ARIZONA COURT OF APPEALS CASES

*State v. Bassett,*
    215 Ariz. 600, 161 P.3d 1264 (App. 2007)................................................ 30, 40

*State v. Cannon,*
    127 Ariz. 147, 618 P.2d 641 (App. 1980)...................................................... 54

*State v. Mills,*
    196 Ariz. 269, 995 P.2d 705 (App. 1999)...................................................... 39

*State v. Salazar,*
    181 Ariz. 87, 887 P.2d 617 (App. 1994)........................................................ 26

## CASES FROM OTHER STATES

*People v. Harrington,*
    42 Cal. 165 (1871)............................................................................................ 38

*State v. Dixon ,*
    283 So.2d 1 (Fla. 1973).................................................................................... 78

## CONSTITUTIONAL PROVISIONS

### United States Constitution

Fifth Amendment............................................................................... 82, 84

Sixth Amendment ..................................................... 43, 44, 47, 48, 51, 52, 53, 82, 86

Eighth Amendment................................................................ 81, 82, 84, 85, 86, 87

Fourteenth Amendment ...................................................... 81, 82, 83, 84, 85, 86, 87

xiii

**Arizona Constitution**

Article 2, § 1 .................................................................................... 82, 83, 84

Article 2, § 4 .................................................................................... 82, 83, 84

Article 2, § 13 .......................................................................................... 84

Article 2, § 15 .............................................................................. 82, 84, 85, 87

Article 2, § 23 .......................................................................................... 82

Article 2, § 24 ................................................................................. 20, 44, 82

 Article 6, § 5(3)........................................................................................ 9

**STATUTES**
**Arizona Revised Statutes**

13–703.01 ............................................................................................... 85

13-4031 .................................................................................................. 13

13–1421 ........................................................................................ 68–69, 72

13-4033(A)(Supp. 2000) ........................................................................... 13

**RULES**
**Arizona Rules of Criminal Procedure**

Rule 26.15................................................................................................. 9

Rule 31.2(b)............................................................................................... 9

**Arizona Rules of Evidence**

Rule 404(B) ................................................................................................ 21

Rule 404(C) ................................................................... 3, 19, 22, 24, 27

Rule 703 ............................................................................... 50–51, 52

Rule 801(C) .......................................................................................... 72

Rule 803(3) ...................................................................................... 46, 73

Rule 803(8) .......................................................................................... 46

## SECONDARY MATERIALS

1 Joseph M. Livermore et al., ARIZONA PRACTICE LAW OF EVIDENCE (4th ed. 2000) ................................................................................................ 52

## STATEMENT OF THE CASE

On November 26, 2002, the State charged Appellant with Count 1, first-degree murder of Deana Bowdoin, a class 1 felony, and Count 2, first-degree rape of Deana Bowdoin, a class 1 felony for offenses committed on January 7, 1978.[1] On March 28, 2003, the State filed a notice of intention to seek the death penalty.[2]  On April 17, 2003, the State filed an allegation of historical prior convictions.[3]

On October 31, 2003, the trial court granted Appellant's motion to dismiss Count 2, with the agreement or acknowledgement of the State, based on the running of the statute of limitations.[4]

Appellant filed motions to extend the deadline for the completion of the investigation of Appellant's social history for mental health evaluation and mitigation, and to extend the time to provide a date to the court for completion of the mental health examination.[5] Appellant again moved for each of these extensions on April 14, 2004.[6]

On January 20, 2004, Appellant filed an objection to evidence of other crimes,

---

[1] Record on Appeal (R.O.A.) at 1.
[2] *Id.* at 29.
[3] *Id.* at 38.
[4] *Id.* at 78; Reporter's Transcript (R.T.) 10/31/03 at 4.
[5] *Id.* at 76, 77.
[6] *Id.* at 96, 97.

1

wrongs, or acts.[7]  The State filed its response on October 7, 2005.[8]

On January 20, 2004, Appellant filed a motion to dismiss the State's notice of intention to seek the death penalty as unsupported by findings of probable cause.[9]  The same day Appellant filed a motion for a bill of particulars on the aggravating circumstances alleged in the State's notice of intent to seek the death penalty.[10]

On January 14, 2005, Appellant filed a motion to dismiss the aggravating factors in A.R.S. § 13–703(F)(6) as legally insufficient.[11]  The State filed its response on April 14, 2005.[12]

On October 11, 2005, Appellant filed a pro per motion to change counsel, asking that the two Public Defenders on his case be withdrawn and an attorney from the Office of the Legal Defender be substituted.[13]  On March 16, 2006, Appellant waived his right to counsel and moved for the appointment of advisory counsel.[14]  Appellant

---

[7] *Id.* at 85.
[8] *Id.* at 119.
[9] *Id.* at 87.  The State filed its response on February 3, 2004.  *Id.* at 90.  Appellant filed a reply on February 19, 2004.  *Id.* at 91.
[10] *Id.* at 85.  The State filed its response on February 3, 2004.  *Id.* at 89.  Appellant filed a reply on February 19, 2004.  *Id.* at 92.
[11] *Id.* at 107.  In 1978, the aggravating circumstances were listed in §13–454(E).
[12] *Id.* at 108.
[13] *Id.* at 120.
[14] *Id.* at 131, 132.

later moved for the assignment of a mitigation specialist and paralegal to his case.[15]

Appellant filed an objection to the State's use of Rule 404(C) evidence based on the Rule's not being in existence at the time of the offense.[16] The State filed its response, countering that the adopting of the Rule was not a violation of the ex post facto clause.[17] Appellant filed his reply, arguing that the State's position was contrary to the existence of an effective date for the application of the Rule, the law of the case, the federal and state ex post facto clauses, and interpretive case law.[18] After a hearing, the trial court ruled that the other acts evidence was admissible under Rule 404(C).[19]

Appellant filed several requests for continuance based on his mitigation specialist's being unable to gather and fully assess what mitigating factors were present and determine what areas needed to be explored.[20] The trial court struck the first motion because it was filed by advisory counsel and not Appellant.[21] At a later date advisory counsel informed the trial court that the mitigation specialist had to hire someone to work solely on Appellant's case, and advised of the continuing problems

---

[15] *Id.* at 140.
[16] *Id.* at 156.
[17] *Id.* at 161.
[18] *Id.* at 165.
[19] *Id.* at 128.
[20] *Id.* at 217, 225.

the current mitigation specialist was having going through the information gathered by the previous mitigation specialists.[22]

On November 6, 2007, the trial court held a trial management conference during which it asked the mitigation specialist about the status of his research.[23]   The mitigation specialist informed the court that the mitigation research was approximately sixty percent complete, at best.[24] The trial court stated it was prepared to start the trial and was not prepared to continue it.[25]   The court said that the parties had been informed that the trial date was a date certain, and had been told to be ready to proceed.[26]

The case went before a jury, which found Appellant guilty of first-degree murder on both premeditated and felony-murder, based on the dismissed rape charge, theories.[27]   The case proceeded to the aggravation phase.  The State withdrew the aggravating circumstance that Appellant had been previously convicted of a serious

---

[21] *Id.* at 220.
[22] R.T. 5/4/07 at 5.
[23] R.T. 11/6/07 at 11.
[24] *Id.*
[25] *Id.* at 12.
[26] *Id.*
[27] R.T. 1/15/08 at 10–11.

offense.[28]  The State then alleged the aggravating circumstance that Appellant had been convicted of another offense for which, under Arizona law, a sentence of life imprisonment is imposable.[29]  Appellant told the trial court that, as he said before, he was not prepared to present mitigation because it was incomplete and he did not want to present it piecemeal.[30]

The State called the medical examiner to testify concerning the manner of death.  He opined that the eye injury would be painful if Deana had been conscious, and because the eye swelled death, was not instantaneous with the eye injury.[31]  The medical examiner said he could not determine whether the manual or ligature strangulation occurred first.[32]  He opined further that in the spectrum of deaths, this was not one of the longer deaths, but was a shorter death.[33]  He clarified that a quick death is four to five minutes, from the beginning to the end of the attack.[34]  Unconsciousness would take place in one to one and one-half minutes during a manual

---

[28] R.T. 1/16/08 at 4–5.
[29] *Id.* at 5.  In 1978, the statute was numbered § 13–454(E)(1).
[30] *Id.* at 13–14.
[31] *Id.* at 38–39.
[32] *Id.* at 47.
[33] *Id.* at 55.
[34] *Id.* at 86.

strangulation, and sooner in ligature strangulation that affects the carotid bodies.[35]

The State also presented fingerprint technicians who matched Appellant's fingerprints to the pen pack from the Arizona Department of Corrections, demonstrating that Appellant had been convicted of a subsequent offense.[36]

In January 17, 2008, the jurors found the aggravating circumstances that Appellant had committed another offense for which life or death could be imposed, and that Appellant committed the offense in an especially heinous and cruel manner.[37] They were unable to reach a unanimous decision on the especially depraved aggravating circumstance.[38]

On January 22, 2008, the penalty phase began with the trial court advising Appellant of his right to allocute, and explaining that he might be subject to cross-examination.[39]

Advisory counsel then told the court that the mitigation was complete, although the mitigation specialist said the information was not done in his usual manner, and

---

[35] *Id.* at 57.
[36] *Id.* at 59–61, 64, 65–68.
[37] R.T. 1/17/08 at 4.
[38] *Id.*
[39] R.T. 1/22/08 at 7.

6

that he needed more time to complete social history issues.[40]  Appellant informed the trial court that he chose not present mitigation evidence based on the incomplete information gathered by his mitigation specialist.[41]  Appellant told the court that he did not believe that the mitigation specialist had the opportunity to interview everyone.[42]

The trial court told Appellant that his advisory counsel had said that Appellant was choosing not to present mitigation, and that Appellant had had enough time to prepare mitigation.[43]  The trial court then asked the advisory counsel to respond to Appellant's comments that he was not apprised of the extent of the mitigation they developed.[44]  Advisory counsel told the court they had identified twelve areas that they would have covered had they been representing Appellant and that "[a]ll we can do at this point, get the experts. Let him know they're here, and so he makes the decision if he wants to use them.  We identified 12 different areas, and that's all we can do at this time."[45]  Advisory counsel added that there were some areas of mitigation that had been investigated fully and that they would have an impact on the jury's consideration

---

[40] *Id.* at 26.
[41] *Id.* at 27.
[42] *Id.* at 28.
[43] *Id.* at 30.
[44] *Id.*
[45] *Id.* at 30–31.

of the punishment in this case.[46]

Appellant then told the court that there was simply not enough time, despite what advisory counsel had said.[47] The trial court then told Appellant that whatever Appellant put forth as mitigation, the State would have the chance to rebut.[48] Appellant added that his mitigation was "stale," and that "there is no – there is nobody to come and sit or stand in that witness box and tell people how it was back then."[49]

On January 23, 2008, the jury heard the testimony of Deana's mother, sister, and father.[50] The trial court let the jury leave on an early lunch break because they were crying.[51] Appellant's witness, James Aiken, the president of a prison consulting company, testified that Appellant was serving 175 years' imprisonment and that he has been and can be managed.[52] Appellant called no other witnesses.[53] The State called a forensic psychologist who detailed Appellant's problems in prison, four or five

---

[46] *Id.* at 31–32.
[47] *Id.* at 33.
[48] *Id.* at 33.
[49] *Id.* at 34.
[50] R.T. 1/23/08 at 15–23.
[51] *Id.* at 23.
[52] *Id.* at 30, 44, 47.
[53] *Id.* at 80.

incidents in the past twenty-two years.[54]

On January 24, 2008, Appellant addressed the jury, telling them that he would be spending the rest of his life in prison, that he would never get out, and that he presented no danger to society.[55]  In his closing, Appellant told the jurors that he presented no danger to the prison staff or other inmates, that he has "no fruitful life now," and that he valued his life.[56]  He compared his life to Deana's like comparing "a dirty penny and a shiny dime."[57]  The jury returned a sentence of death.[58]  The trial court then sentenced Appellant to death.[59]

On January 28, 2008, an automatic notice of appeal was filed under Arizona Rules of Criminal Procedure 26.15 and 31.2(b) and A.R.S. §§ 13–4031 and –4033 (2001).[60]  This Court has jurisdiction under the Arizona Constitution, Article 6, § 5(3), and A.R.S. §§ 13–4031, and 13–4033.

---

[54] *Id.* at 101–06, 108–09, 118.
[55] R.T. 1/24/08 at 26.
[56] *Id.* at 38, 40, 43.
[57] *Id.* at 45, 46.
[58] *Id.* at 79.
[59] *Id.* at 80.
[60] R.O.A at 361.

## STATEMENT OF THE FACTS[61]

Deana Bowdoin was a senior at Arizona State University and lived in a nearby studio apartment with her boyfriend, Michael Banes.[62]  Although she and her parents saw each other three to four times a week, they did not know of the arrangement with Michael, nor were they acquainted with all of her or Michael's friends.[63]  Deanna spoke with her father about other boyfriends, but did not tell him that she wanted to marry Michael or have a long-term relationship with him.[64]  Appellant was also a university student at that time and lived in an apartment complex near Deana's.[65]

On Friday, January 6, 1978, Deana drove to her parents' home after work.[66]  After speaking with her mother, Deana went to bathe and change her clothes while her mother went to the store.[67]  Deana put on underpants, trousers, and a midriff-bearing top.[68]  While Deana was dressing, her father came home.[69]  At around 7:00 p.m.,

---

[61]Except in its independent review of the death sentence, A.R.S. § 13-755(A) (Supp. 2008), this Court views the facts in the light most favorable to sustaining the jury's verdict. *See State v. Garza*, 216 Ariz. 56, 61 n. 1, 163 P.3d 1006, 1011 n. 1 (2007).
[62] R.T. 12/4/07 at 15–16, 66, 72.
[63] *Id.* at 16–17, 28–30.
[64] *Id.* at 37–38.
[65] R.T. 12/11/07 at 68–70; R.T 12/12/07 at 67.
[66] R.T. 12/4/07 at 18.
[67] *Id.* at 18–20.
[68] *Id.* at 22.

Deana and her parents went out to dinner at a restaurant at 48th Street and Indian School Road.[70] They stayed at the restaurant until around 9:00 p.m., when Deana left to meet a friend at a nearby bar.[71]

Deana met her friend Bonnie Marcus at the bar.[72] They met shortly after 9:00 p.m. and spent the evening drinking and talking.[73] Bonnie knew about Michael, but did not think he was Deana's "active" boyfriend.[74] Bonnie was under the impression that Deana had more than one boyfriend.[75] They left the bar at around 12:30 a.m.[76] Bonnie later told the police that she did not like Michael, adding that Deana made bad choices in men.[77]

Michael and his brother Richard also had plans for the evening.[78] They met at the apartment Michael and Deana shared, and both men changed clothes to dress up for

---

[69] *Id.* at 21, 33.
[70] *Id.* at 22–23.
[71] *Id.* at 24.
[72] R.T. 12/10/07 at 20.
[73] *Id.* at 22, 24.
[74] *Id.* at 25.
[75] R.T. 12/17/07 at 31.
[76] R.T. 12/10/07 at 24.
[77] R.T. 12/17/07 at 25, 26.
[78] R.T. 12/4/07 at 40–41.

the evening.[79] They drank about one and one-half glasses of wine at the apartment and

went to a nearby bar where they drank and danced until midnight.[80]  Richard did not

recall telling the police that Michael "disappeared" for at least an hour while they were

at the bar.[81]  In a later statement to police, Michael said the he felt out of control while

at the bar and changed to drinking beer.[82]

Michael and Richard then went back to the apartment, stayed for about thirty

minutes, then left around 12:30 a.m. for their parents' home.[83]  Michael bought some

beer at a convenience store, but did not remember whether he drank beer at his parents'

home.[84]  They remained at the house for about thirty minutes, and then Michael left to

return to the apartment.[85]

At around 1:45 a.m., neighbor Claire Harriet was awakened by the sound of a

female voice arguing and yelling, which went on for about five minutes.[86]  Harriet then

---

[79] *Id.* at 42–43.
[80] *Id.* at 44–45.
[81] R.T. 12/17/07 at 49.
[82] *Id.* at 66.
[83] R.T. 12/4/07 at 48.
[84] R.T. 12/5/07at 16.
[85] R.T. 12/4/07 at 49.
[86] R.T. 1/7/08 at 69; R.T.  1/8/08 at 17, 31.  Harriet had originally told the police
that he heard the yelling at 12:45 a.m., but later corrected the time.  *Id.*

heard a scream, and the female voice stopped.[87]  Harriet's apartment was on the ground floor, one apartment to the north of Deana's second-floor apartment.[88]

Michael did not remember whether the apartment door was locked or unlocked when he got there.[89]  The police later found no evidence of forced entry into the apartment.[90]  Michael went to the kitchen area, turned on the light, and saw Deana laying half on, half off the bed, her head resting against the nearby wall.[91]  Michael ran to Deana, pulled her completely on the bed, and then noticed she was not breathing.[92] He then saw the belt around her neck.[93]

Michael tried to remove the belt, but could not, and then he tried to give Deana cardio-pulmonary respiration, also pounding on her chest.[94]  He was very excited and upset, and when he heard Deana gurgling, he pulled up her shirt and saw three puncture wounds.[95]  Michael called the police and told them that Deana had stabbed

---

[87] *Id.*
[88] R.T. 12/4/07 at 16.
[89] *Id.* at 81.
[90] 12/5/07 at 101.
[91] R.T. 12/4/07 at 81–82.
[92] *Id.* at 82–83.
[93] *Id.* at 83.
[94] *Id.* at 83–84.
[95] *Id.* at 84.

13

herself.[96]   He said he got blood around his mouth and on his hands when he tried to revive her.[97]  He then ran out onto the balcony to wait for the police.[98]

Tempe Police Officer Lawrence Murphy was the first officer on the scene, arriving at around 2:15 p.m.[99]  Michael was pacing up and down outside the apartment when the officer arrived.[100]  Once inside, the officer saw Deana on the bed, went over to her, felt for a heartbeat and noted there was none.[101]  The officer also noted the belt around her neck and that she was still warm.[102]

Other officers arrived at the scene; they noted there was no evidence of any struggle.[103]  Police did not find Appellant's fingerprints in the apartment, which did not appear to have been wiped to eliminate fingerprints.[104]

The medical examiner, who had not performed the autopsy, testified that Deana died of manual or ligature strangulation.[105]  She also suffered postmortem stab wounds

---

[96] R.T. 12/17/07 at 106.
[97] *Id.*
[98] R.T. 12/4/07 at 84–85.
[99] *Id.* at 72.
[100] *Id.* at 75.
[101] *Id.* at 77–78.
[102] *Id.* at 78.
[103] R.T. 12/18/07 at 92, 103.
[104] *Id.* at 102; R.T. 1/2/08 at 62, 69, 70.
[105] R.T. 12/10/07 at 26, 33.

to her chest and abdomen, and a blunt force injury to her eye.[106] She did not aspirate any blood from the stab wounds.[107] Detective Roger Ferguson impounded Deana's clothing, the vaginal swab, and cuttings from the comforter on the bed.[108]

Detective Ferguson was to interview Michael, but before he could he received a telephone call from Assistant Chief of Police David Brewster, who told him Michael had been one of his enlistees in the Arizona National Guard.[109] Brewster interviewed Michael first; it is unknown whether the interview was recorded.[110] Detective Ferguson eventually interviewed Michael at the Maricopa County Sheriff's Office.[111]

The police continued to interview Michael over the next eighteen years, interviewing him five times about Deana's death.[112] Michael said he did not rape or murder Deana.[113] Michael said during a subsequent interview that he could have killed Deana but did not remember.[114] He later said that he had said he could have killed

---

[106] *Id.* at 34, 25.
[107] *Id.* at 34.
[108] *Id.* at 53–57, 59–60.
[109] *Id.* at 76.
[110] *Id.* at 78.
[111] *Id.* at 79–80.
[112] R.T. 12/5/07 at 53, 57.
[113] *Id.* at 86–87.
[114] R.T. 12/5/07 at 32.

Deana but did not remember to get the police to stop questioning him.[115]

Years later, Tempe Police Officer Thomas Magazzeni of the Cold Case Bureau was reviewing Deana's case and obtained saliva and blood samples that had been taken from Michael, Richard and another brother, and Appellant.[116]  The Department of Public Safety laboratory (the DPS Lab) tested the samples and Appellant became the chief suspect in Deana's murder because his DNA matched the DNA found on her underpants.[117]

The DPS Lab also tested the macramé belt but was unable to identify any of the several DNA donors detected.[118]  The examination could neither include nor exclude Michael or Appellant as the donors.[119]

---

[115] *Id.* at 47–48.
[116] R.T. 12/11/07 at 60, 63, 64.
[117] *Id.* at 62, 68, 95.
[118] R.T. 12/11/07 – Partial Transcript at 27, 33–35.
[119] *Id.* at 38–44, 44–45.

16

## ISSUES PRESENTED FOR REVIEW

I.   The prosecutor committed misconduct when he introduced Rule 404(c) evidence because he knew his medical expert would not testify that there was any evidence that the victim had been raped. The Rule 404(c) evidence was admitted for the improper purpose of showing that Appellant was acting in conformity therewith, and that Deana must have been raped because there was evidence that she and Appellant had had sexual intercourse, which must have been nonconsensual based on Appellant's aberrant sexual propensity.

II.  The trial court abused its discretion when it permitted Appellant to be shackled with a leg restraint and a stun belt during trial based solely on their being required by jail policy, without first conducting a hearing to determine the necessity for such restraints.

III. The trial court abused its discretion when it allowed a medical examiner other than the one who conducted the autopsy of the victim to testify about the report's findings and to testify about his conclusions based on that information.

IV.  The trial court erred as a matter of law when it denied Appellant's request for assistance in examining the DNA expert based on its mistaken legal conclusion that Arizona law prohibits hybrid representation.

V.   The trial court abused its discretion when it denied Appellant's motion for a continuance based on the incompleteness of the mitigation evidence.

VI.  The trial court abused its discretion when it denied Appellant's attempt to introduce passages from Deana's diaries that stated she would fight back if someone attempted to sexually assault her again.

VII.   In its independent review, this Court should find that Appellant's sentence of death is excessive and disproportionate to the penalty imposed in similar cases.

VIII.  Issues preserved for federal review.

## ARGUMENT I

THE PROSECUTOR COMMITTED MISCONDUCT WHEN HE INTRODUCED RULE 404(C) EVIDENCE BECAUSE HE KNEW HIS MEDICAL EXPERT WOULD NOT TESTIFY THAT THERE WAS ANY EVIDENCE THAT THE VICTIM HAD BEEN RAPED. THE RULE 404(C) EVIDENCE WAS ADMITTED FOR THE IMPROPER PURPOSE OF SHOWING THAT APPELLANT WAS ACTING IN CONFORMITY THEREWITH, AND THAT DEANA MUST HAVE BEEN RAPED BECAUSE THERE WAS EVIDENCE THAT SHE AND APPELLANT HAD HAD SEXUAL INTERCOURSE, WHICH MUST HAVE BEEN NONCONSENSUAL BASED ON APPELLANT'S ABERRANT SEXUAL PROPENSITY.

The State charged Deana's murder as felony-murder and premeditated, both based on Appellant's first raping then murdering Deana. There was a great flaw in the State's case that it must certainly have been aware of from the start:  there was no evidence that Deana had been raped and its medical examiner would be testifying to that fact.  Without the Rule 404(C) evidence, there was no evidence associating Appellant with any rape, committed at any time.  Because there was no evidence that Appellant was the person who strangled Deana, the allegation that he had raped her provided the only link between Appellant and her, and was the only basis of the State's case against Appellant:  he raped Deana so he must also have murdered her.

19

*Standard of Review*

To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868 (1974). "Reversal on the basis of prosecutorial misconduct requires that the conduct be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *State v. Atwood*, 171 Ariz. 576, 611, 832 P.2d 593, 628 (1992) (quoting *United States v. Weinstein*, 762 F.2d 1522, 1542 (11th Cir.1985) ((quoting *United States v. Blevins*, 555 F.2d 1236, 1240 (5th Cir.1977))); see also *State v. Lee*, 189 Ariz. 608, 616, 944 P.2d 1222, 1230 (1997).

In *State v. Hughes*, which this Court called a "masterpiece of misconduct," this Court set forth the test for reversal based on prosecutorial misconduct:

> [A] defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial. To determine whether prosecutorial misconduct permeates the entire atmosphere of the trial, the court necessarily has to recognize the cumulative effect of the misconduct.

193 Ariz. 72, 79, ¶ 26, 969 P.2d 1184, 1191 (1998) (citations and quotations omitted).

"Prosecutorial misconduct is harmless error if we can find beyond a reasonable doubt that it did not contribute to or affect the verdict."  *Id.* at 80, ¶ 32, 969 P.2d at 1192.

***Applicable Facts***

On January 20, 2004, Appellant filed an objection to the State's offering evidence of other crimes, wrongs, or acts under Rule 404 of the Arizona Rules of Evidence, the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and Article 2, §§ 4, 15, and 24 of the Arizona Constitution.[120]  At a hearing held on December 6, 2005 and January 20, 2006, the State offered the testimony of Dr. Steven Gray, a mental health expert, and Andrea Salazar Opper to show that Appellant's conviction for his sexual assault of Opper seven years after Deana's death demonstrated that he had acted in this (Deana's) case with the same aberrant sexual propensity that he would eventually exhibit in the later Opper sexual assault case.[121]

Dr. Gray testified that he had read "police reports, transcripts, psychological evaluations, if any, medical history, detective reports, virtually any information that

---

[120] R.O.A. at 85.  The State filed its response on October 7, 2005.  *Id.* at 119.
[121] R.T. 12/6/05 at 33.  At the beginning of the hearing, the trial court verified that the subject of the hearing was the State's intention to present information admissible under Rule 404(C), not 404(B).  *Id.* at 13.

would be available in written or visual form" in forming his opinion.[122] He concluded that "the criteria for 404(c) are met.  They're sexually aberrant.  They're not too remote.  And the similarities outweigh the differences in this case."[123]

On cross-examination Dr. Gray stated that he had taken into consideration that there was evidence of semen found on the bedspread, but did not know that the semen was not Appellant's.[124]  Dr. Gray also said he was aware of a report from the behavioral science unit of the FBI profiling Deana's murderer, which stated, "It is our feeling that anger may have been the true motive in this instance, and that the perpetrator was known to the victim," but that he had dismissed the report as "this person's opinion."[125]

On January 20, 2006, the trial court heard testimony from Opper, who detailed Appellant's assault of her.[126]  Dr. Gray testified again, and again reached the conclusion that Appellant "meets the criteria for aberrant propensity under the statute."[127]

---

[122] *Id.* at  22.
[123] *Id.* at 33.
[124] *Id.* at 60.
[125] *Id.* at 61–62.
[126] R.T. 1/20/06 at 5–28.
[127] *Id.* at 60.

On January 24, 2006, the trial court issued a minute entry in which it concluded that Appellant "has a character trait giving rise to an aberrant sexual propensity to commit the crime charged (sexual assault against non-consenting adult females)."[128]

At trial, the State called Dr. Philip Keen, a contractor with Yavapai County, to testify about the autopsy results reached by the medical examiner, Heinz Karnitschnig, who had conducted the procedure in 1978.[129]  The State asked Dr. Keen about the manner of death, manual and ligature strangulation, but did not ask Dr. Keen any questions about Deana's sexual assault.[130]

Dr. Keen was recalled as a defense witness, and testified that there were no signs that Deana had been raped, adding that "there were no documented or observed vaginal injuries, tearing, contusion, abrasions.  None of those."[131]  Dr. Keen further testified that a substance was observed that could have been either dried seminal fluid or a dried lubricant, but that the substance had not been tested.[132]  Dr. Keen confirmed that there was no bruising on Deana's inner thighs.[133]

---

[128] R.O.A. at 128.
[129] R.T. 12/10/07 at 22.
[130] Id. at 24–39, 45–46, 48–49.
[131] R.T. 12/18/07 at 52.
[132] *Id.*
[133] *Id.* at 53.

23

During cross-examination by the State, Dr. Keen testified that he could not independently verify that there was rape on the absence of injuries."[134] Dr. Keen went on to answer the State's hypothetical questions about the presence or absence of injuries in rape cases, but did not retract in any way his statement that he could not independently verify that Deana had been raped.[135]

On redirect, Dr. Keen clarified his testimony on how he arrived at an independent opinion, and specified the types of injuries he looked for in arriving at his conclusion whether a victim has been raped.[136] Dr. Keen verified that he found no such injuries in this case.[137]

***Discussion***

The State's theory was that Appellant raped Deana and then killed her. To prove this, the State used evidence under Rule 404(C) that Appellant had raped another woman 7 years later. Appellant contends that it was the improper introduction of the Rule 404(C) evidence that led the jurors to believe that Appellant murdered Deana after, and likely to cover up, his raping her, a conclusion that they would not have

---

[134] *Id.* at 63.
[135] *Id.*
[136] *Id.* at 67.
[137] *Id.* at 67–68.

24

reached had the evidence of the Opper sexual assault not been improperly admitted. The evidence was improperly admitted because the State undoubtedly knew that Dr. Keen, its forensic witness, would not testify that Deana had been raped.   The prosecutor scrupulously avoided asking Dr. Keen any questions concerning her possible sexual assault when it questioned him during its case in chief.

The prosecutor thus misled the trial court and Dr. Gray at the earlier Rule 404(C) hearing that there had been a rape in this case.   Acting on that information, Dr. Gray and the trial court proceeded on a good faith basis and dutifully reached their respective conclusions that Appellant displayed an aberrant sexual propensity to commit rape and that the evidence of the subsequent Opper incident was admissible. The State then used Opper's subsequent assault to prove the fact that Appellant had raped Deana, something to which its own medical examiner would not testify.

The State had no evidence that Deana had been sexually assaulted by anyone.   It was misconduct for the prosecutor to even seek the admission of the subsequent sexual assault of Opper because it was admitted for the improper purpose of showing Appellant had acted in this case in conformity with his subsequent behavior, and bolster its non-existent claim that Appellant had sexually assaulted Deana here.

The State's obvious purpose in introducing the Opper evidence was to create

25

overwhelming prejudice against Appellant. Eliminating the information about the subsequent sexual assault, what remains is that Deana had sexual intercourse with Appellant sometime before she was murdered. The Opper evidence had no place in this trial. It seems, therefore, that by introducing Opper's subsequent sexual assault, "the prosecution's conspicuous purpose with this evidence was to luxuriate in inflammatory detail and create overwhelming prejudice against the defendant." *State v. Salazar*, 181 Ariz. 87, 92, 887 P.2d 617, 622 (App. 1994).

Excluding the subsequent Opper evidence, the State's evidence of the rape would have consisted of information that Appellant lived near Deana, that although Appellant and Deana were students at Arizona State University at the same time, they did not have any classes together and that neither Deana's friends nor her family was acquainted with Appellant. The jurors would have then had to draw the improbable conclusion that the presence of Appellant's semen in Deana's underpants was conclusive proof that their sexual intercourse was nonconsensual and that Appellant had murdered her to cover up that fact despite Dr. Keen's testimony that he could not independently verify that Deana had been raped.

The prosecutor must have known that the State's medical expert would not testify that Deana had been raped; that information came out during Appellant's

26

defense, and not in the State's case in chief.  The State did not ask its medical expert whether there was any evidence that Deana had been raped, directing its questions only to the manual and ligature strangulation.  There was, in fact, no testimony by anyone about any physical evidence demonstrating rape.  There was physical evidence only that Appellant had had sexual intercourse with Deana, as evidenced by the presence of his semen in her underpants.  The only testimony suggesting that Deana had been raped came from Detective Ferguson, who said that when he entered the apartment, he looked around and decided that Deana had been raped, redressed, then strangled, but offered nothing other than this surmise as proof.[138]

Deana's rape was the linchpin of the State's case.  The Rule 404(C) evidence was the only evidence associating Appellant with the crime of rape, albeit of a rape that occurred after this offense.  Its introduction was essential to the State's case; without it there was no suggestion that Appellant would have engaged in anything other than consensual intercourse with Deana.

The admission of the Rule 404(C) evidence was error caused by the State, and was not harmless error.  "Error, be it constitutional or otherwise, is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the

---

[138] R.T. 12/10 /07 at 88.

27

verdict." *State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993); *accord State v. Bolton*, 182 Ariz. 290, 303, 896 P.2d 830, 843 (1995). "'The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.'" *Bible*, 175 Ariz. at 588, 858 P.2d at 1191 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S. Ct. 2078 (1993)). The State has the burden of convincing the court that any error was harmless. *Id.*

Here, the State cannot discharge this burden. Although the trial court properly instructed the jury that the "other acts" evidence could be considered only on the issue of Appellant's aberrant sexual propensity and not as evidence of guilt in this case, that did not lessen the impact of the improperly-admitted evidence. As this Court noted in *State v. Terrazas*,

> [s]uch evidence is quite capable of having an impact beyond its relevance to the crime charged and may influence the jury's decision on issues other than those on which it was received, despite cautionary instructions from the judge. Studies confirm that the introduction of a defendant's prior bad acts can easily tip the balance against the defendant.

189 Ariz. 580, 584, 944 P.2d 1194, 1198 (1997)(internal citations and quotations omitted). The danger of prejudice is markedly heightened when the "other act" allegation is that the Appellant had raped Deana, something the State could only

28

insinuate here because, according to their medical expert, there was a lack of physical evidence that a sexual assault had occurred. Moreover, the allegation was not a passing reference, but rather the central theme of the State's case and provided the sole motive for Appellant to have strangled Deana.

Appellant's conviction was based on the false premise that he had raped Deana, a premise that the prosecutor promoted at every opportunity. Appellant's conviction and sentence must be set aside because the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.

29

## ARGUMENT II

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED APPELLANT TO BE SHACKLED WITH A LEG RESTRAINT AND A STUN BELT DURING TRIAL BASED SOLELY ON THEIR BEING REQUIRED BY JAIL POLICY, WITHOUT FIRST CONDUCTING A HEARING TO DETERMINE THE NECESSITY FOR SUCH RESTRAINTS.**

The Sixth and Fourteenth Amendments prohibit using physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that restraints are justified by a state interest specific to the particular defendant. *Deck v. Missouri*, 544 U.S. 622, 629, 125 S. Ct. 2007, 2012 (2005). Arizona courts have applied the same obligation on the trial court to make a determination when a defendant is required to wear a stun belt, which is not generally visible.[139] Where, as here, the trial court did not make a determination that Appellant needed to wear a leg restraint, which caused him to walk with a stiff and unnatural gait, and was particularly noticeable during the time the restraint was placed, alternatively, on each of his legs, or needed to wear a stun belt, which was visible under Appellant's clothing, for case

---

[139] A stun belt is a device that goes under clothing and can be "secured around a prisoner's waist." *State v. Bassett*, 215 Ariz. 600, 601, ¶ 3 n.1, 161 P.3d 1264, 1265 (App. 2007) (citing *Gonzalez v. Pliler*, 341 F.3d 897, 899 (9th Cir. 2003)). It is "a method of prisoner restraint used as an alternative to shackles." *Gonzalez*, 341 F.3d at 899.

30

specific security concerns, but only because it is jail policy, it is an abuse of discretion that requires the reversal of Appellant's sentence and conviction.

**Standard of Review**

Matters of courtroom security are left to the discretion of the trial court. *State v. Boag*, 104 Ariz. 362, 366, 453 P.2d 508, 512 (1969) ("[A]bsent incontrovertible evidence of hurt, the trial court should be permitted to use such means to secure the named ends.") The appellate court will uphold a trial court's decision concerning trial security measures when the decision is supported by the record. *State v. Davolt*, 207 Ariz. 191, 211, ¶ 84, 84 P.3d 456, 476 (2004) (citing *State v. McKinney*, 185 Ariz. 567, 576, 917 P.2d 1214, 1223 (1996)). It is the state's burden to prove any shackling error harmless beyond a reasonable doubt. *Deck*, 544 U.S. at 635, 125 S. Ct. at 2015.

**Applicable Facts**

A.      The Leg Restraint

On November 6, 2007, while directing Appellant on how it wanted to handle objections at the bench, the trial court told Appellant that it did not want "any confrontation or disagreements in front of the jury on the record."[140]   Instead, it directed Appellant that:

31

> If you want to say whatever you want to say, make sure the jury's out. Or if you feel you need to make a record that second and the jury is here, you ask one of your advisory counsel and tell them what it is. And if they think it is significant enough, they will ask to approach and I will talk to them. If necessary, I will get the jury out of here and then we will talk about it. All right?[141]

When Appellant asked why he could not approach, the trial court said it was because Appellant was in leg braces and the jury would see him walking in "a very stilted fashion," which would be prejudicial.[142]

The trial court continued:

> You will have leg braces and also a stun belt on. That's for security purposes. The leg braces are a common customary practice for all in-custody defendants when they are dressed out. I don't think it's in your best interests for the jury to see you walking up with leg braces on, because they impede your movement. And it's possible some intelligent juror could figure out you're [sic] being shackled.[143]

Appellant continued to object to having to remain seated, and the trial court kept telling him to "talk to your attorneys about that."[144] The trial court then told Appellant that if he went against the court's admonition, it would "take [Appellant] through a

---

[140] R.T. 11/6/07 at 36.
[141] *Id.* at 37.
[142] *Id.*
[143] *Id.* at 37–38.
[144] *Id.* at 38–40.

waiver to make sure [he] understood his rights."[145]  The trial court then asked the

deputy if there was "anything about jail policy that prohibits a defendant representing

himself from being in the center of the podium or not."[146]  The deputy did not have that

information, but told the trial court he would "have to get back to you about it."[147]

When Appellant continued to object to having to remain seated, the trial court

again told him to "talk to his attorneys about it," and again advised Appellant that the

jurors might conclude that he was shackled if they saw him walking with the leg

brace.[148]  The trial court added, "And so your decision is you don't care, I will have to

make sure there is a knowing, intelligent and voluntary waiver before I let you go

forward.  Just talk to your attorneys."[149]

Appellant asked the court to consider that because he was wearing a stun belt it

could eliminate the leg brace.[150]  The trial court replied:

> No.  Not going to happen.  That's jail policy.  So if you decide that
> you wish to go up to the center and stay at the podium, your call,  and I
> will  consider  it.   But  you  have  to  understand  that  there  are  security
> policies for all in-custody defendants who dress out in civilian clothes,

---

[145] *Id.* at 39.
[146] *Id.*
[147] *Id.* at 39–40.
[148] *Id.* at 40.
[149] *Id.*
[150] *Id.*

And I'm not making an exception for you.[151]

The trial court then suggested that Appellant could be standing at the podium when the jury came into the courtroom, but again admonished him that "there are going to be times when you will stand up or whatever, and if the jury sees you stiff legged, there could be a taint.[152]   The court then told Appellant to "get back to [the court] on Tuesday and we will talk about it."[153]

The trial court revisited the matter on November 13, 2007, the next trial day. The court asked Appellant if he wanted to examine witnesses sitting, standing, or at the podium.[154]   Appellant replied that he wanted to be at the podium.[155]   The trial court then told Appellant that the jurors will see Appellant walking "in some sort of stilted fashion," adding:

> I can't tell you what conclusions they will derive from that, whether they conclude that you have a bum leg or legs or some sort of impairment or that you have some sort of restraints.  But you, if you make the decision to move up there, do so knowing that they could draw that inference.[156]

The court then inquired whether Appellant had consulted advisory counsel about

---

[151] *Id.* at 40–41.
[152] *Id.* at 41.
[153] *Id.*
[154] R.T. 11/13/07 at 9.
[155] *Id.*

34

his decision to speak from the podium, and Appellant replied that he had not.[157]  The trial court noted, "Well, my understanding is from [advisory counsel's] facial reaction he probably isn't in favor of it, so I want to make sure it's your decision even if it isn't the recommendation from your advisory counsel."[158]  Appellant agreed with that observation.[159]

Appellant then told the court the he had a motion to exclude the leg brace.[160] The trial court denied the motion, telling Appellant,

> That's a jail security issue and I have told you this before.  You're not being treated any differently than any other defendant who comes to this court who is in custody but dressed out in civilian clothes.  You're not being given different treatment at all.  That's a jail policy.  It's also security policy.  You're on trial for extremely serious crimes.  The Court needs to be concerned that you will not try to escape or run, and for those reasons, all in-custody defendants who are dressed out are in leg braces.[161]

Appellant asked the trial court to consider his motion before making its ruling.[162]

---

[156] *Id.*

[157] *Id.* at 10.

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Id.* at 10–11.

[162] *Id.* at 11.  On November 13, 2007, Appellant filed a motion to exclude his having to wear the leg brace as he was wearing the stun belt. R.O.A. at 257. Appellant argued that his remaining seated would hamper his efforts to communicate with and

The trial court noted it had not seen the motion, and told Appellant that it would "tell [Appellant] in advance that's my policy," adding that it would consider the motion when it had read it.[163]

The trial court then ruled that Appellant's decision to approach the podium although wearing a leg brace and although there was a possibility that a jury could draw inferences was done knowingly, voluntarily, and intelligently.[164]

On November 14, 2007, the trial court ruled on Appellant's motion regarding the leg brace, noting, "I previously told you what my policy is in this court. I think I've explained to you it's not just my policy, it's also jail policy and security."[165] The trial court told Appellant he was not being treated any differently, adding:

> Every in-custody defendant who is dressed out in this court for trial, no matter what kind of trial, from a capital trial to a class 6 felony, does wear leg braces under their clothes. So you have not been singled out in any way, shape, or form. You have not been given special treatment, nor have you been denied privileges given to anybody else. So that is a policy, and I'm simply choosing to treat you the same way. I'm simply

effectively persuade a jury using "the spoken word accompanied by positive body language by way of facial and hand gestures, pivots, and short steps (the orator's dance), while positioned at the podium." Appellant noted that the prosecutor would enjoy that freedom while it was denied to him. Appellant argued further that the stun belt would be a sufficient security device.

[163] *Id.*

[164] *Id.* at 11–12.

[165] R.T. 11/14/07 at 3.

choosing to follow jail protocol for security reasons regarding in-custody defendants.[166]

The trial court then told Appellant it was denying his motion.[167]  On November 26, 2007, in accordance with Appellant's request, the trial court "recommended" to the deputies that they "put an order in place that says to please make sure [Appellant's] leg brace is always on the right side, so it won't be an issue."[168]

B.    The Stun Belt

The trial court noted on the record that each time Appellant leaned toward the defense table, either to refer to his notes or confer with his advisory counsel, the stun belt was very visible to the jury.[169]  On a later date, the trial court told advisory counsel that the stun belt was visible to the jury when Appellant turned toward the defense table and away from the jury.[170]

---

[166] *Id.* at 4.
[167] *Id.*
[168] R.T. 11/26/07 at 175–76.
[169] R.T. 12/17/07 at 16.
[170] R.T. 1/7/08 at 34.

37

## *Discussion*

Arizona courts have long held that a person being tried for a criminal offense "was entitled to appear free from all manner of shackles or bonds . . . unless there was evident danger of his escape." *Parker v. Territory*, 5 Ariz. 283, 287, 52 P. 361, 363 (1898) (quoting *People v. Harrington*, 42 Cal. 165, 167 (1871)). This Court has adhered to that "common law rule" unless the record supported the trial court's exercise of discretion to shackle the defendant. *Parker* at 287–88, 52 P. at 363; see also *State v. Stewart*, 139 Ariz. 50, 54, 676 P.2d 1108, 1112 (1984); *State v. Starks*, 122 Ariz. 531, 534, 596 P.2d 366, 369 (1979).

*Deck* prohibits the routine shackling of defendants absent a determination by the trial court that the restraints are justified by a specific state interest particular to the defendant's trial. 544 U.S. at 629, 125 S. Ct. at 2012 see also *Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002) (criminal defendant has constitutional right to be free of shackles in presence of jury absent essential interest justifying physical restraints); *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) (same). This Court has held that a decision to shackle a defendant based solely on a general jail policy of shackling jail garb or on their decision to exercise their constitutional right to represent themselves is not the kind of "case specific" determination of "particular concerns"

38

that *Deck* requires.  *State v. Gomez*, 211 Ariz. 494, 504, ¶ 49, 123 P.3d 1131, 1141 (2005).

This rule applies even during the sentencing phase, when the defendant's guilt has been established.  In *Gomez*, this Court, relying on *Deck*, stated that a convicted defendant should not be visibly shackled during the sentencing phase absent information on the record that there were "indisputably good reasons for shackling." *Id.* at ¶ 46.  In *Gomez*, the shackles were visible and were placed on the defendant only because there was a jail policy that required the shackling of all defendants in prison garb.  *Id.* at ¶¶ 47–48.

The court of appeals has applied the same requirements to restraining devices that are hidden from the view of the jury.  In *State v. Mills*, the trial court precluded the use of handcuffs or shackles during trial, but did not preclude other restraints.  196 Ariz. 269, 272, ¶ 13, 995 P.2d 705, 708 (App. 1999).  Without objection, Mills was restrained by a leg brace underneath his clothes.  *Id.*  On appeal, the court of appeals found that Mills had waived the issue by failing to object, but noted that if he had "made a proper objection at trial . . . the state would have been required to establish 'some reason' for the restraint in the courtroom." 196 Ariz. at 273, ¶ 15, 995 P.2d at 709.

39

In Appellant's case, the trial court abused its discretion as the record does not indicate that the trial court weighed the particular circumstances of this case. There was no inquiry concerning Appellant's being an escape risk or a threat to courtroom security. The only reason for Appellant's being forced to wear a leg restraint and stun belt was because it was jail policy and it was the way the trial court always did things.

The record shows that the trial court recognized the prejudicial effect of the leg restraint and the stun belt. The restraint was worn beneath Appellant's pant leg, and apparently for a time the restraint was worn on alternating legs. The restraint caused Appellant to walk with a pronounced stiff gait. The trial court eventually went only so far as to require that the jailor place the leg restraint on the same leg each day, expressing the hope that the jury would believe only that Appellant was disabled.

The record also shows that the trial court was particularly concerned about the visibility of the stun belt to the jurors. The particularly prejudicial effect of the jury's noticing a stun belt was discussed in *United States v. Durham*, 287 F.3d 1297 (11th Cir. 2002), which our court of appeals cited in *Bassett*. After recognizing that stun belts are worn underneath clothing and are not readily visible to the jury, the *Durham* court noted that "if the stun belt protrudes from the defendant's back to a noticeable degree, it is at least possible that it may be viewed by the jury [and] [i]f seen, the belt

40

'may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant.'" 287 F.3d at 1304. The *Durham* court continued:

> We are more concerned about the possibility that a stun belt could disrupt a different set of a defendant's constitutionally guaranteed rights . . . . The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movement during trial – including those movements necessary for effective communication with counsel.

*Id.* The *Durham* court found the government's attempts to show harmless error were insufficient and held that "the defendant's ability to participate meaningfully throughout his trial was hampered by the use of the stun belt. 287 F.3d at 1306–07.

In this case, it was very apparent to all onlookers that Appellant was being restrained. The leg restraint was so obvious that the trial court wanted to restrict Appellant from any movement at all in front of the jurors, at first directing that he should remain seated all the time. This directive was based on the trial court's belief that it was jail policy that all defendants dressed in civilian clothes were required by jail policy to wear leg restraints. In recognition of that fact, the trial court apparently adopted the jail policy as its own, without any inquiry as to the necessity for the restraint on a defendant-by-defendant basis. This is not in accordance with Arizona or

41

United States Supreme Court law.

Appellant's shackling with an obvious leg restraint was done in violation of Appellant's right to be free of shackles without the trial court's finding an individualized determination of the need.  The problem was compounded by the problem the trial court noted more than once about the stun belt's obviousness.

This Court has held that a decision based solely on a jail policy of shackling defendants who wear jail clothing or represent themselves is not the kind of "case specific determination" of "particular concerns" that *Deck* requires. *Gomez*, 211 Ariz. at 504, ¶ 51, 123 P. 3d at 1142.  Where, as in *Gomez* and here, the trial court fails to make the required case-specific findings but bases its decision to restrain Appellant with two obvious restraints such as a leg restraint and stun belt, Appellant's rights have been violated.  Because it is impossible to calculate the harm and prejudice it caused Appellant to appear shackled before the jury, his conviction and sentence must be reversed.

## ARGUMENT III

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED A MEDICAL EXAMINER OTHER THAN THE ONE WHO CONDUCTED THE AUTOPSY OF THE VICTIM TO TESTIFY ABOUT THE REPORT'S FINDINGS AND TO TESTIFY ABOUT HIS CONCLUSIONS BASED ON THAT INFORMATION.**

The testimony of Dr. Philip Keen concerning the autopsy findings of a former medical examiner was constitutionally barred by the Confrontation Clause of the Sixth Amendment. The former medical examiner was alive and available to testify.[171] Through that testimony about the contents of the report and the opinions based on the report, the State introduced information about the nature of Deana's death. Dr. Keen's testimony conveyed the details of the victim's physical injuries and, particularly when commented and opined upon by Dr. Keen, were likely understood by the jurors as demonstrating Deana's suffering.

*Standard of Review*

This Court reviews the trial court's ruling on the admissibility of evidence for an abuse of discretion. *State v. Tucker,* 215 Ariz. 298, 314 ¶ 58, 160 P.3d 177, 193 (2007). It reviews the facts in the light most favorable to sustaining the trial court's

---

[171] R.T. 12/10/07 at 23.

43

ruling. *State v. Hyde*, 186 Ariz. 252, 265, 921 P.2d 655, 668 (1996). This Court defers

to the trial court's factual findings and independently reviews the trial court's legal

conclusions. *State v. Gonzalez-Gutierrez*, 187 Ariz. 116, 118, 927 P.2d 776, 778

(1996); *see also State v. Ellison*, 213 Ariz. 116, 129, ¶ 42, 140 P.3d 899, 912 (2006)

(confirming de novo review of challenges regarding admissibility under the

Confrontation Clause.)

***Discussion***

    A.    THE CONFRONTATION CLAUSE AND *CRAWFORD V. WASHINGTON* BAR
THE ADMISSION OF THE CONTENT OF THE REPORT AND ANY CONCLUSIONS
DRAWN FROM IT.

    The Sixth Amendment of the United States Constitution provides that ("[i]n all

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

witnesses against him." U.S. Const. amend. VI . The Sixth Amendment was made

applicable to the States via the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S.

400, 403, 85 S. Ct. 1065 (1965). The Arizona Constitution provides similar protection:

"[i]n criminal prosecutions the accused shall have the right . . . to meet the witnesses

against him face-to-face". Ariz. Const. Art. 2, § 24.

    In *Crawford v. Washington*, the United States Supreme Court held that the

Confrontation Clause bars "admission of testimonial statements of a witness who did

44

not appear at trial unless he was unavailable to testify, and the defendant had had a

prior opportunity for cross-examination." 541 U.S. 36, 53–54, 124 S. Ct. 1354, 1365–

66 (2004).

*Crawford* detailed the class of testimonial statements covered by the

Confrontation Clause as follows:

> Various formulations of this core class of testimonial statements exist: ex
> parte in-court testimony or its functional equivalent-that is, material such
> as affidavits, custodial examinations, prior testimony that the defendant
> was unable to cross-examine, or similar pretrial statements that declarants
> would reasonably expect to be used prosecutorially; extrajudicial
> statements ... contained in formalized testimonial materials, such as
> affidavits, depositions, prior testimony, or confessions; statements that
> were made under circumstances which would lead an objective witness
> reasonably to believe that the statement would be available for use at a
> later trial.

541 U.S. at 51–52, 124 S. Ct. at 1364 (internal quotation marks and citations omitted).

    B. The Autopsy Report Falls Within the "Core Class of
            Testimonial Statements" Described in *Crawford*.

The autopsy report prepared by the non-testifying medical examiner was a

testimonial statement because it was "'made under circumstances which would lead an

objective witness reasonably to believe that the statement would be available for use at

a later trial.'" *Crawford*, 541 U.S. at 52, 124 S. Ct. at 1353. Under *Crawford*, the

statements in the autopsy report were testimonial and the author of the report, here the

45

non-testifying medical examiner, was a witness for purpose of the Sixth Amendment. Absent a showing that the non-testifying medical examiner was unavailable to testify at trial – which showing was not made here – *and* that Appellant had a prior opportunity to cross-examine the non-testifying medical examiner, Appellant was entitled to "'be confronted with'" the non-testifying medical examiner at trial. *Id.* at 54, 124 S. Ct. at 1365.

C. THE AUTOPSY REPORT WAS NOT ADMISSIBLE AS A PART OF REGULARLY-CONDUCTED BUSINESS.

The autopsy report was not admissible as a part of regularly-conducted business because a great part of the business activity of the medical examiner's office is the production of evidence for use at trial. See Rule 803(8) (defining public records as "excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel"). That distinction was made clear in *Palmer v. Hoffman*, 318 U.S. 109, 63 S. Ct. 477 (1943). There, an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad's operations, it was "calculated for use essentially in the court, not in the business." *Id.* at 114, 63 S. Ct. at 481.

The autopsy report does not qualify as a business or public record for precisely

46

the same reason.  Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because they were created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial.  For that reason they are not testimonial.  Whether it qualifies as a business or official record, the autopsy report was made specifically for use at trial, constituted testimony against Appellant, and the non-testifying medical examiner was subject to confrontation under the Sixth Amendment.

That the autopsy report was the result of neutral, scientific testing does not exempt it from Confrontation Clause concerns.  The Supreme Court said in *Crawford*:

> To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. . . . Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.

541 U.S. at 54, 124 S. Ct. at 1370–71.

Moreover, the Supreme Court has recognized that forensic evidence is not uniquely immune from the risk of manipulation, noting that "A forensic analyst

47

responding to a request from a law enforcement official may feel pressure – or have an

incentive- – to alter the evidence in a manner favorable to the prosecution," and noting

further that "Confrontation is one means of assuring accurate forensic analysis."

*Melendez-Diaz v. v. Massachusetts*, ___ U.S. ___, 129 S. Ct. 2527, 2536 (2009).

     D.    THAT THE AUTOPSY REPORT MAY HAVE BORNE INDICIA OF
           RELIABILITY BECAUSE OF ITS NATURE HAS BEEN REJECTED BY
           *CRAWFORD*, WHICH OVERRULED *OHIO V. ROBERTS*.

     *Crawford* overruled *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531 (1980),

which had held that an unavailable witness's out-of-court statement may be admitted

so long as it had adequate "indicia of reliability." *Id.* at 66, 100 S. Ct. 2531, 2539. The

court favored actual confrontation and cross-examination over judicial determinations

of reliability:

> Where testimonial statements are involved, we do not think the Framers
> meant to leave the Sixth Amendment's protection to the vagaries of the
> rules of evidence, much less to amorphous notions of "reliability."
> Certainly none of the authorities discussed above acknowledges any
> general reliability exception to the common-law rule. *Admitting
> statements deemed reliable by a judge is fundamentally at odds with the
> right of confrontation.* To be sure, the Clause's ultimate goal is to ensure
> reliability of evidence, but it is a procedural rather than a substantive
> guarantee. It commands, not that evidence be reliable, but that reliability
> be assessed in a particular manner: by testing in the crucible of cross-
> examination. The Clause thus reflects a judgment, not only about the
> desirability of reliable evidence (a point on which there could be little
> dissent), but about how reliability can best be determined.

48

*Crawford*, 541 U.S. at 61–62, 124 S. Ct. at 1370–71 (emphasis added).  Although there may be other ways to challenge or verify the results of some forensic tests and procedures, an autopsy cannot be repeated.

E.    THAT APPELLANT HAD THE ABILITY, WHETHER PURSUANT TO STATE LAW OR THE COMPULSORY PROCESS CLAUSE, TO SUBPOENA THE NON-TESTIFYING MEDICAL EXAMINER BUT DID NOT, IS NOT A SUBSTITUTE FOR THE RIGHT OF CONFRONTATION.

Unlike the Confrontation Clause, neither state laws providing for the subpoenaing of witnesses nor the Compulsory Process Clause are of any use to the defendant when the witness is unavailable or simply refuses to appear.  *See, e.g., Davis v. Washington*, 547 U.S. 813, 820, 126 S. Ct. 2266, 2272 (2006) ("[The witness] was subpoenaed, but she did not appear at . . . trial").  Converting the State's duty under the Confrontation Clause into the defendant's privilege under state law or the Compulsory Process Clause shifts the consequences of adverse-witness no-shows from the State to the accused.  More importantly, the Confrontation Clause burdens the prosecution to present its witnesses; the defendant need not bring those adverse witnesses into court.  Its value to the defendant is not replaced by a system in which the State presents its evidence via another employee of a department who may or may not have worked there at the time the report was prepared, who may or may not be familiar with the

work ethic, habits, professionalism, and ability of the report preparer, then waits for the

defendant to subpoena the long-absent preparer if he chooses.

F.   BECAUSE THE STATE DID NOT PRODUCE THE NON-TESTIFYING MEDICAL EXAMINER WHO ACTUALLY PERFORMED THE AUTOPSY OF THE VICTIM, APPELLANT DID NOT HAVE THE OPPORTUNITY TO CONFRONT AND CROSS-EXAMINE THE AUTHOR OF THE AUTOPSY REPORT. THEREFORE, THE AUTOPSY REPORT AND DR. KEEN'S TESTIMONY AND OPINION BASED ON THE REPORT SHOULD HAVE BEEN PRECLUDED UNDER *CRAWFORD*.

Dr. Keen relied on the report in formulating his expert opinion about the cause

of death and its attending circumstances.  The fact that Dr. Keen relied on the report

does not mean that it was admissible for the limited purpose of providing a basis of

that opinion and not to prove the truth of the matter asserted.  See Rule 703, Ariz. R.

Evid.[172] This Court has warned of the "dangers lurking" in the application and that the

"facts or data" relied on by an expert is not absolute, and is subject to the weighing

required by Rule 403 of the probative value against the unfair prejudice that may arise

from such disclosure.  *State v. Lundstrom*, 161 Ariz. 141, 148, 776 P.2d 1067, 1074

(1989).  The official comment accompanying the adoption of Rule 703 discloses that

---

[172] Rule 703 provides:  "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

50

the rule was not intended to authorize the admission of information that "should be excluded pursuant to an applicable constitutional provision, statute, rule or decision." This Court has emphasized that if the expert "merely acts as a conduit for another non-testifying expert's opinion, the 'expert opinion' is hearsay and is inadmissible, Rule 703 notwithstanding." *Lundstrom*, 161 Ariz at 148, 776 P.2d at 1074.

Whether an expert is merely acting as a conduit for another non-testifying expert's opinion is necessarily a fact-specific inquiry. In this case, the State offered Dr. Keen solely to testify in lieu of the medical examiner who actually performed the autopsy. Therefore, to the extent that Dr. Keen's testimony was simply a conduit for the autopsy performed by the absent medical examiner, his testimony was inadmissible hearsay, Rule 703 notwithstanding.

Additionally, the trial court should have considered the impact of Dr. Keen's testimony on the jurors. Where, as here, the likelihood was great that the jurors would consider the evidence for its truth rather than for the limited purpose for which it is being offered, the core concerns protected by the Confrontation Clause must be scrutinized more carefully. Nothing about the crime scene suggested any struggle or violence had occurred, nor was there any vaginal bruising on the victim to suggest that she had been overcome by force. The only evidence about the nature and

51

circumstances of her death was Dr. Keen's opinion, which he arrived at based on his interpretation of the report.  It would have been impossible for the jurors not to consider the report as the key evidence of Appellant's murder of the victim and nature and extent of her suffering.  See *United States v. Reyes*, 18 F.3d 65, 71–72 (2nd Cir. 1994) (although courts ordinarily assume jurors will follow limiting instructions, if an out-of-court declaration has no probative value other than for its truth, an instruction that the jurors should not use the declaration for its truth is unlikely to be followed); see also 1 Joseph M. Livermore et al., ARIZONA PRACTICE LAW OF EVIDENCE § 105.1, at 28 (4th ed. 2000) ("The giving of a limiting instruction . . . should not automatically eliminate Rule 403 concerns – if only because one must have serious doubts, at least, about the ability of jurors to follow such an instruction.").

Because the report was such a crucial part in the State's evidence of Deana's death and the nature and extent of her suffering, and would have been considered by the jurors for the truth of the matters stated therein, the evidence should be considered as the functional equivalent of hearsay for Confrontation Clause purposes, although it might usually be considered as facts or data relied upon by an expert under Rule 703. *See Crawford*, 541 U.S. at 50–51, 124 S. Ct. at 1363–64 ("Accordingly, we once again reject the view that the Confrontation Clause applies of its own force only to in-court

52

testimony, and that its application to out-of-court statements introduced at trial depends upon 'the law of Evidence for the time being.' Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices.") (citations omitted); *Reyes*, 18 F.3d at 69 (explaining that "when the likelihood is sufficiently high that the jury will not follow the limiting instructions [to avoid consideration of out-of-court declarations as proof of the truth of what was said], but will treat the evidence as proof of the truth of the declaration, the evidence is functionally indistinguishable from hearsay").

Dr. Keen should not have been permitted to testify about the conclusions he reached based on the report of the former medical examiner.  It was only through his testimony that the State produced any evidence about Deana's death and the attendant circumstances, thereby adducing the evidence of the cruelty and heinousness of the offense.  For these reasons, Appellant's conviction and sentence should be set aside.

## ARGUMENT IV

**THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DENIED APPELLANT'S REQUEST FOR ASSISTANCE IN EXAMINING THE DNA EXPERT BASED ON ITS MISTAKEN LEGAL CONCLUSION THAT ARIZONA LAW PROHIBITS HYBRID REPRESENTATION.**

On several occasions, Appellant informed the court that he needed help in questioning the DNA experts on their findings, and asked that his advisory counsel assist him. The trial court denied Appellant's request, stating that hybrid representation was proscribed by Arizona law. The trial court erred as a matter of law because there is no such prohibition in Arizona law.

### *Standard of Review*

Neither this Court nor any applicable law prohibits hybrid counsel. *State v. Cornell*, 179 Ariz. 314, 325, 878 P.2d 1352, 1363(1994). Rather, this Court has held that it is not a constitutional right and has never forbidden courts to allow a defendant to act as co-counsel. *Id.* (citing, *e.g., State v. Cannon*, 127 Ariz. 147, 148–49, 618 P.2d 641, 642–43 (App. 1980); *United States v. Aponte*, 591 F.2d 1247, 1248 (9th Cir.1978)). Whether to allow hybrid representation remains within the sound discretion of the trial court and is reviewed for an abuse of discretion. *Id.*

54

### *Applicable Facts*

On November 13, 2007, before jury selection began for the day, the trial court told Appellant that his advisory counsel had approached the court with a request to allow hybrid representation.[173]   The trial court told advisory counsel and Appellant, "This Court does not allow hybrid representation.  You have a constitutional right to counsel.  You also have a constitutional right to represent yourself.  You do not have a constitutional right to avail yourself of both avenues.  You get to make that choice."[174]

Appellant then informed the trial court that he had filed a request for hybrid representation with regard to DNA testimony.[175]   The trial court said,

> I haven't seen that, but my position doesn't change.  Whether you want hybrid representation on a single issue, two issues, five or ten issues, it doesn't matter.  You have the right to represent yourself or you have the right to have them represent you, but you can't do both.  And so I haven't seen it.  I'm just telling you that's been my policy for three and a half years on the court.[176]

On November 20, 2007, before jury selection resumed, the trial court again went over Appellant's self-representation right and his right to withdraw that request and be

---

[173] R.T. 11/13/07 at 4.
[174] *Id.*
[175] R.O.A. at 258.
[176] R.T. 11/13/07 at 6.

represented by counsel.[177]  The court noted that when it had mentioned the previous day to advisory counsel that they needed to be on notice that Appellant could withdraw his waiver of counsel, advisory counsel said they did not believe they could give Appellant effective representation.[178]  In response to the trial court's question whether they could offer effective assistance if asked to step in four weeks from that day, advisory counsel replied that if ordered to, they could.[179]

The trial court then admonished Appellant, "You're the one who put this issue at the forefront when you asked me for permission to have hybrid representation and I said no, because *the law of Arizona doesn't allow hybrid representation.*"[180]

### Discussion

The Sixth Amendment to the United States Constitution guarantees a defendant the right to self-representation. *Faretta v. California*, 422 U.S. 806, 819–20, 95 S. Ct. 2525, 2533 (1975); see also *Robinson v. Hotham*, 211 Ariz. 165, 169, ¶ 13, 118 P.3d 1129, 1133 (2005).  The Sixth Amendment also guarantees an indigent defendant the right to representation by counsel. *Johnson v. Zerbst*, 304 U.S. 458, 462, 58 S. Ct.

---

[177] R.T. 11/20/07 – A.M. at 3.
[178] *Id.* at 4.
[179] *Id.* at 5.
[180] *Id.* at 6 (emphasis added).

56

1019, 1022 (1938). Hybrid representation occurs where a defendant concurrently represents himself and is represented by counsel. *State v. Murray*, 184 Ariz. 9, 27, 906 P.2d 542, 560 (1995). Although hybrid representation is not a constitutional right and is disfavored, it is permitted at the discretion of the court. *Cornell*, 179 Ariz. at 325, 878 P.2d at 1363.

The trial court in this case could have allowed advisory counsel to question the DNA experts as Appellant requested. The only reason the trial court denied Appellant's request was based on its mistaken belief that hybrid representation was prohibited by *Cornell* and its standing policy never to allow it. The court did not examine of the merits of Appellant's or his advisory counsel's arguments in favor of hybrid representation.

The fact that advisory counsel told the trial court that it would need time to prepare should not be regarded as a factor that eliminated the possibility of hybrid representation. The trial was ongoing, and in fact, the matter came up during its earliest stage, jury selection. There was plenty of time for advisory counsel to prepare for the cross-examination of the DNA experts, had the trial court directed it to do so.

The first DNA testimony came in on December 11, 2007, about a month after Appellant's first request for hybrid representation. Had the trial court inquired of

advisory counsels' preparedness to cross-examine the expert at that time instead of dismissing the notion of hybrid representation out of hand, the court could have directed the advisory counsel to be prepared. This did not happen because the trial court was under the mistaken belief that hybrid representation was prohibited under Arizona law.

Appellant was deprived of the assistance of advisory counsel in perhaps that most crucial area of evidence adduced against him at trial. The DNA evidence was the only evidence linking Appellant to the crime scene. Advisory counsel could have more effectively interviewed the witnesses, asked more appropriate questions of them, engaged experts to qualify the other expert's testimony or possibly refute it. The trial court's mistaken belief that hybrid representation was prohibited by Arizona law deprived Appellant of the invaluable assistance that advisory counsel could have provided.

Because the DNA evidence was so crucial to Appellant's conviction, and because the trial court mistakenly deprived him of the assistance of advisory counsel in questioning the DNA experts and providing experts of his own, this Court should set aside Appellant's conviction and sentence.

58

## ARGUMENT V

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S MOTION FOR A CONTINUANCE BASED ON THE INCOMPLETENESS OF THE MITIGATION EVIDENCE.**

The trial court abused its discretion when it denied Appellant's motion for continuance necessitated by the mitigation specialist's not having completed gathering all the mitigation evidence. The trial court's denial of the motion without a complete inquiry into the status of the research, the problems, if any, that the mitigation specialist was encountering, and the prospect for the completion of the project denied Appellant the right to a fair trial because it prevented his placing a complete picture of various aspects of himself and his life before the jury, his sentencer.

### *Standard of Review*

This Court reviews denials of continuances for abuse of discretion. *State v. Amaya-Ruiz*, 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990). There is no abuse of discretion unless the court's actions "substantially prejudiced the defendant." *State v. Clabourne*, 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984). The Court considers all the circumstances of the case to decide if denial of a motion to continue violated a defendant's rights. *Amaya-Ruiz*, 166 Ariz. at 164, 800 P.2d at 1272.

*Applicable Facts*

Appellant filed several requests for continuance based on his mitigation specialist's inability to timely gather and fully assess what mitigating factors were present and determine what areas needed to be explored.[181]  The trial court struck the first motion because it was filed by advisory counsel and not Appellant.[182]  On November 6, 2007, the trial court held a trial management conference during which it asked the mitigation specialist about the status of his research.[183]  The mitigation specialist informed the court that the mitigation research was approximately sixty percent complete, at best.[184]  The trial court stated it was prepared to start the trial and was not prepared to continue it.[185]  The court said that the parties had been informed that the trial date was a date certain, and had been told to be ready to proceed.[186]

On November 13, 2007, before jury selection began, the trial court advised the mitigation specialist to continue working because the mitigation phase of the trial

---

[181] R.O.A. at 217, 225.
[182] *Id.* at 220.
[183] R.T. 11/6/07 at 11.
[184] *Id.*
[185] *Id.* at 12.
[186] *Id.*

would not begin for approximately two months.[187]

On January 22, 2008, the penalty phase began and advisory counsel told the court that the mitigation was complete, although the mitigation specialist said the information was not done in his usual manner, and that he needed more time to complete social history issues.[188]   Appellant informed the trial court that he was choosing not to present mitigation evidence based on the incomplete information gathered by his mitigation specialist.[189]   Appellant told the court that he did not believe that the mitigation specialist had the opportunity to interview everyone.[190]

The trial court told Appellant that his advisory counsel had said that Appellant was choosing not to present mitigation, and that Appellant had had enough time to prepare mitigation.[191]   The trial court then asked the advisory counsel to respond to Appellant's comments that he was not apprised of the extent of the mitigation they developed.[192]   Advisory counsel told the court they had identified twelve areas that they would have covered had they been representing Appellant and that "[a]ll we can

---

[187] R.T. 11/13/07 at 4.
[188] R.T. 1/22/08 at 26.
[189] *Id.* at 27.
[190] *Id.* at 28.
[191] *Id.* at 30.
[192] *Id.*

61

do at this point, get the experts. Let him know they're here, and so he makes the decision if he wants to use them.  We identified 12 different areas, and that's all we can do at this time."[193]  Advisory counsel added that there were some areas of mitigation that had been investigated fully and that they would have an impact on the jury's consideration of the punishment in this case.[194]

Appellant then told the court that there was simply not enough time, despite what advisory counsel had said.[195]  The trial court then told Appellant that whatever Appellant put forth as mitigation, the State would have the chance to rebut.[196] Appellant added that his mitigation was "stale," and that "there is no – there is nobody to come and sit or stand in that witness box and tell people how it was back then."[197]

### Discussion

The death penalty is "unique in both its severity and its finality, and the qualitative difference between a capital sentence and other penalties calls for a greater degree of reliability when it is imposed." *Monge v. California*, 524 U.S. 721, 722, 118 S. Ct. 2246, 2247–48 (1998).  In every capital case, the sentencer "is required to

---

[193] *Id.* at 30–31.
[194] *Id.* at 31–32.
[195] *Id.* at 33.
[196] *Id.* at 33.

consider the defendant's background before imposing sentence." *State v. Bocharski*, 200 Ariz. 50, 60, ¶ 50, 22 P.3d 43, 53 (2001) (citing *Lockett v. Ohio*, 438 U.S. 586, 601-604 (1978)).  An effort must be made by the defense to present the defendant to the jury as a human being.  *Kubat v. Thieret*, 867 F.2d 351, 368 (7th Cir. 1989).

Preparing for the penalty phase of a capital trial "is the equivalent of preparing for an entirely new trial, and trial counsel must treat it as such." *Turner v. Calderon*, 281 F.3d 851, 891 (9th Cir. 2002).  Because all relevant mitigating evidence must be considered during the penalty phase, "the scope of trial counsel's penalty phase investigation must necessarily be broader than that conducted at the guilt phase." *Id.* All relevant mitigating evidence must be unearthed for consideration at the capital sentencing phase, even if the defense ultimately decides against introducing it in accordance with the penalty phase strategy. *Id.*

The sentencer in a capital case may not refuse to consider or be precluded from considering any relevant mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 394, 107 S. Ct. 1821, 1822 (1987); see also *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869 (1982).

---

[197] *Id.* at 34.

Here, the request for a continuance was made in the context of a death penalty case, which is not merely complex but involves the ultimate penalty. The possible finality of the penalty in the capital case sets it apart from all others. Trials should not begin until the defense has had adequate time to prepare not only as to the guilt phase, but on the more time-consuming, difficult penalty phase.

Extraordinary circumstances are also present in this particular case because Appellant represented himself from jail, and his ability to consult with his mitigation specialist and advisory counsel were hampered. Although the trial court kept advising Appellant that his problems in his self-representation were of his own doing, not all of them were, and the gathering of mitigation evidence certainly was not. The principle problem the mitigation specialist was presented with was, of course, the age of the case. The trial was taking place almost thirty years after the offense. Another problem was that although the trial court appointed the mitigation specialist on May 12, 2006, the mitigation specialist did not receive word of his appointment until August of that year.[198] The mitigation specialist then hired someone to work on Appellant's case alone, and advisory counsel had previously informed the trial court of the continuing problems the current mitigation specialist was having going through the information

64

gathered by the previous mitigation specialists.[199]

In the trial court's refusal to even consider the extraordinary facts present here, it has failed to acknowledge that the ends of justice required a continuance. The trial court pushed Appellant to trial in a death penalty case without full and complete preparation of his mitigation evidence and violated his due process right to a fair trial. The harm to his case was catastrophic. Just as the State brought out the aggravating circumstances of the offense through as many witnesses as it could, Appellant could have brought out his mitigating circumstances throughout the trial.

Instead, Appellant essentially gave up trying to gather and present mitigation evidence because he believed that his mitigation specialist did not have time to do a complete social history and that his mitigation was so incomplete as to be meaningless. Appellant told the trial court that his mitigation was "stale," and that "there is no – there is nobody to some and sit or stand in that witness box and tell people how it was back then."

In fact, Appellant had given the trial court some information about his social history that he could have presented to the jury through mitigation testimony.

---

[198] R.T. 9/7/07 at 11.
[199] R.T. 5/4/07 at 5.

Appellant told the trial court that at the time of this offense, he was an alcoholic and prone to blackouts.[200]  He also told the trial court that at the time of the offense, he weighed 115 pounds.[201]  Had this information been conveyed to the jury through the testimony of the mitigation specialist, it would have explained one of the points in Appellant's allocution, that he felt no remorse because he did not believe that he had committed the offense.[202]  The remark is that of a conscienceless killer without the information about Appellant's alcohol-induced blackouts to put it in context.

Similarly, the information about Appellant's weight, then 115 pounds, would have put other aspects of the offense in a different light.  Even if the jury believed Appellant had nonconsensual intercourse with Deana, they could reflect on whether someone of Appellant's diminutive size would have been strong enough to strangle her.

The trial court's denial of Appellant's motion for a continuance so that his mitigation specialist could have time to complete gathering information on his behalf was an abuse of discretion.  It deprived Appellant of information that he could have used in questioning the State's and his own witnesses, and perhaps more importantly, it

---

[200] R.T. 1/8/08 at 80.
[201] *Id.*

66

deprived his sentencers of getting the full measure of him and his life.  The time the trial court allotted for the completion of the mitigation was insufficient, and did not remedy the abuse of discretion.   For these reasons, this Court should set aside Appellant's conviction and sentence.

---

[202] R.T. 1/24/08 at 24–25.

## ARGUMENT VI

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S ATTEMPT TO INTRODUCE PASSAGES FROM DEANA'S DIARIES THAT STATED SHE WOULD FIGHT BACK IF SOMEONE ATTEMPTED TO SEXUALLY ASSAULT HER AGAIN.**

Appellant sought to introduce a passage from Deana's diary in which she stated that she would fight back if someone tried to sexually assault her again. The trial court based its preclusion of the diary entry in which Deana mentioned that she would fight back if she were again threatened with a sexual assault on the bases hearsay and the "Rape Shield Law," *i.e.*, A.R.S. § 13–1421, which it interpreted as precluding any mention of her sexual past.[203]

_____

[203] A.R.S. §13–1421 provides:

A.  Evidence relating to a victim's reputation for chastity and opinion evidence relating to a victim's chastity are not admissible in any prosecution for any offense in this chapter. Evidence of specific instances of the victim's prior sexual conduct may be admitted only if a judge finds the evidence is relevant and is material to a fact in issue in the case and that the inflammatory or prejudicial nature of the evidence does not outweigh the probative value of the evidence, and if the evidence is one of the following:

1. Evidence of the victim's past sexual conduct with the defendant.

2. Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease or trauma.

3. Evidence that supports a claim that the victim has a motive in accusing the defendant of the crime.

4. Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue.

68

### *Standard of Review*

This Court reviews evidentiary rulings for an abuse of discretion. *Tucker*, 215 Ariz. at 314, ¶ 58, 160 P.3d at 193.

### *Applicable Facts*

Appellant sought to have information from Deana's diaries concerning her resolve to fight back if anyone again tried to sexually assault her. Appellant had asked Deana's mother whether she was familiar with Deana's diary entries about her trip to Europe, and she replied she was not.[204] The next day, the State moved to preclude any questions about Deana's diaries on the basis of hearsay and relevance.[205]

The trial court asked Appellant if there were anyone who could testify about the diaries, and Appellant replied that the police had seized the diaries and read them.[206]

---

5. Evidence of false allegations of sexual misconduct made by the victim against others.

B. Evidence described in subsection A shall not be referred to in any statements to a jury or introduced at trial without a court order after a hearing on written motions is held to determine the admissibility of the evidence. If new information is discovered during the course of the trial that may make the evidence described in subsection a admissible, the court may hold a hearing to determine the admissibility of the evidence under subsection A. The standard for admissibility of evidence under subsection A is by clear and convincing evidence.

[204] R.T. 12/4/07 – P.M. at 29
[205] R.T. 12/5/07 at 4.
[206] *Id.* at 5.

The trial court then asked if three were anyone else who would be testifying about the diaries, and Appellant stated he would ask Michael whether he knew about them.[207]

The trial court then queried, "In other words, you want him to testify as to what somebody else who is unavailable to testify was thinking or writing, which as [the prosecutor] says, would be classic hearsay?"[208]  The trial court next asked Appellant what exception to the hearsay rule would make the diaries admissible.[209]  In response to Appellant's reply that the information in the diaries was relevant to his defense – an explanation why Deana carried a knife – and that he could elicit that information without specifically mentioning the diaries, the trial court told Appellant that he could not ask anyone what was in the diaries, as that was hearsay.[210]  Appellant could ask about the trip and Appellant could ask if the witness knew Deana carried a knife, nothing more.[211]

Appellant explained that the reason he wanted the information from the diaries was because Deana had been sexually assaulted, which he planned to refer to as an

---

[207] *Id.*
[208] *Id.*
[209] *Id.* at 5–6.
[210] *Id.* at 6.
[211] *Id.* at 6–7.

"experience."[212]  The trial court then stated:

> We ruled under the rape shield law that her sexual activity or conduct is irrelevant, immaterial, and specifically excluded by the statue unless you can fit it into one of the narrowly defined exceptions under the rule.  You haven't given me a reason why this should now come in. Whether you call it an experience, a rape, a molestation, whether you call it consensual activity, whatever you call it, it's still sexual conduct under the statute.[213]

The previous ruling to which the trial court referred was one it made denying Appellant's motion to admit evidence that Deana was sexually active at the time of the offense.[214]

Appellant then told the trial court that Deana began carrying a knife and that she had told Michael that she would use the knife if she were ever threatened or attacked again.[215]  The trial court replied, "That's hearsay," later adding that Appellant could ask Michael whether Deana carried a knife for personal protection, and if answers yes, "end of discussion."[216]  The trial court continued, "You can't ask him why, because that then he would get into the sexual conduct of the victim and that's specifically been

---

[212] *Id.* at 7.
[213] *Id.*
[214] R.T. 12/3/07 at 5–8.
[215] R.T. 12/5/07 at 7.
[216] *Id.* at 7–8.

71

precluded."[217]

### Discussion

The admission of statements from Deana's diary that she had been sexually assaulted in Spain was not hearsay because they were not offered to prove the truth of the matter asserted, but for some other relevant purpose. See Rule 801(C), Ariz. R. Evid. Appellant had sought their admission because they revealed Deana's state of mind concerning what she would do if again threatened with a sexual assault. See Rule 803(3), Ariz. R. Evid.

The trial court's ruling that the testimony was inadmissible under Rule 803(3) was incorrect. Rule 803(3) permits the admission of a "statement of the declarant's then existing state of mind . . . (such as intent, plan, [or] motive)." That is exactly the purpose Appellant advanced in his argument. This information was relevant to refute the State's contention that Deana had been raped: she made an entry in her diaries that she would resist any attempt sexual assault. It was particularly relevant because the State's medical examiner testified that there was an absence of defensive wounds, i.e., Deana did not apparently fight back. The jury should have this information to determine whether the sexual intercourse, as evidenced by the semen stain on Deana's

---

[217] *Id*. at 8.

72

underpants, was consensual or nonconsensual.  The information was particularly relevant in light of the fact that the State presented no evidence that the intercourse was anything but consensual.

The trial court also erred in excluding the evidence based on the A.R.S. § 13–1421, the so-called Rape Shield Law.  The information that Deana had been sexually assaulted while in Europe did not go to her chastity; she had been the victim of a crime of violence.  Appellant was not seeking to impugn her character or morality; he was seeking to introduce information concerning her determination to fight back against anyone who attempted to make her a crime victim again.

The trial court's ruling that Appellant could not introduce evidence that Deana had been a victim of a previous sexual assault, and that she had made entries into her diary that she intended to fight back should she ever be so threatened again was admissible under Rule 803(3) as a statement of the Deana's then existing state of mind, and it provided an indication of how she would deal with any future sexual assault. Her previous sexual assault is not a reflection of her chastity nor her morality, and so is not subject to preclusion under A.R.S. § 13–1421.  The trial court clearly abused its discretion when it ruled that the information could not come in because there was not hearsay exception and because it was precluded under the Rape Shield Law.

73

## ARGUMENT VII

## IN ITS INDEPENDENT REVIEW, THIS COURT SHOULD FIND THAT APPELLANT'S SENTENCE OF DEATH IS EXCESSIVE AND DISPROPORTIONATE TO THE PENALTY IMPOSED IN SIMILAR CASES.

Although the evidence supports the sentencer's finding of one of the aggravating circumstances, prior conviction of an offense for which a life sentence is imposable, Appellant contends that circumstances surrounding Deana's death, and the fact that the trial court truncated his efforts to compile mitigation evidence support a finding that his death sentence is excessive and disproportionate to the penalty imposed in similar cases.

### *Standard of Review*

In determining the appropriateness of Appellant's death sentence, this Court independently reviews the aggravation and mitigation findings of the trial court. A.R.S. § 13-703.01(A); see, *e.g.*, *State v. Kayer*, 194 Ariz. 423, 432–33, ¶ 28, 984 P.2d 31, 40–41 (1999). Such review ensures that the death penalty is not imposed arbitrarily, is reserved for exceptional cases which satisfy statutory aggravation standards, and is the appropriate sanction for the crime in question. *Bible*, 175 Ariz. at 606, 858 P.2d at 1209.

74

In performing its independent review, the Court reviews the record for the presence or absence of aggravating and mitigating circumstances, and determines the weight to be accorded each circumstance. *Bolton*, 182 Ariz. at 312, 896 P.2d at 852 (presence or absence of factors); *State v. Ramirez*, 178 Ariz. 116, 128, 871 P.2d 237, 249 (1994) (weight given to factors). The State must prove at least one aggravating factor under A.R.S. § 13-703(F) before a defendant becomes eligible for the death penalty. *State v. Spreitz*, 190 Ariz. 129, 147, 945 P.2d 1260, 1278 (1997).

Aggravating circumstances must be proven beyond a reasonable doubt. *Kayer*, 194 Ariz. at 433, ¶ 28, 984 P.2d at 41 (citing *State v. Brewer*, 170 Ariz. 486, 500, 826 P.2d 783, 797 (1992)). Both statutory and non-statutory mitigating circumstances may be proven by a preponderance of the evidence. *State v. Djerf*, 191 Ariz. 583, 595, 959 P.2d 1274, 1286 ¶ 39 (1998) (citing *Brewer*, 170 Ariz. at 504, 826 P.2d at 801). When mitigation evidence is conflicting and entails considerations of credibility, the Court accords deference to the trial court's conclusions. *State v. Hoskins*, 199 Ariz. 127, 149, ¶ 97, 14 P.3d 997, 1019 (2000) (citing *State v. Milke*, 177 Ariz. 118, 128, 865 P.2d 779, 789 (1993)). The Court is independently responsible for weighing all factors to determine ultimately whether proven mitigating circumstances, measured separately or cumulatively, are sufficient to outweigh aggravating circumstances established on the

record. *Kayer*, 194 Ariz. at 433, ¶ 28, 984 P.2d at 41.

### Applicable Facts

The State advanced two aggravating circumstance: previous conviction of offense for which, under Arizona law, a sentence of life imprisonment was imposable, and that the murder was especially heinous, cruel, or depraved. The jurors found the first factor beyond a reasonable doubt, and found that the murder was especially heinous and cruel, but could not unanimously conclude that it was especially depraved.

During the guilt phase, Dr. Keen testified that Deana died of manual or ligature strangulation, but that she had not been raped.[218] He also testified that, before death, Deana sustained a blunt force injury to her eye, consistent with being punched, and that the blow could have caused unconsciousness.[219]

During the aggravation phase, Dr. Keen testified that Deana's death "was not one of the longer deaths," and occurred within minutes[220] Dr. Keen said that in cases of prolonged death, the lungs get heavy, and here the lungs were not heavy, "[s]o this is on the shorter end."[221]   Dr. Keen said there were no typical defense injuries or

---

[218] R.T. 12/10/07 at 26, 33; R.T. 12/18/07 at 52.
[219] R.T. 12/10/07 at 25; R.T. 12/18/07 at 61.
[220] R.T. 1/16/08 at 55.
[221] *Id.*

bruises or other similar impacts on the forearms.[222] Dr. Keen said the attack lasted four to five minutes, beginning at the time of the blunt force trauma to the eye to death.[223] Deana would have fallen into unconsciousness about a minute or a minute and a half after the strangulation began.[224]

### Discussion

Appellant acknowledged that he was serving a life sentence for another offense, and so cannot argue that he had no prior conviction. He does, however, take exception to the finding of cruelty and heinousness and bases his argument on Dr. Keen's testimony about the circumstances of Deana's death.

"Cruelty exists if the victim consciously experienced physical or mental pain prior to death and the defendant knew or should have known that suffering would occur." *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997) (citation omitted). "Mental anguish includes a victim's uncertainty about [his] ultimate fate." *State v. Kiles*, 175 Ariz. 358, 371, 857 P.2d 1212, 1225 (1993).   In *State v. Knapp*, this Court set defined heinous as "hatefully or shockingly evil; grossly bad." 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977). These circumstances are not supposed to apply to all first-

---

[222] *Id.*
[223] *Id.* at 56.

degree murders, but only to "those capital crimes where the actual commission . . . was accompanied by such additional acts as to set the crime apart from the norm of capital felonies – the conscienceless or pitiless crime which is unnecessarily torturous to the victims." *Id.* (citing *State v. Dixon*, 283 So.2d 1, 9 (1973)).

Here, the evidence established that Deana experienced only brief physical pain and possible mental anguish before she fell into unconsciousness. Dr. Keen testified, "In the spectrum of the duration of deaths at this time, this was not one of the longer deaths. This is one of the shorter deaths."[225]

In the panoply of deaths by strangulation, the imposition of death for what took place here is unsupported because there are no other attendant circumstances. For instance, in *State v. Salazar*, the defendant strangled a fragile, partially blind 83-year-old woman so severely that she suffered a crushed Adam's apple, and also beat her and broke nose. 173 Ariz. 399, 412, 844 P.2d 566, 579 (1992). In *State v. McCray*, the victim was conscious during a substantial part of the "murder transaction" and that she suffered intense physical pain and mental anguish during that time defendant physically assaulted, raped, and only then murdered her. 218 Ariz. 252, 259, ¶ 33, 183

---

[224] *Id.* at 57.
[225] R.T. 1/16/08 at 55.

P.3d 503, 510 (2008).   In *Tucker*, the defendant bound, gagged, strangled, beat, sexually assaulted, and shot the victim.   215 Ariz. at 306, ¶ 2, 160 P.3d at 185.

Here, death came quickly.   There was no sign of a struggle, no evidence of defensive wounds, just the likelihood of one minute to one and one-half minutes of consciousness.   The victim sustained an eye injury, but not the massive injuries inflicted in *Salazar*, *McCray*, or *Tucker*.

Appellant would now usually offer the evidence he had presented in mitigation to support his contention that his sentence was inappropriate, but he has shown that his attempt to gather that information was truncated by the trial court into virtual nonexistence. See Argument V.  What Appellant could have offered, in the very least, had his mitigation specialist been able to complete his research, was testimony that he suffered from alcohol-induced blackouts at the time.   This information would have raised doubts about Appellant's state of mind and, in turn, cast doubt on the existence of the cruelty and heinousness aggravating circumstances.   If Appellant was intoxicated to the extent that he eventually blacked out, did he have the intent to inflict pain and suffering on Deana, and did he realize he was stabbing her after she was dead?

The circumstances surrounding Deana's death and the fact that the trial court

truncated Appellant's efforts to compile mitigation evidence support a finding that his death sentence is excessive and disproportionate to the penalty imposed in similar cases. This Court should set aside Appellant's death.

## ARGUMENT VIII

## ISSUES PRESERVED FOR FEDERAL REVIEW

1. The fact-finder in capital cases must be able to consider all relevant mitigating evidence in deciding whether to give the death penalty. See *Woodson v. North Carolina*, 428 U.S. 280, 304 96 S. Ct. 2978 (1976). The trial court's failure to allow the jury to consider and give effect to all mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments. *State v. McGill*, 213 Ariz. 147, 161, ¶ 59, 140 P.3d 930, 944 (2006); see also *State v. Medina*, 193 Ariz. 504, 514–15, ¶ 43, 975 P.2d 94, 104–05 (1999).

2. Arizona's death penalty law unconstitutionally fails to require the cumulative consideration of multiple mitigating factors or require that the jury make specific findings as to each mitigating factor. *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995).

3. The (F)(6) "especially heinous, cruel or depraved" aggravating factor is unconstitutionally vague and overbroad because the jury does not have enough experience or guidance to determine when the aggravator is met. The finding of this aggravator by a jury violates the Eighth and Fourteenth Amendments because it does

81

not sufficiently place limits on the discretion of the sentencing body, the jury, which has no "narrowing constructions" to draw from and give "substance" to the otherwise facially vague law. *State v. Cromwell*, 211 Ariz. 181, 188-90, ¶¶ 38–45, 119 P.3d 448, 455–57 (2005), and *State v. Anderson*, 210 Ariz. 327, 353, ¶ 114, 111 P.3d 369, 395 (2005).

4. The court also instructed the jury that they "must not be influenced by mere sympathy or by prejudice in determining these facts." These instructions limited the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, §§ 1, 4, 15, 23, and 24 of the Arizona Constitution. *State v. Carreon*, 210 Ariz. 54, 70–71, ¶¶ 81–87, 107 P.3d 900, 916–17 (2005).

5. The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *Gregg v. Georgia*, 428 U.S. 153, 186–87, 96 S. Ct. 2909 (1976); *State v. Harrod*, 200 Ariz. 309, 320, ¶ 59, 26 P.3d 492, 503 (2001), *vacated on other grounds*, 536 U.S. 953, 122 S. Ct. 2653 (2002)(mem.); see also *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

82

6. The death penalty is irrational and arbitrarily imposed; it serves no purpose that is not adequately addressed by life in prison, in violation of the defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, §§ 1 and 4 of the Arizona Constitution. *State v. Smith*, 203 Ariz. 75, 82, ¶¶ 35–36, 50 P.3d 825, 832 (2002), and *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

7.   There is no meaningful distinction between capital and non-capital cases, making each crime the product of an unconstitutionally vague statute. *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

8. Arizona's capital sentencing scheme unconstitutionally serves no deterrent purpose, exceeds any legitimate retributive aim, is without penological justification, and results in the gratuitous infliction of suffering. *Gregg*, 428 U.S. at 183.

9. The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments, and Article 2, §§ 1, 4, and 15 of the Arizona Constitution. *State v. Sansing*, 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954, 122 S. Ct. 2654 (mem.); see also *Cromwell*, 211 Ariz. at 181, §58, 119 P.3d at 459; *State v. Finch*, 202 Ariz. 410, 419, ¶ 50, 46 P.3d 421, 430 (2002).

10. Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants, particularly when the victim is a Caucasian, in violation of Article 2, §§ 1, 4, and 13 of the Arizona Constitution. *Sansing*, 200 Ariz. at 361, ¶ 46, 26 P.3d at 1132; see also *State v. Stokley*, 182 Ariz. 505, 516, 898 P.2d 454, 465 (1995); *State v. West*, 176 Ariz. 432, 455, 862 P.2d 192, 215 (1993).

11. Proportionality review serves to identify which cases are above the "norm" of first degree murder, thus narrowing the class of defendants who are eligible for the death penalty. The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *Gulbrandson*, 184 Ariz. at 73, 906 P.2d at 606; see also *Salazar*, 173 Ariz. at 417, 844 P.2d at 584.

12. Arizona's capital sentencing scheme is unconstitutional because it does not require the State to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. Instead, Arizona's death penalty statute requires defendants to prove their lives should be spared, in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *State v.*

84

*Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988); see also *Carreon*, 210 Ariz. at 76 ¶ 122, 107 P.3d at 922.

13. Arizona's death penalty scheme does not sufficiently channel the sentencing jury's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. A.R.S. § 13–703.01 is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances and fails to provide principled means to distinguish between those who deserve to die or live. *State v. Johnson*, 212 Ariz. 425, 440, ¶69, 133 P.3d 735, 750 (2006). The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *State v. Pandeli*, 200 Ariz. 365, 382 ¶ 90, 26 P.3d 1136, 1153 (2001), *vacated on other grounds*, 536 U.S. 953, 122 S. Ct. 2654 (2002)(mem.); see also *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

14. The jury instruction that required the jury to unanimously determine that the mitigating circumstances were "sufficiently substantial to call for leniency" violated the Eighth Amendment. *Ellison*, 213 Ariz. at 139, ¶¶ 101–102, 140 P.3d at 922.

15.  The failure to instruct the jury that only murders that are "above the norm" may qualify for the death penalty violates the Sixth, Eighth and Fourteenth Amendments.  *State v. Bocharski*, 218 Ariz. 476, 487–88, ¶¶ 47–50, 189 P.3d 403, 414–15 (2008).

16.  The refusal to permit voir dire of prospective jurors regarding their views on specific aggravating and mitigating circumstances violates Appellant's rights under the Sixth and Fourteenth Amendments. *Johnson*, 212 Ariz. at 440, ¶¶ 29–35, 133 P.3d at 750.

17.  Refusing to instruct the jury or permit the introduction of evidence and argument regarding residual doubt violated Appellant's rights under the Sixth, Eighth and Fourteenth Amendments and Arizona law.  *State v. Harrod*, 218 Ariz. 268, 278–79, ¶¶ 37–39, 183 P.3d 519, 529–30 (2008); *State v. Garza*, 216 Ariz. 56, 70 ¶ 67, 163 P.3d 1006, 1020 (2007).

18.  Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *State v. Van Adams*, 194 Ariz. 408, 422, ¶ 55, 984 P.2d 16, 30 (1999); *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

86

19. Arizona's current protocols and procedures for execution by lethal injection constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *State v. Andriano*, 215 Ariz. 497, 510, ¶¶ 61–62, 161 P.3d 540, 553 (2007).

20. Arizona's death penalty scheme unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. Arizona's death penalty law cannot constitutionally presume that death is the appropriate default sentence. *Walton v. Arizona*, 497 U.S. 639, 648, 110 S. Ct. 3047 (1990); *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996). Arizona's death statute creates an unconstitutional presumption of death and places an unconstitutional burden on Appellant to prove mitigation is "sufficiently substantial to call for leniency." *State v. Glassel*, 211 Ariz. 33, 52 ¶ 72, 116 P.3d 1193, 1212 (2005).

21. The failure to provide the jury with a special verdict on Appellant's proffered mitigation deprived him of his rights to not be subject to ex post facto legislation and right to meaningful appellate review. *State v. Roseberry*, 210 Ariz. 360, 373 ¶ 74 & n. 12, 111 P.3d 402, 415 (2005).

87

## CONCLUSION

Appellant's conviction was based on the false premise that he had raped Deana, a premise that the prosecutor promoted at every opportunity. Appellant's conviction and sentence must be set aside because the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. Reversal is appropriate because the prosecutor's conduct was so pronounced and persistent that it permeated the entire atmosphere of the trial.

This Court has held that a decision based solely on a jail policy of shackling defendants who wear jail clothing or represent themselves is not the kind of case specific determination of the particular concerns that federal and Arizona law requires. Where, as in *Gomez* and here, the trial court fails to make the required case-specific findings but bases its decision to restrain Appellant with two obvious restraints such as a leg restraint and stun belt, Appellant's rights have been violated. Because it is impossible to calculate the harm and prejudice it caused Appellant to appear shackled before the jury, his conviction and sentence must be reversed.

Dr. Keen should not have been permitted to testify about the conclusions he reached based on the report of the former medical examiner. It was only through his testimony that the State produced any evidence about Deana's death and the attendant

circumstances, thereby adducing the evidence of the cruelty and heinousness of the offense. For these reasons, Appellant's conviction and sentence should be set aside.

Because the DNA evidence was so crucial to Appellant's conviction, and because the trial court mistakenly deprived him of the assistance of advisory counsel in questioning the DNA experts and providing experts of his own, this Court should set aside Appellant's conviction and sentence.

The trial court's denial of Appellant's motion for a continuance so that his mitigation specialist could have time to complete gathering information on his behalf was an abuse of discretion. It deprived Appellant of information that he could have used in questioning the State's and his own witnesses, and perhaps more importantly, it deprived his sentencers of getting the full measure of him and his life. The time the trial court allotted for the completion of the mitigation was insufficient, and did not remedy the abuse of discretion. For these reasons, this Court should set aside Appellant's conviction and sentence.

Finally, the circumstances surrounding Deana's death and the fact that the trial court truncated Appellant's efforts to compile mitigation evidence support a finding that his death sentence is excessive and disproportionate to the penalty imposed in similar cases.

For all of these reasons, Appellant was denied a fair trial, and this Court should set aside Appellant's conviction and death sentence.

Respectfully submitted,

BRUCE PETERSON
LEGAL ADVOCATE

By_____/s/_____
CONSUELO M. OHANESIAN
Deputy Legal Advocate
Attorney for APPELLANT

90

## CERTIFICATE OF RULE 31.13(b) COMPLIANCE

The brief is double-spaced, uses a 14-point Times New Roman proportionately-spaced typeface, and contains 18,902 words, according to the processing system used to prepare this brief.

BRUCE PETERSON
LEGAL ADVOCATE


By_____/s/_____
CONSUELO M. OHANESIAN
Deputy Legal Advocate
Attorney for APPELLANT

## CERTIFICATE OF SERVICE

**TWO COPIES** of Appellant's Opening Brief delivered this 12th day of November, 2009, to KENT CATTANI, Chief Counsel, Criminal Appeals/Capital Litigation Section, Office of the Attorney General of Arizona, 15 South 15th Avenue, Suite 101 North, Phoenix, Arizona 85007.

**ONE COPY** of Appellant's Opening Brief mailed this 12th day of November, 2009, to CLARENCE DIXON, #038977, Arizona State Prison Complex, Eyman-SMU II, P.O. Box 3400, Florence, Arizona 85232.

BRUCE PETERSON
LEGAL ADVOCATE


By_____/s/_____
    CONSUELO M. OHANESIAN
    Deputy Legal Advocate
    Attorney for APPELLANT
    3800 North Central Avenue, Suite 1500
    Phoenix, Arizona 85012
    Telephone (602) 506-4111
    State Bar Attorney No. 009232

92

B

# ARIZONA SUPREME COURT

| | |
|---|---|
| STATE OF ARIZONA,<br><br>              Appellee,<br><br>       v.<br><br>CLARENCE WAYNE DIXON,<br><br>                     Appellant. | CR–08–0025 AP<br><br><br>Maricopa County<br>Superior Court<br>No. CR–2002–019595 |

## APPELLEE'S ANSWERING BRIEF

Terry Goddard
Attorney General
(Firm State Bar No. 14000)

Kent E. Cattani
Chief Counsel
Criminal Appeals/
Capital Litigation Section

Melissa A. Parham
Assistant Attorney General
Capital Litigation Section
1275 West Washington
Phoenix, Arizona  85007–2997
Telephone: (602) 542–4686
(State Bar Number  025670)

Attorneys for APPELLEE

## QUESTIONS PRESENTED FOR REVIEW

1.      Has Dixon forfeited and waived his claim of prosecutorial misconduct?   Forfeiture notwithstanding, did the prosecutor commit misconduct by seeking to introduce 404(c) evidence of a subsequent, similar violent rape that Dixon committed where the trial court held an evidentiary hearing to determine whether the 404(c) evidence would be admitted at trial?

2.      Has Dixon forfeited and waived his claim that the trial court improperly allowed him to be shackled underneath his clothing without conducting a hearing to determine the necessity for the restraints?  Forfeiture aside, can Dixon prove fundamental error and resulting prejudice where the jail placed a leg brace and stun belt underneath Dixon's clothing, so that they were not visible, and where Dixon knowingly chose to risk revealing the restraints to the jury when he elected to move about the courtroom after receiving repeated warnings that he might reveal his restraints to the jury?

3.      Has Dixon forfeited and waived his claim that the trial court abused its discretion by allowing a medical examiner who did not perform the victim's 1978 autopsy to testify regarding the autopsy findings?  Forfeiture aside, can Dixon prove fundamental error and resulting prejudice when the whereabouts of the 1978 medical examiner were unknown, and where the testifying medical examiner testified to his own opinions and conclusions based on the original medical examiner's work, which this Court has held does not violate the Confrontation Clause?

4.      Did the trial court abuse its discretion by refusing to permit Dixon to switch back and forth between representing himself and having his advisory attorneys represent him throughout trial?

5.      Did the trial court abuse its discretion by denying Dixon's continuance motion, made on the eve of trial, which Dixon claimed he needed to complete his mitigation investigation, where the court had already granted Dixon numerous continuances, spanning almost 5 years, to complete his mitigation investigation, and where the State and the victim's elderly family objected to any further continuances?

6.      Has Dixon forfeited and waived his claim that the trial court should

i

have admitted portions of Deana's personal diaries into evidence under Rule 803(3), the "state of mind" hearsay exception?  Forfeiture aside, can Dixon prove fundamental error and resulting prejudice where the evidence was not admissible under Rule 803(3), where Dixon sought to use it to prove the truth of the matters asserted, and where Arizona's "rape shield law" also prohibited the evidence's introduction?

7.     Should this Court affirm Dixon's death sentence on independent review?

8.     Should this Court revisit resolved constitutional issues that Dixon has raised to avoid preclusion in federal court?

# TABLE OF CONTENTS

Page

QUESTIONS PRESENTED FOR REVIEW .......................................................i

TABLE OF CONTENTS................................................................................ iii

TABLE OF AUTHORITIES .............................................................................v

STATEMENT OF THE CASE .........................................................................1

ARGUMENTS

    I

    DIXON HAS FORFEITED AND WAIVED HIS PROSECUTORIAL MISCONDUCT CLAIM. WAIVER ASIDE, NO PROSECUTORIAL MISCONDUCT OCCURRED, AND EVIDENCE OF DIXON'S CHARACTER TRAIT GIVING RISE TO AN ABERRANT SEXUAL PROPENSITY WAS PROPERLY ADMITTED UNDER ARIZONA RULE OF EVIDENCE 404(c) ...........................................19

    II

    DIXON HAS FORFEITED AND WAIVED HIS CLAIM THAT THE TRIAL COURT IMPROPERLY PERMITTED HIM TO BE SHACKLED DURING TRIAL. FORFEITURE ASIDE, DIXON CANNOT PROVE FUNDAMENTAL ERROR AND RESULTING PREJUDICE BECAUSE HIS RESTRAINTS WERE CONCEALED UNDER HIS CLOTHING AND WERE NOT VISIBLE TO THE JURY UNTIL HE, AFTER RECEIVING REPEATED WARNINGS, REVEALED THE OUTLINE OF HIS STUN BELT ...........................37

    III

    DIXON HAS FORFEITED AND WAIVED HIS CLAIM THAT DR. KEEN'S TESTIMONY VIOLATED THE CONFRONTATION CLAUSE. FORFEITURE ASIDE, THE TESTIMONY WAS ADMISSIBLE ......................................59

IV

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
BY REFUSING TO ALLOW DIXON TO SWITCH BACK
AND FORTH BETWEEN REPRESENTING HIMSELF AND
HAVING HIS ADVISORY COUNSEL REPRESENT HIM
DURING TRIAL ......................................................................66

V

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION
BY DENYING DIXON'S FINAL CONTINUANCE MOTION,
BECAUSE THE COURT HAD ALREADY GIVEN DIXON
NUMEROUS          CONTINUANCES,          SPANNING
APPROXIMATELY  5  YEARS,  TO  COMPLETE  HIS
MITIGATION INVESTIGATION. ........................................74

VI

DIXON HAS FORFEITED HIS MERITLESS CLAIM THAT
THE TRIAL COURT SHOULD HAVE PERMITTED HIM TO
INTRODUCE PORTIONS OF DEANA'S DIARIES TO
SHOW HER "STATE OF MIND" UNDER RULE 803(3) ................92

VII

ON INDEPENDENT REVIEW, THIS COURT SHOULD
FIND  THAT  DIXON'S  MITIGATION  WAS  NOT
SUFFICIENTLY SUBSTANTIAL TO CALL FOR LENIENCY ......103

VIII

ARGUMENTS PRESERVED FOR FURTHER REVIEW.................118

CONCLUSION.................................................................................119

CERTIFICATE OF SERVICE.........................................................119

CERTIFICATE OF COMPLIANCE ...............................................120

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

Crawford v. Washington, 541 U.S. 36 (2004) ....................................................64
Deck v. Missouri, 544 U.S. 622 (2005)..................................................48-50, 55
Donnelly v. DeChristoforo, 416 U.S. 637 (1974)..............................................34
Estelle v. Williams, 425 U.S. 501 (1976) ..........................................................50
Faretta v. California, 422 U.S. 806 (1975) ........................................................71
Holbrook v. Flynn, 475 U.S. 560 (1986)............................................................50
Illinois v. Allen, 397 U.S. 337 (1970)................................................................49
Johnson v. Zerbst, 304 U.S. 458 (1938) ............................................................71
Lakin v. Stine, 431 F.3d 959 (6th Cir. 2005) .....................................................58
Pool v. Superior Court, 139 Ariz. 98, 677 P.2d 261 (1984)..............................35
Rich v. Calderon, 187 F.3d 1064 (9th Cir. 1999)...............................................52
Schriro v. Landrigan, 127 S.Ct. 1933 (2007) ..................................................117
State v. Aguilar, 209 Ariz. 40, 97 P.3d 865 (2004) .....................................32, 34
State v. Aguilar (Higinio), 217 Ariz. 235, 172 P.3d 423 (App. 2007)...............35
State v. Amaya-Ruiz, 166 Ariz. 152, 800 P.2d 1260 (1990)..........28, 86, 89, 110
State v. Anderson (Anderson II), 210 Ariz. 327, 111 P.3d 369 (2005)....104, 118
State v. Anthony, 218 Ariz. 439, 189 P.3d 366 (2008)....................................102
State v. Apelt (Michael), 176 Ariz. 349, 861 P.2d 634 (1993)...........................56
State v. Atwood, 171 Ariz. 576, 832 P.2d 593 (1992) .......................................34
State v. Bassett, 215 Ariz. 600, 161 P.3d 1264 (App. 2007)........................50, 51
State v. Bearup, 221 Ariz. 163, 211 P.3d 684 (2009)......................................111
State v. Bible, 175 Ariz. 549, 858 P.2d 1152 (1993).........................................28
State v. Bocharski (Bocharski I), 200 Ariz. 50,  22 P.3d 43 (2001) ..................91
State v. Bocharski (Bocharski II), 218 Ariz. 476, 189 P.3d 403 (2008) ..........111
State v. Bracy, 145 Ariz. 520, 703 P.2d 464 (1985)..........................................48
State v. Christensen, 129 Ariz. 32, 628 P.2d 580 (1981) ...................................97
State v. Clabourne, 142 Ariz. 335, 690 P.2d 54 (1984) ...............................86, 89
State v. Cornell, 179 Ariz. 314, 878 P.2d 1352 (1994) .........................67, 71-74
State v. Dann, 220 Ariz. 351, 207 P.3d 604 (2009) .....................................34, 91
State v. DeLuna, 110 Ariz. 497, 520 P.2d 1121 (1974) .....................................73
State v. Detrich, 188 Ariz. 57, 932 P.2d 1328 (1997).......................................96
State v. Ellison, 213 Ariz. 116, 140 P.3d 899 (2006)......................................106
State v. Fulminante, 193 Ariz. 485, 975 P.2d 75 (1999)............................97-100

State v. Gendron, 168 Ariz. 153, 812 P.2d 626 (1991). ...............................27, 55
State v. Gilfillan, 196 Ariz. 396, 998 P.2d 1069 (App. 2000)..................101, 102
State v. Gomez, 211 Ariz. 494, 123 P.3d 1131 (2005)......................................50
State v. Greene, 192 Ariz. 431, 967 P.2d 106 (1998)...............................103, 104
State v. Gretzler, 135 Ariz. 42, 659 P.2d 1 (1983) ...........................................110
State v. Hampton, 213 Ariz. 167, 140 P.3d 950 (2006) ...................................113
State v. Harding, 137 Ariz. 278, 670 P.2d 383 (1983).................................53, 54
State v. Harrod, 218 Ariz. 268, 183 P.3d 519 (2008).........................................33
State v. Harvill, 106 Ariz. 386, 476 P.2d 841 (1970).........................................28
State v. Hein, 138 Ariz. 360, 674 P.2d 1358 (1983) .....................................86, 87
State v. Henderson, 210 Ariz. 561, 115 P.3d 601 (2005)............................passim
State v. Hughes, 193 Ariz. 72, 969 P.2d 1184 (1998).......................................34
State v. Jimenez, 165 Ariz. 444, 799 P.2d 785 (1990).....................................112
State v. Johnson, 147 Ariz. 395, 710 P.2d 1050 (1985)....................................57
State v. Johnson, 212 Ariz. 425, 133 P.3d 735 (2006).............................103, 104
State v. Kiles, 222 Ariz. 25, 213 P.3d 174 (2009)....................................106, 116
State v. Kuhs, No. CR-07-0301-AP, 2010 WL 624016
        (Ariz. Feb. 24, 2010) ...........................................................................106
State v. LeBlanc, 186 Ariz. 437, 924 P.2d 441 (1996) .................................37, 58
State v. Lee, 189 Ariz. 608, 944 P.2d 1222 (1997)............................................48
State v. Lopez, 175 Ariz. 407, 857 P.2d 1261 (1993) ......................................112
State v. Lundstrom, 161 Ariz. 141, 776 P.2d 1067 (1989) ..........................63, 64
State v. McCray, 218 Ariz. 252, 183 P.3d 503 (2008) .............................107, 109
State v. McGill, 213 Ariz. 147, 140 P.3d 930 (2006) .......................................116
State v. McMurtrey, 136 Ariz. 93, 664 P.2d 637 (1983)..............................51, 52
State v. Miller, 186 Ariz. 314, 921 P.2d 1151 (1996) ..................................51, 52
State v. Mills, 196 Ariz. 269, 995 P.2d 705 (App. 1999)................. 47, 50-52, 56
State v. Moore, 222 Ariz. 1, 213 P.3d 150 (2009) .............................................91
State v. Murdaugh, 209 Ariz. 19, 97 P.3d 844 (2004) .............................110, 112
State v. Murray, 184 Ariz. 9, 906 P.2d 542 (1995) ...........................................71
State v. Newell, 212 Ariz. 389, 132 P.3d 833 (2006)...............................104, 113
State v. Noleen, 142 Ariz. 101, 688 P.2d 993 (1984)........................................63
State v. Nordstrom, 200 Ariz. 229, 25 P.3d 717 (2001)....................................58
State v. Pena, 209 Ariz. 503, 104 P.3d 873 (App. 2005). ................................29
State v. Reid, 114 Ariz. 16, 559 P.2d 136 (1976)........................................50, 58
State v. Rickman, 148 Ariz. 499, 715 P.2d 752 (1986)......................................71
State v. Rogovich, 188 Ariz. 38, 932 P.2d 794 (1997) ......................................63
State v. Roque, 213 Ariz. 193, 141 P.3d 368 (2006).......................................104

State v. Roseberry, 210 Ariz. 360, 111 P.3d 402 (2005) ...........................103, 104

State v. Roscoe, 184 Ariz. 484, 910 P.2d 635 (1996) ....................................71, 72

State v. Rutledge, 205 Ariz. 7, 66 P.3d 50 (2003)................................................26

State v. Schackart, 190 Ariz. 238, 947 P.2d 315 (1997) ....................86, 106, 110

State v. Sharp, 193 Ariz. 414, 973 P.2d 1171 (1999).........................................56

State v. Smith (Gerald), 114 Ariz. 415, 561 P.2d 739 (1977)............................36

State v. Smith (Joe Clarence), 215 Ariz. 221, 159 P.3d 531 (2007) ........... 62-65

State v. Smith, 182 Ariz. 113, 893 P.2d 764 (App. 1995)...................................56

State v. Speer, 221 Ariz. 449, 212 P.3d 787 (2009) ..........................................55

State v. Stone, 122 Ariz. 304, 594 P.2d 558 (App. 1979) ..................................71

State v. Tankersley, 191 Ariz. 359, 956 P.2d 486 (1998)...................................96

State v. Terrazas, 189 Ariz. 580, 944 P.2d 1194 (1997)....................................32

State v. Tucker, 205 Ariz. 157, 68 P.3d 110 (2003) ............................................1

State v. Villafuerte, 142 Ariz. 323, 690 P.2d 42 (1984)......................................63

State v. Whalen, 192 Ariz. 103, 961 P.2d 1051 (App. 1997).............................54

State v. Wood, 180 Ariz. 53, 881 P.2d 1158 (1994)...........................................97

Tennard v. Dretke, 542 U.S. 274 (2004).........................................................104

Tennessee v. Street, 471 U.S. 409 (1985)..........................................................64

United States v. Brown, 490 F.2d 758 (D.C. Cir. 1973).....................................98

United States v. Howard, 580 F.3d 1005 (9th Cir. 2007) ..................................52

## CONSTITUTIONAL PROVISIONS

Ariz. Const., amend. VI .....................................................................59, 62, 71

Ariz. Const. art. II, § 2.1(A)(10)..........................................................................87

Ariz. Const. art.VI, § 5(3).....................................................................................19

## STATUTES

A.R.S. § 13-751(F)(1)................................................................................18, 105

A.R.S. § 13-751(F)(2)................................................................................18, 107

A.R.S. § 13-751(F)(6).............................................18, 105, 107, 110, 112, 113

A.R.S. § 13-755 ...........................................................................19, 103, 104

A.R.S. § 13-755(B) ...........................................................................................104

A.R.S. § 13-1105(A)(2) ......................................................................................31

A.R.S. §.13-1406 ...............................................................................................31

A.R.S. § 13-1420(C).......................................................................................31

A.R.S. § 13-1421 ....................................................... 93, 94, 96, 101, 102
A.R.S. § 13-1421(A) and (B) ........................................................102
A.R.S. § 13-4031 ..........................................................................19
A.R.S. § 13-4033(A)......................................................................19

**RULES**

Ariz. R. Crim. P. 8.5(b)..........................................................86, 87
Ariz. R. Evid. 403 .........................................................................32
Ariz. R. Evid. 404(b). ...................................................................21
Ariz. R. Evid. 404(c)...........................................i, 19-21, 23, 26, 28, 31-36
Ariz. R. Evid. 404(c)(1)(A) ...........................................................32
Ariz. R. Evid. 404(c)(1)(B) ...........................................................32
Ariz. R. Evid. 404(c)(1)(C) ...........................................................32
Ariz. R. Evid. 404(c)(1)(D) ...........................................................33
Ariz. R. Evid. 404(c)(2)..................................................................33
Ariz. R. Evid. 404(4) ..............................................................31, 32
Ariz. R. Evid. 703 .........................................................................63
Ariz. R. Evid. 801(c)....................................................................100
Ariz. R. Evid. 802 .......................................................................100
Ariz. R. Evid. 803(3) .......................................................ii, 92, 93, 96, 99

## STATEMENT OF THE CASE

On January 24, 2008, a jury sentenced Dixon to death for the January 7, 1978 murder of Deana Bowdoin. (R.T. 1/24/08, at 78-79.) The following facts support Dixon's conviction and sentence.[1]

In January 1978, Deana Bowdoin was a 21-year-old student at Arizona State University, who was near graduation. (R.T. 12/4/07, Kindle Transcript, at 15-16.) She lived in an apartment at 1031 East Lemon Street, in Tempe. (*Id.*) Although Deana had her own apartment near ASU, she often spent time at her parents' house at 5226 North 32nd Street in Phoenix. (*Id.* at 17.) Deana kept clothing at her parents' house, and Deana's mother regularly did her laundry. (*Id.*)

On January 6, 1978, Deana went to her parents' house after leaving work at 5:00 p.m. (*Id.* at 17.) After speaking with Deana, Deana's mother, Beulah Bowdoin, went to the grocery store and bought Deana a container of blueberry yogurt. (*Id.* at 18-19.) After her mother returned, Deana took a clean pair of black underwear into the bathroom and bathed. (*Id.* at 20.) Shortly after 6:00 p.m., Deana emerged from the bathroom wearing the clean underwear and

---

[1] This Court views the facts presented in the trial court in the light most favorable to sustaining the verdict. *State v. Tucker*, 205 Ariz. 157, 160, n.1, 68 P.3d 110, 113, n.1 (2003).

went into her bedroom to dress for the evening. (*Id.* at 21-22.) Deana's mother later learned that Deana had also needed milk from the grocery store. (*Id.* at 27.)

Deana's father, Harold Bowdoin, arrived home from work around 6:00 p.m. and greeted Deana, who was wearing light colored corduroy pants with no stains on them, and a midriff-bearing top (*Id.* at 33-34.)

Around 7:00 p.m., Deana and her parents went to Señor T's, at 48th Street and Indian School Road, for dinner. (*Id.* at 22, 35-36.) Deana drove separately in order to stop for gas, and because she was meeting her friend Bonnie Marcus for drinks after dinner. (*Id.* at 23-24.) Deana and her parents ate until about 9:00 p.m., and at the end of the meal, Deana pulled out her wallet, but her father told her to put it away because he would pay. (*Id.* at 23, 35-36.)

Neither Deana's mother nor father had ever seen or heard of Dixon. (*Id.* at 25-26, 39.) Deana and her parents were close, and they believed that if Deana knew Dixon, she would have mentioned him. (*Id.* at 39.) Deana's parents knew that Deana had dated Michael Banes since high school. (*Id.* at 26-27, 36-37.)

Bonnie Marcus had known Deana since grade school, and the two were close friends. (R.T. 12/10/07, Masciola Transcript, at 20-21, 23.) They

planned to meet at The Monastery bar, at 48th Street and Indian School, at 9:00

p.m. on January 6, 1978 to celebrate the new year together. (*Id.* at 21.) Bonnie

arrived around 9:00 p.m., and Deana arrived at about 9:10 p.m. (*Id.* at 22.)

They each had about two drinks, and stayed at the bar until around midnight or

12:30 a.m. (*Id.*) Bonnie had never heard of Dixon and did not see him at the

bar. (*Id.* at 23.)

When Bonnie and Deana decided to leave, Bonnie walked outside with

Deana, who said that she was going home. (*Id.* at 25-26; R.T. 12/10/07,

Dawson Transcript, at 11.) Deana left alone, and never stated that she was

going to meet someone. (R.T. 12/10/07, Masciola Transcript, at 24-26.)

Bonnie went back inside to use the bathroom, and when she emerged again

around 12:30 a.m., Deana's green Pinto was no longer in the parking lot. (*Id.*

at 26-27.)

That same evening, Deana's boyfriend, Michael Banes, planned to go to

Dooley's—a bar in Tempe—with his brother, Richard. (R.T. 12/4/07, Kindle

Transcript, at 70-74.) In January 1978, Michael lived with Deana in her

apartment. (*Id.* at 66.) Michael stayed at the apartment most of the time, but

Deana paid the rent, and Michael never answered the phone because the couple

did not want Deana's parents to know that they lived together. (*Id.* at 67-68.)

Michael and Deana had been dating for almost 7 years. (*Id.* at 69.)

Michael was not upset with Deana on January 6, 1978, and nothing indicated that Deana was angry at him. (*Id.*)  Michael knew that Deana had plans with her parents that evening, and that she was going to a bar with a friend afterwards. (*Id.* at 70.)  The two often went out separately. (*Id.*)

Michael—a plumber—left work around 3:00 p.m. on January 6, 1978, stopped at a bank and a clothing store, and went home to the apartment that he and Deana shared around 5:00 p.m. (*Id.* at 71-72.)  Michael's brother, Richard, arrived at the apartment around 7:30 p.m., and the two drank part of a small bottle of Blue Nun wine. (*Id.* at 72-74.)  They then walked a few blocks to Dooley's, arriving around 8:45 p.m. (*Id.*)

Michael and Richard each drank two to three beers at the bar, but did not get "drunk." (*Id.* at 75, 46-47.)  They left around midnight and walked back to Deana's apartment, arriving around 12:15 a.m. (*Id.* at 78.)  Richard noticed nothing unusual about Michael's demeanor—Michael seemed "mellow," and was neither depressed nor abnormal. (*Id.* at 49.)

At the apartment, Richard ate something and drank another beer, but Michael did not drink any more alcohol. (*Id.* at 48, 78.)  Eventually, the two drove Richard's truck to their parents' house (where Richard lived) at 12th Street and Glendale, arriving around 1:00 a.m. (*Id.* at 48, 79.)  Michael could not recall whether they stopped to purchase more beer, but Michael did not

4

drink any additional alcohol that night. (*Id.* at 80-81.) Michael stayed at his parents' house for about ½ hour, and then drove Richard's truck back to the apartment. (*Id.* at 49-50, 80-81.)

Michael arrived at the complex around 2:00 a.m. and parked in front of the stairwell leading to the apartment he shared with Deana (number 21). (*Id.* at 80-81.) When Michael entered the apartment and turned on the lights, he saw Deana lying across the bed sideways, hanging partially off. (*Id.* at 81-82.) Michael approached the bed and saw that Deana was not breathing and had a belt around her neck, which he unsuccessfully tried to remove with his hands. (*Id.* at 83.) He then attempted mouth-to-mouth resuscitation, and pounded on Deana's chest to resuscitate her, to no avail. (*Id.* at 83-84.) Hearing gurgling noises emanating from Deana's body, Michael pulled her shirt up and saw three stab wounds on her abdomen. (*Id.* at 84-85.) Michael ran to the phone and called 911. (*Id.*)

Michael then ran outside to the balcony and waited for help, which arrived quickly. (*Id.* at 85-87.) Upset and hysterical, Michael kicked a table inside the apartment, prompting police to take him outside. (*Id.* at 97.) Police gave Michael a breathalyzer test, which showed that his blood alcohol content was .06 percent. (R.T. 12/10/07, Dawson Transcript, at 67-68; R.T. 12/13/07, 50-51.) Eventually, officers transported Michael to a police station and

questioned him extensively.   (R.T. 12/4/07, Kindle Transcript, at 97-98.) Michael cooperated and provided blood and saliva samples.  (*Id.* at 98-99.) Police interviewed Michael about the murder numerous times throughout the years. (*Id.*)

Since Michael dated Deana for so long, he knew most of her friends, and had never heard of Dixon. (*Id.* at 99-100.)

Tempe Police Officer Lawrence Murphy was the first responder at Deana's apartment in the early morning hours on January 7, 1978.  (R.T. 12/5/07, at 71-72.)  He arrived at about 2:15 a.m. and parked in front of the stairwell.   (*Id.*)   Officer Murphy noticed Michael standing upstairs near apartment 21, gesturing at him, and yelling, "hurry up, get in, she's in there!" (*Id.* at 73-75.)

When he entered the apartment, Officer Murphy observed Deana on the bed, motionless. (*Id.* at 76-77.)  He put his hand on Deana's chest, determined that she was not breathing, and detected no heartbeat.  (*Id.* at 78.)  Deana's body was still warm, she appeared recently deceased, and she had a woven belt tied tightly around her neck.  (*Id.*)  Deana's eyes were blackened and swollen shut; she had a scratch on the left side of her forehead; there was discoloration around her neck; and she had blood on her shirt.  (*Id.*)  Underneath Deana's shirt, Officer Murphy observed several stab wounds.  (*Id.* at 79.)  He also

observed indentations on the skin of her right wrist from bracelets that she was wearing, as if someone had grabbed her wrist tightly. (*Id.* at 79-81.)

Paramedics attempted to revive Deana. (*Id.* at 80-81.) Officer Murphy noticed that Michael was distraught and concerned about Deana's condition. (*Id.*) He could tell that Michael had been drinking, but Michael did not appear intoxicated. (*Id.* at 82.) Michael was never evasive or uncooperative. (*Id.* at 81.) Officer Murphy eventually left the scene to ask neighbors if they saw or heard anything. (*Id.* at 81.)

Tempe Detective Roger Ferguson took charge of the investigation. (*Id.* at 97-98.) He examined the crime scene and determined that Deana had parked her Ford Pinto in front of apartment 11, directly below apartment 21. (*Id.* at 97-98, 100.) The complex's mailboxes were close to the area where Deana parked her car, and to the stairwell leading to Deana's apartment. (*Id.* at 102-03.) Inside Deana's apartment, about 10 to 15 feet from the door, Detective Ferguson observed an area containing a desk and chair. (*Id.* at 119-20.) On the chair, Detective Ferguson saw Deana's purse, but her wallet (which her parents had seen her use earlier) was missing. (*Id.* at 120.) On the desk, Detective Ferguson observed cartons of yogurt and milk, and mail from Deana's mailbox. (*Id.* at 120-21.) There were no signs of forced entry. (*Id.* at 101.)

On the floor by the bed, Detective Ferguson saw two pieces of a woven, macramé belt, which officers impounded as evidence. (*Id.* at 128.)  It appeared that paramedics had cut the belt off of Deana's neck.   (*Id.* at 131-32.) Detective Ferguson also saw a quilt on top of the bed with a "circular, wet, straw colored stain approximately the size of a softball or a grapefruit" on it, which he concluded was urine. (*Id.* at 140-42.)

Detective Ferguson believed that Deana was raped before she was murdered because her clothes were disheveled, the sheets were stained, and her legs were scratched. (*Id.* at 88.)

Detective Ferguson attended Deana's autopsy on January 8, 1978, and received Deana's clothing (including her underwear), fingernail scrapings, and hair samples. (*Id.* at 143; R.T. 12/10/07, Dawson Transcript, at 54-55.)  A large yellow stain marked the front and back of Deana's pants.  (R.T. 12/10/07, Dawson Transcript, at 52.)  Dr. Heinz Karnitschnig, who performed Deana's autopsy, obtained a swab from Deana's vagina and gave it to Ferguson, who preserved it for future testing. (*Id.* at 56-57.)

Dr. Philip Keen reviewed Deana's autopsy.  (R.T. 12/10/07, Dawson Transcript, at 22-23.)  Keen was lead Medical Examiner in Maricopa County from 1992 until 2006, and, at the time of Dixon's trial, was contracted as the

Medical Examiner for Yavapai County. (*Id.*) The doctor who performed Deana's autopsy was Keen's predecessor in Maricopa County. (*Id.* at 23.)

In reviewing the autopsy, Dr. Keen noted that Deana's right eye was black. (*Id.* at 24.) This injury was likely caused by blunt force trauma, before death. (*Id.*) Deana also had bruising, abrasions, and blunt force injury to her neck, resulting from compression consistent with both manual and ligature strangulation. (*Id.* at 24-26.) Deana suffered a broken hyoid bone in her neck from the manual strangulation. (*Id.* at 26.) Dr. Keen explained that a person must be deprived of oxygen for 5 to 7 minutes to die from strangulation. (*Id.* at 28-29.) Here, petechial hemorrhages in the whites of Deana's eyes and on the surfaces of her brain showed that she was alive during a portion of the strangulation. (*Id.* at 31.)

Deana had a linear abrasion under her chin, suggesting that she attempted to remove the belt Dixon used to strangle her. (*Id.* at 32-33.) Deana died from a combination of manual and ligature strangulation. (*Id.* at 33.)

The autopsy also showed stab and puncture wounds on Deana's chest and abdomen. (*Id.* at 33-36.) The stab wounds on Deana's chest perforated the chest wall, lung, diaphragm, and liver. (*Id.* at 34.) Keen concluded that the wounds were inflicted shortly *after* Deana's death, because of the absence of internal bleeding or blood in the areas of the wounds. (*Id.* at 34-35.) These

9

wounds penetrated 4 to 5 inches into Deana's body.  (*Id.* at 37.)  On Deana's abdomen, the autopsy showed a circular-shaped, one-eighth inch diameter puncture wound that penetrated 2 inches into her body.  (*Id.* at 36.)  This wound was also inflicted *after* death, and was likely caused by an awl or ice pick.  (*Id.*)  The autopsy also showed an abrasion on Deana's right leg.  (*Id.* at 39.)

In January 1978, before the existence of DNA testing, Edward Trujillo worked at the Arizona Department of Public Safety (DPS) crime laboratory. (R.T. 12/11/07, Masciola Transcript, at 13-15.)  Trujillo determined that several areas of the quilt from Deana's bed contained blood and semen stains, and took cuttings of the quilt for future testing.  (*Id.* at 15-21.)  He also located semen stains in the crotch area of the underwear Deana was wearing when she died. (*Id.* at 24-25.)  And, Trujillo determined that the vaginal swab taken from Deana contained semen.  (*Id.* at 25.)

Approximately 7 years later, in the summer of 1985, Andrea Salazar, a student at Northern Arizona University (NAU), was about to enter her senior year.  (R.T. 12/13/07, at 14-15.)  Andrea remained at NAU over the summer, working in the south residence hall.  (*Id.* at 15-16.)  Every day, Andrea went running for about 30 minutes.  (*Id.* at 17-18.)  On June 10, 1985, around 10:15 a.m., she dressed in a running bra, white t-shirt, underwear, running shorts,

socks, and running shoes, and went for a run south of campus on Lone Tree Road. (*Id.*) The road was paved, but led to a dirt road that ended in an open field surrounded by wooded areas. (*Id.* at 18-19.) Andrea ran for 15 minutes in one direction and was about to turn around when she saw Dixon emerge from the woods 200 to 300 feet away. (*Id.* at 19-20.)

Andrea began running back towards campus, but Dixon grabbed her from behind, grabbed her arm, and put a knife to her side. (*Id.*) Andrea repeatedly asked, "What are you going to do?" and Dixon responded, "You know what I'm going to do to you." (*Id.* at 20-21.) Dixon pulled Andrea along the road with the knife at her side while Andrea begged him not to hurt her and offered him her jewelry. (*Id.*) Dixon said, "I'm going to take you up there and I'm going to fuck you and leave you there." (*Id.*)

For about 5 minutes, Dixon walked Andrea to a clearing where she could not see the road. (*Id.* at 21.) With the knife in his hand, he pushed her to the ground and removed her shirt and bra. (*Id.* at 21-22.) Andrea saw Dixon's face clearly. (*Id.*) Dixon tied Andrea's wrists behind her back, removed the rest of her clothing, and told her, "I'm going to call you Bunny." (*Id.* at 23-24.) As Andrea lay on the ground, Dixon declared, "You have nice tits," and began sucking on her breasts. (*Id.* at 24.) Dixon then pulled his pants down and

11

shoved his penis so far into Andrea's mouth that tears came to her eyes, she started choking, and she begged him to stop. (*Id.* at 24-25.)

Dixon then lay on top of Andrea and began violently chewing on her neck. (*Id.* at 25-26.) He attempted to penetrate her but was unable because she was keeping her legs together. (*Id.*) Dixon rubbed his mouth against Andrea's vagina, attempted to penetrate her again, and when he was unable, became angry. (*Id.*) Dixon put a finger in Andrea's anus, which was excruciatingly painful. (*Id.*) As Dixon grew increasingly angry, Andrea said, "I don't know what you want me to do." (*Id.* at 26-27.) Dixon said, "Don't lie to me. I know you're not a virgin," while rubbing his knife against her throat. (*Id.*) Believing Dixon would kill her if she continued resisting, Andrea cooperated, closed her eyes, and prayed that Dixon would not kill her. (*Id.*)

After Dixon ejaculated, he crouched beside Andrea and said, "Goddamn it. I shouldn't have done that." (*Id.* at 27-29.) When Dixon handed Andrea's clothes to her, she pointed out that she was still bound, and he used his knife to free her. (*Id.*) Then, Andrea dressed in her shirt and shoes. (*Id.*) Dixon handed Andrea his knife and suggested that she cut his face so he would "be scarred by what [he] did," but she refused. (*Id.* at 29.) Dixon asked Andrea if she planned to contact police, and she responded that she just wanted to go home to be alone. (*Id.* at 30.) After Dixon claimed that he would not follow

her, Andrea ran to the road and waved down a car. (*Id.* at 31-32.) A woman drove Andrea back to campus, where Andrea's supervisor contacted police. (*Id.*) Police took Andrea to Flagstaff Medical Center, where nurses performed a vaginal examination and took a vaginal swab. (*Id.*)

Later, Andrea identified Dixon as her assailant in a photographic lineup. (*Id.* at 32-33.) She also identified Dixon during an in-person show-up. (*Id.* at 32-33, 63-65.)

Years later, in 1996, David Duplissa, a DNA technical supervisor in the DPS crime lab, performed additional testing on evidence from Deana Bowdoin's murder. (*Id.* at 42-43.) Duplissa performed microscopic analysis on sections of the quilt Trujillo identified as containing bodily fluids. (*Id.* at 43-44.) Duplissa detected spermatozoa and prepared a slide containing 4 sperm heads from the quilt. (*Id.* at 44-45.)

By 1996, DPS was performing two types of DNA testing, including restriction fragment length polymorphism (RFLP) testing, and first generation polymerase chain reaction (PCR) testing. (*Id.* at 46.) RFLP testing required a significant amount of DNA, and samples could be destroyed as a result. (*Id.* at 47-48.) Fearing that the sample was insufficiently large and could be destroyed, Duplissa did not perform RFLP testing on the sperm heads from the quilt. (*Id.* at 51.)

Duplissa microscopically examined the crotch of the underwear Deana was wearing at her death, and conducted RFLP DNA testing to identify a DNA profile from the sperm cells on the underwear, but the results were inconclusive. (*Id.* at 48-49.) Duplissa also microscopically examined the vaginal swab taken from Deana, and identified the presence of spermatozoa. (*Id.*) He did not perform DNA testing on the swab because he feared the sample would be consumed. (*Id.* at 50.) Instead of risking the evidence's destruction, Duplissa left it for future testing. (*Id.*)

Tempe Detective Thomas Magazzeni investigated homicides from 1994 until 2004, and was assigned to investigate cold cases in the late nineties. (*Id.* at 59-60.) In January 1996, Magazzeni began investigating Deana's murder. (*Id.* at 59-60.) He initially focused his investigation on Michael Banes, obtaining additional blood and saliva samples from him. (*Id.*) Magazenni asked DPS analyst Colleen Proffitt to compare Michael's DNA profile to the DNA found on Deana's underwear. (*Id.* at 61-62; R.T. 12/12/07, at 70-74.)

Using PCR DNA testing, Proffitt excluded Michael as the donor of the semen found in Deana's underwear. (R.T. 12/12/07, at 81-85.) After consulting with Proffitt, Detective Magazzeni no longer considered Michael a suspect. (R.T. 12/11/07, Masciola Transcript, at 61-62.)

Magazzeni also asked Proffitt to compare the sperm in the underwear to DNA samples from other potential subjects, all of whom were excluded as donors. (*Id.* at 63-67; R.T. 12/12/07, at 85.) Over time, DNA testing improved, and the DPS crime lab started using short tandem repeats (STR) testing. (R.T. 12/12/07, at 88.) Detective Magazzeni eventually provided Proffitt with Dixon's known blood sample. (*Id.* at 92-93.) Proffitt developed a DNA profile from the sample, compared it to the DNA profile of the semen found in Deana's underwear, and, on August 1, 2002, determined that it was a match. (*Id.* at 93; R.T. 12/13/07, at 36-37.)

Detective Magazzeni focused his investigation on Dixon. (R.T. 12/11/07, Masciola Transcript, at 68.) Magazzeni provided Proffitt with the pieces of the belt used to strangle Deana, and Proffitt swabbed them to obtain DNA samples. (R.T. 12/13/07, at 37-38.) She developed DNA profiles for the samples, but in most areas of the belt, she did not obtain results. (*Id.* at 41, 43-44.)

Through investigation, Detective Magazzeni learned that when Deana was killed in her apartment, Dixon lived in the complex directly across the street. (R.T. 12/11/07, Masciola Transcript, at 68-70.) Dixon's apartment was just 543 feet away from Deana's complex. (*Id.* at 70.) The mailboxes serving Deana's apartment were in the center of the complex, approximately 75 feet

from Deana's front door. (*Id.* at 71.) Magazzeni spoke with Deana's friends and family and found no evidence that Dixon and Deana had ever met. (*Id.* at 71-72.)

Detective Magazenni learned that, for a short period of time, Dixon and Deana attended Arizona State University simultaneously. (*Id.*) Kathy McBride, an ASU associate registrar, examined their attendance records. (R.T. 12/12/07, at 64-65.) The two had attended different high schools. (*Id.* at 65-66.) Dixon enrolled at ASU in the summer of 1976 and withdrew in the fall of 1977. (*Id.* at 65.) Deana enrolled in the fall of 1974 and was nearing graduation when Dixon killed her in January 1978. (*Id.* at 66.) Dixon's grade point average at ASU was 1.42, while Deana's was 3.72, and the two never had any classes together. (*Id.* at 66-67.)

In 2005, Lorraine Heath, a DPS criminalist, produced a DNA profile for Dixon based on his blood sample. (R.T. 12/11/07, separate transcript, at 6-11, 22-23.) Heath also prepared a DNA profile from Michael Banes' blood. (*Id.* at 35.) She received the swabs that Colleen Proffitt took from the belt used to strangle Deana and combined them together to create a single sample to analyze using Y-STR DNA testing. (*Id.* at 27-29.) Heath found that the belt contained DNA of at least three separate male contributors. (*Id.* at 29.)

Heath could not include or exclude Michael as a contributor to the DNA on the belt. (*Id.* at 38-44.) Dixon's DNA was consistently present in areas of the belt where Heath obtained reactions. (*Id.* at 47-48.) Though Dixon's DNA profile matched some loci on the belt, Heath could not conclude that he was definitively included or excluded as a contributor. (*Id.*)

In 2007, Scott Milne, a DPS criminalist, compared the DNA profile from the Andrea Salazar vaginal swab to Dixon's known DNA profile, and found that it matched. (R.T. 12/13/07, at 75-79.) Milne also tested the male fraction of the vaginal swab from Deana Bowdoin and found that it matched Dixon's DNA. (*Id.* at 83-87.) Michael Banes was *excluded* as the donor. (*Id.*)

On November 26, 2002, a Maricopa County Grand Jury returned an indictment charging Dixon with one count of first-degree murder and one count of first degree rape of Deana Bowdoin. (R.O.A., Item 1.) The State filed a notice of intent to seek the death penalty on the first-degree murder charge on March 28, 2003. (R.O.A., Item 29.) There, the State alleged the following aggravating circumstances: Dixon was previously convicted of another offense for which a sentence of life imprisonment or death was imposable; Dixon was previously convicted of a serious offense; and Dixon committed the murder in an especially heinous, cruel or depraved manner. (*Id.*)

On August 29, 2003, Dixon filed a motion to dismiss count 2 (rape) based on the statute of limitations. (R.O.A., Item 62.) The State conceded that the statute of limitations had run on the rape count, and the court granted Dixon's motion. (R.T. 10/31/03, at 4.)

In early 2006, Dixon moved to represent himself and waived his right to counsel. (R.T. 3/16/06, at 3-26.)

The case proceeded to jury trial in November 2007 through February 2008, with Dixon representing himself. (R.O.A., Items 259-364.) On January 15, 2008, the jurors found Dixon guilty of first-degree murder, which they found to be both premeditated and felony-murder. (R.T. 1/15/08, at 10-11; R.O.A., Item 344.) Before the aggravation phase, the State withdrew the (F)(2) aggravating factor because the comparable 1978 aggravating factor differed from the current (F)(2) aggravating factor. (R.T. 1/16/08, at 5.) At the aggravation phase, jurors found that the State proved that Dixon had been convicted of another offense for which a sentence of life imprisonment or death was imposable (A.R.S. § 13-751(F)(1)); and that Dixon committed the offense in an especially cruel and an especially heinous manner (A.R.S. § 13-751(F)(6)). (R.T. 1/17/08, Newman Transcript, at 3-4.) The jurors could not reach a unanimous decision on whether the offense was especially depraved.

(*Id.*) At the conclusion of the mitigation phase, the jurors returned a verdict of death. (R.T. 1/24/08, at 78-79; R.O.A., Item 364.)

The superior court clerk timely filed a notice of appeal from the judgment and sentence. (R.O.A., Item 361.) This Court has jurisdiction under Arizona Constitution Article VI, Section 5(3), and Arizona Revised Statutes §§ 13–4031, and -4033(A).

Because Dixon murdered his victim before August 1, 2002, A.R.S. § 13-755 applies to this case and requires this Court to independently review Dixon's death sentence.

## ARGUMENTS

## I

**DIXON HAS FORFEITED AND WAIVED HIS PROSECUTORIAL MISCONDUCT CLAIM. WAIVER ASIDE, NO PROSECUTORIAL MISCONDUCT OCCURRED, AND EVIDENCE OF DIXON'S CHARACTER TRAIT GIVING RISE TO AN ABERRANT SEXUAL PROPENSITY WAS PROPERLY ADMITTED UNDER ARIZONA RULE OF EVIDENCE 404(c).**

Dixon argues that the prosecutor committed misconduct by introducing evidence that Dixon raped Andrea Salazar 7 years after he raped and murdered Deana Bowdoin. (Opening Brief, at 19-20.) In support of this argument, Dixon claims that there was "no evidence" that Deana was raped, and thus, Rule 404(c) evidence regarding a separate rape that Dixon committed was inadmissible, and caused his conviction. (*Id.*)

Dixon's argument mischaracterizes the evidence. Moreover, Dixon never contended that the prosecutor was committing misconduct in the trial court, and never moved for a mistrial on that basis. He has thus forfeited and waived this claim absent fundamental error and resulting prejudice, which he cannot prove, since there was independent evidence that Dixon raped Deana, and evidence of Dixon's rape of Andrea Salazar was admissible under Rule 404(c).

## A. RELEVANT FACTS AND PROCEDURAL HISTORY.

The State filed its first Notice of Discovery on March 17, 2003, notifying Dixon of its intent to call victims of other sexual assaults as witnesses at trial, and of its intent to introduce evidence of Dixon's prior acts. (*Id.* at 4.) On June 27, 2003, the State requested more time to designate which witnesses would testify regarding Dixon's "character trait giving rise to an aberrant sexual propensity to commit the offense charged." (R.O.A., Item 52.) On July 1, 2003, the State filed a Notice of Witnesses, informing Dixon that it would call numerous female witnesses to prove his aberrant sexual propensities. (R.O.A., Item 53.)

On August 29, 2003, Dixon filed a Motion to Strike the State's Notice of Witnesses, arguing that Rule 404(c) did not apply because he was not charged with a sexual offense. (R.O.A., Item 63.) Dixon thus argued that no

evidentiary hearing should be held on the proposed 404(c) evidence. (*Id.*) The State responded that 404(c) evidence of Dixon's prior sexual assaults was admissible because Dixon murdered Deana in the course of committing a rape. (R.O.A., Item 68.)

On January 20, 2004, Dixon filed an Objection to Evidence of Other Crimes, Wrongs, or Acts. (R.O.A., Item 85.) There, Dixon objected to the State's introduction of his prior sexual assaults under 404(b). (R.O.A., Item 85.) Dixon never argued that by seeking to admit the prior act evidence, the prosecutor was committing misconduct.

On February 20, 2004, the trial court set an evidentiary hearing to hear witnesses on the State's proposed 404(c)/404(b) evidence. (R.T. 2/20/04, at 18-22.) At an April 15, 2005 status conference, Dixon repeated that the State should not be permitted to introduce 404(c) evidence because he was not charged with a sexual crime. (*Id.* at 16.) Dixon never argued that there was no evidence that Deana was raped.

The court held an evidentiary hearing on the proposed 404(c) evidence on December 6, 2005 and January 20, 2006. (R.T. 12/6/05, at 19-73; R.T. 1/20/06, at 4-84.) The State presented the testimony of Dr. Steven Gray, a sexual abuse, victimology, and offender behavior expert. (R.T. 12/6/05, at 19-33.) Dr. Gray examined the similarities between Dixon's attacks on Andrea

Salazar and Deana Bowdoin, ultimately opining that the similarities outweighed any differences. (*Id.*)  The court did not let the prosecutor question Gray about a separate rape that Dixon committed, because the victim died before trial and Dixon was never convicted. (*Id.* at 26.)

Dr. Gray noted that Andrea and Deana were both college students when Dixon attacked them. (*Id.* at 25-27.)  Dixon used a knife in both attacks, and bound both victims (he tied Andrea's hands behind her back, and he restrained Deana's wrists and strangled her with a belt). (*Id.* at 26-27.)  Dixon engaged in non-consensual vaginal intercourse with both victims.  (*Id.* at 28-29.) Additionally, neither victim knew Dixon, both were adult females, the offenses occurred near universities, and in both cases, murder was either threatened or committed. (*Id.* at 31-33.)  After raping Andrea, Dixon encouraged her to dress, and Deana was found dressed after her rape and murder. (R.T. 1/20/06, at 56-57.)

Gray also noted that the offenses occurred 6 to 7 years apart. (*Id.* at 33.) Although Dixon did not commit additional offenses after raping Andrea Salazar in 1985, he was imprisoned and thus incapable of doing so. (*Id.*)  Dr. Gray opined that, based on Dixon's similar rapes of Andrea and Deana, Dixon had aberrant sexual propensities. (R.T. 12/6/05, at 33.)

The prosecutor noted additional similarities between the two cases—

22

Deana was 5'3" tall and Andrea was 5'6"; Deana weighed 122 pounds and Andrea weighed 120; both were 21 years old; both had brown hair and brown eyes; Dixon followed and isolated both victims; and Dixon ejaculated in both victims, leaving DNA evidence. (R.T. 1/20/06, at 76-78.)

On January 24, 2006, the trial court held that Dixon had an aberrant sexual propensity towards sexually assaulting non-consenting adult females, and ruled that 404(c) evidence of the Andrea Salazar rape would be admissible at trial. (R.O.A., Item 128.) The court noted that between September 19, 1978 and February 18, 1985, Dixon was imprisoned, and thus the 1985 rape was not too remote in time. (*Id.* at 5.) The court also determined that the danger of unfair prejudice did not substantially outweigh the evidence's probative value. (*Id.* at 5-6.)

Soon after the court's decision, Dixon chose to represent himself at trial. (R.T. 3/16/06, at 3-22.) He made another motion to exclude 404(c) evidence of the Andrea Salazar rape, again arguing that it should be excluded because it would violate the statute of limitations because the rape count was dismissed. (R.T. 7/3/07, at 9-13; R.O.A., Item 208.) The court advised Dixon that it had already ruled on the issue. (R.T. 7/3/07, at 10-13.) During trial, Dixon did not object to the 404(c) evidence on the basis of prosecutorial misconduct, and did not move for a mistrial when it was introduced.

During trial, Detective Roger Ferguson, who was originally assigned to investigate Deana's murder, explained that he believed Deana was sexually assaulted because her clothes were disheveled, there were stains on the sheets, and she was injured.  (R.T. 12/10/07, Dawson Transcript, at 88.)   Officer Lawrence Murphy—the first responding officer—noticed indentations on Deana's wrists as if someone had tightly grabbed or bound her. (R.T. 12/5/07, at 79-81.)

Dr. Philip Keen, the medical examiner who reviewed Deana's autopsy, described Deana's injuries.  (R.T. 12/10/07, Dawson Transcript, at 22-49.) Deana was hit in the face (causing a black eye); strangled manually and by ligature, causing her death; and was stabbed in the abdomen after death.  (R.T. 12/10/07, Dawson Transcript, at 22-39.)   Deana also had an abrasion on her right leg. (*Id.* at 39.)

During Deana's autopsy, doctors obtained a swab from Deana's vagina. (*Id.* at 52-57.)  Additionally, doctors gave the black underwear that Deana was wearing at her death to Detective Ferguson.  (*Id.*)  DPS analysts determined that both the vaginal swab and Deana's underwear contained semen.  (R.T. 12/11/07, Masciola Transcript, at 13-25.)   During trial, Deana's mother testified that on the evening of Deana's death, she saw Deana emerge from the bathroom after bathing wearing a clean pair of black underwear. (R.T. 12/4/07,

Kindle Transcript, at 20-22.)

DPS DNA analysts eventually determined that the sperm found in Deana's vagina and underwear belonged to Dixon. (R.T. 12/12/07, at 92-93; R.T. 12/13/07, at 36-37, 83-87.) No evidence showed that Deana knew Dixon. (R.T. 12/4/07, Kindle Transcript, at 25-27, 39, 99-100; R.T. 12/10/07, Masciola Transcript, at 23.) Dixon lived across the street from Deana's apartment complex when Deana was raped and murdered. (R.T. 12/12/07, at 66.)

During his case-in-chief, Dixon called Dr. Philip Keen to testify again regarding Deana's injuries. (R.T. 12/18/07, at 49-61.) Keen testified that the autopsy showed no injuries to Deana that would *independently* verify that she was raped. (*Id.* at 51-52.) For example, the doctor performing the autopsy did not identify any vaginal injuries or bruising of Deana's inner thighs. (*Id.* at 52-53.) On cross-examination, however, Dr. Keen explained that the lack of vaginal trauma did not signify that Deana had *not* been raped. (*Id.* at 61-64.) Rather, sexual assaults do not invariably result in injury, and the fact that doctors did not identify injuries associated with rape did not signify that no rape occurred. (*Id.*) Sexual assaults often occur without injuries to the victim. (*Id.*)

In the final jury instructions, the court instructed the jury:

Evidence of another sexual assault has been presented. You may consider this evidence in determining whether the Defendant had a character trait that predisposed him to commit the crime charged. You may determine that the Defendant had a character trait to commit the crime charged only if you decide that the State has proved by clear and convincing evidence that: One, the Defendant committed this act; and, two, the Defendant's character predisposed him to commit unnatural sexual acts.

You may not convict the Defendant with the crime charged simply because you find that he committed this act or that he had a character trait that predisposed him to commit the crime charged. Evidence of this act does not lessen the State's burden to prove the Defendant's guilt beyond a reasonable doubt.

(R.T. 1/10/08, Newman Transcript, at 11-12.)

In their verdict, all 12 jurors found Dixon guilty of both felony-murder and premeditated murder. (R.O.A., Item 343.)

## B.   STANDARD OF REVIEW.

Because Dixon did not object in the trial court on the basis that the prosecutor's introduction of the Andrea Salazar rape under 404(c) constituted prosecutorial misconduct, he has forfeited his right to seek relief on appeal for all but fundamental, prejudicial error. *See State v. Henderson*, 210 Ariz. 561, 567-68, ¶¶ 19-20, 115 P.3d 601, 607 (2005) (objection not preserved at trial forfeited on appeal absent fundamental, prejudicial error); *State v. Rutledge*, 205 Ariz. 7, 13, ¶ 30, 66 P.3d 50, 56 (2003) (claim reviewed for fundamental error when objection below not on prosecutorial misconduct grounds).

The scope of review for fundamental error is limited, and a defendant who fails to object at trial forfeits the right to obtain appellate relief except in those rare cases that involve "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *Henderson*, 210 Ariz. at 567, ¶ 19, 115 P.3d at 607. "Fundamental error" is error that is "clear, egregious, and curable only via a new trial." *State v. Gendron*, 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991).

To prove that fundamental error occurred, a defendant must satisfy a three-pronged test. *See Henderson*, 210 Ariz. at 567-68, ¶¶ 19-20, 115 P.3d at 607-08. First, he must prove that an error occurred. *Id.* at 568, ¶ 23, 115 P.3d at 608. Second, he must demonstrate that the error was "fundamental" by showing that it went "to the foundation of his case," took from him "a right that [was] essential to his defense," and was "of such magnitude that he could not have received a fair trial." *Id.* at 568, ¶ 24, 115 P.3d at 608. Third, the defendant must prove that he suffered prejudice from the error; this prong of *Henderson*'s test is "fact-intensive," and "the showing required to establish" it "differs from case to case." *Id.* at 568, ¶ 26, 115 P.3d at 608.

**C.**   **DIXON CANNOT PROVE FUNDAMENTAL ERROR BECAUSE THE 404(C) EVIDENCE WAS PROPERLY ADMITTED AND THE PROSECUTOR DID NOT COMMIT MISCONDUCT.**

**1.**   *The evidence proved that Deana was raped.*

First, Dixon's claim that "no evidence" demonstrated that Deana was raped mischaracterizes the record.   (Opening Brief at 19.)   Strong circumstantial evidence proved that Dixon raped Deana, warranting the prosecutor's attempt to introduce evidence of other rapes that Dixon committed.

Jurors can draw reasonable inferences that the evidence supports.   *See State v. Bible*, 175 Ariz. 549, 602, 858 P.2d 1152, 1205 (1993) (noting that during closing arguments, prosecutors can "urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions."); *State v. Amaya-Ruiz*, 166 Ariz. 152, 171, 800 P.2d 1260, 1279 (1990) ("In this case, the record indicates that defendant looked at pictures of nude women shortly before killing the victim.  Although defendant denied that his motive was rape, that inference was supported by the evidence.").   Furthermore, "direct and circumstantial evidence are [of] intrinsically similar [probative value]; therefore, there is no logically sound reason for drawing a distinction as to the weight to be assigned each." *State v. Harvill*, 106 Ariz. 386, 391, 476 P.2d 841, 846 (1970).  The evidence sufficient to support a conviction may thus be either

direct or circumstantial. *State v. Pena*, 209 Ariz. 503, 505 ¶ 7, 104 P.3d 873, 875 (App. 2005).

The jury could clearly infer that Dixon raped Deana. The evidence showed that, the night of her murder, Deana bathed at her parents' house and put on a clean pair of black underpants. (R.T. 12/4/07, Kindle Transcript, at 20-22.) After going to dinner with her parents, Deana met a female friend for drinks. (*Id.* at 22-36; R.T. 12/10/07, Masciola Transcript, at 20-23.) Deana left the bar alone and headed home to the apartment she shared with her boyfriend, Michael Banes. (R.T. 12/10/07, Dawson Transcript, at 11; R.T. 12/10/07, Masciola Transcript, at 24-26.) Michael also went out for drinks that night, and arrived back at the apartment around 2:00 a.m. (R.T. 12/4/07, Kindle Transcript, at 67-81.) Upon his arrival, Michael discovered Deana lying across their bed sideways, deceased, clothed, and with a belt around her neck. (*Id.* at 81-85.) Michael saw that Deana had been stabbed, and called police. (*Id.*)

Police observed that Deana had black eyes, a scratch on her forehead, blood on her shirt, and indentations on her wrists from bracelets that she was wearing, as if someone had tightly restrained her. (R.T. 12/5/07, at 71-81.) Deana must have stopped at the store to purchase milk, and at her apartment complex's mailboxes to get her mail, because she left the blueberry yogurt and

milk cartons and her mail sitting on the desk near the door. (*Id.* at 100-121.) Although Deana was fully dressed, her clothes were disheveled. (*Id.* at 88.)

Testing of vaginal swabs from Deana and of her underwear revealed the presence of Dixon's semen. (R.T. 12/11/07, Masciola Transcript, at 13-25; R.T. 12/12/07, at 92-93; R.T. 12/13/07, at 36-37, 83-87.) No evidence showed that Deana knew Dixon. None of Deana's family or friends had heard of him. (R.T. 12/4/07, Kindle Transcript, at 25-27, 39, 99-100; R.T. 12/10/07, Masciola Transcript, at 23; R.T. 12/11/07, Masciola Transcript, at 71-72.) And, police investigation revealed that when Deana was murdered, Dixon lived across the street and Deana's mailbox could be seen from Dixon's apartment complex. (R.T. 12/12/07, at 66; 12/11/07, Masciola Transcript, at 68-71.)

Dr. Philip Keen *never* testified that there was no evidence that Deana was raped. Rather, Keen testified that the autopsy showed no injuries that would *independently* prove that she was raped. (R.T. 12/18/07, at 51-52.) Regardless, Keen testified that rapes often occur without injuries to the victim, and a lack of injuries does not prove that no rape occurred. (*Id.* at 61-64.)

The jury could infer the chain of events: Dixon saw Deana at her mailbox, gained entry to her residence (by following her and finding the door unlocked, or by forcing her inside), held her at knifepoint, bound her wrists and raped her, ejaculated into her (leaving his DNA), strangled her, causing her

30

death, and then stabbed her post-mortem.   Since the evidence warranted the jury's inference that Deana was raped, the prosecutor was justified in seeking to introduce evidence of Dixon's aberrant sexual propensities under Rule 404(c).

### 2. *The trial court properly admitted the 404(c) evidence after a full evidentiary hearing.*

The State properly notified Dixon that it intended to introduce evidence of his rape of Andrea Salazar under Rule 404(c).  (R.O.A., Items 28, 52, 53.) The trial court held a full evidentiary hearing on the proposed evidence.  (R.T. 12/6/05, at 19-73; R.T. 1/20/06, at 4-84.)   Dixon's attorney opposed the evidence's introduction and thoroughly cross-examined the State's witnesses. (*Id.*)

Arizona Rule of Evidence 404(c) provides, in part:

> In a criminal case in which a defendant is charged with having committed a sexual offense . . . evidence of other crimes, wrongs, or acts may be admitted by the court if relevant to show that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the offense charged.  []

Rule 404(c)(4) explains that, "[a]s used in this subsection of Rule 404, the term 'sexual offense' is defined in A.R.S. Sec. 13-1420(C), and, in addition, includes any offense of first-degree murder pursuant to A.R.S. § 13-1105(A)(2) of which the predicate felony is . . . sexual assault under §.13-1406."

Dixon was charged with first-degree murder under premeditated and felony-murder theories. (R.O.A., Item 1.) The predicate felony for the felony-murder charge was Dixon's first degree rape (now defined as sexual assault) of Deana Bowdoin. (*Id.*) Thus, the State could introduce evidence of Dixon's character trait giving rise to an aberrant sexual propensity to commit the charged offense under Rule 404(c)(4).

In determining whether to admit other act evidence demonstrating that a defendant had a character trait giving rise to an aberrant sexual propensity to commit the charged offense, a trial judge makes three determinations. *See State v. Aguilar*, 209 Ariz. 40, 49, ¶ 30, 97 P.3d 865, 874 (2004). First, the court "must determine that clear and convincing evidence supports a finding that the defendant committed the other act." *Id.* (citing Ariz. R. Evid. 404(c)(1)(A); *State v. Terrazas*, 189 Ariz. 580, 582, 944 P.2d 1194, 1196 (1997)). Second, the court must "find that the commission of the other act provides a reasonable basis to infer that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the charged sexual offense." *Id.* (citing Ariz. R. Evid. 404(c)(1)(B)). Third, the court must "find that the evidentiary value of proof of the other act is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or other factors mentioned in Rule 403." *Id.* (citing Ariz. R. Evid. 404(c)(1)(C)). In

making this determination, the court "also must consider the factors listed in Rule 404(c)(1)(C)(i)-(viii)." *Id.* The judge must make specific findings with respect to each of the prerequisites for admission under the rule. *Id.* (citing Ariz. R. Evid. 404(c)(1)(D)). Finally, if the court admits other act evidence under Rule 404(c), it must "instruct the jury as to the proper use of such evidence." Ariz. R. Evid. 404(c)(2).

Here, the trial court held an evidentiary hearing on the 404(c) evidence, at which it heard testimony from an expert, and from the victim of Dixon's subsequent rape. The court's minute entry clearly tracks 404(c) and provides a detailed explanation of why the court found the evidence admissible. (R.O.A., Item 128.) The court also instructed the jury not to infer Dixon's guilt based on the 404(c) evidence. (R.T. 1/10/08, Newman Transcript, at 11-12.) Dixon does not appear to argue that the court made these determinations improperly—rather, he argues that the prosecutor should never have sought to introduce the evidence because "no evidence" existed that Deana was raped, which is simply inaccurate.

### 3. *There was no misconduct and thus no error.*

Dixon cannot prove error because the prosecutor did not commit misconduct. *See Henderson*, 210 Ariz. at 568, ¶ 23, 115 P.3d at 608; *State v. Harrod*, 218 Ariz. 268, 278, ¶ 35, 183 P.3d 519, 529 (2008) (in proving that

alleged prosecutorial misconduct constituted fundamental error, defendant must first prove that error occurred by proving misconduct). Rather, the prosecutor properly sought to introduce evidence of Dixon's rape of Andrea Salazar to demonstrate Dixon's character trait giving rise to an aberrant sexual propensity to commit the rape and murder of Deana Bowdoin. *See Aguilar*, 209 Ariz. at 49, ¶ 30, 97 P.3d at 874; Ariz. R. Evid. 404(c).

"To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26, 969 P.2d 1184, 1191 (1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In other words, the misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (quoting *State v. Atwood*, 171 Ariz. 576, 611, 832 P.2d 593, 628 (1992)). An appellate court will reverse a conviction because of prosecutorial misconduct "if misconduct is present and 'a reasonable likelihood exists that [it] could have affected the jury's verdict, thereby denying defendant a fair trial.'" *State v. Dann*, 220 Ariz. 351, 373, ¶ 125, 207 P.3d 604, 626 (2009).

Prosecutorial misconduct is "not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole,

amounts to intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial." *State v. Aguilar (Higinio)*, 217 Ariz. 235, 239, ¶ 11, 172 P.3d 423, 427 (App. 2007) (quoting *Pool v. Superior Court*, 139 Ariz. 98, 108-09, 677 P.2d 261, 271-72 (1984)). Thus, it is difficult to argue that a prosecutor committed misconduct when the trial court approved of his actions. *See id.*

Dixon's claim that the prosecutor committed misconduct by seeking to introduce 404(c) evidence of Dixon's rape of Andrea Salazar is meritless. As discussed above, evidence proved that Deana was raped. The prosecutor properly notified the defense that it would seek to introduce 404(c) evidence, and the trial court heard the evidence at an evidentiary hearing, during which Dixon cross-examined the State's witnesses. The court issued a minute entry finding the evidence admissible, which directly tracked Rule 404(c) and analyzed why the evidence was allowed. Finally, the court gave the jury a limiting instruction. The prosecutor's conduct in seeking to have the 404(c) evidence admitted was not "intentional conduct which the prosecutor [knew] to be improper and prejudicial" and was thus not impermissible. *Aguilar (Higinio)*, 217 Ariz. at 238-39, ¶ 11, 172 P.3d at 427.

### 4.   *Any supposed error was not "fundamental."*

Even if the prosecutor's introduction of 404(c) evidence of Dixon's rape of Andrea Salazar was erroneous, the claimed error was not "fundamental." Fundamental error is "error of such dimensions that it cannot be said it is possible for a defendant to have had a fair trial." *State v. Smith (Gerald)*, 114 Ariz. 415, 420, 561 P.2d 739, 744 (1977). Fundamental error "usually, if not always, involves the loss of federal constitutional rights." *Id.*

The error Dixon alleges did not involve the "loss of federal constitutional rights." *Id.* Rather, it involved the allegedly improper admission of 404(c) evidence. This type of evidentiary error does not rise to the level of fundamental error. *See id.*

### 5.   *Dixon cannot carry his burden of proving prejudice.*

Dixon cannot prove that the introduction of the 404(c) evidence prejudiced him. The court gave the jury a limiting instruction directing them only to use the 404(c) evidence to determine whether Dixon had a "character trait that predisposed him to commit the crime charged." (R.T. 1/10/08, Newman Transcript, at 11-12.) The court instructed the jury not to convict Dixon with the crime charged "simply because you find that he committed this act or that he had a character trait that predisposed him to commit the crime charged." (*Id.*) Jurors are presumed to follow jury instructions. *State v.*

*LeBlanc*, 186 Ariz. 437, 439, 924 P.2d 441, 443 (1996).

Moreover, Dixon did not provide a plausible explanation establishing a consensual sexual relationship with Deana.   The evidence overwhelmingly established a non-consensual sexual assault and murder.   Thus, even assuming error in the admission of other act evidence, any such error was harmless.   In any event, Dixon has not established prosecutorial misconduct based on the prosecutor's presentation of evidence the court authorized him to present.

## II

**DIXON HAS FORFEITED AND WAIVED HIS CLAIM THAT THE TRIAL COURT IMPROPERLY PERMITTED HIM TO BE SHACKLED DURING TRIAL.   FORFEITURE ASIDE, DIXON CANNOT PROVE FUNDAMENTAL ERROR AND RESULTING PREJUDICE BECAUSE HIS RESTRAINTS WERE CONCEALED UNDER HIS CLOTHING AND WERE NOT VISIBLE TO THE JURY UNTIL HE, AFTER RECEIVING REPEATED WARNINGS, REVEALED THE OUTLINE OF HIS STUN BELT.**

Dixon argues that the trial court abused its discretion by requiring him to wear a leg brace and stun belt under his clothing during trial.  (Opening Brief at 30-31.)  Dixon contends that the court erred because it required him to wear the shackles as a matter of "jail policy," and did not express concerns specific to Dixon justifying the restraints.   (*Id.*)   Because Dixon did not make this argument at trial, he has waived it absent fundamental error and resulting prejudice, which he cannot prove.

First, Dixon wore the leg brace and stun belt underneath his clothing—the trial court did *not* require him to wear *visible* shackles in front of the jury. Second, Dixon elected to move around the courtroom while representing himself, thereby knowingly risking revealing the restraints to the jury. Indeed, the trial court repeatedly warned Dixon of the inferences that jurors could draw if they noticed his movement was restricted, and the court determined, on the record, that Dixon made his decision to nevertheless approach the podium when questioning witnesses knowingly, intelligently, and voluntarily. Notably, although there were points during trial at which the court stated that the outline of Dixon's stun belt might be visible to the jury, it is not clear that any jurors actually saw the belt or would have recognized it as a restraining device. Dixon therefore cannot show that any error occurred, or that he was prejudiced.

A.   RELEVANT FACTS AND PROCEDURAL HISTORY.

Before Dixon's trial was to begin, the court informed him that he should voice his objections to the court's denial of his continuance motions outside of the jury's presence so that the court would avoid addressing them in front of the jury. (R.T. 11/8/07, at 34-36.) The court told Dixon that if he wished to make a record in the jury's presence, he should ask his advisory attorneys to approach the bench. (*Id.* at 36-37.) The following exchange occurred:

MR. DIXON: Why can't I approach you?

38

THE COURT: Because you will be in leg braces. And if you approach me and the jury sees you walking in a very stilted fashion, that could be prejudicial.

MR. DIXON: So if I had a—if I had a display, a picture or whatnot, I couldn't put it on the easel and demonstrate to the jury that, you know, this is something that is for their consideration? I can't stand before them?

THE COURT: I will put this on the morning calendar for Monday at 10:30 at the end of the morning calendar. And we will talk about do's and don'ts as far as courtroom procedure so you have a better—

You will have leg braces and also a stun belt on. That's for security purposes. The leg braces are a common customary practice for all in-custody defendants when they are dressed out. I don't think it's in your best interests for the jury to see you walking up with leg braces on, because they impede your movement. And it's possible some intelligent juror could figure out you're being shackled.

And there is Supreme Court precedent that says that this Court has to do its best to protect you from that possible taint. So you are going to be conducting your questioning seated. If you need to have something brought to my attention, that's what your advisory counsel can do. We can have a discussion off the record in the presence of advisory counsel who can then relay it to me. If it's really important, it will take more than a minute or so, I can get the jury out of here and we can have a discussion with you out of the presence of the jury.

MR. DIXON: Your Honor, I have to object to that being ordered, to remain seated, I mean.

THE COURT: Talk to your attorneys about that.

MR. DIXON: There is no better way to influence somebody than with body language.

39

THE COURT:  You talk to your attorneys.  And if you want to make a motion to allow you to stand up or to approach and you waive your right to have the jury not see you walking in a stilted fashion, I will consider it.  But for now, that's always my policy.  And it's done for your protection.

MR. DIXON:  But it severely hampers my ability to defend myself.

THE COURT:  Very interesting argument.  Because I've always heard just the opposite, that a defendant is hampered when a jury gets to see him shackled.

MR. DIXON:  I'm just saying that being able to animate— body language is very important, Your Honor.  We all express ourselves in body language.

THE COURT:  I want you to talk to your attorneys.  And you will have a stun belt . . . and leg braces on.  If you decide against this Court's admonition that you be allowed to stand up or even be allowed to approach the podium, I would have to consider that.  And then I would take you through a waiver to make sure you understood your rights.

I'm going to ask the deputy if there is anything about jail policy that prohibits a defendant representing himself from being in the center at the podium or not.

THE DEPUTY:  I have to get back to you about it.

THE COURT:  Talk to your attorneys about it.  I'm just trying to tell you, if the jury sees you with leg braces on, it's possible they can draw the conclusion you are being shackled.  And so if your decision is you don't care, I will have to make sure there is a knowing, intelligent and voluntary waiver before I let you go forward.  Just talk to your attorneys.

Mr. Martinez, do you have a position on that?

MR. MARTNIEZ [The Prosecutor]:  No, sir.

(*Id.* at 37-40.)  Dixon asked the court whether he could wear the stun belt, "but eliminate the leg brace."  (*Id.* at 40.)  The court told Dixon that he could not, because:

> That's jail policy. . . . But you have to understand that there are security policies for all in-custody defendants who dress out in civilian clothes.  And I'm not making an exception for you.
>
> Couple things we may be able to do.  If we know it's your turn to question, it's possible you can already be standing there when the jury comes in. . . . But there are going to be times when you will stand up or whatever, and if the jury sees you stiff legged, there could be a taint.

(*Id.* at 40-41.)

A few days later, before *voir dire*, the court asked Dixon whether he planned to examine witnesses seated at counsel's table, standing at the table, or at the podium.  (R.T. 11/13/07, at 9.)  Dixon voiced his desire to go to the podium, and the court responded:

> Okay.  Now, we talked last week that you do have leg braces on, and there's a possibility that the jurors will see you walking in some sort of stilted fashion.  I can't tell you what conclusions they will derive from that, whether they conclude that you have a bum leg . . . or some sort of impairment or that you have some sort of restraints.  But . . . if you make the decision to move up there, do so knowing that they could draw that inference.
>
> Are you aware of that?

(*Id.* at 9-10.)  Dixon replied that he was, and informed the court that he had filed a written motion to exclude the leg brace.  (*Id.* at 10; R.O.A., Item 257.)

In his motion, Dixon argued that by requiring him to stay seated while questioning witnesses, the court was placing Dixon at a disadvantage for choosing to represent himself.  (R.O.A., Item 257, at 3-4.)  Dixon argued that, "In efforts to communicate with and effectively persuade a jury, the spoken word, accompanied by positive body language by way of facial and hand gestures, pivots, and short steps (the orator's dance), while positioned at the podium before the jury is a very important weapon in the advocate's arsenal." (*Id.*)  Dixon contended that the prosecutor would be permitted to stand at the podium, and thus, he too should be allowed to stand before the jury.  (*Id.*)

Dixon's motion suggested that the court either remove the leg brace and allow him wear only the stun belt, or add an additional deputy to the courtroom.  (*Id.* at 4.)  Dixon argued that the jury might find it "odd" for him to stay seated while the prosecutor would be allowed to stand, and suggested that the trial court require the prosecutor to remain seated too.  (*Id.* at 4-5.)

The court denied Dixon's motion, again explaining:

> That's a jail security issue, and I have told you this before. You're not being treated any differently than any other defendant who comes to this court who is in custody but dressed out in civilian clothes.  You're not being given different treatment at all.  That's a jail policy.  It's also

> security policy.   You're on trial for extremely serious
> crimes.  The Court needs to be concerned that you not try to
> escape or run, and for those reasons, all in-custody
> defendants who are dressed out are in leg braces.

(R.T. 11/13/07, at 10-11.)  The court told Dixon that it would read his motion,

but "at least as of today, you are going to be in your leg braces." (*Id.* at 11.)

Thus, the court cautioned Dixon, "if you are going to address the jury, to sort of

walk slowly and shuffle so as not to . . . point out in any greater way the effect

of the leg braces.  I don't know if they are going to make noise when you

move, but that's a decision you make." (*Id.*)

Dixon said he understood, and the court found Dixon's decision to

approach the podium despite the "possibility a jury could draw inferences" to

be knowing, voluntary, and intelligent.  (*Id.* at 11-12.)  When asked, the

prosecutor stated that he had nothing to put on the record regarding Dixon's

decision. (*Id.* at 12.)

The next day, after reading Dixon's motion, the court explained:

> I previously told you what my policy is in this court.  I think
> I've explained to you it's not just my policy, it's also jail
> policy and security.  The one sentence that sticks out to me
> in your motion is you say it is beyond question that Mr.
> Dixon is permitted no special advantage by deciding to
> represent himself but neither should he be disadvantaged.
>
> You are not being treated any differently.  That's my
> point.  You have asked for no special treatment, yet you've
> also asked not to receive lesser treatment.  Every in-custody
> defendant who is dressed out in this court for a trial . . .

43

from a capital trial to a class 6 felony, does wear leg braces under their clothes. So you have not been singled out in any way, shape, or form. You have not been given special treatment, nor have you been denied privileges given to anybody else. So that is a policy, and I'm simply choosing to treat you the same way. I'm simply choosing to follow jail protocol for security reasons regarding in-custody defendants.

So I have read your motion, but that is the reason I'm denying it.

(R.T. 11/14/07, at 3-4.)

During the defense case, as Dixon questioned Richard Banes, the court

asked Dixon's advisory attorneys to advise Dixon to avoid turning his back to

the jury:

THE COURT: Would you tell Mr. Dixon to not turn his back to the jury because you can see the outline of the stun belt, especially when he bends over? It's one thing to have his back to you guys, but I just noticed him bending over and he was turning and I could see it. I don't think the jury could, but the more he turns the outline is visible.

So if he wants to look for documents . . . don't do it with his back turned to them while he's bending over.

MR. COUNTRYMAN [Dixon's advisory counsel]: Okay. I told him that three or four times during the course of this trial, just to make sure he does not move around, because like the last time we were here, his shirt was a little small. So I've told him that a couple of times. I'll tell him again.

(R.T. 12/17/07, at 16.) Later that same day, the court told Dixon:

> Mr. Dixon . . . I mentioned to your advisory counsel during the break, when you turn your back to the jury and bend over, the outline of the stun belt is easily seen.
>
> You need to be aware of that because, although I don't think the jury knows what it is, I don't want them to start questioning.
>
> So if you want to speak to your lawyers, do it in a way that your back is not facing the jurors and you are bending over so that your shirt tightens up.  How you accomplish that, I don't know, but I'm concerned for you about that.  So just be aware of it.

(*Id.* at 119-20.)

The issue of Dixon's stun belt arose again on January 7, 2008 when, during a sidebar with Dixon's advisory counsel and the prosecutor, the court noted:

> Would you make sure, and I have said this to Mr. Dixon before, when he needs to consult with you guys, he should go around to where Mr. Carr is sitting and turn his back to the wall.  Every now and then, he will go around to where you are sitting at, Mr. Countryman, turn his back to the jury, and his stun belt is readily visible.

(R.T. 1/7/08, at 34.)  Dixon's advisory counsel responded, "Right."  (*Id.*)

Later, during the mitigation phase, Dixon and the court discussed whether Dixon would give an allocution, and the following exchange occurred:

> THE COURT:  What I'd like to do is I'd like you to sit right there.  I don't want the jury to see you walking up, nor do I want to see them [sic] have you taken down.  So you can do that either standing or sitting or at the podium, if you want.

45

MR. DIXON:  Your Honor, I'll do it in front of the pedestal.

THE COURT:  Okay.  Let me remind you one more time . . . when you turn your back to the jury and talk to your advisory counsel, your stun belt is very visible, especially when you bend over.

MR. DIXON:  Your Honor, I believe that the past week . . . they are pretty sure I have been incarcerated ever since, and I don't believe that wearing this stuff matters anymore.

THE COURT:  I would disagree with you.  I'm just reminding you that it is visible.

MR. DIXON:  All right.

THE COURT:  Being incarcerated is one thing.  If they think you are a wearing a stun belt because you are a danger, that's something different.

MR. DIXON:  Well, I believe that they're a little more smarter than that.

THE COURT:  Okay.  I'm just pointing that out to you.

MR. MARTINEZ:  Judge, I will sort of buttress what you said.  There was a case recently reversed where the defendant was pro per, and they knew that he was in custody, and I believe because he had shackles on his feet . . . they indicated somehow that was prejudicial, so I agree with you even though they know he is in custody, that's still not something we should go out of our way to show.

THE COURT:  And I have reminded either you or advisory counsel on several occasions just to do your best to remember that so you don't turn your back on the jury and bend over.  Then it does protrude.

MR. DIXON:  Well, Your Honor, shackles on someone's feet are like medieval, far worse than wearing a leg brace or this stun belt.

THE COURT:  All right.  I want the record to reflect that the Court did have this discussion with you.

(R.T. 1/24/08, at 20-22.)

**B.      STANDARD OF REVIEW.**

Because Dixon did not object on this basis at trial, he has forfeited his right to seek relief on appeal for all but fundamental, prejudicial error.  *See Henderson*, 210 Ariz. at 567-68, ¶¶ 19-20, 115 P.3d at 607 (objection not preserved at trial forfeited on appeal absent fundamental, prejudicial error); *State v. Mills*, 196 Ariz. 269, 272, ¶ 13, 995 P.2d 705, 708 (App. 1999) (holding issue concerning use of physical restraints waived where defendant did not object to use of restraint in trial court).  Appellant's objections at trial were based not on the sheer fact that he was shackled under his clothing, but on the fact that the trial court wanted him to remain seated while questioning witnesses to prevent the jury from noticing his leg brace and stun belt.  (R.T. 11/8/07, at 37-41; R.T. 11/13/07, at 9-12; R.O.A., Item 257; R.T. 11/14/07, at 3-4.)  Indeed, Dixon's comments during sentencing revealed that he was not particularly concerned about the jury seeing his restraints.  (R.T. 1/24/08, at 21-22.)  Dixon's objections did not preserve for appeal the argument that he makes

now—that the trial court should have conducted an individualized hearing to determine whether non-visible restraints were warranted.

## C.   ARGUMENT.

### 1.   *There was no error.*

#### a.   **Dixon's restraints were not visible.**

The leg brace and stun belt placed on Dixon were not visible to the jury, and only may have become visible when Dixon, after having been admonished, nevertheless moved in such a way as to make them visible.  Therefore, the court did not err by not making specific findings supporting the jail's restraint of Dixon.

Whether a defendant will be shackled is within the trial court's sound discretion. *State v. Lee*, 189 Ariz. 608, 617, 944 P.2d 1222, 1231 (1997) (citing *State v. Bracy*, 145 Ariz. 520, 532, 703 P.2d 464, 476 (1985)).  "Courtroom security is within the discretion of the trial court 'absent incontrovertible evidence' of harm to the defendant." *Id.*

In *Deck v. Missouri*, 544 U.S. 622, 624-25 (2005), the defendant was convicted of capital murder.  During sentencing, he was shackled, in plain view of the jury, with leg irons, handcuffs, and a belly chain. *Id.*  A jury sentenced Deck to death, and the Missouri Supreme Court affirmed. *Id.*  The United States Supreme Court vacated the sentence, holding that "the Constitution

48

forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is justified by an essential state interest—such as the interest in courtroom security—specific to the defendant on trial." *Id.* at 624 (emphasis in original; quotation marks deleted).

The United States Supreme Court has never held that the use of *non-visible* security devices, such as a stun belt or leg brace, must be scrutinized by the trial court under the due process umbrella. Indeed, that Court has expressly *limited* its holdings to *visible* restraints. *See Deck*, 544 U.S. at 626, 628, 629, 630, 633 (repeatedly stating that "visible" shackling or restraints implicate due process); *Illinois v. Allen*, 397 U.S. 337, 344 (1970) ("But even to contemplate such a technique [binding and gagging the defendant], much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique itself is something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold."). In *Deck*, the Court noted, "Visible shackling undermines the presumption of innocence and the related fairness of the fact finding process. . . . It suggests to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.'" 544 U.S. at 630 (quoting *Holbrook v. Flynn*, 475

U.S. 560, 569 (1986) and citing *Estelle v. Williams*, 425 U.S. 501, 503 (1976)). Those concerns are simply not implicated when *non*-visible security devices are used.

This Court has also noted that *Deck*'s holding is limited to *visible* shackles. *See State v. Gomez*, 211 Ariz. 494, 502-03, ¶¶ 39-45, 123 P.3d 1131, 1139-40 (2005) (quoting and citing *Deck*, and repeatedly stating that only "visible" restraints give rise to constitutional concern).

Dixon relies on *State v. Bassett*, 215 Ariz. 600, 602, ¶ 10, 161 P.3d 1264, 1266 (App. 2007), and *State v. Mills*, 196 Ariz. 269, 995 P.2d 705 (App. 1999), for the proposition that judges must make specific, individualized findings that *non*-visible shackles are necessary.  (Opening Brief at 39.)  In *Mills*, after wearing a concealed leg restraint during trial, the defendant moved for a new trial, arguing that the "presumption of innocence was impacted when he was 'physically restrained in the courtroom.'"  196 Ariz. at 273, ¶ 15, 995 P.2d at 709.  Jurors saw Mills in shackles outside of the courtroom.  *Id.* at 273, ¶ 14, 995 P.2d at 708.  The Arizona Court of Appeals held that, had Mills properly objected to the restraint during trial, "the state would have been required to establish 'some reason' for the restraint in the courtroom."  *Id.* (quoting *State v. Reid*, 114 Ariz. 16, 22, 559 P.2d 136, 142 (1976)).  The court then cited two cases, both of which concern *visible* restraints.  *Id.* (citing *State v. Miller*,

186 Ariz. 314, 921 P.2d 1151 (1996), and *State v. McMurtrey*, 136 Ariz. 93, 664 P.2d 637 (1983)).  Both of those cases support the State's position that the use of *non*-visible shackles cannot form the basis for a due process claim. *Miller*, 186 Ariz. at 323-24, 921 P.2d at 1160-61 (concluding that shackling claim was "without merit" where defendant did not show "that the jury ever saw him shackled"); *McMurtrey*, 136 Ariz. at 98, 664 P.2d at 642 (concluding that there was no error in trial court's decision to shackle the defendant where the "jury did not see the shackles," and collecting cases).  In *McMurtrey*, this Court specifically noted that it would "not find error on the ground that the defendant was shackled unless *it is shown that the jury saw the shackles*." 136 Ariz. at 98, 664 P.2d at 642 (emphasis added).

Moreover, the defendant in *Mills* never objected to wearing a concealed leg brace under his clothing during trial, and the court of appeals concluded that, "[i]n any event, an *unseen* 'restraint could not have affected the presumption of innocence.'"  *Mills*, 196 Ariz. at 272-73, ¶ 13, 995 P.2d at 708-09 (emphasis added).

In *Bassett*, citing *Mills*, the Arizona Court of Appeals stated, in passing, "that the same rules [for visible restraints] apply for restraining devices that are hidden from the view of the jury." 215 Ariz. at 602, ¶ 10, 161 P.3d at 1266. Precedent from this Court, however, controls over the dicta in *Bassett* that "the

same rules apply" to non-visible restraints.  *See Miller*, 186 Ariz. at 323-24,

921 P.2d at 1160-61; *McMurtrey*, 136 Ariz. at 98, 664 P.2d at 642.

The Ninth Circuit has also noted that a defendant is only prejudiced

when his shackles are visible to the jury.  *See United States v. Howard*,

580 F.3d 1005, 1012-13 (9th Cir. 2007) ("Because the primary concern is the

effect of physical restraints on a jury, we have found no prejudice to a

defendant where the restraint was not visible"); *Rich v. Calderon*,

187 F.3d 1064, 1069 (9th Cir. 1999) ("[W]here care is taken to ensure that a

defendant's shackling is not visible to the jury in the courtroom, no error

results.").

Dixon's leg brace and stun belt were concealed under his clothes and

were not readily visible.  Had Dixon heeded the court's warnings that he

remain seated, or made efforts to avoid bending over and turning his back to

the jury, there would have been no risk of the jury seeing the belt's outline.

Nevertheless, there is no evidence that any juror noticed the belt, or that any

juror would have recognized it as a restraint.  The record does not support

Dixon's claims that members of the jury saw his leg brace.  The trial court and

Dixon's advisory counsel only mentioned that the outline of his stun belt was

visible at times, and no one ever mentioned that Dixon was walking with a

"pronounced stiff gait," as he claims.

### b.   Dixon chose to reveal his restraints.

Despite the court's warnings that Dixon's movement about the courtroom might reveal his concealed restraints to the jury, Dixon chose to stand, walk around the courtroom, and use the podium to question witnesses. (R.T. 11/13/07, at 9-10.)  During trial, as Dixon bent over and turned his back to the jury, both the court and Dixon's advisory attorneys noted that the outline of his stun belt might have been visible to the jury at least once.   (R.T. 12/17/07, at 16, 119-20; R.T. 1/7/08, at 34.)

This Court has held that a defendant does not, simply because he is representing himself, have "some constitutional right, attendant upon his right to self-representation, to walk about the courtroom during the trial." *State v. Harding*, 137 Ariz. 278, 289, 670 P.2d 383, 394 (1983).  In *Harding*, the trial court ordered that the defendant, who represented himself, be shackled at trial because he had threatened his advisory counsel and "any other attorney who might subsequently act in that capacity," and had assaulted others while in custody. *Id.* at 288, 670 P.2d at 393.  Although the defendant was immobilized during trial, this Court held:

> Since the defendant here was fully able to address the judge and jury and to conduct witness examinations from the defense table, we find no substantive encroachment upon his right to self-representation, even though his immobility might have been inconvenient.  We find no error.

*Id.* at 289, 670 P.2d at 394.  Similarly, in *State v. Whalen*, the Arizona Court of

Appeals noted:

> Fundamental to the court's ability to control the courtroom, is the power to instruct those participating in and observing trials as to the manner in which they comport themselves. To further this end, trial judges have the authority and the obligation to ensure that counsel, litigants, jurors, court personnel and spectators behave civilly.  For the same reason, they are also necessarily endowed with the authority to instruct the various parties where they may and may not proceed in carrying out their respective roles.  The pro se defendant is not exempt from these requirements.

192 Ariz. 103, 108-09, 961 P.2d 1051, 1056-57 (App. 1997) (footnote omitted).

It was thus within the trial court's power to ask that Dixon—a convicted felon

serving seven life sentences for violent crimes against Andrea Salazar—remain

seated when questioning witnesses, or that he avoid moving in a way that

might reveal his concealed restraints to the jury.  *See Harding*, 137 Ariz. at 289,

670 P.2d at 394.  Dixon, knowing that he was wearing hidden restraints, chose

to move around the courtroom in a manner that may have revealed the outline

of his stun belt to the jury.  This was his choice, and he cannot now complain

that his rights were violated.  The trial court committed no error.

### 2.    *Any possible error was not "fundamental."*

Even if Dixon could prove that the trial court erred by requiring him to

be invisibly restrained without making specific findings regarding why

restraints were required, Dixon cannot prove that this error was "fundamental."

Fundamental error is error that went to the foundation of the defendant's case, that took from him a right "essential to his defense," and that was "of such magnitude that he could not have received a fair trial." *Henderson*, 210 Ariz. at 568, ¶ 24, 115 P.3d at 608; *Gendron*, 168 Ariz. at 155, 812 P.2d at 628 (fundamental error is "clear, egregious, and curable only via a new trial.").

In *Deck*, the Supreme Court stated that shackling error can be harmless. *See* 544 U.S. at 634 (noting possibility of "exceptional cases" where "the record itself" reveals "indisputably good reasons for shackling," and that convictions may be upheld if the State proves "beyond a reasonable doubt that the [shackling] error" "did not contribute to the verdict obtained."); *State v. Speer*, 221 Ariz. 449, 462-63 ¶¶ 73-76, 212 P.3d 787, 800-01 (2009) ("Reversal is required for a *Deck* violation unless the State can demonstrate harmless error.").

Although the court cited jail policy when it required Dixon to wear shackles under his clothing, Dixon was not a defendant who would ever have been permitted to wander around the courtroom unrestrained while representing himself. Dixon was charged with first degree murder and the State sought the death penalty. (R.O.A., Items 1, 29.) Dixon was already serving seven life sentences for the violent rape of another woman. (R.T. 12/13/07, at 14-65.) When addressing one of Dixon's challenges to wearing

both the leg brace and stun belt, the court noted that Dixon was "on trial for extremely serious crimes," and that it needed "to be concerned that [he] not try to escape or run." (R.T. 11/13/07, at 10-11.)  The court was aware of Dixon's past and the need for his restraint.  The alleged error was not "fundamental"— it neither prevented Dixon from receiving a fair trial nor affected his defense, and was harmless.

### 3. *Dixon cannot prove that he was prejudiced.*

Dixon has not established that wearing concealed restraints prejudiced him. *See Henderson*, 210 Ariz. at 568, ¶ 26, 115 P.3d at 608.  This Court does not presume that a defendant suffered prejudice—prejudice must affirmatively appear from the record.  *See, e.g., State v. Sharp*, 193 Ariz. 414, 422, ¶ 26, 973 P.2d 1171, 1179 (1999); *State v. Smith*, 182 Ariz. 113, 117, 893 P.2d 764, 768 (App. 1995).  A defendant is not automatically prejudiced if jurors saw his shackles.  *See State v. Apelt (Michael)*, 176 Ariz. 349, 361, 861 P.2d 634, 646 (1993) ("[T]he brief and inadvertent exposure of a handcuffed or shackled defendant to members of the jury outside the courtroom is not inherently prejudicial, and the defendant is not entitled to a new trial absent a showing of actual prejudice.") (collecting cases); *Mills*, 196 Ariz. at 271–72, ¶ 8, 995 P.2d at 707-08 ("The question is whether the defendant was prejudiced by what the

jury saw, not the mere fact that it was seen.") (quoting *State v. Johnson*, 147 Ariz. 395, 399, 710 P.2d 1050, 1054 (1985)).

The record does not show that any juror actually saw Dixon's leg brace or stun belt. During Dixon's direct examination of Richard Banes, the court noted that it could see the outline of Dixon's belt when he bent over, but stated that it did not think the jury could see it. (R.T. 12/17/07, at 16.) The court warned Dixon to be careful not to show the jury the belt, but noted that it did not "think the jury knows what it is." (*Id.* at 119-20.)

On a later date, the court informed Dixon's advisory counsel that when Dixon turned his back to the jury, his stun belt was "readily visible." (R.T. 1/7/08, at 34.) However, as the trial court noted, jurors would probably not have known what the belt was—they could have believed it was a medical device. Regardless, since jurors already knew that Dixon violently raped Andrea Salazar in 1985 and was caught, they surely expected him to be restrained during trial as a routine condition of his custody. (R.T. 12/13/07, at 14-34, 63-65, 74-79.)

Additionally, the court instructed the jury that Dixon was "presumed by law to be innocent," and that they "must start with the presumption that the defendant is innocent." (R.T. 1/10/08, Newman Transcript, at 8-9.) This Court presumes the jurors followed their instructions, and must therefore presume

that the instructions mitigated any prejudice caused by the jurors' possible momentary viewing of the outline of Dixon's stun belt. *See LeBlanc*, 186 Ariz. at 439, 924 P.2d at 443; *see also State v. Nordstrom*, 200 Ariz. 229, 254, ¶ 84, 25 P.3d 717, 742 (2001) ("Courts do not presume that jurors betray the court's trust and ignore their instructions.").

Moreover, the evidence *overwhelmingly* established Dixon's guilt. Any fleeting, inadvertent glimpse of Dixon's stun belt that the jurors may have had paled in light of the massive amount of evidence proving that Dixon killed Deana. Dixon lived across the street from Deana when she was raped and murdered. (R.T. 12/11/07, Masciola Transcript, at 68-69.) When Deana got home that night, she checked her mail, and her apartment complex's mailboxes were visible from Dixon's apartment complex. (*Id.* at 70-71.) Dixon and Deana were strangers. (*Id.* at 71-72; R.T. 12/4/07, Kindle Transcript, at 25-26, 39, 99-100; 12/10/07, Masciola Transcript, at 23.) The sperm found in Deana's underwear and vagina was Dixon's. (R.T. 12/13/07, at 74-86.) Thus, any possible error was harmless. *See Reid*, 114 Ariz. at 23, 559 P.2d at 143 (finding shackling error harmless in light of evidence before jury); *see also Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005) (shackling error harmless in light of overwhelming evidence against defendant).

## III

### DIXON HAS FORFEITED AND WAIVED HIS CLAIM THAT DR. KEEN'S TESTIMONY VIOLATED THE CONFRONTATION CLAUSE.   FORFEITURE ASIDE, THE TESTIMONY WAS ADMISSIBLE.

Dixon argues that the trial court should not have permitted Dr. Phillip Keen to testify in place of the medical examiner who performed Deana's autopsy in 1978, because Keen's testimony violated Dixon's Sixth Amendment right to confront witnesses.  Dixon asserts that the 1978 medical examiner was "alive and available to testify" at the time of Dixon's 2007-08 trial, and therefore should have been called so that Dixon could cross-examine him. Dixon has forfeited and waived this issue on appeal because he did not raise it at trial.   Regardless, Dixon cannot prove fundamental error and resulting prejudice.  This Court has held that a medical examiner may testify to his own opinions and conclusions based on the autopsy report of another medical examiner.  Moreover, the record shows that the parties did not know whether the 1978 medical examiner was alive, and that they were unable to locate him. Dr. Keen's testimony was admissible and no error occurred.

### A.   RELEVANT FACTS AND PROCEDURAL HISTORY.

On the first day of trial, during his opening, Dixon told the jury that the medical examiner who performed Deana's autopsy in 1978 was deceased, and

that the State would call a different medical examiner to testify about Deana's injuries. (R.T. 12/4/07, Kindle Transcript, at 10.)

Dr. Phillip Keen, who was the lead Maricopa County Medical Examiner between 1992 and 2006, testified about the findings from Deana's autopsy. (R.T. 12/10/07, Dawson Transcript, at 22-40.)   Dixon neither objected to Keen's testimony nor argued that Dr. Karnitschnig (the 1978 medical examiner) should be required to testify.   Dr. Karnitschnig was Keen's predecessor as the chief Maricopa County Medical Examiner, and, as far as Keen knew, Karnitschnig was still alive. (*Id.* at 23.) At the time of trial, Keen was contracted as the Yavapai County Medical Examiner. (*Id.*) Keen based his testimony about Deana's injuries on his review of Karnitschnig's autopsy report, and on photographs from the autopsy. (*Id.* at 22-23.)

During Dixon's case-in-chief, after Dr. Keen testified again, one of Dixon's advisory attorneys informed the court that Dixon wanted to question Detective Ferguson about something that Dr. Karnitschnig noted in his autopsy report. (R.T. 12/18/07, at 70-71.) The court asked, "Dr. Karnitschnig is dead; is that correct?" (*Id.* at 70.) Dixon's advisory counsel responded, "I think we can stipulate to that." (*Id.*)   When the court asked the prosecutor whether Karnitschnig was dead, he responded, "See, I don't know." (*Id.*)

During Dixon's direct examination of Detective Ferguson, his advisory counsel informed the court that he believed he had located Dr. Karnitschnig in town, and would try to subpoena him for January 2, 2008. (*Id.* at 89.)   On January 2, 2008, the parties did not mention Karnitschnig, and Dixon did not call him as a witness.   Dixon mentioned Karnitschnig again on January 8, 2008, when he told the court that he tried to get the doctor to testify, "But it seems that he is unable." (R.T. 1/8/08, Newman Transcript, at 29-30.)  Dixon asked the court to allow him to read a portion of Karnitschnig's autopsy report to the jury, claiming that it was inconsistent with something that Karnitschnig told police about the puncture wounds on Deana's abdomen. (*Id.* at 29-30.)  In response, the court noted that Dixon and his attorneys had at least 5 years in which to depose Karnitschnig or subpoena him for trial. (*Id.* at 30-31.)  When the court asked Dixon whether Karnitschnig was dead, Dixon responded that he could not "be found." (*Id.*)   The prosecutor noted that Dixon had not presented evidence that he had ever attempted to locate Dr. Karnitschnig. (*Id.* at 31-32.)

## B.   STANDARD OF REVIEW.

Because Dixon did not object on this basis at trial, he has forfeited his right to seek relief on appeal for all but fundamental, prejudicial error. *See Henderson*, 210 Ariz. at 567-68, ¶¶ 19-20, 115 P.3d at 607 (objection not

61

preserved at trial forfeited on appeal absent fundamental, prejudicial error).

Dixon must prove that error occurred, that the error was "fundamental," and

that he was prejudiced. *See id.* at 567-68, ¶¶ 19-26, 115 P.3d at 607-08.

### C. DIXON CANNOT PROVE FUNDAMENTAL ERROR AND RESULTING PREJUDICE.

Dixon contends that the Confrontation Clause barred Dr. Keen's

testimony at trial because Dr. Karnitschnig was "alive and available to testify."

(Opening Brief at 43.)  Dixon's argument has no merit.  It is clear from the

record that the parties did not know whether Karnitschnig was alive, and thus,

whether he was available to testify.  Indeed, Dixon's advisory counsel indicated

a willingness to stipulate that Karnitschnig was dead, and the prosecutor said

that he did not know whether Karnitschnig was alive.  (R.T. 1/8/08, Newman

Transcript, at 29-31.)  Thus, it does not appear that Karnitschnig was readily

"available to testify," as Dixon claims.   (Opening Brief, at 43.)   More

importantly, this Court has held that a medical examiner may testify to his

opinions based on the reports and opinions of another.  *See State v. Smith (Joe*

*Clarence)*, 215 Ariz. 221, 227-29, ¶¶ 19-26, 159 P.3d 531, 537-39 (2007).

Such testimony constitutes neither hearsay nor a violation of the Sixth

Amendment's Confrontation Clause. *See id.*

### 1. *No error occurred.*

The trial court did not err by allowing Dr. Keen to testify regarding

Deana's autopsy findings. Arizona Rule of Evidence 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Additionally, "[e]xpert testimony that discusses reports and opinions of another is admissible under [Rule 703] if the expert reasonably relied on these matters in reaching his own conclusion." *Smith (Joe Clarence)*, 215 Ariz. at 228, ¶ 23, 159 P.3d at 538 (citing *State v. Rogovich*, 188 Ariz. 38, 41-42, 932 P.2d 794, 797-98 (1997); *State v. Villafuerte*, 142 Ariz. 323, 327, 690 P.2d 42, 46 (1984); *State v. Noleen*, 142 Ariz. 101, 104, 688 P.2d 993, 996 (1984)). "Such testimony is not hearsay because it is offered not to prove the truth of the prior reports or opinions," but rather "to show the basis of the testifying expert's opinion." *Smith (Joe Clarence)*, 215 Ariz. at 228, ¶ 23, 159 P.3d at 538 (citing *Rogovich*, 188 Ariz. at 42, 932 P.2d at 798; *State v. Lundstrom*, 161 Ariz. 141, 148, 776 P.2d 1067, 1074 (1989)). A testifying expert, however, may not "act as a 'conduit for another non-testifying expert's opinion.'" *Lundstrom*, 161 Ariz. at 148, 776 P.2d at 1074.

A medical examiner's testimony based on the autopsy report of another medical examiner does not violate the Confrontation Clause, because:

> Facts or data underlying the testifying expert's opinion are admissible for the limited purpose of showing the basis of that opinion, not to prove the truth of the matter asserted. Testimony not admitted to prove the truth of the matter asserted by an out-of-court declarant is not hearsay and does not violate the confrontation clause.

*Smith*, 215 Ariz. at 229, ¶ 26, 159 P.3d at 539.  The Supreme Court has "made plain that the Confrontation Clause is not violated by use of a statement to prove something other than the truth of the matter asserted."  *Id.* (citing *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004); *Tennessee v. Street*, 471 U.S. 409, 419 (1985)).

A review of Dr. Keen's testimony shows that he reached his own conclusions based on the autopsy report and photographs.  (R.T. 12/10/07, Dawson Transcript, at 22-50.)  Notably, Dixon, too, called Keen to testify during his case-in-chief.  (R.T. 12/18/07, at 48-61.)  During his examination of Keen, Dixon asked about Keen's findings and conclusions based on the autopsy report and photographs he reviewed.  (*Id.* at 52-53, 56-57, 59-61.)  Dr. Keen provided his own opinions about Deana's injuries, their causes, and her length of consciousness during the attack.  (*Id.*)  None of Keen's testimony simply summarized the original medical examiner's findings; instead, Keen applied his own expertise to the autopsy report and photographs to reach independent conclusions regarding Deana's death. *See Lundstrom*, 161 Ariz. at

148, 776 P.2d at 1074. This practice did not violate the Confrontation Clause. *See Smith (Joe Clarence)*, 215 Ariz. at 228-29, ¶ 23-26, 159 P.3d at 538-39.

### 2. *Any possible error was not "fundamental."*

Dixon fails to prove that the error he alleges was "fundamental" in that it went "to the foundation of his case," took from him "a right that [was] essential to his defense," and was "of such magnitude that he could not have received a fair trial." *Henderson*, 210 Ariz. at 568, ¶ 24, 115 P.3d at 608.

Dixon's defense at trial was that he had consensual sex with Deana before Michael Banes murdered her after he left. (R.T. 12/18/07, at 52-53; R.T. 1/10/08, Newman Transcript, at 70-74, 79, 86.) The fact that Dr. Keen, rather than Dr. Karnitschnig, testified about findings from Deana's autopsy did not affect Dixon's defense. In fact, when Dixon questioned Dr. Keen during his case-in-chief, Keen testified that Deana suffered no injuries that would independently verify that she was raped. (R.T. 12/18/07, at 51-53.) Portions of Keen's testimony thus helped, rather than hindered, Dixon's defense. Dixon has presented nothing demonstrating that his defense would have been different had the 1978 medical examiner testified.

### 3. *Dixon cannot prove prejudice.*

Dixon does not even attempt to prove that the error he alleges prejudiced him. *See Henderson*, 210 Ariz. at 568, ¶ 26, 115 P.3d at 608. He does not

contend that, had Dr. Karnitschnig been available to testify, he would have asked different questions or his defense would have benefited. Dixon confronted and cross-examined Dr. Keen about the findings in the autopsy report and his conclusions based on those findings. Because Dixon cannot carry his burden of proving fundamental error and resulting prejudice, he has waived this claim.

## IV

**THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY REFUSING TO ALLOW DIXON TO SWITCH BACK AND FORTH BETWEEN REPRESENTING HIMSELF AND HAVING HIS ADVISORY COUNSEL REPRESENT HIM DURING TRIAL.**

Dixon argues that the trial court's denial of his request for hybrid representation was an abuse of discretion because the court incorrectly found that "hybrid representation was proscribed by Arizona law." (Opening Brief at 54.) Dixon contends that, because Arizona law does not prohibit hybrid representation, the court should have "examined the merits of [his] arguments in favor of hybrid representation." (*Id.* at 57.)

Dixon's claim mischaracterizes the trial court's decision, and lacks merit. The court stated that Dixon had no *constitutional right* to hybrid representation, and that it would not permit him to switch back and forth between representing himself and having his advisory attorneys represent him during trial. This

Court upheld a similar decision by a trial court in *State v. Cornell*, 179 Ariz. 314, 324-26, 878 P.2d 1352, 1362-64 (1994). The trial court did not abuse its discretion.

## A.   RELEVANT FACTS AND PROCEDURAL HISTORY.

About a month before Dixon's trial, the court noted that Dixon's advisory counsel had asked "whether the Court would allow hybrid representation," meaning that "[Dixon could] effectively switch back and forth at any given moment" between representing himself and having his advisory attorneys perform direct and cross-examination of particular witnesses. (R.T. 11/13/07, at 4.) The court explained:

> This Court does not allow hybrid representation. You have a constitutional right to counsel. You also have a constitutional right to represent yourself. You do not have the constitutional right to avail yourself of both avenues. You get to make that choice.
>
> I have been the assigned judge in the case now for two years plus, and from the first minute I had you in my court, you have always been adamant that you wanted to represent yourself, and that's how we are going to be proceeding.
>
> If at any point during the trial you decide that you want your attorneys to represent you, you have a constitutional right to make that decision. What you don't have a right to do is switch back and forth. So I'm telling you, you are representing yourself. If you want them to represent you, I live with it, but that's the final decision.
>
> Then if you decide later on down the road, whether it be this phase or another phase, that you've changed your mind

again, as long as I'm the trial judge, I'm not going to let that happen. So what you need to know is you make the call. You represent yourself with them as advisory counsel or they represent you. But this is not a fluctuating decision that you get to keep changing your mind on throughout the trial.

(*Id.* at 4-5.) In response, Dixon said that he had filed a "request for hybrid representation only on the DNA evidence," and the court reiterated its position.

(*Id.* at 5-6; R.O.A., Item 258.) The prosecutor took no position on the issue. (*Id.*)

The next day, the court told Dixon that it would read his motion for hybrid representation, but repeated that it would not permit him to switch back and forth between representing himself and having his attorneys represent him.

(R.T. 11/14/07, at 5-6.) Dixon replied:

> The DNA evidence was the only problem I foresee . . . in terms of eliciting testimony from . . . these expert witnesses on DNA, and Mr. Countryman and Mr. Carr have told me that they are experienced in dealing with that type of testimony, and that's why I put the motion in and specifically for . . . that testimony, none other. And I don't expect nor would I go back and forth after that.

(*Id.* at 6.) The court maintained its position, stating:

> Again, I'm not allowing hybrid representation. What you can't do—and this is a decision I have the power to make— you can't have your cake and eat it too. You can't say, "I'm going to represent myself with regard to these witnesses, but with regard to different witnesses, I want my attorneys to represent me."

> Once you make the decision for them to represent you in the capacity as your lawyer, in my court, that is a final decision . . . .
>
> What you would like is to represent yourself, and when DNA testimony comes, you want them to represent you. And then as soon as that's done, you want to represent yourself again. That's called a hybrid representation. It's not going to happen. If you want them to represent you, you need to let me know now. If you decide when it comes to DNA you want them to represent you, you can do that, but then I'm not going to let you switch back. So if you really believe . . . that you're going to want them to represent you when it comes to DNA, you better make your motion now before we get six weeks into trial and you find I'm denying your request or it causes all sorts of problems in our trial.

(*Id.* at 7.) The court informed Dixon that if he changed his mind about who would represent him, he should tell the court as soon as possible "or there is . . . the possibility you could be deemed to have waived your right." (*Id.*)

A few days later, before *voir dire*, the court again informed Dixon that he could withdraw his waiver of counsel at any time. (R.T. 11/20/07, Masciola Transcript, at 3.) The court told Dixon that if, at some point during trial, he decided that he wanted his advisory attorneys to represent him, the court would allow it because it was Dixon's "constitutional right." (*Id.*) In response to the court's question regarding whether they were prepared to take over Dixon's case if necessary, advisory counsel stated that they were "still advisory counsel," and that if they were lead counsel, they would have hired their own

DNA expert and interviewed the State's witnesses. (*Id.* at 4-6.) Advisory counsel stated that they could not "effectively represent" Dixon on DNA issues, but would step in if the court took Dixon's *pro per* status away from him. (*Id.*) The court then advised Dixon that if he decided to have his attorneys represent them later on, he might not be granted a continuance and his attorneys might not be prepared. (*Id.*) The court added:

> You have asked to represent yourself. This Court tried to talk you out of it. I didn't get anywhere, and now you're exercising those rights. You're the one who put this issue at the forefront when you asked me for permission to have hybrid representation and I said no, because the law in Arizona doesn't allow hybrid representation. But it did make a light bulb go off in my mind as to what might happen down the road if you choose to withdraw your waiver of the right to counsel, which is your constitutional right.
>
> I don't want to blind-side you. I don't want to blind-side the victims. I want you to understand ramifications. That's all I'm doing.

(*Id.* at 6-7.) Dixon's advisory attorneys conceded that, if asked, they could step in to represent him. (*Id.* at 13-14.)

The first witness to provide DNA testimony testified on December 11, 2007. (R.T. 12/11/07, Masciola Transcript, at 4.) Dixon did *not* renew his request that advisory counsel represent him during DNA-related portions of the trial.

**B.     STANDARD OF REVIEW.**

This Court reviews a trial court's decision on whether to allow hybrid representation, or a defendant's decision to switch back and forth between representing himself and having an attorney represent him, for an abuse of discretion. *See State v. Cornell*, 179 Ariz. 314, 324-26, 878 P.2d 1352, 1362-64 (1994).

**C.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION.**

The Sixth Amendment "guarantees a defendant the right to self representation." *State v. Roscoe*, 184 Ariz. 484, 498, 910 P.2d 635, 649 (1996) (citing *Faretta v. California*, 422 U.S. 806 (1975)).  It "also guarantees an indigent defendant the right to representation by counsel." *Id.* (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)).  When a defendant "concurrently has self-representation and representation by counsel, hybrid representation results." *Id.* (citing *State v. Murray*, 184 Ariz. 9, 27, 906 P.2d 542, 560 (1995)).  Hybrid representation is "not a constitutional right," and is "disfavored." *Id.* (citing *State v. Cornell*, 179 Ariz. 314, 878 P.2d 1352 (1994)); *see also State v. Rickman*, 148 Ariz. 499, 503-04, 715 P.2d 752, 756-57 (1986) (noting that Arizona does not "recognize any right to 'hybrid' representation"); *State v. Stone*, 122 Ariz. 304, 307, 594 P.2d 558, 561 (App. 1979) (same).  Nevertheless, hybrid representation is permitted "at the discretion of the court."

*Roscoe*, 184 Ariz. at 498, 910 P.2d at 649; *see also Cornell*, 179 Ariz. at 325, 878 P.2d at 1363.

In *Cornell*, the defendant, charged with first degree murder, sought to present expert psychological testimony regarding his supposed organic personality disorder. 179 Ariz. at 324-25, 878 P.2d at 1362-63. Cornell was representing himself, but before the expert was to testify, Cornell informed the court that he was not prepared and wanted his advisory counsel to conduct the direct examination. *Id.* Although the prosecutor did not object, the court told Cornell that case law prevented him from having hybrid representation, and that he would not be permitted to switch back and forth between representing himself and having his advisory counsel represent him. *Id.* Cornell ultimately chose to continue representing himself. *Id.*

On appeal, this Court explained that while hybrid representation is not *prohibited* in Arizona, it is not a constitutional right. *Id.* at 325, 878 P.2d at 1363. This Court also noted that permitting hybrid representation is "disfavored," as it is "likely to create many procedural problems and should be adopted only for very unusual, and specific reasons, and when necessary to serve the ends of justice." *Id.* at 325 n.2, 878 P.2d at 1363 n.2.

This Court explained that the trial judge "could have allowed advisory counsel to examine this crucial witness." *Id.* at 325, 878 P.2d at 1363. Cornell,

however, sought to waive counsel, withdraw his waiver so that his advisory attorney could examine one witness, and then waive counsel again. *Id.* The trial judge thus did not deny Cornell the right to withdraw his waiver of counsel, but rather told him that if he did withdraw his waiver, he could not switch back and represent himself again. *Id.*

This Court found the trial court's decision proper because "A defendant's right to discharge counsel and proceed in *propia persona* is a qualified right once trial has begun." *Id.* at 326, 878 P.2d at 1364. A "[d]efendant has the right to ask that counsel be appointed to represent him midway through the trial, but the court need not stop the trial for the convenience of the defendant each time he changes his mind." *Id.* (citing *State v. DeLuna*, 110 Ariz. 497, 502, 520 P.2d 1121, 1126 (1974)). Once Cornell "invoked his right to counsel, it was within the judge's discretion not to allow him to switch back." *Id.* "Under these circumstances, warning Defendant in advance that the court would not allow further switching was proper. Defendant was given the opportunity to have counsel under these terms but chose not to do so. The judge's ruling was therefore not an abuse of discretion." *Id.*

Dixon's case is strikingly similar to *Cornell*. After waiving counsel and representing himself for over a year, Dixon asked the court to allow his advisory attorneys to conduct cross-examination of the State's DNA experts.

(R.T. 11/13/07, at 4-5; R.O.A., Item 258.)  The court informed Dixon that, if he wanted to revoke his waiver of his right to counsel when the State's DNA experts testified, he could do that, but he would not be permitted to waive counsel again and represent himself when they were finished.  (R.T. 11/14/07, at 5-6.)  The court ruled that, during trial, Dixon would not be permitted to switch back and forth between representing himself and having his advisory attorneys represent him.  (*Id.* at 5-6, 7; R.T. 11/20/07, Masciola Transcript, at 3-7.)  The trial court's ruling is the same as the ruling upheld in *Cornell.  See* 179 Ariz. at 325-26, 878 P.2d at 1363-64.  The court did not prevent Dixon from moving to be represented by his advisory attorneys during trial, but instead warned Dixon that he would not be permitted to switch back and forth between representing himself and having his advisory counsel represent him.  This was not an abuse of discretion.

## V

**THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING DIXON'S FINAL CONTINUANCE MOTION, BECAUSE THE COURT HAD ALREADY GIVEN DIXON NUMEROUS CONTINUANCES, SPANNING APPROXIMATELY 5 YEARS, TO COMPLETE HIS MITIGATION INVESTIGATION.**

Dixon argues that the trial court abused its discretion and violated his due process and fair trial rights by denying his November 8, 2007 motion for a continuance to complete his mitigation investigation.  (Opening Brief at 59-

67.) He claims that the court denied the motion "without a complete inquiry into the status of the research, the problems, if any, that the mitigation specialist was encountering, and the prospect for the completion of the project." (*Id.* at 59.) Dixon contends that, had the court granted his motion, he could have investigated and presented evidence that at the time of this offense, "he was an alcoholic and prone to blackouts," and "weighed 115 pounds." (*Id.* at 66.) Dixon argues that, had he presented this information to the jury, they could have believed that he blacked out when he murdered Deana, or that he was physically incapable of strangling Deana to death because of his size. (*Id.*)

Dixon's arguments are meritless. The trial court did not abuse its discretion by denying Dixon's continuance motion, because the court had given Dixon almost *5 years* in which to complete his mitigation investigation. During that time, Dixon's first and second mitigation specialists identified numerous areas of potential mitigation, collected thousands of documents, and interviewed numerous witnesses, including experts. Throughout that period, Dixon received numerous continuances to complete his mitigation investigation. Despite that, Dixon and his second mitigation specialist repeatedly claimed that Dixon needed at least 1 to 2 additional *years* to complete the investigation. The court did not abuse its discretion by denying Dixon's unreasonable request for a 3-month continuance on the eve of trial.

Furthermore, despite Dixon's advisory attorneys' statements that they developed tremendous amounts of mitigating evidence that could be presented (including information regarding substance abuse and mental health problems), Dixon stated that his mitigation was essentially non-existent, exaggerated, and could not be proven. Thus, Dixon *chose* not to present the mitigation his defense team had prepared, and of which he was aware, and he cannot prove that the trial court's refusal to grant him a continuance prejudiced him.

## A.   RELEVANT FACTS AND PROCEDURAL HISTORY.

After Dixon's indictment in 2002, his public defender (Vikki Liles) informed the court that she needed more time to complete Dixon's mitigation investigation and make required disclosure to the State. (R.T. 4/16/03, at 4-6.) Early in the case, Liles explained that she had identified Dixon's mental health as potentially mitigating, and that Dixon might pursue an insanity defense, because 2 days before he raped and murdered Deana, then Superior Court justice Sandra Day O'Connor found Dixon not guilty by reason of insanity in another sexual assault case. (R.T. 7/18/03, at 4-6.)

Between 2002 and 2006, Liles requested numerous extensions of time to complete Dixon's mitigation investigation, citing the case's age and her office's lack of resources and overabundance of cases. (R.T. 6/5/03, at 7-10; R.T. 7/18/03, at 3-6, 36; R.T. 9/5/03, at 15-20, 24-27; R.T. 10/31/03, at 8-12, 25-27;

R.O.A., Items 76, 77, 78; R.T. 12/17/03, at 6; R.T. 2/20/04, at 4-6; R.O.A., Items 96, 97; R.T. 4/16/04, at 15-19; R.T. 10/1/04, at 6-18; R.T. 1/14/05, at 2-9; R.T. 4/15/05, at 14-21.)  At an April 16, 2004 status conference, Liles stated that Dixon's mitigation investigation could be completed by October 31, 2004. (R.T. 4/16/04, at 15-16.)  She anticipated that the case could be ready for trial by February 2005.  (*Id.*)  But, at an October 1, 2004 status conference, Liles said that while her office was almost finished gathering records of Dixon's background, and family interviews would be complete by the end of the year, experts' reports might not be finished by that time.  (R.T. 10/1/04, at 6-13.)

Deana's family appeared at a January 14, 2005 status conference to assert their speedy trial rights, but Dixon was still given more time to investigate mitigation.  (R.T. 1/14/05, at 7-9.)  Dixon withdrew insanity as a defense in April 2005.  (R.T. 4/15/005, at 14.)

After Dixon voiced dissatisfaction and disagreement with his attorneys, the court granted his motion to represent himself.  (R.O.A., Item 120; R.T. 12/5/05, at 7-8; R.T. 2/27/06, at 3; R.T. 3/16/06, at 3-4, 21-22.)  Deana's family raised concerns that Dixon's desire to represent himself was a delay tactic, and again asserted their speedy trial rights.  (R.T. 3/16/06, at 18-19.)

The court appointed Dixon a new investigator and mitigation specialist on May 12, 2006.  (R.T. 5/12/06, at 4-8.)  Even though Dixon's public defender

had claimed that the mitigation investigation was nearly complete, on September 8, 2006, Dixon told the court that his new mitigation specialist advised him that the investigation would take at least 2 years. (R.T. 9/8/06, at 16.) The victims again objected, noting that a full mitigation investigation was already done, necessitating numerous continuances. (*Id.* at 19-20.)

On November 8, 2006, the prosecutor informed the court that Deana's elderly father's cancer had recurred, and the family wanted Dixon's trial accelerated. (R.T. 11/8/06, at 12-13.) Dixon repeated that his mitigation investigation would take at least 2 years. (*Id.* at 15-16.) Ultimately, the case was not accelerated because of the court's calendar. (R.T. 3/2/07, at 18-19.) After further delays, the court set the case for trial on September 13, 2007, giving Dixon more time for his mitigation investigation. (R.T. 7/3/07, at 5-7.) Still, Dixon objected, claiming the investigation was incomplete because of the age of the crime and because his family lived 5 hours away on the Navajo reservation. (*Id.* at 31.) The prosecutor and victims objected to any further continuances. (*Id.* at 33-34.)

After hearing argument, the presiding criminal judge continued Dixon's trial until November 13, 2007. (R.T. 8/30/07, at 3-11; R.O.A., Item 232, at 3; R.T. 9/7/07, at 3-4.) While addressing the judge's decision, the trial court noted that in his original letter to Dixon, Dixon's mitigation specialist stated

that he needed about a year to "do a thorough mitigation package." (R.T. 9/7/07, at 4.) With the granted continuance, Dixon had received "just about a year." (*Id.*) The court explained:

> With this continuance, Mr. Mayberry would have been on the case for 18 months and that is certainly in this Court's view appropriate time to gather together mitigation. And when you take into consideration that he had some head start because of previous mitigation specialists who were on board for about two and a half years, I do believe that this is plenty of time . . . .

(*Id.*)

On November 6, 2007, the court informed the parties that it had started prescreening jurors. (R.T. 11/6/07, at 4.) Dixon's mitigation specialist stated that Dixon was "probably about 60 percent done with the mitigation," and, on November 8, 2007, Dixon announced that he had filed another continuance motion. (*Id.* at 11; R.T. 11/8/07, at 35; R.O.A., Item 254.) Claiming that his mitigation specialist still needed to interview 40 witnesses and contact experts, Dixon requested a 3-month continuance until March, 2008. (R.O.A., Item 254, at 1-5.)

The court denied Dixon's motion in a detailed minute entry, which described the age of the case and the amount of time Dixon was given for his mitigation investigation, including the numerous continuances his public defenders received to pursue the investigation. (R.O.A., Item 264.) It also

79

noted the victims' repeated objections to further continuances because of the crime and case's ages, and explained:

> While the court recognizes that an investigation into a defendant's life in order to assemble mitigation evidence takes time and that how much time will depend upon the individual case, the Arizona Supreme Court has determined that 18 months is a sufficient time. *See* Arizona Rule of Crim. Pro 8.2(a)(4). Current mitigation specialist Mayberry concurs as he noted in a December 4, 2006 letter to Defendant that "normally it takes at least 18 months to do a thorough mitigation package." He further admitted to having a head start on this case because of work done by the previous mitigation specialists and concluded that mitigation could possibly be completed "close to a year from now."
>
> The defense mitigation work-up in this case has been ongoing for well over four years. Mr. Mayberry has had the case for 16 months, and it's anticipated that the mitigation phase of the trial will not begin, if at all, until early January 2008, which would be approximately 18 months after he received the Defendant's file.
>
> Under these circumstances, based upon the history of the case, the amount of time Defendant has had to assemble his mitigation, and the victim's objections to yet another continuance,
> IT IS ORDERED denying the Defendant's Motion to Continue the November 13, 2007 trial.

(*Id.*)

At the close of the guilt phase, after the jury convicted Dixon of first degree murder, his advisory counsel addressed Dixon's mitigation, noting that

Dixon would present two witnesses who were disclosed to the State and one who was not. (R.T. 1/16/08, at 11.) Dixon stated:

> Your Honor . . . at the beginning of this, it was made known to the Court it was going to be over like 20 witnesses that were going to be called in if mitigation came about. And, of course, you know that . . . we started this trial and I made it on the record that . . . my mitigation was not prepared to go. And it's still not prepared, and I feel that doing it halfway is not—it's not even halfway. So . . . the only witness I propose to call is . . . John Akins []. He's a former prison warden, and he is going to . . . present mitigation evidence about my prison history. And that's as far as I want to go. I do not want to bring my family laundry into this. That part of my mitigation is completely incomplete, and because of the age of this case, it . . . wouldn't help.

(*Id.* at 13-14.)  The court responded that it would make a record of Dixon's decisions and reasoning on a future date. (*Id.* at 14.)

The prosecutor asserted that, based on his research, Dixon's family history would not be mitigating and would likely have the opposite effect:

> [T]he defendant says he does not want to use family history, and he gave a number of reasons. I will buttress what he said by indicating that his family history would only hurt him. Specifically, we have spoken—"we" being Detective Magazzeni . . . to his sister, who indicated that the defendant sexually assaulted her when she was a teenager. The investigation involving the rape of Andrea Salazar disclosed that those officers spoke to his brother, who did not have anything positive to say about the defendant. I don't know exactly how far they've gone. But our investigation has indicated that in terms of the family history, there really isn't anything positive, and, if anything, it could probably hurt the defendant.

81

(*Id.* at 15.)  Dixon admitted that the prosecutor was "stating some of the facts,"

but added, "If push came to shove, Your Honor, I might have been able to find

somebody who would have been able to corroborate my claim that I saved

somebody from drowning when I was 16 years old.  Other than that, I have

nothing else." (*Id.* at 16-17.)

The court noted that Dixon once mentioned that around the time of

Deana's murder, he "may have been a severe alcoholic prone to blackouts."

(*Id.* at 17.)  The court wanted to ensure that "[Dixon's] decision not to put on

any mitigation evidence [was] with full knowledge of that particular area of

potential mitigation." (*Id.*)  Dixon replied that there were only "like three

people" who knew about his supposed alcoholism and blackouts. (*Id.*)  The

court stated:

> Your attorneys have remarked, I think, weeks ago, issues
> regarding possible mental health concerns.  You're the boss.
> You're representing yourself.  You get to make the call on
> what you put in and what you don't.  [T]he appellate record
> should be very clear why you make the decisions you make
> so that we don't have to have someone looking back and not
> knowing.  So we will do that.

(*Id.* at 17-18.)

After the jury found two aggravating factors, the parties again addressed

Dixon's mitigation.  (R.T. 1/17/08, Newman Transcript, at 7-10.)  Dixon

declared his belief that his mitigation was restricted to what would have been

permitted in 1978, but the court corrected him, stating, "[Y]ou have the right at the mitigation phase to put on any evidence that you believe is pertinent to the jury for consideration of leniency." (*Id.* at 7-8.)  When asked if he and his attorneys had discussed what mitigation he would present, Dixon stated, "Your Honor, I don't even know what the hell my mitigation is right now.  I told you a while ago mitigation is not ready and still isn't ready and probably never will be ready.  So I don't know what the hell is going on." (*Id.*)  When the court reiterated that it had placed no limits on his mitigation presentation, Dixon insisted on restricting his mitigation based on his own beliefs about the law. (*Id.* at 9-10.)

At the next trial date, the court listed numerous common mitigating factors for Dixon, including non-statutory factors. (R.T. 1/22/08, at 5-6.)

Dixon's advisory attorneys made a record regarding the mitigation they had prepared. (*Id.* at 26-27.)  They stated that the record gathering process was complete, but it remained Dixon's mitigation specialist's position that "the compiling of mitigation wasn't largely done in a manner that's consistent with the way that he does it," and he needed more time to "complete the social . . . history issues." (*Id.* at 26.)  Advisory counsel continued:

> With regard to what's been done, Your Honor, I want to make clear for the record, *we have completed a substantial amount of mitigation that could be presented and could address largely all of the issues that the court has set forth*

> with regard to Mr. Dixon's appreciation for the
> wrongfulness of his conduct, family instability, parental
> instability, mental disorders, mental health and substance
> issues. We have not only gathered records in that respect,
> but also have experts to cover those issues with regard to a
> presentation of mitigation.
>
> And those experts . . . some of them have met with Mr.
> Dixon. And I think at this point . . . *he's choosing not to
> present that information.* That's not what we believe should
> be done in the case. We think those issues should be
> addressed in addition to the issue you have addressed.
> There is a catch-all provision, and we have information
> prepared to address other issues with regard to mitigation
> that are applicable to Mr. Dixon's case.
>
> So given the enormity of the seriousness of the case and
> given the way the instructions and the law is with regard to
> the jury's decision in the case, it's our position that
> mitigation is very important. It's an aspect of the case that
> should be presented in total and that a lot of that has been
> prepared and is available for Mr. Dixon to use. And I think
> it's his decision not to use the information that's available
> and not call the experts that are available for his disposal.

(*Id.* at 26-27, emphasis added.) Mr. Dixon's other advisory attorney added

that: Dixon's mental health/family history experts were approved and retained;

they had about 5000 documents for mitigation; and they and the mitigation

specialist would have helped Dixon present mitigation to the jury. (*Id.* at 27-

28.)

Dixon nevertheless maintained that his mitigation specialist did not have

enough time. (*Id.* at 28-29.) But, he agreed with the prosecutor that "the

mitigation . . . is really not there." (*Id.* at 29.) In response, Dixon's advisory

attorney stated that they had "put together roughly a list of 12 different things with regard to mitigation, the areas we would have covered had we been counsel." (*Id.* at 30.) He added that all he and his co-counsel could do was "get the experts, let him know they're there, and so he makes the decision if he wants to use them." (*Id.* at 30-32.)

Dixon repeated that his mitigation was not worthwhile. (*Id.* at 33-34.) He disagreed with his advisory counsel that it was important to put forth a lot of mitigating evidence, and declared that presenting mitigation was like "wallow[ing] in spilled milk." (*Id.* at 33.) And, Dixon admitted having lied to the court about saving someone's life when he was younger, noting that he instead "helped somebody save a life" when he was 13 or 14, and it occurred so long ago that he did not remember the names of anyone involved. (*Id.* at 34.) He also admitted that he could not present anyone who knew that he was an alcoholic, because "there is nobody to come and sit or stand in that witness box and tell people how it was back then." (*Id.*)

The prosecutor added that the life-saving incident to which Dixon referred involved his ex-wife, and that she would "tell a different story than what he is telling." (*Id.* at 34-35.) And, the prosecutor had come across no one who could verify that Dixon ever had an alcohol problem. (*Id.* at 35.)

Dixon presented one witness for mitigation purposes—a former prison warden and president of a "prison consulting firm," who testified that he believed Dixon could be controlled in prison. (*Id.* at 30-50.)

## B.   STANDARD OF REVIEW.

This Court reviews a trial court's denial of a continuance for the purposes of continuing a mitigation investigation "only for a clear abuse of discretion." *State v. Schackart*, 190 Ariz. 238, 254-55, 947 P.2d 315, 331-32 (1997) (citing *State v. Amaya-Ruiz*, 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990)). A defendant must show that the court's denial of his requested continuance substantially prejudiced him. *Amaya-Ruiz*, 166 Ariz. at 164, 800 P.2d at 1272; *State v. Clabourne*, 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984)). In determining whether the denial of a continuance "violated a defendant's constitutional rights," this Court examines all of "the circumstances of the case." *Amaya-Ruiz*, 166 Ariz. at 164, 800 P.2d at 1272 (citing *State v. Hein*, 138 Ariz. 360, 369, 674 P.2d 1358, 1367 (1983)).

## C.   ARGUMENT.

### 1.   *Dixon was not entitled to another continuance.*

Arizona Rule of Criminal Procedure 8.5(b) sets forth the circumstances under which courts may grant continuances, and describes what courts should consider:

> A continuance of any trial date shall be granted only upon a showing that extraordinary circumstances exist and that delay is indispensable to the interests of justice. A continuance may be granted only for so long as is necessary to serve the interests of justice. In ruling on a motion for continuance, the court shall consider the rights of the defendant and any victim to a speedy disposition of the case.

The comment to Rule 8.5(b) states that "A continuance shall be no longer than necessary and in no case longer than 30 days." "[T]he trial court is the only party in a position to judge the inconvenience of a continuance to the litigants, counsel, witnesses, and the court." *Hein*, 138 Ariz. at 368, 674 P.2d at 1366.

Arizona's Victims' Bill of Rights states that crime victims have a right "To a speedy trial or disposition and prompt and final conclusion of the case after the conviction and sentence." Ariz. Const. Art. II, § 2.1(A)(10).

Dixon's original attorneys began their mitigation investigation in March 2003. (R.T. 4/16/03, at 4-6.) Between March 2003 and March 2006, Dixon repeatedly requested and received more time to complete his investigation, and the trial court set monthly status conferences. (R.T. 4/16/03, at 4-6; R.T. 6/5/03, at 7-9; R.T. 7/18/03, at 3-4; R.T. 9/5/03, at 11-27; R.T. 10/31/03, at 8-27; R.O.A., Items 76, 77, 78; R.T. 12/17/03, at 6; R.T. 2/20/04, at 4-6; R.O.A., Items 96, 97; R.T. 4/16/04, at 15-19; R.T. 10/1/04, at 6-18; R.T. 1/14/05, at 2-9; R.T. 4/15/05, at 14-21.) At one point, Dixon's attorneys advised the court that

the mitigation investigation could be completed by October 31, 2004. (R.T. 4/16/04, at 15.)

After Dixon waived his right to counsel and began representing himself in March 2006, he received approximately 18 months (between March 2006 and November 2007) to complete his mitigation investigation before the start of his trial. (R.O.A., Item 232, at 3; R.T. 9/7/07, at 3-4.) Dixon had two advisory attorneys, a private investigator, a mitigation specialist, and later, a second mitigation specialist all working on his case. (R.T. 5/12/06, at 7-8; R.T. 5/4/07, at 6.)

In denying Dixon's final motion for a 3-month continuance in November 2007, the court considered the case's history and the number of continuances already granted to Dixon to complete his mitigation investigation, along with the victims' objections to further continuances of the 5 year-old case (with a crime that occurred in 1978), made partly because Deana's elderly father had cancer. (R.O.A., Item 264; R.T. 11/8/06, at 12-13.) Considering those circumstances, the court's decision was proper under Rule 8.5(b) and was not an abuse of discretion.

### 2. *The trial court's denial of the continuance did not substantially prejudice Dixon.*

Dixon must not only demonstrate that the trial court abused its discretion by denying his continuance motion, but also that the denial substantially

prejudiced him.   *See Amaya-Ruiz*, 166 Ariz. at 164, 800 P.2d at 1272; *Clabourne*, 142 Ariz. at 342, 690 P.2d at 61.  He cannot make this showing.

Before the mitigation phase, Dixon informed the court that he planned to call only one witness. (R.T. 1/16/08, at 13-14.)  He stated that he did not want to "bring [his] family laundry into this," and he believed that his potential mitigation "wouldn't help." (*Id.*)  When the prosecutor informed the court that Dixon had sexually assaulted his sister and that his brother disliked him, Dixon admitted that the prosecutor was "stating some of the facts." (*Id.* at 16-17.) Dixon said the only mitigation he might have was evidence that he saved someone from drowning when he was 16. (*Id.*)  Later, however, Dixon admitted that this was, at least partially, a lie. (R.T. 1/22/08, at 34.)  Dixon also declared that he did not think he could prove that he had substance abuse problems, because only "like three people" knew about them. (R.T. 1/16/08, at 17.)  And, despite the court's repeated corrections of Dixon's misunderstanding of the law, Dixon declared that he wished to restrict his mitigation to evidence that would have been permitted in 1978. (R.T. 1/17/08, Newman Transcript, at 7-10.)

Dixon also said that his mitigation would "probably never . . . be ready." (*Id.* at 9.)  Despite Dixon's negative statements about his potential mitigation, his advisory attorneys described a large amount of mitigating evidence that

they and the rest of Dixon's defense team had collected. (R.T. 1/22/08, at 26-28.) Dixon dismissed this possible evidence, stating that he simply had no real mitigation, and that he saw no point in "wallow[ing] in spilled milk." (*Id.* at 29, 33.)

Clearly, despite the court's denial of his requested continuance, Dixon had a "substantial amount of mitigation" to present, including information about his "appreciation for the wrongfulness of his conduct, family instability, parental instability, mental disorders," and "mental health and substance issues." (R.T. 1/22/08, at 26-27.) Dixon's advisory defense team had obtained experts who were prepared to testify. (*Id.*) Even so, Dixon, who was competent to represent himself, communicated to the court that he thought that this proposed evidence had little value, and he did not want it presented. Thus, Dixon could not have been prejudiced by the court's denial of his continuance motion.

Dixon's claim that he was prejudiced because he could have presented evidence of his alcoholism, blackouts, and diminutive size at the time of the offense to show that he was blacked out during the offense or that he could not have strangled Deana because he was too small, is meritless. Dixon's advisory attorneys developed evidence related to Dixon's substance abuse problems, and Dixon was obviously aware of whether he had a substance abuse problem.

90

Nevertheless, Dixon chose not to present it.  (R.T. 1/22/08, at 26-27.)  And, Dixon's supposed inability to strangle Deana because of his size does not relate to mitigation, because the jury had already found Dixon guilty of strangling her.  This Court has repeatedly held that "[o]nce a person is found guilty beyond a reasonable doubt, claims of innocence or residual doubt do not constitute mitigation for sentencing purposes." *State v. Moore*, 222 Ariz. 1, ¶ 133, 213 P.3d 150, 171 (2009) (citing *Dann III*, 220 Ariz. at 375, ¶ 136, 207 P.3d at 628).

Dixon's case is not like *State v. Bocharski* (*Bocharski I*), 200 Ariz. 50, 59-60 ¶¶ 44-62, 22 P.3d 43, 52-53 (2001), where the defendant was repeatedly denied funding for his mitigation investigation.  There, after struggling to have his mitigation investigation funded, the defendant sent a letter to the judge stating that he wanted to be sentenced without his attorneys present, and he did not want any more motions made for funding for his mitigation because he was "done asking." *Bocharski*, 200 Ariz. at 60, ¶ 48, 22 P.3d at 53.  The trial judge became concerned that Bocharski's decision to end his mitigation investigation was based on the lack of funding. *Id.* at ¶ 52, 22 P.3d at 53.  Nevertheless, the judge expedited the case, accepted Bocharski's sudden waiver of further mitigating evidence, and sentenced him to death. *Id.* at 61, ¶¶ 58-62, 22 P.3d at 54.

Here, on the other hand, Dixon received funding and his defense team conducted an investigation that developed a substantial amount of mitigating evidence. (R.T. 1/22/08, at 26-27.) But, Dixon maintained that his mitigation would probably "never . . . be ready" and continued to request more time, even though his investigation was ongoing for nearly 5 years. (R.T. 1/17/08, Newman Transcript, at 9.) Unlike Bocharski, Dixon repeatedly stated that the mitigating evidence his attorneys had developed was of little value, could not be proven, and would likely be rebutted. (R.T. 1/16/08, at 13-14, 15-18; R.T. 1/22/08, at 28-29, 33-34.) Dixon was not forced to waive the presentation of mitigating evidence because he did not receive more time or funding to develop it. Rather, he consciously chose to limit his mitigation presentation.

## VI

### DIXON HAS FORFEITED HIS MERITLESS CLAIM THAT THE TRIAL COURT SHOULD HAVE PERMITTED HIM TO INTRODUCE PORTIONS OF DEANA'S DIARIES TO SHOW HER "STATE OF MIND" UNDER RULE 803(3).

Dixon contends that the trial court abused its discretion by not permitting him to question Michael Banes about portions of Deana's personal diary discussing a sexual assault of which she was apparently the victim when her family lived in Europe. (Opening Brief at 68.) Although he did not make this contention at trial, Dixon argues that the court should have allowed the questioning under Arizona Rule of Evidence 803(3), which "permits the

admission of a 'statement of the declarant's then existing state of mind . . . (such as intent, plan, [or] motive).'" (*Id.* at 72.)  Dixon contends that the information from Deana's diary was "relevant to refute the State's contention that Deana had been raped: she made an entry in her diaries that she would resist any attempt [sic] sexual assault," and was "particularly relevant" because the medical examiner testified that Deana suffered no "defensive wounds." (*Id.*)

Dixon also contends that the trial court abused its discretion when it ruled that Dixon could not question Michael Banes regarding the previous rape because it was not permitted under the "rape shield law," A.R.S. § 13-1421. (*Id.* at 72-73.)  Dixon argues that he did not seek to introduce the evidence to impugn Deana's chastity or character, but rather to show her "determination to fight back against anyone who attempted to make her a crime victim again." (*Id.*)

Dixon's arguments are meritless.  First, he has waived his claim that evidence related to a prior rape Deana suffered was admissible under Arizona Rule of Evidence 803(3) because he did not make this contention at trial. Dixon cannot prove fundamental error and resulting prejudice because the evidence was not admissible to show Deana's "state of mind," and because the evidence's relevance was wholly speculative.  Second, the trial court correctly

ruled that evidence of a prior sexual assault against Deana was irrelevant and inadmissible under A.R.S. § 13-1421.

## A.   RELEVANT FACTS AND PROCEDURE.

During his cross-examination of Deana's mother, Beulah, Dixon asked if she ever read "[Deana's] diary from the European experience," and Beulah responded that she had not. (R.T. 12/4/07, Kindle Transcript, at 29.)   The following day, the prosecutor objected to Dixon questioning witnesses about Deana's diaries, because they were irrelevant hearsay. (R.T. 12/5/07, at 4.)

Dixon responded that he wanted to ask Michael Banes whether he had first-hand knowledge of issues discussed in Deana's diaries. (*Id.* at 5.) The court informed Dixon that to have Banes "testify as to what somebody else who is unavailable to testify was thinking or writing" would be "classic hearsay." (*Id.*)   Dixon argued that Deana's diaries were "relevant to [his] defense," but did not contend that they fell under any hearsay exception. (*Id.* at 6.) Dixon wanted to ask Michael whether he knew about a trip that Deana took to Europe in 1975, where she was apparently raped, which prompted her to begin carrying a knife. (*Id.* at 6-7.) Dixon planned to refer to the rape as an "experience," and hoped that Michael would testify that Deana told him she would "use a knife if she was ever threatened or attacked again." (*Id.*)

The court reiterated that Dixon could not introduce evidence of Deana's sexual activity:

> We ruled under the rape shield law that her sexual activity or conduct is irrelevant, immaterial and specifically excluded by statute unless you can fit it into one of the narrowly defined exceptions under the rule. You haven't given me a reason why this should now come in. Whether you call it an experience, a rape, a molestation, whether you call it consensual activity, whatever you call it, it's still sexual conduct under the statute.

(*Id.*) The court told Dixon that he could "ask [Michael] if he knows whether [Deana] . . . carried a weapon," for personal protection, and Michael could "say yes or no." (*Id.* at 8.) If Michael "said yes, end of discussion." (*Id.*) The court clarified:

> You can't ask him why, because that . . . would get into the sexual conduct of the victim that's specifically been precluded. If he says no, you can't badger him with it and say, wait a minute, I have information that suggests that you're not telling the truth, because you can't get in that hearsay. But I will let you ask him if, as the person who was living with her most of the week, he knows whether she carried around the weapon for personal protection. I'll let you ask that.

(*Id.*)

During his cross-examination of Michael Banes, Dixon asked if Michael went to Europe with Deana in 1975. (*Id.* at 20.) Michael responded that he flew to Europe to visit Deana and her parents when they lived in Brussels. (*Id.* at 20-21.) The two traveled around Europe, and then Michael returned home.

95

(*Id.*)  When Dixon asked Michael if he knew whether Deana carried a folding knife in her handbag, Michael said that he could not recall.  (*Id.*)

**B.    STANDARD OF REVIEW.**

Although Dixon sought to question Michael about whether Deana carried a knife in her purse to fight back against sexual assaults, Dixon *never* argued that such information was admissible under Arizona Rule of Evidence 803(3) to prove Deana's state of mind (and consequently that, had Dixon's sex with Deana been non-consensual, she would have suffered defensive wounds). This Court thus reviews this aspect of Dixon's claim for fundamental error only.  *See State v. Detrich*, 188 Ariz. 57, 65, 932 P.2d 1328, 1336 (1997) (holding that a defendant must make a *specific objection*, contemporaneous with the alleged error, to preserve an issue for appeal).

This Court reviews the trial court's ruling that evidence related to a previous rape that Deana suffered was inadmissible under the "rape shield law," A.R.S. § 13-1421, for an abuse of discretion.  *See State v. Tankersley*, 191 Ariz. 359, 369, 956 P.2d 486, 496 (1998).

**C.    ARGUMENT.**

**1.    *The evidence was not admissible to prove Deana's "state of mind."***

Arizona Rule of Evidence 803(3) states that the following is not excluded by the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

To be admissible under the state of mind exception, the proposed testimony must "be connected to the declarant's state of mind at the time the statement was made and be relevant for a purpose independent from any prohibited use of hearsay." *State v. Fulminante*, 193 Ariz. 485, 495, ¶ 32, 975 P.2d 75, 85 (1999). The statement must also "describe declarant's present feeling or future intention rather than look backward, describing declarant's past memory or belief about another's conduct." *Id.* And, the statement must "be limited to a declaration showing the state of mind and not include a description of the factual occurrence that engendered that state of mind." *Id.* (citing *State v. Wood*, 180 Ariz. 53, 63, 881 P.2d 1158, 1168 (1994)).

A victim's state of mind is "only relevant when identity or the defense of accident, suicide or self-defense is raised." *State v. Christensen*, 129 Ariz. 32, 36, 628 P.2d 580, 584 (1981). Additionally, "the declarant's statement" must be "relevant to prove the state of mind, though not to prove the truth of any other facts included in the statement." *Fulminante*, 193 Ariz. at 495-96, ¶ 33, 975 P.2d at 85-86. The "state of mind itself" must be "relevant to an essential

element of the claim or defense," or "tend to prove relevant conduct of the declarant." *Id.* Thus, the hearsay evidence must "tend to prove the declarant's previous or subsequent actions rather than those of another person." *Id.* A statement related to a victim's state of mind cannot be used to show the *defendant's* state of mind. *See id.* (citing *United States v. Brown*, 490 F.2d 758, 774-80 (D.C. Cir. 1973)).  And, a declarant's "statement of memory or belief cannot be admitted to prove the conduct of another." *Fulminante*, 193 Ariz. at 497, ¶ 37, 975 P.2d at 87.

Dixon sought to introduce evidence that Deana was raped years before her murder, prompting her to begin carrying a knife in her purse.  (R.T. 12/5/07, at 5-21.)  Using Deana's diary as the basis for his questions, Dixon sought to ask Michael Banes whether Deana had ever expressed that she would fight back against sexual assaults. (*Id.*)  If Banes said no, or that he could not remember, Dixon hoped to question him regarding passages from the diary indicating that Deana wanted to fight back against future assaults. (*Id.*)

Dixon now contends that this evidence was relevant to prove Deana's "state of mind" during her rape and murder in 1978, which would prove that Dixon did not rape her, because had he raped her, she would have fought back against him with her knife, and would have suffered defensive wounds. (Opening Brief at 72-73.)

The trial court did not err by not admitting the evidence for this purpose. While the evidence from Deana's diary that Dixon sought to introduce may have described Deana's state of mind when she wrote the entries, it did not relate to her state of mind the night of her murder. *See Fulminante*, 193 Ariz. at 495, ¶ 32, 975 P.2d at 85 (to be admissible under state of mind exception, testimony must "be connected to the declarant's state of mind at the time the statement was made").

Dixon sought to use evidence of Deana's state of mind in 1975 to prove that, 3 years later, in 1978, because Deana failed to fight back against her attacker (or was unable to), Dixon's deposit of semen into her vagina was the result of consensual sex and he was thus not her rapist and murderer. But, evidence of a declarant's state of mind may *not* be used to show the subsequent actions of *another* person. *Fulminante*, 193 Ariz. at 495-96, ¶ 33, 975 P.2d at 85-86. Dixon thus could not have used evidence of Deana's 1975 state of mind to prove that *he* engaged in consensual sex with her in 1978. *See id.* And, under Rule 803(3), Dixon could not present evidence that a rape that occurred in 1975 prompted Deana to begin carrying a knife, since a statement of a declarant's state of mind is restricted to a "declaration showing the state of mind," and may "not include a description of the factual occurrence that

engendered that state of mind." *Fulminante*, 193 Ariz. at 495, ¶ 32, 975 P.2d at 85.

Furthermore, Dixon sought to use Deana's 1975 diary entries to prove that she *would* fight back against sexual attacks. Therefore, contrary to his contentions, Dixon sought to use Deana's statements to prove the truth of the matters asserted, which is prohibited by Rules of Evidence 801(c) and 802.

Perhaps most importantly, the relevance of Deana's diary was speculative. Any woman would hope to fight back against an attacker. Even if Deana carried a knife and intended to fight back against sexual assaults, obviously, in this instance, she was unable to. Her attacker took her by surprise and overpowered her. That she suffered no defensive wounds does not mean that she did not attempt to fend off the attack. Deana's supposed "state of mind" in 1975 was not relevant to the crime that Dixon committed in 1978, and the relevance that Dixon has concocted for it is speculative, since there is no evidence that Deana had the chance to attempt to fend off her attacker. The trial court did not err by excluding the evidence.

Additionally, Dixon cannot prove that he was prejudiced. *See Henderson*, 210 Ariz. at 568, ¶ 26, 115 P.3d at 608. The relevance and probative value of the proposed evidence was so speculative that it would not have affected the jury's decision.

## 2.  *Under the "rape shield law," the evidence was not admissible.*

Arizona's "rape shield law," A.R.S. § 13-1421, states that evidence relating to a "victim's reputation for chastity" and opinion evidence regarding a victim's chastity are not admissible in prosecutions for sexual offenses.  The statute allows evidence of "specific instances of the victim's prior sexual conduct" to be admitted only if:

> [A] judge finds the evidence is relevant and is material to a fact in issue in the case and that the inflammatory or prejudicial nature of the evidence does not outweigh the probative value of the evidence, and if the evidence is one of the following:
>
> 1.  Evidence of the victim's past sexual conduct with the defendant.
>
> 2.  Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease or trauma.
>
> 3.  Evidence that supports a claim that the victim has a motive in accusing the defendant of the crime.
>
> 4.  Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue.
>
> 5.  Evidence of false allegations of sexual misconduct made by the victim against others.

The statute is designed to "protect victims of rape from being exposed at trial to harassing or irrelevant questions concerning any past sexual behavior." *State v. Gilfillan*, 196 Ariz. 396, 400-01, ¶ 15, 998 P.2d 1069, 1073-74 (App.

2000).  The standard for admissibility of evidence under § 13-1421 is clear and convincing evidence.  A.R.S. § 13-1421(B).

The trial court correctly determined that evidence from Deana's diary that she was sexually assaulted in 1975 was not admissible.   Under A.R.S. § 13-1421, the court first had to determine that the evidence was relevant and "material to a fact in issue in the case."   Since the evidence dealt with a specific instance of Deana's "prior sexual conduct," it had to qualify for one of the statute's enumerated exceptions, and had to be proven by clear and convincing evidence.  A.R.S. § 13-1421(A) and (B).  Evidence that, 3 years before she was raped and murdered, Deana wrote in her diary that she had been sexually assaulted and intended to fight off any future attacker was not relevant to whether she was forcibly raped in 1978, and was not material to whether Dixon was her attacker.  The evidence fit into no exception under § 13-1421, and was not proven by clear and convincing evidence.  The diaries Dixon described were never authenticated, and they were inadmissible hearsay to which no exception applied.

Even if the trial court incorrectly found that the rape shield statute prohibited the evidence, any error was harmless.   *See State v. Anthony*, 218 Ariz. 439, 446, ¶¶ 39-41, 189 P.3d 366, 373 (2008) (error is harmless where the "guilty verdict actually rendered . . . was surely unattributable to the

error."). The evidence was irrelevant, inadmissible, speculative, and would not have altered the jury's verdict, since there was absolutely no evidence that Deana knew Dixon, Dixon lived in an apartment across the street and could have seen Deana coming home late at night from his complex, Dixon left his semen inside of Deana's vagina, and Deana was beaten, stabbed, and strangled to death.

## VII

### ON INDEPENDENT REVIEW, THIS COURT SHOULD FIND THAT DIXON'S MITIGATION WAS NOT SUFFICIENTLY SUBSTANTIAL TO CALL FOR LENIENCY.

Because Dixon murdered Deana before August 1, 2002, this Court independently reviews his death sentence. *See* A.R.S. § 13-755; *State v. Johnson*, 212 Ariz. 425, 438, ¶ 48, 133 P.3d 735, 748 (2006). For the reasons set forth below, this Court should find that Dixon's mitigation was not sufficiently substantial to warrant leniency and determine that the death penalty is appropriate.

### A.   STANDARD OF REVIEW.

This Court "independently determines 'if the mitigation is sufficiently substantial to warrant leniency in light of existing aggravation.'" *State v. Roseberry*, 210 Ariz. 360, 373, ¶ 77, 111 P.3d 402, 415 (2005) (quoting *State v. Greene*, 192 Ariz. 431, 434–44, ¶ 60, 967 P.2d 106, 118–19 (1998)); *see*

*also* A.R.S. § 13–755 ("On review, the supreme court shall independently review the trial court's findings of aggravation and mitigation and the propriety of the death sentence."). In so doing, this Court considers "'the quality and the strength, not simply the number, of aggravating and mitigating factors.'" *Roseberry*, 210 Ariz. at 374, ¶ 77, 111 P.3d at 416 (quoting *Greene*, 192 Ariz. at 443, ¶ 60, 967 P.2d at 118); *see also State v. Newell*, 212 Ariz. 389, 406, ¶ 82, 132 P.3d 833, 850 (2006).

Although this Court does not "'require that a [causal] nexus between the mitigating factors and the crime be established before [it] consider[s] the mitigation evidence,'" a defendant's "'failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence.'" *Johnson*, 212 Ariz. at 440, ¶ 65, 133 P.3d at 750 (quoting *Newell*, 212 Ariz. at 405, ¶ 82, 132 P.3d at 849); *see also State v. Roque*, 213 Ariz. 193, 231, ¶ 169, 141 P.3d 368, 406 (2006) (citing *Tennard v. Dretke*, 542 U.S. 274, 289 (2004), and *State v. Anderson (Anderson II)*, 210 Ariz. 327, 357, 111 P.3d 369, 399 (2005)).

If this Court finds "that an error was made regarding a finding of aggravation, it "shall independently determine if the mitigation . . . is sufficiently substantial to warrant leniency in light of the existing aggravation." *Newell*, 212 Ariz. at 405, ¶ 82, 132 P.3d at 849 (quoting A.R.S. § 13–755(B)).

If so, it must impose a life sentence; if not, it is "required to affirm the death sentence." *Id.*

**B.    AGGRAVATING CIRCUMSTANCES.**

**1.    *Dixon concedes the A.R.S. § 13-751(F)(1) aggravating factor.***

Dixon acknowledges that he "was serving a life sentence for another offense" at the time of Deana's murder, and thus "cannot argue that he had no prior conviction." (Opening Brief at 77.)   Additionally, the State introduced evidence that Dixon had prior felony convictions for aggravated assault; kidnapping; sexual abuse; and four counts of sexual assault.  (R.T. 1/16/08, at 67-69; Trial Exhibits 31.001 and 31.002; R.T. 1/17/08, Archibeque Transcript, at 24-26.)   All seven felony convictions arose from Dixon's rape of Andrea Salazar, committed on June 10, 1985.  (R.T. 1/17/08, Archibeque Transcript, at 26.)  The State proved the (F)(1) aggravating factor beyond a reasonable doubt.

**2.    *Overwhelming evidence established that Deana's murder was especially cruel and especially heinous under the A.R.S. § 13-751(F)(6) aggravating factor.***

Dixon contends that Deana's death was neither especially cruel nor especially heinous because Deana "experienced only brief physical pain and possible mental anguish before she fell into unconsciousness." (Opening Brief at 78.)  Dixon argues that "death came quickly," but concedes that Deana was conscious for "one minute to one and one-half minutes." (*Id.* at 79.)  Dixon

presents no argument as to why Deana's death was not especially heinous. Dixon's arguments are meritless, because it is clear that Deana consciously suffered both mental and physical pain before her death, and that the murder was "hatefully or shockingly evil" and "grossly bad."

### a. The murder was especially cruel.

To prove cruelty, the State must prove "that the manner of death caused the victim to suffer mental and physical anguish and the defendant knew or should have known that suffering would occur." *State v. Kuhs*, No. CR-07-0301-AP, 2010 WL 624016, at *11, ¶ 62 (Ariz. Feb. 24, 2010). Cruelty involves "pain and distress" to the victim and "may be found when the victim 'consciously experienced physical or mental pain prior to death.'" *State v. Kiles*, 222 Ariz. 25, ¶ 65, 213 P.3d 174, 188 (2009). Mental anguish can support an especially cruel finding where the victim "experienced significant uncertainty as to her ultimate fate." *State v. Ellison*, 213 Ariz. 116, 142, ¶ 120, 140 P.3d 899, 925 (2006).

This Court has held that "a period of suffering from eighteen seconds to two or three minutes can be enough to warrant application of the cruelty aggravator." *State v. Schackart*, 190 Ariz. 238, 248, 947 P.2d 315, 325 (1997). While this Court has held that not all stranglings are *per se* cruel, it has noted that a "[p]roper analysis requires [the Court] to examine the totality of

106

circumstances surrounding the murder and not just the final act that killed the victim." *Id.*

In *State v. McCray*, 218 Ariz. 252, 255, ¶¶ 2-6, 183 P.3d 503, 506 (2008), a case similar to Dixon's, the defendant raped his victim, strangled her to death, and was caught years later through DNA testing. Along with the (F)(2) aggravating factor, the jury found the (F)(6) aggravating factor. *Id.* at 259, ¶¶ 28-29, 183 P.3d at 510. On independent review, this Court found the (F)(6) aggravating factor proven because the victim "was conscious during a substantial part of the 'murder transaction,'" and suffered "intense physical pain and mental anguish during that time." *Id.* at 259, ¶ 33, 183 P.3d at 510. This Court also held that the defendant "should have known that attacking, raping, and strangling [the victim] would cause her severe physical and mental pain." *Id.*

Here, evidence from trial showed that Dixon—a stranger who lived across the street—saw Deana coming home in the early morning hours, accosted her with a knife, and forced her into her apartment and onto her bed. (R.T. 12/5/07, at 78-81; R.T. 12/11/07, Masciola Transcript, at 67-72.) Dixon held Deana tightly by her wrists, punched her in her face, and raped her. (R.T. 12/5/07, at 78-81; R.T. 12/10/07, Dawson Transcript, at 24-25, 54-57; R.T. 12/12/07, at 93-94; R.T. 12/13/07, at 83-86.) After he was finished raping her,

Dixon either allowed Deana to dress or dressed her.  (R.T. 12/5/07, at 76-81.)
At some point during the attack, a neighbor overheard a man and woman
arguing, a woman screaming, and then noted that the screaming stopped.  (R.T.
1/8/08, Masciola Transcript, at 16-17.)  Rather than leaving after the rape,
Dixon strangled Deana with his hands and with a belt that belonged to her.
(R.T. 12/10/07, Dawson Transcript, at 24-33.)   Deana died from the
combination of manual and ligature strangulation.  (*Id.* at 33.)

During the aggravation hearing, Dr. Keen noted that Deana suffered a
black eye, which resulted from being hit, and which would have caused
physical pain because of the nerve endings in the eye area.  (R.T. 1/16/08, at
38-39.)  Keen testified that the blow to the eye did *not* immediately render
Deana unconscious or dead.  (*Id.* at 39.)

Dr. Keen noted that Deana was also manually strangled.  (*Id.* at 40.)
This strangulation would have caused physical pain because of the "pressure
effect," and because of the "psychological as well as neurological response,"
including "anxiety because of the discomfort that's occurring."  (*Id.*)  Keen
stated that Deana would have suffered discomfort until she lost consciousness
from the airway restriction.  (*Id.* at 41-42.)  He explained that Deana could
have screamed during a portion of the strangulation, but eventually would have
become unable to.  (*Id.* at 42-43.)

Keen also noted that Dixon applied ligature strangulation—the belt. (*Id.* at 43-44.)  With the combination of manual and ligature strangulation, Deana was likely conscious and suffering for 4 to 5 minutes while Dixon strangled her. (*Id.*)  If Deana died from the manual strangulation, she would have been conscious for at least 1 to 1 and ½ minutes during the strangulation. (*Id.* at 56-57.)  The scratch mark on the side of Deana's neck indicated that she attempted to remove the belt as Dixon strangled her, and was thus conscious during the attack. (*Id.* at 44.)  Additionally, Keen noted that "[i]ndividuals who are not drugged and are not unconscious and are in this kind of a situation will always resist." (*Id.*)  Dr. Keen also observed that Deana urinated on herself and the bed during the attack, possibly from fear. (*Id.* at 47-48.)

The evidence adduced during the guilt and aggravation phases showed that Deana was conscious before and during the rape, when Dixon punched her in the face, and as Dixon strangled her.  Deana indisputably suffered both mental and physical anguish throughout the attack, and, as in *McCray*, Dixon should have known that attacking, raping, and strangling Deana would cause her "severe physical and mental pain."  *McCray*, 218 Ariz. at 259, ¶ 33, 183 P.3d at 510.

Contrary to Dixon's arguments, this Court has never required that specific "attendant circumstances" be present in addition to the victim's

physical and mental suffering to establish the (F)(6) aggravating factor.   The State proved the (F)(6) aggravating factor beyond a reasonable doubt.

### b.      The murder was heinous.

The term "heinous" focuses on the defendant's state of mind at the time of the offense, as reflected in his words and actions.  *Schackart*, 190 Ariz. at 249, 947 P.2d at 326 (citing *Amaya-Ruiz*, 166 Ariz. at 178, 800 P.2d at 1286); *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983).   An especially heinous murder is "hatefully or shockingly evil" and "grossly bad."   *Id.*; *see also State v. Murdaugh*, 209 Ariz. 19, 31, ¶ 59, 97 P.3d 844, 856 (2004).   This Court listed the factors to be considered in determining whether a murder was especially heinous (or depraved) in *Gretzler*, 135 Ariz. at 51-52, 659 P.2d at 10-11: (1) relishing; (2) gratuitous violence; (3) mutilation; (4) senselessness; and (5) helplessness.[2]  *Schackart*, 190 Ariz. at 249, 947 P.2d at 326.   Not all of those factors must be present to find that a killing was especially heinous or depraved.  *Murdaugh*, 209 Ariz. at 31, ¶ 59, 97 P.3d at 856.

The evidence proved that Deana's murder involved gratuitous violence and/or mutilation, that the killing was senseless, and that she was a helpless victim.

---

[2] The jury found the murder especially cruel and especially heinous, but could not reach a unanimous decision on depravity.

Gratuitous violence "occurs when the defendant uses violence in addition to that necessary to kill and intends to inflict such violence." *State v. Bearup*, 221 Ariz. 163, 173, ¶ 52, 211 P.3d 684, 694 (2009). It "may be demonstrated by the continued infliction of violence after the defendant knew or should have known that a fatal action had occurred." *Id.* Mutilation "requires an act separate and distinct from the killing itself, committed with the intent to mutilate the victim's corpse." *State v. Bocharski (Bocharski II)*, 218 Ariz. 476, 492-93, ¶ 84, 189 P.3d 403, 419-20 (2008).

Dr. Keen testified that Deana died from a combination of manual and ligature strangulation. (R.T. 1/16/08, at 45-46.) Either *after* Deana's death, or when she was "not quite dead but almost dead," Dixon stabbed Deana in the chest with a knife that penetrated 4 to 5 inches into her body. (*Id.* at 49, 58.) In that same time frame—after Deana's death or as she was "almost dead"—Dixon stabbed Deana in the abdomen with a *separate* instrument—possibly an awl or ice pick—also penetrating 4 to 5 inches into her body. (*Id.* at 50-51, 58.) Thus, after Deana was dead or appeared dead, Dixon utilized two separate, new weapons—apart from his hands and the belt used to strangle her—to stab and cut her body. It would have been evident to Dixon that Deana was dead, as she had stopped struggling and breathing. Dixon's continued infliction of violence upon Deana was gratuitous. *See Bocharski II*, 218 Ariz.

111

at 494, ¶ 87, 189 P.3d at 421 ("A showing that a defendant continued to inflict violence after he knew or should have known that a fatal action had occurred provides essential evidence of the defendant's intent to inflict gratuitous violence."). Moreover, Dixon's purposeless stabbing of Deana's body with two separate sharp instruments constituted mutilation. *See State v. Jimenez*, 165 Ariz. 444, 455, 799 P.2d 785, 796 (1990) (finding (F)(6) aggravating factor proven where defendant "needlessly mutilated the victim's body with numerous post-mortem stab wounds, indicating the use of gratuitous violence.").

A murder is "senseless" when it is "unnecessary for the defendant to achieve his objective." *Murdaugh*, 209 Ariz. at 32, ¶ 65, 97 P.3d at 857. Dixon's objective was rape. Despite this, after completing the rape, Dixon murdered Deana for no apparent reason. *See State v. Lopez*, 175 Ariz. 407, 412, 857 P.2d 1261, 1266 (1993) ("Although the defendant clearly intended to kill the victim, there was no reason to do so. The sexual assault could have been committed without the murder, and no other reason for the killing is apparent from the record. Nothing in the record suggests that the defendant and the victim knew each other or had any prior contact."). Deana's murder was clearly "senseless."

A victim is "helpless" when, for example, she is "unable to resist." *State v. Hampton*, 213 Ariz. 167, 176, ¶¶ 37-39, 140 P.3d 950, 959 (2006). Dixon accosted Deana with a knife early in the morning when she was alone. (R.T. 12/5/07, at 78-81; R.T. 12/11/07, Masciola Transcript, at 67-72.) He isolated her in her apartment, raped her, held her wrists so she could not escape, placed a belt around her neck, and strangled her with his hands and the belt. (R.T. 12/5/07, at 76-81; R.T. 12/10/07, Dawson Transcript, at 24-33, 54-57; R.T. 12/12/07, at 93-94; R.T. 12/13/07, at 83-86.) Deana was "helpless."

Because Deana's murder was especially cruel and especially heinous, this Court should affirm the jury's finding of the (F)(6) aggravating factor.

## C.   DIXON'S MITIGATION IS NOT SUFFICIENTLY SUBSTANTIAL TO CALL FOR LENIENCY.

Dixon raised only one, non-statutory mitigating factor, which paled in comparison to the "compelling aggravating circumstances" the State proved. *Newell*, 212 Ariz. at 406, ¶ 87, 132 P.3d at 850. In light of the violent rape that Dixon committed of Andrea Salazar after he evaded capture in this case, and the extremely cruel and heinous manner in which Dixon murdered Deana, this Court should conclude that the mitigation is not sufficiently substantial to call for leniency.

### 1.   *Dixon's mitigating evidence.*

Dixon presented one witness—James Aiken, the head of a "prison

consulting concern"—for mitigation purposes, who testified that Dixon could be managed in prison. (R.T. 1/23/08, at 30-50.) Aiken stated that Dixon had only been involved in one altercation during his approximately 20 year imprisonment. (*Id.* at 49-50.) On cross-examination, however, Aiken admitted that he did not review records from the Maricopa County Jail, where Dixon had resided since 2002, and where he committed several infractions. (*Id.* at 60.)

Dixon now contends that, if his mitigation investigation had not been "truncated by the trial court into virtual nonexistence," he would have introduced evidence that he "suffered from alcohol-induced blackouts" at the time of Deana's murder. (Opening Brief at 79.)

During his allocution, Dixon denied responsibility for Deana's murder, stating, "I'm not going to show any remorse because I don't believe I did it," and, "you don't see any remorse from me." (R.T. 1/24/08, at 25.) Dixon said that he felt "sorry" for Deana's family, and told the jury that he had already been punished for Deana's murder because he received life imprisonment for raping Andrea Salazar. (*Id.* at 26.)

## 2.    *The State's rebuttal evidence.*

Kimberly Carroll, a forensic psychologist who reviewed Dixon's prison and jail records, testified in rebuttal. (R.T. 1/23/08, at 88-93.) Carroll noted a number of recent incidents from Dixon's jail records. (*Id.* at 100-04.) On May

27, 2003, officers found a razor blade removed from a pencil sharpener hidden in Dixon's cell. (*Id.* at 103.) On December 29, 2006, Dixon removed another razor blade from his issued razor and hid it in his cell. (*Id.* at 101-02.) On January 22, 2007, officers found a razor blade hidden in Dixon's legal paperwork. (*Id.* at 102-03.) On May 8, 2006, Dixon called a jail sergeant an "asshole." (*Id.* at 103.) On May 24, 2007, Dixon got into an argument with another inmate and broke his cell window. (*Id.*) With regard to the razor blades that Dixon repeatedly concealed in his cell, Carroll noted that jail inmates routinely used razor blades to cut and injure others. (*Id.* at 104.)

Carroll also reviewed Dixon's Department of Corrections (DOC) records. (*Id.* at 107-08.) Between February 13, 1991 and February 21, 1991, Dixon approached a female DOC officer in the kitchen and told her that she was "being foolish for acting brave," because "someone might hurt her." (*Id.* at 109.) Dixon told the guard that he would not mind "doing more time" if he hurt her, and that he would "like to try to see her kick his butt." (*Id.*) When told that he would end up in lockdown, Dixon said he did not care. (*Id.*)

Later the same week, in the kitchen, the same female officer observed Dixon cutting carrots to look like penises and placing them on the counter in the officer's view. (*Id.* at 109-10.) When the officer approached, Dixon knocked the carrots down. (*Id.*)

115

On June 22, 1992, Dixon approached another female DOC officer and requested to ask her a "hypothetical question." (*Id.* at 108.) Dixon then asked, "If you weren't married, would you sit on an inmate's lap?" (*Id.*)

Carroll noted a number of other incidents during which Dixon refused to follow prison guards' orders. (*Id.* at 115-17.) Based on Dixon's behavior while in jail and prison, Carroll concluded that Dixon was a potentially violent prisoner. (*Id.*)

### 3. *Dixon's de minimis mitigation is insufficiently substantial to call for leniency.*

Dixon's mitigation focused solely on his supposedly good behavior in prison and one witness's belief that Dixon could be managed there. This Court has stated that "[e]vidence that a defendant will be a 'model prisoner' provides non-statutory mitigation." *State v. McGill*, 213 Ariz. 147, 162, ¶ 66, 140 P.3d 930, 945 (2006). However, evidence established that Dixon was *not* a model prisoner—he hoarded razorblades, fought with other inmates, damaged jail property, threatened female DOC officers, and demonstrated demented, sexually perverse behavior towards female officers. (R.T. 1/23/08, at 88-117.) Furthermore, this Court "accords this mitigating factor minimal weight because of the expectation that prisoners behave in prison." *Kiles*, 222 Ariz. at 25, ¶ 89, 213 P.3d at 191.

Dixon's contentions that, had the trial court given him more time to prepare his mitigation, he would have introduced evidence that he suffered from alcohol-induced blackouts are meritless. Dixon's advisory attorneys told the court they had developed mitigation relating to Dixon's supposed substance abuse problems. (R.T. 1/22/08, at 26-32.) Despite this, Dixon stated he did not want to "wallow in spilled milk," that his mitigation could not be proven because no one knew about his alcoholism, and that he did not believe that he had any mitigation. (*Id.* at 28-35.) Dixon repeatedly requested more time for investigation, but declared that his mitigation would "never be ready." (R.T. 1/17/08, Newman Transcript, at 8.) Dixon knowingly chose not to present evidence of his supposed alcoholism and blackouts. *Cf. Schriro v. Landrigan*, 127 S.Ct. 1933, 1942-44 (2007) (holding that defendant's attorneys were not required to investigate and present additional mitigating evidence where defendant repeatedly stated that he did not want it presented).

**D.     THE DEATH PENALTY IS APPROPRIATE.**

As set forth above, the aggravation in this case was strong and Dixon's mitigation is entitled to little weight. This Court should find that Dixon's mitigation is not sufficiently substantial to call for leniency, and uphold Dixon's death sentence.

# VIII

## ARGUMENTS PRESERVED FOR FURTHER REVIEW.

Dixon raises 21 constitutional challenges to his sentence of death to preserve them for further review in the federal courts, acknowledging that this Court has previously rejected each of these claims. Because Dixon has given this Court no reasons to re-address its previous decisions, the Court should deny these claims. *See Anderson II*, 210 Ariz. at 59, ¶ 147, 111 P.3d at 401 ("Anderson raises fourteen other constitutional challenges to preserve them for review in the federal courts. He acknowledges that each has been rejected by this Court, but invites the Court to revisit its jurisprudence . . . In the absence of any argument why our prior decisions should be overturned, we will not re–address those decisions here.").

## CONCLUSION

Based on the foregoing authorities and arguments, Appellee respectfully requests that this Court affirm the judgment and sentence of the trial court.

Respectfully submitted,

Terry Goddard, Attorney General

Kent E. Cattani, Chief Counsel
Criminal Appeals/
Capital Litigation Section

/s/_____
Melissa A. Parham
Assistant Attorney General

Attorneys for APPELLEE

## CERTIFICATE OF SERVICE

TWO COPIES of this Brief were deposited for mailing this 17th day of March, 2010, to:

Bruce Peterson, Legal Advocate
Consuelo M. Ohanesian
Deputy Legal Advocate
3800 N. Central Ave., Suite 1500
Phoenix, Az  85012

Attorney for APPELLANT

/s/_____
L. Wright
Legal Secretary
Capital Litigation Section
1275 West Washington
Phoenix, Arizona  85007–2997

626268

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 31.13, Arizona Rules of Criminal Procedure, undersigned counsel certifies that this brief is double spaced, uses a 14-point proportionately-spaced typeface, and contains 27,994 words.

/s/_____
Melissa A. Parham
Assistant Attorney General

# Submission Received

Your filing has been submitted successfully to our system.
Your ACE Submission ID is **2253** received on **3/17/2010 3:32:11 PM** MST.
A copy of this confirmation is being sent to the email address:
**melissa.parham@azag.gov**
Upon Clerk Review, an acceptance or rejection notification will be sent to the same email address.
We recommend you print a copy for your records.


**What would you like to do next?**

      


If you have any questions about your filing, please contact **e-Filing Support:**
602-452-3519