1  **WO**

2

3

4

5

6           **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

8

9  Clarence Wayne Dixon,                   No. CV-14-258-PHX-DJH

10                 Petitioner,             **ORDER**

11  v.                                     <u>DEATH PENALTY CASE</u>

12  Charles L. Ryan, et al.,

13                 Respondents.

14

15         Clarence Dixon is an Arizona death row inmate. Before the Court is Dixon's

16  petition for writ of habeas corpus. (Doc. 27.) Respondents filed an answer to the petition,

17  and Dixon filed a reply. (Docs. 36, 39.) Also before the Court is Dixon's motion for

18  evidentiary development, which Respondents oppose. (Docs. 49, 55.) For the reasons set

19  forth below, the Court concludes that Dixon is not entitled to habeas relief or evidentiary

20  development.

21                      **I.  BACKGROUND**

22         In 2008, Dixon was convicted of first-degree murder and sentenced to death for

23  the 1978 murder of Deana Bowdoin. The following facts surrounding the crime are taken

24  from the opinion of the Arizona Supreme Court upholding the conviction and sentence.

25  *State v. Dixon*, 226 Ariz. 545, 548–49, 250 P.3d 1174, 1177–78 (2011).

26         On January 6, 1978, Deana, a 21-year-old Arizona State University senior, had

27  dinner with her parents and then went to a nearby bar to meet a female friend. The two

28  arrived at the bar at 9:00 p.m. and stayed until approximately 12:30 a.m., when Deana

told her friend she was going home. She drove away alone.

Deana and her boyfriend, Michael Banes, lived together in Tempe. He returned to their apartment at about 2:00 a.m. after spending the evening with his brother and found Deana dead on the bed. She had been strangled with a belt and stabbed several times.

Investigators found semen in Deana's vagina and on her underwear, but could not match the resulting DNA profile to any suspect until 2001, when a police detective checked the profile against a national database and found that it matched that of Clarence Dixon, an Arizona prison inmate. His DNA was on file due to a 1985 rape conviction.[1]

Dixon was initially charged with first-degree murder, under both premeditation and felony murder theories, and rape in the first degree. The rape charge was dropped as outside the statute of limitations.

Dixon chose to represent himself at trial, with the assistance of advisory counsel. The jury found that he had committed both premeditated and felony murder. At sentencing, the jury found two aggravating factors: that Dixon had previously been convicted of a crime punishable by life imprisonment, A.R.S. § 13–751(F)(1), and that the murder was especially cruel and heinous, A.R.S. § 13–751(F)(6). The jury then determined that Dixon should be sentenced to death.

The Arizona Supreme Court affirmed Dixon's conviction and sentence on appeal. *Dixon*, 226 Ariz. 545, 250 P.3d 1174.

In his state post-conviction relief ("PCR") proceeding, Dixon, now represented by counsel, raised three claims: (1) the state supreme court should not have affirmed his death sentence on independent review; (2) his pre-trial counsel provided constitutionally ineffective assistance by failing to challenge Dixon's competency to waive counsel; and (3) advisory counsel provided ineffective assistance. The PCR court rejected the claims and the Arizona Supreme Court denied review on February 11, 2014.

---

[1] While on probation for a 1978 assault and burglary, Dixon kidnapped and sexually assaulted a Northern Arizona University ("NAU") student at knifepoint. *See State v. Dixon*, 153 Ariz. 151, 152, 735 P.2d 761, 762 (1987). He was sentenced to seven consecutive 25-years-to-life sentences. *Id.*

1
2

## II.  APPLICABLE LAW

3         Because it was filed after April 24, 1996, this case is governed by the

4 Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254

5 ("§ 2254).[2] *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *see also Woodford v. Garceau*,

6 538 U.S. 202, 210 (2003).

7 **A.     Exhaustion and Procedural Default**

8         Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears

9 that the petitioner has exhausted all available state court remedies. 28 U.S.C. §

10 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*,

11 455 U.S. 509 (1982). To exhaust state remedies, the petitioner must "fairly present" his

12 claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v.*

13 *Boerckel*, 526 U.S. 838, 848 (1999).

14         A claim is fairly presented if the petitioner has described the operative facts and

15 the federal legal theory on which his claim is based. *Anderson v. Harless*, 459 U.S. 4, 6

16 (1982); *Picard v. Connor*, 404 U.S. 270, 277–78 (1971). A petitioner must clearly alert

17 the state court that he is alleging a specific federal constitutional violation. *See Casey v.*

18 *Moore*, 386 F.3d 896, 913 (9th Cir. 2004).

19         In Arizona, there are two procedurally appropriate avenues for petitioners to

20 exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the

21 Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a

22 petitioner is precluded from relief on any claim that could have been raised on appeal or

23 in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3).

24         A habeas petitioner's claims may be precluded from federal review in two ways.

25 First, a claim may be procedurally defaulted in federal court if it was actually raised in

26 state court but found by that court to be defaulted on state procedural grounds. *Coleman*,

27         _____

28         [2] Petitioner's challenge to the constitutionality of the AEDPA is meritless. *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that AEDPA violates neither the Suspension Clause nor separation of powers).

501 U.S. at 729–30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998).

As a general matter, the Court will not review the merits of a procedurally defaulted claim unless the petitioner demonstrates legitimate cause for his failure to exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

Because "[t]here is no constitutional right to an attorney in state post-conviction proceedings . . . a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman*, 501 U.S. at 752 (internal citations omitted). Consequently, any ineffectiveness of PCR counsel will ordinarily not establish cause to excuse a procedural default.

However, as discussed in more detail below, the Supreme Court has recognized a "narrow exception" to *Coleman*'s procedural default principle: "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012). The Ninth Circuit has expanded *Martinez* to include procedurally defaulted claims of ineffective assistance of appellate counsel. *Nguyen v. Curry*, 736 F.3d 1287, 1294–96 (9th Cir. 2013).

**B.      Standard for Habeas Relief**

Pursuant to 28 U.S.C. § 2254(d), a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

- 4 -

1

2

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3

4

5

6

7

8

9

10

11

12

13

14

15

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *(Terry) Williams v. Taylor*, 529 U.S. 362, 410 (2000). In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court clarified that under § 2254(d), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101. Accordingly, to obtain habeas relief, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see Frost v. Pryor*, 749 F.3d 1212, 1225–26 (10th Cir. 2014) ("[I]f all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable. . . . If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.").

16

17

18

19

20

21

22

23

24

25

26

27

With respect to § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice v. Collins*, 546 U.S. 333, 341–342 (2006); *see Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (explaining that on habeas review a court cannot find the state court made an unreasonable determination of the facts simply because it would reverse in similar circumstances if the case came before it on direct appeal).

28

To find that a factual determination is unreasonable under § 2254(d)(2), the court

1

2

must be "convinced that an appellate panel, applying the normal standards of appellate

3

review, could not reasonably conclude that the finding is supported by the record."

4

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). "This is a daunting standard—one

that will be satisfied in relatively few cases." *Id.*

5

6

"[R]eview under § 2254(d)(1) is limited to the record that was before the state

7

court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181

8

(2011) (holding that "the record under review is limited to the record in existence at that

9

same time, *i.e.* the record before the state court"); *see Murray v. Schriro*, 745 F.3d 984,

10

998 (9th Cir. 2014) ("Along with the significant deference AEDPA requires us to afford

state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely

11

on in the normal course of discharging our responsibilities under § 2254(d)(1)."). The

12

Ninth Circuit has observed that "*Pinholster* and the statutory text make clear that this

13

evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*,

14

738 F.3d 976, 993 n.6 (2013) (citing § 2254(d)(2) and *Pinholster*, 563 U.S. at 185 n.7).

15

Therefore, as the court explained in *Gulbrandson*:

16

> for claims that were adjudicated on the merits in state court, petitioners can
> rely only on the record before the state court in order to satisfy the
17
> requirements of § 2254(d). This effectively precludes federal evidentiary
> hearings for such claims because the evidence adduced during habeas
18
> proceedings in federal court could not be considered in evaluating whether
> the claim meets the requirements of § 2254(d).
19

20

*Id.* at 993–94.

21

The relevant state court decision is the last reasoned state decision regarding a

22

claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v.*

23

*Nunnemaker*, 501 U.S. 797, 803–04 (1991)).

24

Finally, a federal habeas court may reject a claim on the merits without reaching

25

the question of exhaustion. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of

26

habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to

27

exhaust the remedies available in the courts of the State."); *Rhines v. Weber*, 544 U.S.

28

269, 277 (2005) (a stay is inappropriate in federal court to allow claims to be raised in state court if they are subject to dismissal under §2254 (b)(2) as "plainly meritless").

### III.  DISCUSSION OF CLAIMS

Dixon raises thirty-six claims in his habeas petition, a number of which contain several subclaims. (Doc. 27.) Twenty-two of the claims were raised, in whole or in part, in state court. The remaining claims and subclaims are raised for the first time here.

**A.     Claims 1–4**

Underlying Claims 1–4 is Dixon's contention that he was not competent to be tried, to waive counsel, or to waive the presentation of mitigating evidence. Underlying Dixon's alleged incompetence are events that occurred thirty years before his trial.

In 1977 Dixon was arrested and charged with assault with a deadly weapon after striking a teenage girl with a metal pipe. Pursuant to Rule 11 of the Arizona Rules of Criminal Procedure, the trial court appointed two psychiatrists, Drs. Otto Bendheim and Maier Tuchler, to evaluate Dixon. (PCR Pet., Appx. F.) Both found he was not competent to stand trial and suggested a diagnosis of "undifferentiated schizophrenia." (*Id*.) Based on these reports, on September 14, 1977, Maricopa County Superior Judge Sandra O'Connor found Dixon incompetent and committed him to the Arizona State Hospital. (*Id*. Appx. M.)

On October 26, 1977, psychiatrist Dr. John Marchildon reported that Dixon was now competent to stand trial. (*Id*. Appx. L.) Dr. Marchildon found that Dixon's "mental condition substantially differs at this time with that described by" Tuchler and Bendheim. (*Id*.) Dr. Marchildon's assessment noted:

> Affect is appropriate. Mood is neutral, with some evidence of apprehension. General information and vocabulary are above average. He is animated and spontaneous. Memory for recent and remote events is satisfactory. There is no evidence of confusion or retardation. Hallucinations and delusions are denied. Insight and judgment are satisfactory.

(*Id*.)

- 7 -

Dr. Marchildon found no evidence of mental illness. He concluded that Dixon understood the charges and the nature of the legal proceedings. (*Id*.) He noted that Dixon's "hospital stay has been uneventful. He has participated in psychotherapeutic sessions, has received no neuroleptic drugs, and has displayed no behavior or ideation which would indicate mental illness." (*Id*.)

On December 5, 1977, Dixon appeared before Judge O'Connor, waived his right to a jury trial, and agreed that the case could be determined on the record. (*See id*. App. M.) On January 5, 1978, Judge O'Connor found Dixon "not guilty by reason of insanity." (*Id*.) The Court ordered that Dixon remain released pending civil proceedings. (*Id*.) Dixon murdered Deana less than two days later.

A second basis for allegations of incompetence is Dixon's so-called "perseveration" and "delusional conduct" concerning a particular legal issue arising from the 1985 rape case. This issue involved Dixon's theory that NAU officers lacked the statutory authority to investigate the case; therefore, according to Dixon, his prior conviction was "fundamentally flawed" and the DNA comparison made pursuant to his invalid conviction should be suppressed. (*See* ROA 143 at 8, 9.)[3] In his motion to the trial court, Dixon noted that his argument regarding the lack of statutory authority to investigate was rejected in the 1985 proceedings; he also listed other instances in which he had raised the claim and it had been denied. (*Id*. at 3–4.) Dixon was convinced, however, that the issue was never "fully and correctly adjudicated." (*Id*. at 9.)

### 1.   Claim 1

Dixon alleges that he received ineffective assistance of trial counsel when his lawyer failed to challenge Dixon's competency to stand trial and to waive counsel. (Doc. 27 at 43.) The PCR court denied this claim on the merits. (ME 7/2/13.)[4]

#### a.   *Background*

---

[3] "ROA" refers to the record on appeal from Dixon's trial and sentencing (Case No. CR-08-0025-AP).

[4] "ME" refers to the minute entries of the state court.

The Maricopa County Public Defender's Office initially represented Dixon. His case was assigned to Vikki Liles, who was joined by Garrett Simpson as second chair in July 2005. Liles objected to court-ordered testing of Dixon's IQ and to a pre-screening evaluation for competency and sanity. (ROA 35, 36.) At a hearing in April 2004, Liles reiterated that Dixon would not participate in an IQ test or a competency examination. (ME 4/16/03.) Liles told the court, however, that Dixon's mental health needed to be investigated for a possible insanity defense and as a potential mitigating circumstance. (RT 4/16/03.)[5] On September 25, 2003, Liles filed a Notice of Possible Insanity Defense. (ROA 68.) In April 2005, however, Liles informed the court that Dixon would not offer an insanity defense. (ME 4/15/05.)

In February 2006, Simpson replaced Liles as lead counsel. He drafted a Motion to Dismiss, arguing that Dixon's sanity had not been restored at the time of the murder. (*See* PCR Pet., Ex. E)  Thereafter, Dixon moved to waive counsel. (ROA 131.) The court granted the motion after a colloquy with Dixon. (RT 3/16/06; ME 3/16/06.) Simpson was appointed as advisory counsel. (ME 3/23/06.)

In his PCR petition, Dixon alleged that Simpson performed ineffectively by failing to challenge Dixon's competency to waive counsel. (PCR Pet. at 10.) He contended that Simpson was on notice of Dixon's lack of competence based on his knowledge of the 1977 Rule 11 exams and not guilty by reason of insanity verdict ("NGRI"), and because of Dixon's "perseveration" on the "NAU issue." (*Id.*)

During the PCR proceedings, Dr. John Toma performed a "full neuropsychological and psychological evaluation" of Dixon. In his report, dated June 30, 2012, Dr. Toma diagnosed Dixon with schizophrenia, paranoid type. (PCR Pet., Appx. A at 24.) According to Dr. Toma, Dixon "was clearly not capable of representing himself and his competence to proceed should have been questioned, especially given the fact

---

[5] "RT" refers to the court reporter's transcript.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that he was not treated for his psychiatric disorder, the main symptom of which is paranoid ideation." (*Id.*)

b.    *Ineffective Assistance of Counsel*

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes,* 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook,* 558 U.S. 4 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

With respect to *Strickland*'s second prong, a defendant must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the Court explained in *Richter*:

> Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." [*Strickland*, 466 U.S.] at 689. The

- 10 -

1
2
3
question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. [*Id.*] at 690.

4
5
6
7
8
9
10
Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

11
12
13
*Id.* (additional citations omitted); *see Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (discussing "doubly deferential judicial review that applies to a *Strickland* claim under the § 2254(d)(1) standard").

14
    *c.    Analysis*

15
16
17
18
19
20
21
In rejecting this claim during the PCR proceedings, Judge Andrew Klein, who also presided over Dixon's trial, explained that at the time Dixon waived counsel the court was aware of the 1977 Rule 11 proceedings and NGRI verdict, as well as the fact that Dixon's counsel were contemplating an insanity defense in this trial. (ME 7/2/13 at 5.) As Judge Klein explained, "this Court was in possession of information that placed Defendant's mental health at issue. . . . Defendant's counsel could not have been ineffective in failing to give the Court information it already had." (*Id.*)

22
23
24
25
Judge Klein Court further noted that Dixon "was adamant that he would not submit to [a competency evaluation]." (*Id.*) In an affidavit prepared in 2013, Simpson likewise attested that "Dixon was vehemently opposed" to "seeking a determination of competency."[6] (PCR Pet., Appx. C at 2, ¶ 7.)

26

27
28
      [6] Simpson also stated in his affidavit that he had initially prepared the motion to dismiss based on the 1978 insanity verdict, but before he could speak with Dixon's counsel on the 1977 case, the attorney was quoted in a local publication as having stated

As a basis for his conclusion that Dixon was not incompetent, Judge Klein also discussed his first-hand impressions of Dixon:

> This Court has a history with this Defendant before the March 16, 2006 hearing on the waiver of counsel and remembers him well. During Defendant's previous appearances, the Court had ample opportunity to observe Defendant, speak with him, and review his written work product. At all times, the Court found Defendant to be able to adequately advance his positions, he was cogent in his thought processes, lucid in argument, and always able to respond to all questions with appropriate answers. At no time did Defendant appear to this Court to be anything but reasoned in his approach.

(ME 7/2/13 at 6.) Finally, the court noted that the record did not contain evidence of mental health issues following the NGRI verdict:

> Twenty-seven years elapsed between the date of the murder and the date of the March 2006 hearing on Defendant's competence to intelligently, knowingly and voluntarily waive counsel and to proceed *pro se*. Defendant makes no suggestion that either his competency or his sanity were of concern in proceedings related to the intervening crimes in Maricopa County (late 1978 court proceedings) or in Coconino County (1985 court proceedings; 1987 appellate decision) notwithstanding the early-1978 NGRI finding. Moreover, Defendant provides no evidence that he required treatment for the mental illness or that it interfered with his functioning.

(*Id.* at 12.)

The court concluded that Simpson "did not act unreasonably in failing to challenge Defendant's competency before he was allowed to waive counsel, nor was his performance deficient at any point during his representation." (*Id.* at 7.) The court's ruling was neither contrary to nor based on an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d).

---

that Dixon was not mentally ill and had "conned" Judge O'Connor. (*Id.* at ¶¶ 5–6.) Simpson spoke with the attorney, who "maintained that he made no such statements," but nonetheless Simpson "felt compelled to move to withdraw" as advisory counsel. (*Id.* at ¶ 6.) Simpson also attested that Dixon was "adamant that he did not want to be characterized as insane or mentally ill. I should have seen this as a symptom of his illness but I did not." (*Id.* at ¶ 7.)

1

2    A criminal defendant has a Sixth Amendment right to waive counsel and conduct

3    his own defense. *Faretta v. California*, 422 U.S. 806, 819 (1975). However, he may not

4    waive his right to counsel unless he does so "competently and intelligently." *Godinez v.*

5    *Moran*, 509 U.S. 389, 396 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938)).

6    The standard for determining competency to waive counsel is the same as the standard

7    for competency to be tried. *Id.* at 399. It requires that a defendant have (1) "'a rational as

8    well as factual understanding of the proceedings against him,' and (2) 'sufficient present

9    ability to consult with his lawyer with a reasonable degree of rational understanding.'"

10   *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011) (quoting *Dusky v. United States*, 362

11   U.S. 402, 402 (1960) (per curiam)). Whether a defendant is capable of understanding the

12   proceedings and assisting counsel is dependent upon evidence of the defendant's

13   irrational behavior, his demeanor in court, and any prior medical opinions on his

14   competence. *Drope v. Missouri*, 420 U.S. 162, 180 (1975).

15   "A claim that counsel was deficient for failing to move for a competency hearing

16   will succeed only when there are sufficient indicia of incompetence to give objectively

17   reasonable counsel reason to doubt defendant's competency, and there is a reasonable

18   probability that the defendant would have been found incompetent to stand trial had the

19   issue been raised and fully considered." *Hibbler v. Benedetti*, 693 F.3d 1140, 1149–50

20   (9th Cir. 2012) (quotations omitted).  Dixon can make neither showing.

21   First, there were not sufficient indicia of incompetence to give Simpson reason to

22   doubt Dixon's competence. The fact that Dixon had a distant history of mental health

23   problems was not in itself sufficient to show that he was incompetent to waive counsel.

24   *See Hoffman v. Arave*, 455 F.3d 926, 938 (9th Cir. 2006) ("We have held that those with

25   mental deficiencies are not necessarily incompetent to stand trial."), *vacated on other*

26   *grounds by Arave v. Hoffman*, 552 U.S. 117, 117–19 (2008) (per curiam)); *United States*

27   *v. Garza*, 751 F.3d 1130, 1135–37 (9th Cir. 2014) (finding no need for competency

28   hearing where defendant was diagnosed with anxiety and dementia but his behavior, in

and out of court, was not erratic and there was no clear connection between any mental

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

disease and a failure on defendant's part to understand the proceedings or assist in his own defense); *Boyde v. Brown*, 404 F.3d 1159, 1166–67 (9th Cir. 2005) (finding inmate's "major depression" and "paranoid delusions" did not raise a doubt regarding his competence to stand trial). Dixon was initially found incompetent to stand trial for the 1977 assault. Six weeks later, after hospitalization and treatment, he showed no signs of mental illness and was found competent. Apart from these events thirty years ago, with which the trial judge was already familiar, there was not a significant history of mental illness that Simpson failed to bring to the court's attention.

Finally, Dixon's obsession with the NAU suppression motion was not so bizarre as to suggest incompetence. "Criminal defendants often insist on asserting defenses with little basis in the law, particularly where, as here, there is substantial evidence of their guilt," but "adherence to bizarre legal theories" does not imply incompetence. *United States v. Jonassen*, 759 F.3d 653, 660 (7th Cir. 2014) (noting defendant's "persistent assertion of a sovereign-citizen defense"); *see United States v. Kerr*, 752 F.3d 206, 217-18 (2d Cir.), *as amended* (June 18, 2014) ("Kerr's obsession with his defensive theories, his distrust of his attorneys, and his belligerent attitude were also not so bizarre as to require the district court to question his competency for a second time."). "[P]ersons of unquestioned competence have espoused ludicrous legal positions," *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003), "but the articulation of unusual legal beliefs is a far cry from incompetence." *United States v. Alden*, 527 F.3d 653, 659–60 (7th Cir. 2008) (explaining that defendant's "obsession with irrelevant issues and his paranoia and distrust of the criminal justice system" did not imply mental shortcomings requiring a competence hearing).

Apart from the NAU suppression issue, Dixon has failed to identify an instance in which he behaved irrationally, appeared not to understand the proceedings, or did not communicate effectively with counsel. *See Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir. 1988) (rejecting ineffective assistance of counsel claim when defendant made only "conclusory allegations that he was incompetent to stand trial" and gave "no concrete

examples suggesting that at the time of his trial he did not have the ability to consult with his lawyer or he did not understand the proceedings against him."); *Stanley*, 633 F.3d at 863 (finding that state court reasonably rejected prisoner's ineffective assistance claim where the record contained "insufficient evidence of [the prisoner's] incompetence during the guilt phase to justify a conclusion that defense counsel were ineffective in failing to move for competency proceedings.").

Second, there was not a reasonable probability that Dixon would have been found incompetent even if counsel had raised the issue. *Hibbler*, 693 F.3d at 1149–50. As an initial matter, Dixon was adamant that he did not want to be evaluated for competency. *See Douglas v. Woodford*, 316 F.3d 1079, 1086 (9th Cir. 2003) (explaining that counsel "did not err by failing to obtain further testing, as [counsel] could not secure such testing without his client's cooperation"). In addition, Judge Klein was familiar with Dixon's past mental health issues, but having interacted with Dixon through several years of court proceedings, he observed no indications of incompetence. Under these circumstances, it is difficult to see how a competency examination would have been ordered even if Simpson had requested one. As discussed below, there is no reasonable probability that Dixon would have been found incompetent if he had undergone an evaluation.

The PCR court's rejection of this claim satisfies neither § 2254(d)(1) nor (2). A "reasonable argument" could be made that Simpson "satisfied *Strickland*'s deferential standard." *Richter*, 566 U.S. at 105; *see Hibbler*, 693 F.3d at 1150. The PCR court's factual determinations were not objectively unreasonable in light of the state court record. *See Taylor*, 366 F.3d at 1000; *Hibbler*, 693 F.3d at 1149. Claim 1 is therefore denied.

2.    Claims 2 and 3

In Claim 2, Dixon alleges that that he was tried and sentenced while legally incompetent. (Doc. 27 at 54.) Claim 3 consists of two allegations: that the trial court (A) "erred when it found [Dixon] competent to waive counsel and represent himself" and (B) "abdicated its obligation . . . to ascertain whether Dixon was competent to stand trial, despite the fact that considerable evidence was before the court he was not." (*Id.* at 61,

66.) Dixon did not raise Claims 2 or 3(B) in state court. He raised Claim 3(A), which the PCR court denied on the merits. (ME 7/2/13 at 7.)

      *a.*    *Background*

On March 16, 2006, the trial court conducted a hearing on Dixon's request to waive counsel. The court first inquired why Dixon wished to represent himself. (RT 3/16/03 at 3−4.) Dixon explained that it involved a disagreement about a motion counsel did not feel she could legally or ethically file. (*Id.* at 4.)

The trial court warned Dixon that if he represented himself he would be held to the standards of a lawyer. (*Id.*) The court also noted there would be a significant delay in beginning the trial. (*Id.*) Dixon acknowledged there were over 3,000 documents that he needed to review. (*Id.*) He would also have to read the rules of criminal procedure and find a textbook on trial procedure and preparation. (*Id.* at 6.)

The court nevertheless explained that in setting a trial date it would have to balance competing interests, including those of the victims and the State, and might ultimately select a date when Dixon did not feel he was ready. (*Id.*) Dixon stated he was aware of that, but indicated that he was hindered in preparing for trial by the inefficiency of Inmate Legal Services. (*Id.*) The court explained that Dixon would not be afforded greater freedoms than other inmates and would not get everything he requested simply because he represented himself. (*Id.* at 6−7.) Dixon stated that he understood. (*Id.* at 7.)

Dixon told the court he had fourteen years of education, that he read and understood the English language, and that the only medication he had taken in the last twenty-four hours were "[a]sprin, ibuprofen, and that's it." (*Id.* at 7−8.) He told the court that he had not taken any psychotropic medications or anything that prevented him from understanding what the court was stating. (*Id.* at 8.) When asked if he had ever been in a Rule 11 proceeding for mental problems, Dixon responded that he had, "way back in 1977." (*Id.*) The court inquired further:

> THE COURT: Okay. But since then have you had any kind of mental problems that would prevent you from having a trial, that you're aware of?

THE DEFENDANT: No, I'm not.

THE COURT: Okay. And let me ask counsel if you know of any in your evaluation that would make this court's decision as to whether to grant the waiver of right to counsel in jeopardy.

[SIMPSON]: Not that I'm aware of.

(*Id.*)

The court told Dixon that "an attorney can be of great benefit to you" and there were "some significant dangers and disadvantages to representing yourself." (*Id.* at 9.) Dixon responded "I'm aware that a fool, a fool has himself for a client, yes." (*Id.* at 10.)

The court responded, "Not that you're a fool or anyone is a fool, but I have yet to see someone represent himself in this court and fare better than I think he or she would have done had they had a lawyer." (*Id.*) Dixon understood that in choosing to represent himself, he may have decreased his chance of success at trial. (*Id.*)

The court reiterated that Dixon had the right to an attorney who would represent him at all critical stages of trial. (*Id.*) Dixon said he understood. (*Id.*) The court asked Dixon whether he was aware that he was charged "with the most serious of crimes imaginable." (*Id.*) Dixon stated that he was. (*Id.*)

The court instructed the prosecutor to read the indictment to Dixon. (*Id.* at 11.) Dixon stated that he understood the charges and potential sentences. (*Id.* at 11−12.)

Dixon also indicated that he understood that if he were allowed to represent himself, he would have "sole responsibility for [his] defense, introducing witnesses, doing investigation, doing legal research, filing and arguing motions, examining and cross-examining witnesses, giving opening statement and final argument to the jury," and that because of his custody status he would have more difficulty investigating the case than attorneys would. (*Id.* at 12−13.) The court again explained Dixon would be held to the same standard as an attorney. (*Id.* at 13.) Dixon said he understood. (*Id.*) The court explained that "this type of case is probably the most complex of all criminal cases"; that the law is "complicated," "unsettled," and "constantly evolving"; that trying the case

- 17 -

required knowledge of both case law and statutory authority; and that the trial would involve numerous witnesses and exhibits. (*Id*. at 13−14.) Dixon stated that he was "aware of all that." (*Id*. at 14.)

Dixon was also aware that in a capital case two certified lawyers are typically appointed to represent the defendant. (*Id.*) The court explained that if Dixon were given advisory counsel, "their job is not to try your case" or "give you advice," but to "assist you as needed." (*Id*.) Dixon acknowledged that if he represented himself, he "[bore] all responsibilities." (*Id.*)

Dixon understood that he could change his mind about self-representation "at any time." (*Id.* at 15.) He also understood that if he misbehaved or violated the rules, the court could have a lawyer take over the case. (*Id*. at 15−16.)

When asked if he had any questions about anything he had discussed with the court, Dixon replied "No, your Honor. I believe you'll be fair and impartial in this case." (*Id*. at 16.) The court then gave Dixon time to read the written waiver. (*Id*.) Dixon read the waiver, told the court he understood, and then signed it. (*Id*. at 17.)

The court gave Dixon's counsel and the prosecutor the opportunity to make a record. (*Id.*) Neither suggested there was any reason to doubt Dixon's competency. (*Id.* at 17–18.)

Based upon Dixon's answers, the avowals of counsel, and the totality of the circumstances, the trial court expressly found that Dixon had made a knowing, intelligent, and voluntary waiver of his right to counsel and was competent to represent himself. (*Id*. at 21−22.)

    *b.*    *Analysis: Claim 3(A)*

With respect to Claim 3(A), the PCR court, citing *Godinez*, 509 U.S. at 399–400, and *Dusky*, 362 U.S. at 402, found that Petitioner was competent and that his waiver of counsel was "knowing, voluntary, and intelligent." (*Id.*) This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

The PCR court stated that under *Godinez* "the competency standard for waiving the right to counsel is the same as the competency standard for standing trial." (*Id.*) Dixon asserts that the standards for competency to be tried and competency for self-representation diverged with the Supreme Court's opinion in *Indiana v. Edwards*, 554 U.S. 164 (2008). In *Edwards*, the Court held that the Constitution "permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." 554 U.S. at 178. The Court explained that a defendant who is otherwise able to satisfy the *Dusky* competence standard may nevertheless be "unable to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 175–76. Accordingly, a court is permitted, but not required, to appoint counsel for a "gray area" defendant. *Edwards*, 554 U.S. at 175. The Ninth Circuit has interpreted *Edwards* as holding that "[t]he standard for a defendant's mental competence to stand trial is now different from the standard for a defendant's mental competence to represent himself or herself at trial." *United States v. Ferguson*, 560 F.3d 1060, 1068 (9th Cir. 2009).

While noting that a "higher standard" applies to assessing a defendant's competency for self-representation, compared to the competency to stand trial or to waive counsel, the Court in *Edwards* expressly declined to adopt a "specific standard" to determine when a defendant lacks the mental capacity to defend himself. 554 U.S. at 172–76, 178. The Court noted that the trial judge "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.* at 176.

Even under a "higher" standard, Dixon was competent to represent himself. As the PCR court made clear, Dixon was able to carry out the basic tasks needed to present his own defense. His behavior at trial was not "decidedly bizarre," nor did he do "absolutely nothing" to defend himself at trial and sentencing. *Ferguson*, 560 F.3d 1068–69 (remanding to determine applicability of *Edwards*). Instead, Dixon was clearly "aware of

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

what was occurring" and "participated extensively throughout his trial." *United States v. Thompson*, 587 F.3d 1165, 1173 (9th Cir. 2009); *see United States v. Johnson*, 610 F.3d 1138, 1146 (9th Cir. 2010) (finding district court did not err in concluding that defendants were competent to represent themselves, noting the "defendants gave opening statements, testified, examined and cross-examined witnesses, challenged jury instructions, and delivered closing arguments of significant length").

In arguing that the trial court erred in finding he was competent to represent himself, Dixon again relies on the 1977 Rule 11 reports and NGRI verdict and his persistent pursuit of the NAU suppression issue. As already discussed, however, Judge Klein was aware of these issues at the time he found Dixon competent to waive counsel and represent himself.

Dixon also cites Dr. Toma's report from 2012, which opined that Dixon "was clearly not capable of representing himself and his competence to proceed should have been questioned." (PCR Pet., App. A. at 24.) Dr. Toma's opinion was formed four years after Dixon's trial. Judge Klein, who observed Dixon while presiding over pretrial and trial proceedings, "was in the best position to observe [Dixon's] behavior and to make the determination that [he] had the mental capacity to represent [himself]." *Johnson*, 610 F.3d at 1146; *see Edwards*, 554 U.S. at 177.

In his decision denying this claim during the PCR proceedings, the court noted that Dixon displayed no signs that he was not competent to represent himself. Judge Klein explained:

> [T]his Court had the opportunity to read the Defendant's motions, listen to his arguments, and to observe his behavior and demeanor at numerous *pro se* appearances during the pretrial and trial phases. Based on those observations, this Court concluded that Defendant's thoughts and actions demonstrated coherent and rational behavior.
>
> Defendant, concerned about whether he could represent himself, requested multiple continuances, subsequently asked for hybrid representation during the trial when complicated DNA evidence was being presented, and expressed often on the record his frustration with jail

facilities, access to records and research, and communications with advisory counsel. All of these actions demonstrated appropriate and logical conduct on Defendant's part.

The Court's observation about Defendant's competence over a 2½ year time period, including the nearly 3 months of concentrated trial time, have been borne out over the intervening years as Defendant, to the Court's knowledge, has not been placed on medication, there is no evidence that he suffered from delusions (other than comments Defendant made during a neuropsychological evaluation more than <u>four years post-trial</u>), there was no psychiatric intervention, and he was able to write lucid pleadings.

(ME 7/2/13 at 6–7.)

On habeas review, a state court's determination that the petitioner was competent is entitled to a presumption of correctness unless that determination is rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Torres v. Prunty*, 223 F.3d 1103, 1110 n. 6 (9th Cir. 2000). In *Demonsthenes v. Baal*, 495 U.S. 731, 735 (1990), the Supreme Court reiterated that a state court's conclusion regarding a defendant's competency is a factual determination that is entitled to a presumption of correctness. *Id.* (citing *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam)); *Evans v. Raines*, 800 F.2d 884, 887 (9th Cir. 1986).

Based on the facts discussed above, and supported by this Court's review of the state court record, including the pretrial and trial transcripts, the PCR court's determination that Dixon was competent to waive counsel was not an unreasonable determination of the facts pursuant to § 2254(d)(2), *Maggio v. Fulford*, 462 U.S. at 117, nor was it contrary to or an unreasonable application of clearly established federal law under § 2254(d)(1). Claim 3(A) is denied.

c.    *Analysis: Claims 2 and 3(B)*

As noted, Dixon did not raise these claims in state court, so they are procedurally defaulted. Dixon asserts that under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), the ineffective assistance of his PCR counsel constitutes cause and prejudice to excuse the default. Dixon is incorrect. *Martinez* held that "[i]nadequate assistance of counsel at

- 21 -

1
2
3
4
5
6
7
8
9
10

initial-review collateral proceedings may establish cause for a prisoner's procedural default of *a claim of ineffective assistance at trial*." *Martinez*, 132 S. Ct. at 1315 (emphasis added). *Martinez* applies only to ineffective assistance of trial or, in the Ninth Circuit, appellate counsel. It has not been expanded to other types of claims. *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015) (explaining that the Ninth Circuit has "not allowed petitioners to substantially expand the scope of *Martinez* beyond the circumstances present in *Martinez*"); *Hunton v. Sinclair,* 732 F.3d 1124, 1126–27 (9th Cir. 2013) (denying petitioner's claim that *Martinez* permitted the resuscitation of a procedurally defaulted *Brady* claim, holding that only the Supreme Court could expand the application of *Martinez* to other areas).

11
12
13
14
15
16

Because Claims 2 and 3(B) do not allege ineffective assistance of trial or appellate counsel, their default cannot be excused under *Martinez*. Because Dixon does not show cause for his default of either claim in state court, or a fundamental miscarriage of justice, the claims are barred from federal review. The claims are also meritless because, as discussed above, the trial court adequately addressed the issue of Dixon's competence and reasonably determined that he was competent to stand trial and represent himself.

17

    <u>3.</u>   <u>Claim 4</u>

18
19
20
21
22
23
24
25
26

Dixon alleges that his Sixth and Fourteenth Amendment rights were violated when advisory counsel failed to raise the issue of his competency with the trial court. (Doc. 27 at 69.) The PCR court rejected this claim on the merits. (ME 7/2/13 at 8–9.) The court explained that Dixon, having voluntarily and intelligently waived counsel, had "no constitutional right to challenge the advice or services provided by advisory counsel." (*Id.* at 8.) The court further determined that even if such a right existed, there was no ineffective assistance of advisory counsel because the court was already aware of Dixon's mental health issues. (*Id.* at 9.) This decision does not entitle Dixon to relief under § 2254(d).

27
28

After the trial court found Dixon competent and accepted his waiver of counsel, it appointed Simpson to serve as advisory counsel. After Simpson withdrew, the court

appointed attorneys Kenneth Countryman and Nathaniel Carr III as advisory counsel. They did not raise the issue of Dixon's competence.

Once a court has determined that a defendant's waiver of his right to counsel is knowing and intelligent, it may appoint standby or "advisory" counsel to assist the defendant without infringing on his right to self-representation. *McKaskle v. Wiggins*, 465 U.S. 168, 176–77 (1984). It is well established, however, that "a defendant who waives his right to counsel does not have a right to advisory counsel." *United States v. Moreland*, 622 F.3d 1147, 1155 (9th Cir. 2010); *see United States v. Mendez-Sanchez*, 563 F.3d 935, 947 (9th Cir. 2009) (noting that "under our established precedent there is no right to the assistance of standby counsel"); *Simpson v. Battaglia*, 458 F.3d 585, 597 (7th Cir. 2006) ("Certainly there is no Supreme Court precedent clearly establishing such a right."). Accordingly, if a defendant elects to waive counsel, but the court nonetheless appoints stand-by or advisory counsel, there is no constitutional right to effective assistance from waived counsel. *See Wilson v. Parker*, 515 F.3d 682, 697 (6th Cir. 2008) ("Logically, a defendant cannot waive his right to counsel and then complain about the quality of his own defense."). In *Simpson*, for example, the petitioner argued that stand-by counsel performed ineffectively by failing to assist him in the mitigation phase of his capital sentencing. 458 F.3d at 597. The Seventh Circuit affirmed the district court's denial of the claim, explaining that "the inadequacy of standby counsel's performance . . . cannot give rise to an ineffective assistance of counsel claim under the Sixth Amendment." *Id.*

Dixon nonetheless contends that one of the roles of advisory counsel is to monitor the defendant's competence and step in if he becomes incompetent to waive counsel. Dixon alleges that Countryman and Carr performed ineffectively in that role. As described above, however, there were no significant indications that Dixon was incompetent, nor were there issues concerning his mental health of which the judge was unaware. Advisory counsel did not perform ineffectively in failing to raise the issue of Dixon's competence.

The PCR court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Claim 4 is denied.

**B.     Claim 5**

Dixon alleges that the trial court violated the *Ex Post Facto* Clause and Dixon's right to due process and a fair trial when it retroactively applied law that permitted the victim of the 1985 rape to testify at trial. (Doc. 27 at 78.)

In 1985, Dixon raped a 21-year-old college student at knifepoint. Following an evidentiary hearing, the court allowed the victim to testify at Dixon's murder trial pursuant to Rule 404(c) of the Arizona Rules of Evidence, which provides:

> In a criminal case in which a defendant is charged with having committed a sexual offense, or a civil case in which a claim is predicated on a party's alleged commission of a sexual offense, evidence of other crimes, wrongs, or acts may be admitted by the court if relevant to show that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the offense charged.

In 2005, the Rule was amended to expand the definition of "sexual offense" to include first-degree felony murder where the predicate felony involved a sexual offense. Ariz. R. Evid. 404(c)(4). This amendment made the Rule applicable to Dixon's case, despite the fact that the rape charge had been dismissed. Dixon argues that applying the amended rule resulted in an *ex post facto* violation.

In denying Dixon's motion to preclude the victim's testimony, the trial court held that because Rule 404(c) was a rule of evidence, it applied retroactively to Dixon's case. The court explained:

> It is axiomatic that evidentiary rule changes do not constitute substantive changes in the law such that they can be applied prospectively only. Rather, they generally are viewed as procedural changes that apply to all proceedings as of the date of the change. Accordingly, the amendment to rule 404(c)(4) is applicable to this case. *See, State v. Steelman*, 120 Ariz. 301, 585 P.2d 1213 (1978), where the Arizona Supreme Court held that constitutional prohibitions ex post facto do not apply to changes in rules of evidence, whether statutory or court-made.

1

2      (ROA 128 at 2.)

3          Dixon did not raise this claim on appeal. Although it is procedurally defaulted,

4      Respondents ask the Court to dismiss the claim pursuant to 28 U.S.C. § 2254(b)(2) ("An

5      application for a writ of habeas corpus may be denied on the merits, notwithstanding the

6      failure of the applicant to exhaust the remedies available in the courts of the State."). The

7      Court agrees that the claim can be denied as "plainly meritless." *Rhines v. Weber*, 544

8      U.S. 269, 277 (2005).

9          The *Ex Post Facto* Clause provides that "no State shall . . . pass any . . . ex post

10     facto Law." U.S. Const. art. I, § 10, cl. 1. The Clause prohibits the legislative enactment

11     of any law that "changes the punishment, and inflicts a greater punishment, than the law

12     annexed to the crime, when committed." *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001)

13     (quoting *Calder v. Bull*, 3 Dall. 386, 1 L.Ed. 648 (1798)); *see Schroeder v. Tilton*, 493

14     F.3d 1083, 1087 (9th Cir. 2007) (explaining clause prohibits "states from enacting laws

15     that criminalize an act already performed"). "When examining a rule of evidence to

16     determine if it violates this prohibition, courts examine whether the evidentiary rule

17     'affect[s] the quantum of evidence sufficient to convict' the defendant." *Doe v. Busby*,

18     661 F.3d 1001, 1023 (9th Cir. 2011) (quoting *Schroeder*, 493 F.3d at 1088); *see Carmell

19     v. Texas*, 529 U.S. 513, 530 (2000).

20         Applying the amended Rule 404(c) at Dixon's trial was not an *ex post facto*

21     violation. The expanded definition of sexual offense "merely permitted the admission of

22     a type of evidence that was previously excluded for the purpose of showing propensity."

23     *Id.* (finding no *ex post facto* violation where state court retroactively applied rule

24     allowing evidence of prior domestic abuse). The amended Rule "does not alter the

25     quantum of evidence needed to convict a defendant." *Id.* Therefore, the use of the

26     evidence at Dixon's trial did not violate the *Ex Post Facto* Clause. Claim 5 is denied as

27     plainly meritless.

28     . . . .

1

2

**C.    Claim 6**

Dixon alleges that his Sixth and Fourteenth Amendment rights were violated when

3

the trial court ordered him to conduct his trial with a leg restraint and stun belt without

4

conducting the proper inquiry to determine the necessity of such restraints. (Doc. 27 at

5

98.) The Arizona Supreme Court rejected the claim on direct appeal.

6

1.    Facts

7

At a pretrial conference the court directed Dixon not to approach the bench during

8

trial while the jury was in the courtroom. The court explained that Dixon would be

9

prejudiced if the jury saw him "walking in a very stilted fashion" because it was

10

"possible some intelligent juror could figure out you're being shackled." (RT 11/01/07 at

11

37.) The court further explained: "You will have leg braces and also a stun belt on. That's

12

for security purposes. The leg braces are a common customary practice for all in-custody

13

defendants when they are dressed out." (*Id.* at 37.)

14

Dixon objected to the court's ruling, arguing that wearing the restraints "severely

15

hampers my ability to defend myself" by limiting his "body language." (*Id.* at 39.) He

16

asked the court to consider eliminating the leg brace since he was also wearing a stun

17

belt. The court responded: "No. Not going to happen. That's jail policy. . . . [Y]ou have to

18

understand there are security policies for all in-custody defendants who dress out in

19

civilian clothes. And I'm not making an exception for you." (*Id.* at 40–41.)

20

At a subsequent pretrial conference, Dixon again asked the court to remove the leg

21

brace. (RT 11/13/07 at 10.) The court repeated its view of the issue:

22

> That's a jail security issue and I have told you this before. You're not being
> treated any differently than any other defendant who comes to this court
> who is in custody but dressed out in civilian clothes. You're not being
> given different treatment at all. That's a jail policy. It's also security policy.
> You're on trial for extremely serious crimes. The Court needs to be
> concerned that you not try to escape or run, and for those reasons, all in-
> custody defendants who are dressed out are in leg braces.

23

24

25

26

27

(*Id.* at 10–11.)

28

In a written motion, Dixon argued that having to remain seated would impede his

- 26 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

efforts to communicate with the jury using "the spoken word accompanied by positive body language." (ROA 257 at 3.) The court ultimately ruled that Dixon could approach the podium but warned him he was doing so despite the possibility that the jury could draw negative inferences. (RT 11/13/07 at 11.) The court reaffirmed its ruling on leg braces, again citing jail policy. (RT 11/14/08 at 3.) The court repeated that "[e]very in-custody defendant who is dressed out in this court for trial, no matter what kind of trial, from a capital trial to a class 6 felony, does wear leg braces under their clothes. . . . [s]o that is a policy, and I'm simply choosing to treat you the same way." (*Id.* at 4.)

As the Arizona Supreme Court noted, the trial court "repeatedly took steps to prevent the jury from seeing the leg brace and stun belt." *Dixon*, 226 Ariz. at 551, 250 P.3d at 1180. The court arranged for Dixon to be standing at the podium when the jury entered the courtroom and reminded him outside the jury's presence not to allow the jury to see him walking. (RT 1/24/08 at 21.) The court also told Dixon several times not to turn his back to the jury and bend over, because doing so might show the outline of the stun belt under his shirt. (*Id.*; RT 12/17/07 at 16.)

    2.   Analysis

On direct appeal, Dixon argued that the trial court's requirement that he wear a stun belt and a leg brace violated his right to a fair trial under *Deck v. Missouri*, 544 U.S. 622 (2005), which holds that the Due Process Clause forbids the routine use of physical restraints visible to the jury. The Arizona Supreme Court rejected Dixon's arguments. *Dixon*, 226 Ariz. at 552, 250 P.3d at 1181. Dixon alleges that the court unreasonably applied Supreme Court precedent, that it unreasonably determined the facts in light of the record, and that the "shackling" error had a substantial influence on the verdict. (Doc. 27 at 108–10.)

The Arizona Supreme Court recognized that the trial court erred by citing only jail policy as the justification for the restraints and failing to make a particularized finding of the need for security measures. *Dixon*, 226 Ariz. at 552, 250 P.3d at 1181. It reiterated that "judges should not simply defer to jail policy in ordering restraints of defendants.

1

2

Rather, they should determine on a case-by-case basis whether security measures are

3

required as to the particular defendant before them." *Id*. at 551–52, 250 P.3d at 1180–81.

4

Accordingly, "[b]efore authorizing visible restraints, the trial court must make a 'case

5

specific' determination reflecting 'particular concerns, say, special security needs or

6

escape risks, related to the defendant on trial.'" *Id*. at 551, 250 P.3d at 1180 (quoting

7

*Deck*, 544 U.S. at 633.)

8

With respect to the leg braces, the court found no violation of *Deck* because the

9

braces were not visible. *Id*. at 552, 250 P.3d at 1181. The court noted that "the reported

10

decisions correctly treat a leg brace worn under clothing as not visible in the absence of

11

evidence to the contrary. There is no evidence here that the jury either saw the brace or

12

inferred that Dixon wore one." *Id*. In reviewing the stun belt issue for fundamental error,

the court again found that Dixon failed to show the belt was visible to the jury.[7] *Id*.

13

14

Finally, the court found that even if the restraints were visible, the error was

harmless given the DNA evidence and the circumstances of the murder:

15

16

> To conclude that Dixon had not committed the murder, the jury would have had to accept that Deana agreed, in the ninety minutes between the time she left the bar and was found dead, to have had sex with Dixon, apparently a complete stranger, and that after Dixon left her apartment, another person entered the apartment, strangled and stabbed her.

17

18

19

*Id*.

20

Dixon contends that the Arizona Supreme Court's rejection of this claim "was

21

based on an inaccurate recitation of the facts and an unreasonable application of federal

22

law." (Doc. 27 at 107.) Dixon alleges that the court erred by finding that the restraints

23

were not seen by the jury. (*Id*. at 108.) He states that "[t]hroughout trial, both the stun belt

24

and the leg brace were visible to the jury." (*Id*. 102.) As Respondents note, however, in

25

support of this statement Dixon asserts only that "[o]n numerous occasions, the court

26

27

28

---

[7] Because Dixon objected to wearing the leg brace, but never objected to the stun belt, the Arizona Supreme Court analyzed the issue under the fundamental error standard of review. *Id*. at 551, 250 P.3d at 1180.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

noted that the *stun belt* was visible to the jury." (*Id.*) (emphasis added). Dixon does not contend that the jurors actually saw the leg brace.

The Court also agrees with Respondents that "the passages Dixon cites as supporting the jurors seeing the stun belt, do not establish that the jurors actually recognized the stun belt as a restraining device." (Doc. 36 at 50.) Instead, they show only that the court was aware that the outline of the belt could become visible to jurors from certain angles:

> THE COURT: Would you tell Mr. Dixon to not turn his back to the jury because you can see the outline of the stun belt, especially when he bends over? It's one thing to have his back to you guys, but I just noticed him bending over and he was turning and I could see it. I don't think the jury could, but the more he turns the outline is visible.
>
> So if he wants to look for documents, which is fine, don't do it with his back turned to them while he's bending over.
>
> MR. COUNTRYMAN: Okay. I told him that three or four times during the course of this trial, just to make sure he does not move round, because like the last time we were here, his shirt was a little small. So I've told him that a couple of times. I'll tell him again.
>
> . . . .
>
> THE COURT: Mr. Dixon, one of the things I want to tell you, I mentioned to your advisory counsel during the break, when you turn your back to the jury and bend over, the outline of the stun belt is easily seen.
>
> You need to be aware of that because, although I don't think the jury knows what it is, I don't want them to start questioning.
>
> So if you want to speak to your lawyers, do it in a way that your back is not facing the jurors and you are bending over so that your shirt tightens up. How you accomplish that, I don't know, but I'm concerned for you about that. So just be aware of it.

(RT 12/17/06 at 16, 119–20). Later in the trial the court told advisory counsel that "when [Dixon] needs to consult with you guys, he should go around to where Mr. Carr is sitting and turn his back to the wall. Every now and then, he will go around to where you are

- 29 -

sitting at, Mr. Countryman, turn his back to the jury, and his stun belt is readily visible." (RT 1/7/08 at 34.)

Based on these passages, the Arizona Supreme Court found that "[a]lthough the trial judge, in warning Dixon not to bend over or turn his back to the jury, speculated that jurors might be able to see the outline of the belt beneath Dixon's clothing, Dixon has not established that the jury actually saw the belt or inferred its presence." *Dixon*, 226 Ariz. at 552, 250 P.3d at 1181. This is a reasonable determination of the facts under § 2254(d)(2). *See Wood*, 558 U.S. at 301 (explaining that a "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance"); *Rice*, 546 U.S. at 341–42; *Hurles*, 752 F.3d at 778.

Dixon also argues that the court unreasonably found that he was not prejudiced by the use of the restraints. (Doc. 27 at 108–110.) The Court disagrees. "To determine whether the imposition of physical restraints constitutes prejudicial error, we have considered the appearance and visibility of the restraining device, the nature of the crime with which the defendant was charged and the strength of the state's evidence against the defendant." *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008); *see Dyas v. Poole*, 317 F.3d 934, 937 (9th Cir. 2003) (per curiam) Here, the restraints, if they were apparent at all, were under Dixon's clothing and therefore unobtrusive and seen only in outline. *See id.* (finding that a leg brace worn by defendant, possibly outside his pant leg, was "not as visually obtrusive or prejudicial a restraining device as handcuffs, leg irons, waist chains or gags"). In addition, while the fact that Dixon was charged with a violent crime increased the risk of prejudice, that concern was "mitigated" because the state's evidence against him was "overwhelming." *Id.*

Dixon has not shown that wearing the leg brace and stun belt had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Brecht v. Abrahamson,* 507 U.S. 619 (1993). The Arizona Supreme Court did not unreasonably apply federal law in finding no prejudice. Claim 6 is denied.

- 30 -

1

2

**D.      Claim 7**

3

Petitioner alleges that his Sixth and Fourteenth Amendment rights to confront

4

witnesses against him were violated when a medical examiner who did not perform the

5

autopsy testified at trial. (Doc. 27 at 110.)

6

Dr. Heinz Karnitschnig, the Maricopa County medical examiner at the time of the

7

murder, conducted the autopsy and prepared a report. He did not testify at Dixon's trial.

8

Instead, Dr. Philip Keen, who had more recently served as the medical examiner, testified

9

based on his review of the autopsy report and photographs. Neither the report nor the

10

photographs were admitted into evidence.

11

Citing *Crawford v. Washington,* 541 U.S. 36 (2004), Dixon argued on appeal that

12

Dr. Keen's testimony violated the Sixth Amendment's Confrontation Clause. The

13

Arizona Supreme Court denied the claim:

14

> Because the State does not argue to the contrary, we assume
> *arguendo* that the autopsy report itself was testimonial hearsay. *But see*
> *United States v. De La Cruz,* 514 F.3d 121, 133 (1st Cir. 2008) (autopsy
> reports not testimonial hearsay under *Crawford* ); *United States v. Feliz,*
> 467 F.3d 227, 230 (2d Cir. 2006) (same). But that assumption avails Dixon
> not at all, because the autopsy report was not admitted into evidence.
> Rather, Dixon argues that Dr. Keen's testimony, which relied on the
> objective data in the report, was testimonial hearsay and thus violated the
> Confrontation Clause.

15

16

17

18

19

> We have previously rejected this very argument. Our cases teach that
> a testifying medical examiner may, consistent with the Confrontation
> Clause, rely on information in autopsy reports prepared by others as long as
> he forms his own conclusions.

20

21

22

23

> Dr. Keen's testimony is indistinguishable from that upheld in our
> prior cases. The medical examiner offered his independent conclusions,
> relying on the factual findings of the prior autopsy. He neither parroted the
> report nor recited Dr. Karnitschnig's opinions.

24

25

26

*Dixo*n, 226 Ariz. at 553, 250 P.3d at 1182 (citations omitted).

27

Dixon alleges that this ruling was based on an unreasonable finding of fact and an

28

unreasonable application of federal law. (Doc. 27 at 110.) The Court disagrees.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Before *Crawford*, the Supreme Court held that the Confrontation Clause did not bar the admission of an out-of-court statement that fell within a firmly rooted exception to the hearsay rule. *See Ohio v. Roberts*, 448 U.S. 56, 66 (1980). In *Crawford*, however, the Court offered a new interpretation of the confrontation right, holding that "[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. at 59; *see Williams v. Illinois*, 132 S. Ct. 2221, 2232 (2012). In subsequent cases the Supreme Court, applying *Crawford*, held that scientific reports were testimonial in nature and were inadmissible as substantive evidence against the defendant unless the analyst who prepared the report was subject to confrontation. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) (certificate of analysis identifying substance as cocaine); *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011) (forensic report certifying blood-alcohol level).

Petitioner argues that the state courts unreasonably applied *Crawford*, *Melendez-Diaz*, and *Bullcoming* in denying this claim. The Court disagrees. There is no clearly established federal law holding that an autopsy report is testimonial in nature. As the First Circuit observed in the wake of the rulings in *Melendez-Diaz* and *Bullcoming*, "even now, it is uncertain whether, under its primary purpose test, the Supreme Court would classify autopsy reports as testimonial." *Nardi v. Pepe*, 662 F.3d 107, 112 (1st Cir. 2011); *see Hensley v. Roden*, 755 F.3d 724, 732–35 (1st Cir. 2014) (noting circuit split on whether autopsy reports are testimonial)

Cases from the Ninth Circuit reinforce this Court's conclusion that the state courts did not violate clearly established federal law in denying Dixon's Confrontation Clause claims. *See Flournoy v. Small*, 681 F.3d 1000 (9th Cir. 2012); *McNeiece v. Lattimore*, 501 Fed.Appx. 634 (9th Cir. 2012). In *Flournoy*, the Ninth Circuit considered a claim in which a forensic analyst testified as an expert based on the work and conclusions of

another analyst. The testifying expert performed a technical review of the unavailable analyst's work and gave an independent conclusion about the test results. 681 F.3d at 1002. Noting that *Melendez-Diaz* "held only that a lab report could not be admitted without a witness appearing to testify in person," the Ninth Circuit discussed the effect of the holding in *Bullcoming*. *Id.* at 1005. The court observed that:

> Justice Sotomayor provided the decisive fifth vote for the majority in *Bullcoming*. In her separate opinion, she specifically identified Confrontation Clause questions that in her view remained unanswered by the Court's holdings in that 2011 case, let alone by *Crawford*. These unresolved areas included the treatment of experts testifying to their opinions based on reports not admitted into evidence, as well as the degree of proximity the testifying witness must have to the scientific test. . . . Both of these open issues were relevant to Flournoy's case. If those areas remained unsolved as of 2011, it is impossible to conclude that the California court's conclusions in this case were contrary to clearly established federal law at the time.

*Id.*

In this case, to the extent that any of the materials reviewed by Dr. Keen could properly be characterized as testimonial, they were not admitted into evidence. Therefore, as explained in *Flournoy*, a determination that Dr. Keen's testimony did not violate the Confrontation Clause was not an unreasonable application of clearly established federal law.

In *McNeiece v. Lattimore*, the trial court admitted into evidence an autopsy report showing a diagram of the victim's body with descriptions of the bullet wounds. 501 Fed.Appx. at 636. The Ninth Circuit found that the state appellate court's determination that these excerpts were non-testimonial was not contrary to or an unreasonable application of *Crawford*. *Id.* The trial court also allowed a pathologist who had not conducted the autopsy to testify about the diagrams and to offer his opinions based on the report and other evidence. Again, the Ninth Circuit held that the state court did not unreasonably apply clearly established federal law when it determined that the testimony did not violate the Confrontation Clause. *Id.* (citing *Flournoy*, 681 F.3d at 1004–05).

1

2          The Supreme Court's recent decision in *Williams v. Illinois*, 132 S. Ct. 2221

3    (2012), is also instructive on the state of clearly established federal law. In *Williams*, the

4    Court found no Confrontation Clause violation when an expert in a rape case expressed

5    an opinion based on a DNA profile produced by an outside laboratory. The Court

6    explained that when such an expert testifies, "the defendant has the opportunity to cross-

7    examine the expert about any statements that are offered for their truth. Out-of-court

8    statements that are related by the expert solely for the purpose of explaining the

9    assumptions on which that opinion rests are not offered for their truth and thus fall

10   outside the scope of the Confrontation Clause." *Id.* at 2228. As the Tenth Circuit

11   commented in *United States v. Pablo*, 696 F.3d 1280, 1293 (10th Cir. 2012), after

12   *Williams*, "the manner in which, and degree to which, an expert may merely rely upon,

13   and reference during her in-court expert testimony, the out-of-court testimonial

14   conclusions in a lab report made by another person not called as a witness is a nuanced

15   legal issue without clearly established bright line parameters." *See also United States v.

16   Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013).

17          Accordingly, the Arizona Supreme Court's adjudication of Dixon's confrontation

18   claim challenging Dr. Keen's testimony was neither contrary to nor involved an

19   unreasonable application of clearly established federal law. *See Knowles v. Mirzayance*,

20   556 U.S. 111, 122 (2009) (holding that "it is not 'an unreasonable application of clearly

21   established Federal law' for a state court to decline to apply a specific legal rule that has

22   not been squarely established by this Court"); *Carey v. Musladin*, 549 U.S. 70, 77 (2006)

23   ("Given the lack of holdings from this Court regarding" the claim, "it cannot be said that

24   the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); *Brewer v.

25   Hall*, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly

26   established federal law relating to the legal issue the habeas petitioner raised in state

27   court, the state court's decision cannot be contrary to or an unreasonable application of

28   clearly established federal law.").

            Dixon also contends that the Arizona Supreme Court unreasonably found that

1

2    "Keen's testimony was his own" rather than simply a recitation of Dr. Karnischnig's

3    autopsy findings. (Doc. 27 at 115.) The court found that Dr. Keen "offered his

4    independent conclusions, relying on the factual findings of the prior autopsy. He neither

5    parroted the report nor recited Dr. Karnitschnig's opinions." *Dixon*, 226 Ariz. at 553, 250

6    P.3d at 1172.

7         To challenge that finding, Dixon points to Dr. Keen's testimony that Deana was

8    strangled both manually and with a ligature. (Doc. 27 at 116.) The prosecutor asked,

9    "Why do you say there's more than a ligature by looking at [an autopsy photo]?" (RT

10   12/10/07 at 26.) Dr. Keen replied, "I don't know that so much from looking at the photo.

11   I know that from the autopsy report." (*Id.*) He then described the information from the

12   report that indicated manual strangulation, including the fact that the victim's hyoid bone

     was broken. (*Id.*)

13        The fact that Dr. Keen relied on more than just a photograph to reach his opinion

14   that Deana had been manually strangled does not suggest that he simply parroted Dr.

15   Karnischnig's findings. Dixon's arguments are not sufficient to overcome the

16   presumption of correctness that attaches to the Arizona Supreme Court's determination

17   that Dr. Keen's opinions were reached independently. *See Wood*, 558 U.S. at 301; *Rice*,

18   546 U.S. at 341–42. Claim 7 is denied.

19   **E.    Claim 8**

20        Dixon alleges that the trial court violated his Sixth and Fourteenth Amendment

21   rights by denying his motion for hybrid representation. (Doc. 27 at 117.) The Arizona

22   Supreme Court rejected the claim on direct appeal.

23        As already discussed, before trial Dixon chose to represent himself. Later,

24   however, he requested that his advisory counsel cross-examine the State's DNA experts.

25   The trial court denied this request for "hybrid representation," stating that it was

26   impermissible and explaining to Dixon that he had a constitutional right to counsel and a

27   constitutional right to represent himself, but not a "constitutional right to avail yourself of

28   both avenues." (RT 11/13/07 at 4.) The court informed Dixon that he could elect to have

counsel represent him at any point in the trial, but would not be allowed to revert to self-representation.  (*Id.* at 4; RT 11/14/07 at 6.)

The Arizona Supreme Court held that the trial court did not abuse its discretion, correctly observing that there is "no constitutional right to hybrid representation." *Dixon*, 226 Ariz. at 553, 250 P.3d at 1182.

The state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. "A defendant has the right to represent himself or herself pro se or to be represented by an attorney," but "does not have a constitutional right to 'hybrid' representation" at trial. *United States v. Olano*, 62 F.3d 1180, 1193 (9th Cir. 1995) (citing *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994)); *see McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) (holding that trial judge is not required to appoint hybrid counsel). A *pro se* defendant who has waived his right to counsel "does not have a constitutional right to choreograph special appearances by counsel." *McKaskle*, 465 U.S. at 183.

Dixon asserts that the Arizona Supreme Court "failed to consider the specifics of [his] situation"—namely, the importance and scientific complexity of the DNA evidence. (Doc. 27 at 121.) However, the trial court did specifically consider Dixon's request in the context of the DNA evidence, explaining, "If you decide when it comes to DNA you want them [advisory counsel] to represent you, you can do that, but then I'm not going to let you switch back." (11/14/07 at 7.) Dixon chose to proceed *pro se*.

Because there is no clearly established federal law requiring a trial court to permit hybrid representation, and because the trial court offered to reappoint counsel for Dixon,[8] a fairminded jurist could find that the Arizona Supreme Court's denial of this claim was reasonable. Claim 8 is denied.

. . . .

---

[8] In *John–Charles v. California*, 646 F.3d 1243, 1249–50 (9th Cir. 2011), the Ninth Circuit explained that no clearly established federal law exists requiring the reappointment of counsel after a defendant's initial waiver.

**F.      Claims 9 and 10**

In Claim 9, Dixon alleges that the trial court violated his Eighth and Fourteenth Amendment rights by denying him the opportunity to adequately develop relevant mitigation evidence. (Doc. 27 at 122.) Dixon raised the claim on direct appeal. In Claim 10, Dixon alleges that standby counsel's "contradictory and false representations to the trial court and the court's reliance on those representations violated Dixon's right to represent himself at sentencing and his due process right to a fair sentencing." (*Id.* at 136.) Dixon did not raise this claim in state court.

   1.      Background

Dixon was arraigned in January 2003. In April 2003, defense counsel informed the court that Dixon's mitigation specialist, Pamela Davis, would need a year to complete her investigation. (RT 4/16/03.) In July 2003, the trial court ordered defense counsel to obtain Dixon's mental health records from the Arizona Department of Corrections. (ME 7/18/03.) The court also ordered the disclosure of public records. (ME 7/30/03; *see* ME 4/23/04.) In September 2003, the judge set the trial date for June 15, 2004. (ME 9/5/03.) The court noted that defense counsel had received Dixon's mental health records. (*Id.*) Over the next three years Dixon sought, and the court granted, additional continuances. During this period, the mitigation investigation proceeded.[9] When Dixon chose to

---

[9]      At a status conference in December 2003, Dixon's counsel told the court that the defense team was "moving ahead" with its investigation and that Ms. Davis, the mitigation specialist, "has been working and has identified more people we need to talk to. And she has interviewed a lot of people, and we are looking for additional records which she has identified." (RT 12/17/03 at 6.)

At a status conference in April 2004, defense counsel updated the court:

> We have worked on this case. We have retained a mental health expert. All the records that we have so far have been given to the expert and the expert has reviewed them, and has told us additional things that we need to see if we can find, and it was a lot of records.
> We have interviewed people. We have obtained additional records, and [sic] analyzing them right now.

represent himself, a private mitigation specialist, Tyrone Mayberry, was appointed.

On November 6, 2007, a week before trial, the court held a status conference. At the request of advisory counsel, the court asked Mayberry about the "current status" of his investigation. (RT 11/06/07 at 11.) Mayberry stated they were "probably about 60 percent done with the mitigation. I got ahold of people, all the previous mitigation people, previous attorneys, and got as much of the records as they still had. But it was probably a small fraction. They were still missing quite a bit. . . . [W]e're still . . . trying to get as much as I can and get through it as fast as we can, but we're still probably, at best, 60 percent." (*Id.*)

On November 8, 2007, Dixon filed a motion to continue the trial to the first week of March. (ROA 254.) He asserted that the delay was necessary because there were forty mitigation witnesses that still needed to be interviewed and because his mitigation specialist "has proposed a psychological slant to mitigation defense that needs to be considered." (*Id.* at 5.)

Attached to the motion was a letter from Mayberry dated November 7, 2007, addressing the status of the mitigation investigation. (*Id.*, Ex. A.) Mayberry informed Dixon that the "mitigation is not complete and there is no way ethically to proceed to trial under the current circumstances." (*Id.* at 1.) He wrote that he was appointed July 27, 2006; first met with Dixon in mid-August 2006; and first received the case file in November 2006. (*Id.*) He stated that the records were unorganized and that his previous estimate that it would take a year to prepare was based on his erroneous belief that all the documents had been collected and all the experts appointed or interviewed. (*Id.*) He explained that his workload included eight other cases. (*Id.*) He was assisted on Dixon's case by another mitigation specialist, Michelle McCloskey, who over a period of six months had organized the files, determined what additional records were needed, and completed a social history timeline. (*Id.*) Mayberry wrote that there were at least forty

---

(RT 4/16/04 at 14–15.) Counsel indicated that the social history investigation should be completed by October 31, 2004. (*Id.* at 15.)

witnesses who still needed to be interviewed; with respect to many of these witnesses, he believed the assistance of social workers from the Navajo reservation would be required. (*Id.*)

Finally, Mayberry indicated that he had recommended a number of experts to advisory counsel, including a neuropsychologist, an expert in brain scans of sex offenders, a cultural expert, a psychologist, and a prison expert. (*Id.* at 2.) He estimated that the experts would need up to five months to prepare their reports. (*Id.*) The psychologist, Dr. Gaughan, met with Dixon but did not testify on Dixon's behalf. James Aiken, the prison expert, was the only witness Dixon presented at the mitigation hearing.

Mayberry concluded that he did "not see any possible way you can go to trial at this point with your mitigation incomplete. I will provide whatever assistance to you and your advisory counsel as I can, but I believe your mitigation would be severely hindered and ineffective at this stage." (*Id.*)

The trial court denied Dixon's motion to continue the trial. (ROA 264; ME 11/19/07.) The court explained:

> The Defendant was initially represented by the Public Defender, who engaged in extensive investigation of the Defendant's social and mental health history with the assistance of its mitigation specialists and investigators. The time needed to pursue this mitigation investigation resulted in 5 defense requests for continuances beginning in October, 2003.

> On May 12, 2006, private mitigation specialist Ty Mayberry and an investigator were appointed to assist the Defendant and replace the previous mitigation specialists and investigators (although Mayberry contends he didn't actually receive the file until late July, 2006). Shortly thereafter, Mr. Mayberry hired a second mitigation specialist, Michelle McCloskey, to assist him full-time due to his heavy caseload and to work exclusively on the Defendant's case.

> After the Defendant began representing himself in early 2006, another trial continuance was sought due to this change in status, and a firm trial date was scheduled for October 18, 2006. Unfortunately, due to the court's calendar being congested with older capital cases that needed to be tried first, the trial was again continued to June 25, 2007. On June 13, 2007

and July 3, 2007, the Defendant's oral motions for continuances were granted and the trial was rescheduled to September 13, 2007.

Over the vigorous objections of the victims, the court once again granted Defendant's request to continue the September 13, 2007, trial but stated that the new trial date of November 13, 2007, was a date certain. . . .

While the court recognizes that an investigation into a defendant's life in order to assemble mitigation evidence takes time and that how much time will depend upon the individual case, the Arizona Supreme Court has determined that 18 months is a sufficient time. Current mitigation specialist Mayberry concurs as he noted in a December 4, 2006 letter to defendant that "normally it takes at least 18 months to do a thorough mitigation package." He further admitted to having a head start on this case because of work done by previous mitigation specialists and concluded that mitigation could possibly be completed "close to a year from now."

The defense mitigation work-up in this case has been ongoing for well over four years. Mr. Mayberry has had the case for 16 months, and it's anticipated that the mitigation phase of the trial will not begin, if at all, until early January 2008, which would be approximately 18 months after he received the Defendant's file.

(*Id.*)

At a status conference on January 16, 2008, the court and the parties discussed the upcoming penalty phase of trial, including Dixon's mitigation case. Dixon addressed the court:

Your Honor, if I may, at the beginning of this, it was made known to the Court it was going to be over like 20 witnesses that were going to be called in if mitigation came about. And, of course, you know that I—we started this trial and I made it on the record that I—my mitigation was not prepared to go. And it's still not prepared, and I feel that doing it halfway— it's not even halfway. So what I'm going to do, Your Honor, is I'm going to—the only witness I propose to call is the—I guess the name is John Akins [sic]. . . . He's a former prison warden, and he is going to . . . present mitigation evidence about my prison history. And that's as far as I want to go. I do not want to bring my family laundry into this. That part of my mitigation is completely incomplete, and because of the age of this case, it is wholly—I don't even think—it wouldn't help.

- 40 -

1
2
(RT 1/16/08 at 13–14.) In response to Dixon's statements, the prosecutor made the
following record:

> [T]he defendant says he does not want to use family history, and he gave a
> number of reasons. I will buttress what he said by indicating that his family
> history will only hurt him. Specifically, [a detective] has spoken to his
> sister, who indicated that the defendant sexually assaulted her when she
> was a teenager. The investigation involving the rape of Andrea Salazar
> disclosed that those officers spoke to his brother, who did not have
> anything positive to say about the defendant. . . [O]ur investigation has
> indicated that in terms of family history, there really isn't anything positive,
> and, if anything, it could probably hurt the defendant.

(*Id.* at 15.)

On January 22, 2008, the day before the mitigation hearing, the court discussed
with Dixon and his advisory counsel the status of their mitigation case. First, the court
explained to Dixon that it "puts no limit on what you can present in mitigation. What you
choose to put on is up to you, but the Court has never limited it nor has the State sought
to limit your mitigation." (RT 1/22/08 at 5.)

The court then informed Dixon of the nature of mitigating evidence and the
various categories of information that could be presented in support of a life sentence,
including a history of family instability, family tragedy, domestic violence, and parental
drug and alcohol abuse; a genetic propensity toward addiction or mental illness; low IQ
or learning disability; substance abuse; physical, sexual, or emotional abuse; neglect and
poverty; mental disorder; mercy; and the "catch-all" category of any relevant factor. (*Id.*
at 6.)

The court informed Dixon that the jury would be instructed to consider "whatever
mitigating factors they believe exist from any of the phases of trial." (*Id.*) Finally, the
court explained that it was up to Dixon to decide what mitigation to present:

> I will also note that this case is five years old, and that the mitigation
> specialist was appointed close to 18 months ago. And I know that the
> mitigation specialist has been working with you and advisory counsel to
> develop mitigation. Whether you have chosen to accept that to reject that is

1

2   totally up to you. But the record will now reflect that at least you have been
3   told or advised of the kind of mitigation that typically are [sic] put on in
    capital cases.

4   (*Id.* at 7.) The court then asked for input from advisory counsel:

5

6   MR. COUNTRYMAN: First, with regard to the completion of
    mitigation, the record gathering process is complete. But, again, Mr.
7   Maybury's [sic]—it's his position that the compiling of mitigation wasn't
    largely done in a manner that's consistent with the way that he does it. And
8   he would need more time to complete the social, in particular the social
9   history issues. And so I just want the record to be here that it's with regard
    to that aspect of mitigation, that part isn't done and is not done here as we
10  prepare for mitigation.

11
    With regard to what's been done, Your Honor, I want to make clear
12  for the record, we have completed a substantial amount of mitigation that
    could be presented and could address largely all of the issues that the Court
13  has set forth with regard to Mr. Dixon's appreciation for the wrongfulness
14  of his conduct, family instability, parental issues, mental disorders, mental
    health and substance abuse. We have not only gathered the records, but also
15  have experts to cover those issues with regard to presentation of mitigation.

16
    And those experts have been informed of Mr. Dixon—some of them
17  have met with Mr. Dixon. And I think at this point, it's—he's choosing not
18  to present that information. That's not what we believe should be done in
    the case. We think those issues should be addressed. . . . There is a catch-all
19  provision, and we have information prepared to address other issues with
20  regard to mitigation that are applicable to Mr. Dixon's case.
    . . . .
21
22  [I]t's our position that mitigation is very important. It's an aspect of the
    case that should be presented in total and that a lot of that has been prepared
23  and is available for Mr. Dixon to use. And I think it's his decision not to
24  use the information that's available and not call the experts that are
    available.
25
    (*Id.* at 26.) Advisory counsel Carr also elaborated on the state of the mitigation case:
26
27  [W]e have four experts approved and retained. . . . They have been
28  approved for some time now with regard to mental health and family
    history. We have about 5,000 documents. We of course wouldn't present all

- 42 -

those, but they have been prepared. And they are things that can be used in
defense of Mr. Dixon's life. Mr. Countryman and I would have presented
those with the help of Mr. Marybury [sic], had we been counsel. We have
let Mr. Dixon know that. But since he is his own counsel, he has chosen to .
. . pick one person, and that's Mr. Aiken. . . .

(*Id.* at 28.)

Dixon then offered his view of the status of the mitigation investigation. He

explained that he had not met Aiken yet. (*Id.* at 28.) He had met twice with one of the

psychologists, Dr. Gaughan, whom he described as unprepared to discuss his case. (*Id.*)

He had not met with the other two experts. (*Id.*) Dixon continued:

As far as mitigation goes, I do not believe Mr. Maybury [sic] had
enough time to interview the 40 some-odd people that he had listed in his
letter. The person he hired on to help him with mitigation didn't exactly put
together what a—what he considered an adequate report, and he had to go
through it again.

To me, Your Honor, the mitigation, like [the prosecutor] said, is
really not there.

(*Id.* at 28–29.)

The court then asked Dixon if he agreed with advisory counsel's representations

about the state of the mitigation case and his decision not to follow their advice about

presenting mitigation evidence. (*Id.* at 29.)  Dixon replied:

I would agree with their assessment up to the point where I am
completely unprepared for that simply because, you know, legal counsel in
a death penalty case, he would be right here, hands on with mitigation, and
would know exactly what kind of reports are being referred to. He'd know
who—he'd know pretty much what is going on with mitigation.

Me, I have no idea whatsoever. I have a general idea simply from
what [advisory counsel] have alluded to, but other than that, Your Honor,
mitigation is not. . . .

THE COURT: You have said before, mitigation has not been
developed as extensively as you would like. . . . But you've also said from
everything you know to this point, there is no mitigation.

- 43 -

1

2

3

4

5

    MR. DIXON: . . . I imagine mitigation is a presentation. And the presentation to me is, in order to be effective, it has to be complete. And this is not complete. . . . I imagine if Mr. Maybury [sic] had the time to make it complete, then I probably would have been very satisfied with it. But I have no idea, no idea whatsoever . . . how it looks.

6

(*Id.* at 30.)

7

  The court then asked advisory counsel to respond to Dixon's characterization of

8

the status of the mitigating evidence. (*Id.*) Carr stated that counsel had "put together

9

roughly a list of twelve different things with regard to mitigation, the areas we would

10

have covered had we been counsel. All we can do at this point, get the experts, let him

11

know they're there, and so he makes the decision if he wants to use them." (*Id.* at 30–31.)

12

Countryman concurred, explaining that counsel had worked with Mayberry to compile a

13

checklist of the twelve areas of mitigation, and they gave the list to Dixon. (*Id.* at 31.)

14

Countryman continued:

15

16

17

18

    We understand what Mr. Dixon's saying with regard to the social history and the volumes of people that Mr. Maybury [sic] believes he did not have time to address. But then there's other aspects of Mr. Dixon's life that the jury ostensibly would not hear about that we believe very strongly bear into the jury's determination as to what sentence to provide.

19

20

21

22

23

    There are numerous reports about Mr. Dixon's mental health history back at that time that we have reviewed that we have an expert prepared to address. There are numerous reports about Mr. Dixon's substance abuse issues. All kinds of factors that an expert is available to address with the jury so they have an idea of what he was going through and the type of issues he had 30 years ago. That's information that is important for a jury to consider. But they're not going to hear that.

24

25

26

27

28

    That information is—those reports are complete. Those have been reviewed by an expert and are ready to be presented. So there are areas in which Mr. Maybury [sic] didn't have time to complete, but there are also other areas that are complete that have experts available to discuss that we, had we been counsel, we could have presented in this case, and we think would have had a substantial impact on a jury's consideration of the punishment.

. . . .

> [Y]es, we agree with Mr. Dixon that we don't believe there was enough time to cover all of the aspects of mitigation. But there are several other aspects that are completed that have experts . . . approved and remain and have reviewed that information that is ready to be presented to the jury.

(*Id.* at 31–32.) When asked to respond, Dixon stated:

> Your Honor, it's advisory counsel's position, I believe, and I don't want to put words in their mouth, but I believe they have—they feel that— that providing as much mitigation as they can will somehow work in my favor. I don't believe that's so, simply because of my understanding of the mitigation is different from their understanding of the mitigation. They have an obligation to do the best they can, and I respect that. And I guess you would say I honor that, but there was simply not enough time. And rather than—what is it, wallow in spilled milk? I think we just need to get on with it.

(*Id.* at 33.)

The court reminded Dixon that the State would be allowed to rebut any mitigating evidence he presented. (*Id.*) Dixon explained that his mitigating evidence was based on incidents from thirty years ago and was "stale." (*Id.* at 34.) "[T]here is nobody to come and sit or stand in that witness box and tell people how it was back then." (*Id.*) He also described Mr. Aiken's testimony as the only mitigation evidence that wasn't "two dimensional," explaining that "as far as I know, jurors don't care for two dimensional." (*Id.*)

The prosecutor again noted that if Dixon were to present mitigating evidence of his family history, the door would be open to negative information, such that Dixon was "disenfranchised [sic] from the family" and that he had sexually assaulted his sister. (*Id.*)

The mitigation hearing took place on January 23, 2008. Dixon called Aiken, who testified that Dixon's prison record indicated that he did not pose a danger while incarcerated. The state presented a rebuttal witness who testified that Dixon's record showed the potential for future violence. The jury returned with a death sentence the next

day.

In a declaration prepared during the PCR proceedings in 2013, mitigation specialist Mayberry attested that the mitigation investigation had been going on for four years when he received the case, "but there were no interview notes from the previous mitigation investigation and numerous documents that were referenced but missing." (Doc. 37–2, PCR Pet., Ex. D.) He stated that he reviewed 3,000 pages of discovery in preparation for Dixon's case, including "an extensive mental health history." (*Id.* at 2.)

Mayberry explained that advisory counsel "regarded their role in Dixon's defense as discretionary and limited. They agreed to answer Dixon's questions (if he posed them) but did not actively prepare Dixon for trial." (*Id.*) Advisory counsel "did not prepare questions or facilitate development of further mitigation." (*Id.*) Advisory counsel told Mayberry that "they could only answer Dixon's questions regarding experts," but they did meet with Gaughan and Aiken. (*Id.*) Mayberry encouraged Dixon to participate in an evaluation, and Dr. Gaughan was "doing testing during trial." (*Id.*) According to Mayberry, "We had to change our focus of mitigation completely and rely on whatever Dr. Gaughan and James Aiken could provide, because they were the only experts that could be ready in such a short time." (*Id.*)

2.    Analysis: Claim 9

The Arizona Supreme Court rejected Claim 9 on the merits. *Dixon*, 226 Ariz. at 554–56, 250 P.3d 1183–85. The court described the facts surrounding the claim as follows:

> Dixon was arraigned in January 2003; the State filed a notice of intent to seek the death penalty in March of that year. In July 2003, defense counsel suggested that it might take longer than usual to compile mitigation evidence because Dixon spent his early life on the Navajo reservation. After counsel stated that the mitigation specialist would need "a year," the judge set the trial date for June 15, 2004.
>
> Over the next few years, the court repeatedly granted defense requests to continue the trial. In April 2004, the public defender estimated that if a new specialist were assigned, the mitigation investigation could be

completed in five months. The court granted a defense motion for a continuance and vacated the June trial date. After the case was reassigned to a new specialist, the deadline for disclosure of mitigation evidence was accordingly extended to January 2005. That deadline was not met, and after Dixon was granted permission to represent himself in March 2006, the trial date was set for October 18, 2006. In September 2006, however, Dixon estimated that his mitigation evidence would not be ready for "nine months or a year." The court continued the trial to June 25, 2007, "a date certain."

In May 2007, however, Dixon told the court his mitigation was still not ready and sought another continuance. The trial was reset for August 2007. Two months later, Dixon requested another continuance. Although he expressed frustration, the judge reset the trial date for September 13, 2007. At a subsequent hearing, the trial date was moved back to November 13, 2007.

A week before trial was scheduled to begin, Dixon asked for a three-month continuance. The court denied the motion, noting in a minute entry that "[t]he defense mitigation work-up in this case has been ongoing for well over four years." Dixon claims that the court erred in denying this last continuance request.

*Id.*

The court then noted that the Arizona Rules of Criminal Procedure provided that capital cases "shall be tried" within eighteen months of arraignment and that trial dates can be continued "only upon a showing that extraordinary circumstances exist and that delay is indispensable to the interests of justice," taking into account "the rights of the defendant and any victim to a speedy disposition of the case." *Id.*

Based on this background, the Arizona Supreme Court found that the trial court did not abuse its discretion in refusing to grant another continuance:

Dixon was given more than four years to develop mitigation. The trial court found that the particular circumstances of this case, including Dixon's decision to represent himself and request a new mitigation expert, justified repeatedly continuing the original trial date. Indeed, the judge granted continuances even after cautioning Dixon that he had set "a date certain for trial."

Dixon's requests for continuances were premised on the alleged

- 47 -

need to develop more mitigation evidence. However, in the penalty phase, Dixon presented virtually no evidence, even though advisory counsel advised the court that witnesses, both expert and percipient, were prepared to present substantial amounts of mitigation. In deciding to forego this available mitigation evidence, Dixon rejected the explicit advice of advisory counsel and the strong suggestions of the trial court. Instead, he chose to call only an expert to testify about his prison history.

In rejecting Dixon's final continuance request, the trial court appropriately considered not only Dixon's interests, but also the rights of Deana's parents, the crime victims. Rule 8.5(b) expressly directs the trial judge to consider the rights of victims, who, like the defendant, are entitled under our Constitution to a speedy disposition of criminal charges. *See* Ariz. Const. art. 2, § 2.1(A)(10). Deana's parents repeatedly asserted that right and the superior court did not abuse its discretion, after granting numerous continuances, in finally honoring their request that the trial proceed.

*Id.*

Dixon contends that the trial court failed to consider the "undisputed evidence and representations that supported his motions to continue and, contrary to the law, relied on the inaccurate representations made by standby counsel, all to Dixon's prejudice." (Doc. 27 at 123.) He alleges the denial of a continuance violated his right to a fair trial and an individualized sentencing. (*Id.* at 130.) Dixon alleges that the Arizona Supreme Court's rejection of this claim involved an unreasonable application of clearly established federal law and an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(1) and (2). The Court disagrees.

Dixon's principal contention is that the trial court ignored his arguments about the incomplete state of mitigation case and instead relied on the misrepresentations made by advisory counsel. These assertions are flawed for a number of reasons.

First, when Dixon filed his motion to continue the trial in early November 2007, more than two months before the mitigation hearing, the mitigation investigation was sixty percent complete, according to Mayberry. Nevertheless, Dixon chose not to present this available evidence. Dr. Gaughan, the psychologist who examined Dixon, could have

testified in mitigation, but Dixon chose to call only Aiken, the prison expert. (PCR Pet., Appx. D at 1–2.) It was also clear from Dixon's discussion with the court and the prosecutor that he did not believe there was helpful family history evidence to present in mitigation, particularly given the potential rebuttal evidence (*see* RT 1/22/08 at 28–29, 34); nor did he want to air his family's "dirty laundry" (RT 1/16/08 at 14). Dixon challenges the assertion that he voluntarily chose to forego the presentation of mitigating evidence. However, when examined by Dr. Toma in 2012, Dixon again "made it clear that he does not want to present mitigation." (PCR Pet., Appx. A at 24.)

Dixon's assessment of his mitigation evidence is not inconsistent with the Supreme Court's *Strickland* jurisprudence. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003). As the Ninth Circuit has noted, "There will always be more documents that could be reviewed, more family members that could be interviewed and more psychiatric examinations that could be performed." *Leavitt v. Arave*, 646 F.3d 605, 612 (9th Cir. 2011) (citing *Pinholster*, 131 S. Ct. at 1407; *Strickland*, 466 U.S. at 691).

Next, advisory counsel's alleged misrepresentations were made at the January 22, 2008, conference, more than two months after the court had denied Dixon's last motion to continue. Clearly, whatever their accuracy, the court did not rely on those statements in denying the continuance.

a.   *Dixon has not satisfied 28 U.S.C. § 2254(d)(1)*

Dixon contends that the Arizona Supreme Court unreasonably applied *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), "when it found the trial court did not violate Dixon's rights by precluding the sentencer from considering mitigation." (Doc. 27 at 131.) Under *Lockett* and *Eddings*, the Eighth Amendment requires "that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

Here, Dixon proffered a single basis for a sentence less than death—the expert opinion of Mr. Aiken that Dixon could be managed in the prison system and did not present a threat of violence. As already described, Dixon had other avenues of mitigation available, including mental health evidence, but chose not to present them; instead, he wanted to "get on with" the sentencing hearing. (RT 1/22/08 at 33.) The court did not preclude him from presenting the evidence. In fact, the court informed Dixon about the types of mitigation that were typically presented and made it clear to Dixon that foregoing the presentation of such evidence was contrary to the advice of counsel. (RT 1/22/08 at 6, 29.) There was no violation of *Lockett/Eddings*.

Although not cited by the parties, the clearly established law governing Claim 9 includes *Morris v. Slappy*, 461 U.S. 1 (1983), and *Ungar v. Sarafite*, 376 U.S. 575 (1964). *See Dixon*, 226 Ariz. at 555, 250 P.2d at 1184 (citing *State v. Hein*, 138 Ariz, 360, 368, 674 P.2d 1358, 1366 (1983)). Analysis under this line of cases also shows Claim 9 is meritless.

A trial court's decision to grant or deny a continuance is a matter of discretion. *Ungar*, 376 U.S. at 589. Denial of a continuance warrants habeas relief when it constitutes an abuse of discretion and the resulting error is "so arbitrary and fundamentally unfair that it violates constitutional principles of due process." *Bennett v. Scroggy*, 793 F.2d 772, 774–75 (6th Cir. 1986) (citation omitted). A constitutional violation occurs only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Slappy*, 461 U.S. at 11–12 (quoting *Ungar*, 376 U.S. at 89). To be entitled to relief, a petitioner must also show actual prejudice to his defense as a result of the refusal to grant a continuance. *Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997). "Actual prejudice may be demonstrated by showing that additional time would have made relevant witnesses available or otherwise [would have benefited] the defense." *Powell v. Collins*, 332 F.3d 376, 396 (6th

Cir. 2003).

Based on the circumstances described above, including the age of the case, the number of continuances already granted, and the work performed by Dixon's mitigation specialists, the Arizona Supreme Court reasonably could conclude that the decision of the trial court was not an "unreasoning and arbitrary" insistence on proceeding to trial in the face of a justifiable request for delay. *Slappy*, 461 U.S. at 11; *see Middleton v. Roper*, 498 F.3d 812, 817 (8th Cir. 2007). Moreover, Dixon cannot show actual prejudice given his own decision not to present available mitigating evidence concerning his family background and mental health.  Claim 9 does not satisfy 2254(d)(1). *See Harrington*, 562 U.S. at 103 (the state court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").

### b.     Dixon has not satisfied 28 U.S.C. § 2254(d)(2)

Dixon contends that the trial court made factual errors in denying his motion to continue. He argues that the court misstated the date of Mayberry's appointment, mischaracterized the amount of mitigation work that had been performed, and failed to specifically address the obstacles and delays cited in Dixon's motion. (Doc. 27 at 128–29.) Dixon also argues that the Arizona Supreme Court relied on the erroneous claims of advisory counsel when it denied this claim on direct appeal. (*Id.* at 132–34.) These arguments are not persuasive.

In its order denying Dixon's final request for a continuance, the trial court stated that Mayberry was appointed on May 12, 2006, but noted that "Mayberry contends he didn't actually receive the file until late July, 2006." (ME 11/19/07.) The court further stated that by the time the mitigation phase started, in January 2008, Mayberry would have had Dixon's file for eighteen months. As Dixon notes, Mayberry indicated in his letter to Dixon, attached to Dixon's motion for a continuance, that he did not receive the file until November 2006.

The length of time Mayberry actually had the file is incidental to the

representations he and Dixon made about the status of the mitigation investigation. The court was aware that in Mayberry's estimation, the investigation was only sixty percent complete. The court also knew that Dixon and Mayberry believed there were some forty witnesses yet to be interviewed. Finally, the court was keenly aware that Dixon faced difficulties in pursuing a mitigation case while representing himself; it had warned him repeatedly of the drawbacks of proceeding *pro se* (*see, e.g.*, RT 2/27/06), and had granted several continuances based on Dixon's circumstances. *Dixon*, 226 Ariz. at 555, 250 P.2d at 1184. The fact that the court omitted another discussion of the impediments Dixon faced as a *pro se* litigant did not render its ruling unreasonable. "[S]tate courts are not required to address every jot and tittle of proof suggested to them, nor need they 'make detailed findings addressing all the evidence before [them].'" *Taylor*, 366 F.3d at 1001 (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 347 (2003)).

In any event, under review in Claim 9 is the Arizona Supreme Court's determination that the trial court did not abuse its discretion in denying a continuance. *See Barker v. Fleming*, 423 F.3d at 1091. The court cited the representations made by advisory counsel at the January 22, 2008, status conference. *Dixon*, 226 Ariz. at 555, 250 P.2d at 1184. Dixon contends those representations were false. Advisory counsel told the court that there were four experts who had been "approved and retained," including experts on "mental health and family history." (RT1/22/08 at 27–28.) Advisory counsel also stated there were 5,000 documents that had "been prepared." (*Id.* at 28.) They also indicated they had shared this information with Dixon. (*Id.* at 31.)

Dixon contends that advisory counsel's representations are contradicted by Mayberry's statements about the status of mitigation. (Doc. 27 at 138–39.) The Court disagrees. As discussed above, two months before the January 22 status conference, Mayberry indicated that his investigation was sixty percent complete, and during the investigation Mayberry reviewed 3,000 pages of documents. This information does not contradict the representations of advisory counsel, who never contended that the mitigation investigation was complete. In fact, they "agree[d] with Mr. Dixon that we

1

2

don't believe there was enough time to cover all the aspects of mitigation." (RT 1/22/08 at 32.)

3

4

5

6

7

8

9

Likewise, the record does not meaningfully contradict advisory counsel's representations with respect to expert witnesses. As they told the trial court, one witness, presumably Dr. Gaughan, was ready to present evidence about Dixon's mental health. (*Id.* at 32.) Although they did not work on the case, funding was approved for Drs. Anna Scherzer, a psychiatrist, and Carlos Jones, a psychologist. Mr. Aiken, another expert, did testify on Dixon's behalf. Advisory counsel did not state that all of the expert witnesses they referred to had worked on the case and were prepared to testify. (*Id.* at 27–28.)

10

11

12

13

14

Because advisory counsel's representations were not inaccurate, the Arizona Supreme Court's ruling, which cited those representations, was not based on an unreasonable determination of the facts regarding the status of Dixon's mitigation case. Accordingly, Dixon has not satisfied § 2254(d)(2). *See Wood v. Allen*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. at 341–42; *Hurles*, 752 F.3d at 778.

15

Claim 9 is denied.

16

3. Analysis: Claim 10

17

18

19

20

21

22

Dixon contends that his advisory counsel made false representations to the trial court and the court's reliance on them violated Dixon's right to self-representation. (Doc. 27 at 136.) Dixon did not raise this claim in state court. Respondents contend that the claim, while procedurally defaulted, is plainly meritless and can be dismissed under 28 U.S.C. § 2254(b)(2). The Court agrees. Advisory counsel did not violate Dixon's right to self-representation.

23

24

25

26

27

Advisory counsel's participation is limited in two ways: (1) the defendant has the right to preserve actual control over the content of the case presented to the jury, and so advisory counsel is not allowed to "make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance"; and (2) advisory counsel's participation must

28

1
2
not be allowed to destroy the jury's perception that the *pro se* defendant is representing himself. *McKaskle*, 465 U.S. at 178–79.

3
4
5
6
7
Here, Dixon maintained actual control over his case, choosing to present a very limited case in mitigation notwithstanding advisory counsel's advice to the contrary. Advisory counsel's participation in the January 22 status conference took place without the jury present, so there was no impact on the jury's perception that Dixon was representing himself. Claim 10 is plainly meritless and will be denied.

8
**G.    Claim 11**

9
10
11
12
13
14
15
Dixon alleges that his rights to due process and a fair sentencing were violated when the court permitted the state to present rebuttal testimony at sentencing.[10] (Doc. 27 at 152.) Dixon did not raise this claim in state court. He contends that default of the claim is excused under *Martinez*. As already noted, however, *Martinez* applies only to ineffective assistance of counsel claims. *Pizzuto*, 783 F.3d at 1177. Because Dixon does not show cause for his default of the claim in state court, and because he does not allege a fundamental miscarriage of justice, Claim 11 is barred from federal review.

16
**H.    Claim 12**

17
18
19
20
21
22
Claim 12 consists of several allegations of prosecutorial misconduct, only one of which was raised in state court. (Doc. 27 at 158–89.) Claim 12(1), alleging that the prosecutor committed misconduct by presenting evidence of the prior rape, was denied on the merits by the Arizona Supreme Court. *Dixon*, 226 Ariz. at 549–50, 250 P.3d at 1178–79. The remaining subclaims are procedurally defaulted and barred from federal review.

23
    1.    Claim 12(1)

24
On direct appeal Dixon argued "that because the medical examiner could not

25

26
27
28
    [10] As described in more details below, Aiken, the corrections expert, testified in mitigation that Dixon did not pose a threat of future dangerousness because he was serving life sentences and could be managed within the prison system. (RT 1/23/08 at 40, 47.) The trial court allowed the State to call Dr. Kimberly Carroll, a psychologist, in rebuttal. (*See id.* at 104–05.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

conclusively opine that Deana had also been raped, the prosecutor committed misconduct by offering the testimony of the 1985 victim." *Id.* at 549, 250 P.3d at 1178. The Arizona Supreme Court found no misconduct:

> Dixon nonetheless argues that the prosecutor committed misconduct because he knew that the State could not prove that Deana had been raped, and the prior acts therefore could not demonstrate "an aberrant sexual propensity to commit the crime charged," as Rule 404(c)(1)(B) requires. The jury, however, convicted Dixon of felony murder, and rape was the charged predicate felony. On appeal, Dixon has not directly challenged the sufficiency of the evidence to support that verdict.

> In any event, the record does not support Dixon's argument. Although the testifying medical examiner could not independently verify that Deana had been raped, he refused to rule out a sexual assault. Rather, he affirmed that "rape can occur with no injuries."

> There was ample evidence from which the jury could conclude that Deana had been raped. She had left a bar alone at 12:30 a.m. and was found dead in her apartment, with a belt tightly cinched around her neck, only 90 minutes later. Dixon's semen was found on her underpants (which she had first put on that evening) and in her vagina. Deana had no known previous acquaintance with Dixon. She had indentations on her right wrist, indicating she had been restrained. Her clothing was disheveled, and she had urinated on the bed. Dixon's claim that the prosecutor "misled the trial court" as to whether Deana had been raped finds no support in the record.

*Id.* The court also noted, as discussed above, that the evidence was properly admitted under Rule 404(c). *Id.* at 549–50, 250 P.3d at 1178–79.

The appropriate standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (explaining petitioner not entitled to relief in the absence of a due process violation even if the prosecutor's comments were "undesirable or even universally condemned"). Therefore, in order to succeed on this claim, Dixon must prove not only that the prosecutor's conduct was improper but that it "so infected the trial with unfairness as to make the resulting conviction a denial of due

process." *Id.*; *see Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (explaining that acts of prosecutorial misconduct "warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict'") (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Dixon cannot show misconduct. The trial court determined that the evidence was admissible under Rule 404(c). It is not prosecutorial misconduct for a prosecutor to offer evidence which is deemed relevant and admissible by the trial court. *See Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008); *Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997)

Dixon nevertheless contends that the Arizona Supreme Court's denial of this claim—principally, its conclusion that ample evidence supported a finding that the sex between Dixon and Deana was nonconsensual—was based on an unreasonable determination of the facts. (Doc. 27 at 164.) Contrary to Dixon's argument, however, the court's account of the facts is fully supported by the record. Dixon's critique of the evidence is not sufficient to render the Arizona Supreme Court's decision unreasonable under § 2254(d)(2).[11] *See Rice v. Collins*, 546 U.S. at 341–42 (explaining that the fact "[r]easonable minds reviewing the record might disagree" is not enough to supersede the state court's determination); *Wood v. Allen*, 558 U.S. at 301; *Hurles*, 752 F.3d at 778.

Claim 12(1) is denied.

2.    Claims 12(2)–(6)

Dixon did not present his remaining claims of prosecutorial misconduct in state court. He contends that under *Martinez* their default can be excused by the ineffective assistance of appellate and PCR counsel. (Doc. 39 at 55.) *Martinez* is available only to

---

[11] For example, Dixon notes that a stain on the bed, which the state argued was the victim's urine, was never tested. (Doc. 27 at 164.) Whatever the significance of the stain, the fact that it was not tested does nothing to undermine the reasonableness of the finding that the victim was raped.

excuse the default ineffective assistance claims. *Pizzuto*, 783 F.3d at 1177. Because Dixon does not show cause for his default of these claims in state court, and because he does not show a fundamental miscarriage of justice, Claims 12(2)–(6) are barred from federal review. However, because the claims of prosecutorial misconduct underlie one of Dixon's claims of ineffective assistance of appellate counsel, the Court will discuss them here.

       a.    *Claim 12(2)*

Dixon alleges that the prosecutor engaged in misconduct when he avowed to the court that he would limit his arguments supporting the (F)(6) aggravating factor to specific facts and then exceeded those limitations during the penalty phase of trial. (Doc. 27 at 165.)

At a pretrial hearing on February 20, 2004, the court heard oral argument on Dixon's request for a bill of particulars on the F(6) aggravating factor.[12] (RT 2/20/04.) The court asked the prosecutor which subsections of the cruel, heinous, or depraved factor the State was proceeding under. (*Id.* at 13.) The prosecutor responded:

> The heinous aspect of it. I believe that the treatment of the victim and the fact that she was alive for a period of time. So it would be depraved, cruel, and heinous that we're going to proceed under.
>
> She was alive we believe for a period of time [sic] he forced her to dress. There was some relishing afterwards so it would be all three I guess. She was stabbed post-mortem. She had to suffer the indignity of rape. And this was something she was not conscious [sic] about. This was something she knew was happening at the time he finally strangled her to death.

(*Id.* at 13–14.)

The court denied the motion for a bill of particulars because the information sought was included in the State's disclosure obligations. (*Id.* at 15.) Addressing the prosecutor, the court explained: "I'll expect you to limit your presentation at the

---

[12] At the time of the motion, the case was before Maricopa County Superior Court Judge John Foreman.

aggravation phase . . . to the evidence and subparts of the cruel, heinous, and depraved aggravator. . . . I expect you to limit your presentation to what you articulated today." (*Id.*) When the prosecutor noted that the State was alleging all three subsections, the court responded:

> Yes, but I expect you to specifically refer to the evidence that you intend to use for each one of those specific subparts. And I believe that's a part of your disclosure requirement under the Rules of Criminal Procedure. If you haven't done that specifically I want you to do that.

(*Id.*) The prosecutor replied that he thought he had already made the disclosure but would "do it more specifically within a week." (*Id.*)

Dixon contends that during the penalty phase of his trial the prosecutor presented arguments in support of the (F)(6) factor that he did not discuss at the hearing four years earlier, including the victim's "fear and distress, the disgust of the rape, that she was in her own home, the additional violence such as punching her in the face and squeezing her arm, her loss of pride when she urinated on herself, [] that the last thing she saw before she died was the man that raped her," and that "the post-mortem injuries to her body were mutilation of the corpse." (Doc. 27 at 166.)

The prosecutor did not commit misconduct. First, his arguments did not extend significantly beyond those he had outlined at the 2004 hearing. In addition, the arguments were based on the facts and circumstances surrounding the murder, including the rape and the victim's injuries. Dixon does not allege that the State failed to disclose such information. Claim 12(2) is plainly meritless.

### b.    *Claim 12(3)*

Dixon alleges that the prosecutor engaged in misconduct when he presented evidence and made arguments that were inconsistent with a laboratory report that excluded Dixon as a major contributor of the DNA found on the murder weapon. (Doc. 27 at 167.)

#### i.    Claim 12(3)(a)

Dixon contends that the prosecutor presented misleading expert testimony at the

- 58 -

guilt phase of trial by offering testimony inconsistent with the DNA expert's report. (*Id.*)

Lorraine Heath, a forensic expert, examined the murder weapon—a macramé belt—for DNA. (RT 12/11/07, Heath testimony, at 5–8, 19.) With the results obtained from the belt, she compared profiles from Dixon and from Michael Banes, Deana's boyfriend. (*Id.* at 25, 44.) There was "very, very little DNA" available for testing. (*Id.* at 27.) Her analysis identified a mixture of three male sources on the belt. (*Id.* at 29, 32.) Heath testified that DNA consistent with Michael Banes' profile was found at nine locations and DNA consistent with Dixon's profile was found at seven of the sixteen locations. (*Id.* at 47.) Heath testified that Dixon could be neither excluded nor included as a major contributor:

> Q. Can you tell which of the two [Dixon or Banes] is the major contributor of the DNA sample?
>
> A. No, I can't.
>
> Q. And that's because they're roughly the same, right, in terms of the location?
>
> A. The profile is of poor enough quality that there is not enough information for me to say that either of those two are a major contributor. The conclusion I would draw, in my opinion, on both of those is about the same. They are not definitely included, and they are not definitely excluded. They might be present.
>
> Q. In terms of Mr. Dixon, as I understand it, is he excluded from that sample based on what you see?
>
> A. No, he is not definitely excluded. He may or may not be present.

(*Id.* at 48.)

Heath testified that in the locations where all three male DNA profiles were present, DNA consistent with Dixon's profile was also present. (*Id.* at 48, 62.) If DNA consistent with Dixon's DNA profile was not present at one of those locations, Heath testified she would have reported an exclusion. (*Id.* at 54.)

- 59 -

1

2       As Dixon notes, Heath wrote in her 2005 report that "[t]he partial male DNA

3   profile from Item #3, 4 (swabs from belt) is a mixture of at least three individuals. Item

4   #78 (Clarence Dixon) is excluded as a major contributor." (Doc. 49-1, Ex. 3.) Heath's

5   trial testimony did not contradict her report. Although Dixon was excluded as a "major

6   contributor," neither the report nor Heath's testimony excluded Dixon's DNA profile as

    being consistent with the profiles found on the belt.

7                    ii.     Claim 12(3)(b)

8       Dixon alleges that the prosecutor "misled the jury on the key issue of whose DNA

9   was on the belt used to strangle Bowdoin." (Doc. 27 at 171.) Dixon cites a number of

10  excerpts from the prosecutor's closing argument. Respondents contend that the DNA

11  comments in the prosecutor's closing argument, when taken in context, constitute

12  reasonable inferences from the trial evidence. (Doc. 36 at 76.) The Court agrees.

13      In his opening statement, Dixon told the jury that "DNA evidence was found on

14  the murder weapon and it was tested, and that DNA evidence is not mine." (RT 12/4/07

15  at 10.) The prosecutor responded to that statement in his closing argument:

16              If you take a look at what you have on the DNA belt, it's a mixture
17          of, according to the criminalist, of three individuals; one of them where
            they can get a full profile or they can get a full result at each of the [loci] or
18          each of the locations where they can get a result, one of the individuals is
            Michael Bains [sic]. And remember he said, "Yes, I came home and I
19          touched it." But one of the things we have to keep in mind here is, if you
            remember, her mother, Dina's [sic] mother said, "she wasn't wearing a
20          belt." So, that belt had to be placed on there after she got home and after the
            rape or at the time of the rape.
21
22                  . . . .
23          The other person that's in this mixture is the Defendant. And that's the crux
24          of the case. How can he say, "Yes, Michael Bains did touch this belt and
            let's go with this partial profile—as they call it—but exclude my partial
25          profile from there"? How can he explain away to you that his DNA, which
            is corroborated by the evidence, is on that belt?
26

27  (*Id*. at 33-34.)

28

1

2          After discussing more of the evidence and the jury instructions, the prosecutor

3   returned to the DNA evidence.

4          And we also know, because of the DNA tests, that his DNA, his cellular
           material, is on that belt, a belt she was not wearing that night. And if you
5          take a look at the progression of that belt, the only time that that belt was
           placed in action, if you will, was at the time he placed it around her neck.
6          So by necessity and the way things played out, he was the individual that
           first touched that belt. That is how his DNA was on that belt. It wasn't that
7          Michael Bains put it there first and then it was the Defendant. The only
           time the Defendant had any contact with this woman was between 1:30 and
8          2:00 o'clock in the morning, and he had to have it first. So his DNA was
           placed on that belt first. So there is no doubt that he is the individual that
9          did this. There is no doubt that he's the individual that choked her or placed
10         that in there so that she would choke and die.

11

12  (*Id.* at 44.) Later the prosecutor argued "[w]e also know that it's his DNA. It's a mixture,

13  but his DNA that is on—or at least the profile where you get a result, there's a match, is

14  around her neck." (*Id.* at 48.)

15          In his closing argument, Dixon, citing Heath's testimony, asserted that his DNA

16  was not on the belt: "[The prosecutor] kept saying that my DNA was on that belt. No. My

17  DNA is not on that belt. You heard testimony from Loraine Heath. She said—when he

18  asked her about that, she said, he cannot be included but he can't be excluded either." (*Id.*

19  at 82; *see id.* at 89, 98.) Dixon argued that the State's DNA evidence could put him "on

20  and in" the victim, but could not put him in the apartment. (*Id.* at 83–84.)

21          In rebuttal, the prosecutor argued that Dixon took the belt "placed it around her

22  neck, and that's how his DNA got on there. There is no other way that it could have

23  gotten on there." (*Id.* at 102.) In response to Dixon's suggestion that the victim may have

24  been raped outside the apartment, the prosecutor argued that Dixon's DNA on the belt

25  demonstrated that the sexual assault happened in the apartment, because the victim had

26  not been wearing the belt earlier in the evening. (*Id.* at 102–03.)

27          "Counsel are given latitude in the presentation of their closing arguments, and

28  courts must allow the prosecution to strike hard blows based on the evidence presented

- 61 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996); see *United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005); *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000)

Given the totality of the evidence, including the presence of Dixon's DNA inside the victim and on her panties, it was not improper for the prosecutor to argue that Dixon's DNA profile was present on the murder weapon. Although there was not a "match" to Dixon's DNA on the belt, it was reasonable to draw the inference that the DNA consistent with his profile did in fact belong to him.

Finally, to the extent the prosecutor inaccurately argued that a DNA match was found on the belt, there was no due process violation. First, the trial court instructed the jury to determine the facts "only from the evidence produced in court." (RT 1/10/08 at 8.) The court explained that, "When I say 'evidence,' I mean the testimony of witnesses and the exhibits introduced in court." (*Id.* at 7.) The jurors were also instructed that "[w]hat the lawyer said is not evidence." (*Id.* at 8.) The Court must presume that the jury followed its instructions. *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000). In addition, the evidence of Dixon's guilt was strong. *See id.* (citing *Darde*n, 477 U.S. at 181–82.) The prosecutor's arguments did not render Dixon's trial fundamentally unfair.

　　　*c.*　　*Claim 12(4)*

Dixon alleges that the prosecutor engaged in misconduct when he allowed false testimony by Michael Banes to go uncorrected. (Doc. 27 at 174.) This claim is based on alleged inconsistencies between Banes' trial testimony in December 2007 and statements he made during a police interview on the morning of the murder in January 1978.[13] The inconsistencies involve the status of his relationship with Deana, the amount of alcohol Banes consumed on the night Deana was murdered, and the history of the couple's practice of bondage.

---

[13] The interview was disclosed to the defense prior to trial and available to Dixon during his cross-examination of Banes. (*See* Doc. 27 at 174 n.48.)

A State may not knowingly use false testimony to obtain a conviction. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A *Napue* violation consists of three components: (1) the testimony was actually false; (2) the prosecution knew or should have known that the testimony was actually false; and (3) the false testimony was material. *Hayes v. Ayers*, 632 F.3d 500, 520 (9th Cir. 2011). An error is material where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976).

There was no *Napue* violation arising from Banes' testimony. "The fact that a witness may have made an earlier inconsistent statement, or that other witnesses have conflicting recollections of events, does not establish that the testimony offered at trial was false." *United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997); *see United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) ("Discrepancies in the testimony . . . could as easily flow from errors in recollection as from lies.").

Moreover, the inconsistencies related to collateral matters and were not material. *Id.*; *see United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995) (perjured testimony not cause for reversal if it was not "directly related to the defendant's guilt or innocence"). Given the DNA evidence directly implicating Dixon, there is not a reasonable likelihood that the jury's judgment was affected by testimony from Banes about the state of his relationship with Deana, his level of intoxication when he discovered her body, or their sexual practices.

### d.    Claim 12(5)

Dixon alleges that the prosecutor engaged in the following instances of misconduct in his opening statement and closing argument: (a) he told the jury that Dixon was not sorry for the Salazar rape; (b) argued that Dixon's good behavior in prison was not a mitigating circumstance; and (c) argued that a life sentence in this case would be a "free pass." These claims are meritless.

. . . .

. . . .

1
2

i.      Claim 12(5)(a)

Dixon chose not to cross-examine his previous rape victim, Andrea Salazar Opper.
Instead, he simply stated "I have nothing further to say to you except I'm sorry." (RT
12/13/07 at 34.) The prosecutor referenced this in his opening remarks during the
aggravation phase:

> In the prior proceeding, the defendant stood before you, and as he
> attempted to walk over to Andrea Salazar, he professed his contrition and
> he attempted or said that he was sorry. Well, he told you that as part of this
> proceeding. But originally that was not the case.
>
> The documents that will be presented to you indicated that originally
> at the time of that proceeding back in 1985 and into the sentencing hearing
> of 1986, the defendant went through a trial much the same as the trial he
> went through here. And so his contrition and his saying that he was sorry
> was not manifested from those documents, but in those documents, after
> consideration of the evidence, the jury found the defendant guilty of seven
> charges associated with that rape of Andrea Salazar.

(RT 1/16/08 at 28–29.)

Dixon claims that this statement violated his due process rights, because the fact
that he took the prior case to trial was irrelevant and was unfairly used against him. (Doc.
27 at 181.) The Court disagrees. First, Dixon's conviction and sentence in the Andrea
Salazar case was relevant to the F(1) aggravator. In addition, Dixon's statement to
Salazar before the jury opened the door to argument casting doubt on his contrition for
the 1985 rape. *See Brooks v. Tennessee*, 406 U.S. 605, 609 (1972) (explaining that a
defendant may "open the door to otherwise inadmissible evidence which is damaging to
his case").

Finally, the Court agrees with Respondents that any error by the prosecutor in
discussing this evidence did not rise to the level of a due process violation infecting the
aggravation phase, nor did it rise to the level of having a "substantial and injurious effect"
on the sentencing verdict. *See Brecht*, 507 U.S. at 631.

. . . .

- 64 -

1

2

            ii.     Claim 12(5)(b)

3           Dixon alleges that the prosecutor committed misconduct by telling the jury that

4   "Dixon's conduct in prison was not a mitigating factor at all." (Doc. 27 at 183.) This

5   allegation misrepresents the record.

6           In his opening statement during the penalty phase, Dixon told the jurors that he

7   had been in prison since June 10, 1985, serving seven consecutive life sentences for the

8   Salazar rape; that his mitigation was going to be limited to the testimony of a former

9   prison warden; and that his record showed he was not a violent prisoner or a threat to

10  staff or other inmates. (RT 1/22/08 at 53–54.) Dixon also described prison as a "fairly

11  boring and empty life." (*Id*. at 54.)

12          In his opening statement, the prosecutor remarked that Dixon's "mitigation . . . is

13  nothing more than he is a model prisoner." (*Id.* at 55.) Dixon objected on the grounds that

14  the prosecutor misstated the facts; Dixon had not claimed to be a model prisoner. (*Id.* at

15  56.) The objection was sustained. (*Id*.) The prosecutor then stated that Dixon was "trying

16  to garner that sympathy about being a boring and empty life, that's what he is asking you

    for." (*Id*.) He continued:

17
            It's nothing more than an excuse. It's not a mitigating circumstance, and the
18          State asks that you find, number one, when the evidence is in, that this is
            not a mitigating circumstance. And if you do find some or you find that it is
19          a mitigating circumstance, that it wasn't of sufficiently substantial quality
            to call for leniency when, on the other hand, you consider the aggravating
20          factors and the impact to those that loved Deana Lynn Bowdoin.

21

22  (*Id*. at 56–57.)

23          The prosecutor's statements are not misconduct. They are a response to Dixon's

24  statements about the nature of prison life, not about Dixon's conduct in prison.

25          Mitigating factors are "any aspect of a defendant's character or record and any of

26  the circumstances of the offense that the defendant proffers as a basis for a sentence less

27  than death." *Lockett*, 438 U.S. at 604. The fact that prison is a "fairly boring and empty

28  life" has no bearing on Dixon's character, prior record, or the circumstances of his

offense, and the prosecutor was free to argue that it was not a mitigating circumstance or, if the jury found otherwise, that it was entitled to little weight. The prosecutor's remarks did not preclude consideration of any mitigating evidence. *See Lockett*, 438 U.S. at 604.

### iii.   Claim 12(5)(c)

Dixon alleges that the prosecutor committed misconduct by arguing that life in prison would amount to a "free pass" for Dixon. (Doc. 27 at 183.) The prosecutor began his penalty phase closing argument by stating:

> We now know that the defendant simply is asking for a free pass. When he asks you to sentence him to life in prison with the possibility of parole after the expiration of 25 calendar years, we know that he's asking for a free pass, because you know he is serving, according to their own expert, a sentence of approximately 175 years. So a life sentence is nothing, nothing for killing Deana Bowdoin, because he's already going to serve it anyway. So he's asking you for a free pass.

(RT 1/24/08 at 47.)

Dixon objected. (*Id.*) At a bench conference the trial court thought the defense had a "reasonable point," but did not have a problem "with what you have said, because so far it's true. You can let it linger and leave them with the impression, but I wouldn't make the statement" that the jurors must give him death because that is the only way to punish him. (*Id.* at 48.)

The prosecutor then continued his argument:

> The defendant asks for a life sentence.
>
> . . . .
>
> He told you that, well: Yes there are mitigating factors, because I'm already sentenced to 175 years.
>
> . . . .
>
> Well, that is true. There is a sentence of 175 years. But is that a mitigating factor if you take a look at . . . the reason why he's serving those 175 years? Well, he's being punished for something else that he did. So in terms of it being a mitigating factor, how can it be a mitigating factor if it's a punishment for . . . four counts of rape, one count of sexual abuse, one count of kidnapping, and one count of aggravated assault?

- 66 -

> The State does not dispute that he is serving a sentence that was imposed upon him by a judge for the conviction of those seven separate offenses. But now you are being asked to look at that as a mitigating factor.

(*Id.* at 49–50.)

These statements do not entitle Dixon to relief. The prosecutor's argument rested on evidence of Dixon's prior crimes and sentences and did not invite a verdict based on emotion. *See Rodden v. Delo*, 143 F.3d 441, 447 (8th Cir. 1998) ("In context, the prosecutor's statements about the second murder being free urged the jury to impose additional punishment for the additional crime."); *United States v. Davis*, 609 F.3d 663, 687 (5th Cir. 2010) (finding no plain error where court failed to correct "prosecutor's argument that a life sentence would not be adequate punishment because Davis was already serving a life sentence for drug offenses").

### e.    Claim 12(6)

Dixon alleges that the cumulative effect of the prosecutor's misconduct entitles him to relief. (Doc. 27 at 185.) Given Dixon's failure to demonstrate that the enumerated errors actually involved prosecutorial misconduct, this Court cannot conclude that the cumulative impact of the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643; *see Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").

## I.    Claim 13

Dixon alleges that his right to an impartial judge and a fair capital trial was violated because at the time of his trial the Maricopa County Attorney "was simultaneously engaged in a criminal conspiracy against the Maricopa County Superior Court and its judges, including Judge Klein who presided over this case." (Doc. 27 at 189.)

Dixon acknowledges that he did not raise this claim in state court, but argues that its default is excused under *Martinez* by the ineffective performance of appellate and

1

2      PCR counsel. (*Id.*) *Martinez* applies only to ineffective assistance of counsel claims.

3      *Pizzuto*, 783 F.3d at 1177. Because Dixon does not show cause for his default of the

4      claim in state court, and because he does not show a fundamental miscarriage of justice,

5      Claim 13 is barred from federal review and will be denied.

6      **J.      Claim 14**

7              Dixon alleges that the Arizona Supreme Court's failure to reduce Dixon's

8      sentence to life following independent review was error in violation of his Eighth and

9      Fourteenth Amendment rights. (Doc. 27 at 195.) He contends that the especially cruel

10     aggravating factor was not proved at trial because the evidence did not show beyond a

11     reasonable doubt that Deana suffered mental or physical pain before she died.

12             On direct appeal, the Arizona Supreme Court reasoned:

13                      A murder is especially cruel under A.R.S. § 13–751(F)(6) when the
               victim consciously "suffered physical pain or mental anguish during at least
14             some portion of the crime and [ ] the defendant knew or should have known
               that the victim would suffer." *State v. Morris*, 215 Ariz. 324, 338, ¶ 61, 160
15             P.3d 203, 217 (2007). We find especial mental cruelty here. Deana surely
               must have suffered mental anguish while being raped, hit, and strangled,
16             and Dixon should have known that the victim would suffer such anguish.

17     *Dixon*, 226 Ariz. at 556, 250 P.3d at 1185.[14]

18             Dixon asserts that in reaching this conclusion, the Arizona Supreme Court

19     unreasonably applied clearly established federal law and made an unreasonable factual

20     determination.

21             Whether a state court misapplied an aggravating factor to the facts of a case is a

22     question of state law. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Federal habeas

23     review of a state court's application of an aggravating factor is limited to determining

24     whether the state court's finding was so arbitrary or capricious as to constitute an

25

26     _____

27     [14] Because the court found that the evidence supported a finding of mental cruelty,
       which is sufficient to establish the (F)(6) factor, it did not consider whether the murder
28     was also especially physically cruel or heinous. *Dixon*, 226 Ariz. at 556, n.5, 250 P.3d at
       1185.

independent due process or Eighth Amendment violation. *Id.* In *Jeffers*, the Supreme Court held that the appropriate standard of federal habeas review of a state court's application of an aggravating circumstance is the "rational factfinder" standard: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found" the aggravating factor to exist. *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In the aggravation portion of the penalty phase, Dr. Keen testified that Deana's injuries, including a blunt force injury to her left eye, both manual and ligature strangulation, and a scratch on her neck indicating that she struggled to remove the ligature, were consistent with a scenario in which she was alive for four to five minutes during the attack. (RT 1/16/08 43–44, 56–57.) While being strangled, it would have taken a minute to a minute and a half for her to reach unconsciousness. (*Id.*) Based on this testimony, Deana would have experienced physical pain during the attack and, as the Arizona Supreme Court found, she would have "suffered mental anguish while being raped, hit, and strangled." *Dixon*, 226 Ariz. at 556, 250 P.3d at 1185.

Dixon contends that the evidence does not conclusively show that Deana was raped or that she was conscious during the attack. (Doc. 27 at 200–01.) However, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have determined, as the jurors and the Arizona Supreme Court concluded based on Dr. Keen's testimony describing her injuries and the manner in which she was killed, that Deana was conscious and suffered mental pain during the attack. *Jeffers*, 497 U.S. 764, 780. Claim 14 is denied.

**K.    Claim 15**

Dixon alleges that he was denied the effective assistance of counsel on appeal when appellate counsel failed to raise several "nonfrivolous" claims. (Doc. 27 at 201.)

These claims of ineffective assistance of appellate counsel are procedurally defaulted because Dixon failed to raise them in state court. Dixon asserts, however, that pursuant to *Martinez*, 132 S. Ct. 1309, his default of the claims is excused by the

1
2
ineffective assistance of his post-conviction counsel.

3
    The Ninth Circuit has summarized the holding in *Martinez* as follows:

4
5
6
7
8
> a petitioner may establish cause for procedural default of a trial [ineffective assistance of counsel] claim, where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) "counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington,* 466 U.S. 668 (1984)," and (2) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."

9
10
11
*Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318); *see Nguyen*, 736 F.3d at 1294–95 (extending *Martinez* to procedurally defaulted claims of ineffective assistance of appellate counsel).

12
13
14
15
16
    In order to determine whether post-conviction counsel's performance excused the procedural default of Dixon's claims of ineffective assistance of appellate counsel, the Court must determine whether those claims are substantial or have some merit. *See Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012) ("To establish that PCR counsel was ineffective, Sexton must show that trial counsel was likewise ineffective.").

17
18
19
20
21
22
23
24
    Ineffective assistance of appellate counsel claims are evaluated under the standard set forth in *Strickland*. *See Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010) (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). First, Dixon must show that appellate counsel's performance was objectively unreasonable, which requires Dixon to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Id.* Second, Dixon must show prejudice, which in this context means he must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, he would have prevailed in his appeal. *Id.*

25
26
27
28
    Dixon cannot demonstrate that his claims of ineffective assistance of appellate counsel are substantial because the claims appellate counsel failed to raise were without merit. Appellate counsel therefore did not perform incompetently by failing to raise the claims, and Dixon suffered no prejudice from counsel's performance. *See Jones v. Smith*,

231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (finding no prejudice when appellate counsel fails to raise an issue on direct appeal that is not grounds for reversal); *Miller v. Kenney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (explaining that appellate counsel remains above an objective standard of competence and does not cause prejudice when he declines to raise a weak issue on appeal); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").

With respect to several of the allegations of ineffective assistance of appellate counsel, Claims 15(1), (2), (3), (4), and (6), the Court has considered and denied the underlying claims as meritless or barred from review.[15] Appellate counsel did not perform ineffectively by failing to raise the claims. *Jones v. Smith*, 231 F.3d at 1239 n.8; *Miller*, 882 F.2d at 1434; *Boag*, 769 F.2d at 1344. The Court will now consider the remaining subclaims.

### 1.     Claim 15(5)

Dixon alleges that appellate counsel performed ineffectively by failing to raise a claim challenging the admissibility of the State's rebuttal testimony at sentencing. (Doc. 27 at 209.)

As previously discussed, James Aiken, a corrections expert, testified in mitigation that Dixon did not pose a threat of future dangerousness because he was serving life sentences and could be managed within the prison system. (RT 1/23/08 at 40, 47.) The trial court allowed the State to call Dr. Kimberly Carroll, a forensic psychologist, as an expert witness in rebuttal. She testified that Dixon's more-recent jail records showed he had the potential to act violently in the future. (*See id.* at 104–05.) Dixon contends that

---

[15] In subclaim (1) Dixon alleges that appellate counsel performed ineffectively by failing to raise any issues regarding Dixon's competency. In subclaim (2), he alleges that appellate counsel failed to challenge the testimony of Andrea Salazar Opper on the grounds that it violated the *Ex Post Facto* Clause and Dixon's rights to due process and a fair trial. In subclaim (3), he alleges that appellate counsel failed to challenge advisory counsel's role in undermining Dixon's mitigation. In subclaim (4), he alleges that appellate counsel performed ineffectively by failing to raise claims of prosecutorial misconduct. Finally, in subclaim (6) he alleges that appellate counsel performed ineffectively by failing to argue that the trial court's impartiality was affected by the ongoing conspiracy of the Maricopa County Prosecutor's Office.

1
2
3
4

Dr. Carroll's testimony "violated the scope of proper rebuttal and expert testimony" by opining on the prison's ability to manage Dixon's conduct. (Doc. 27 at 209.) He argues that if appellate counsel had raised the issue, there was a reasonable probability that Dixon's death sentence would have been overturned. (*Id.*)

5
6
7
8
9
10
11
12
13

Appellate counsel did not perform ineffectively by failing to raise this claim. The Arizona Supreme Court would not have held that the trial court abused its discretion by admitting the testimony. *See State v. Moody*, 208 Ariz. 424, 453, 94 P.3d 1119, 1148 (2004). Contrary to Dixon's argument, the testimony was proper rebuttal of Aiken's testimony that Dixon could be managed within the prison system without violence. Aiken testified that the prison system could successfully "manage" Dixon. Dr. Carroll rebutted this evidence with testimony showing that Dixon, whose jail record included infractions related to his possession of razor blades, posed a threat of violence even while incarcerated. (*See* RT 1/23/08 at 101–04.)

14

    2.    Claim 15(7)

15
16
17
18
19

Dixon alleges that appellate counsel performed ineffectively by failing to raise a claim alleging that Dixon was tried under a constitutionally infirm statute and that the State's notice of intent to seek death violated the *Ex Post Facto* Clause. (Doc. 27 at 211.) The underlying claim is meritless, so appellate counsel was not ineffective in failing to raise it.

20
21
22
23
24

The indictment charged Dixon with first-degree murder committed on or about January 7, 1978, in violation of A.R.S. §§ 13-451, 13-452 and 13-453. (ROA 1.) On March 28, 2003, the State provided notice of its intent to seek the death penalty, citing three aggravating circumstances under the current statute, A.R.S. § 13-703(F1), (F2), and (F6). (ROA 29.)

25
26
27
28

In 1978, the Arizona Supreme Court held that the portion of the capital sentencing statute that restricted mitigation to the use of statutorily defined circumstances was unconstitutional in light of *Lockett. State v. Watson*, 120 Ariz. 441, 445, 586 P.2d 1253, 1257 (1978). The court upheld the remainder of the capital sentencing statute. *Id.*

Subsequently, the Arizona legislature amended A.R.S. § 13-454 to provide for consideration of any relevant mitigation. Accordingly, Dixon was tried under a constitutional statute and given the benefit of *Lockett* and *Watson* at the time of his sentencing.

Dixon's *ex post facto* argument also fails because he was not disadvantaged by the post-*Lockett* changes to Arizona's sentencing scheme. *See Weaver v. Graham*, 450 U.S. 24, 29 (1981) (for a penal law to be *ex post facto* "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.") (footnotes omitted).

Finally, Dixon asserts that "[t]he changes in Arizona's law as a result of *Ring* were substantive." (Doc. 27 at 227.) The United States Supreme Court has held otherwise. *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004) ("*Ring*'s holding is properly classified as procedural"). "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes." *Id*. The changes made by the Arizona legislature following *Ring* did neither. Rather, they regulated "only the *manner of determining* the defendant's culpability." *Id*.

**L.    Claim 16**

Dixon alleges that he will not be competent to be executed. (Doc. 27 at 212.) Pursuant to *Martinez–Villareal v. Stewart*, 118 F.3d 628, 634 (9th Cir.1997), *aff'd,* 523 U.S. 637 (1998), a claim of incompetency for execution raised in a first habeas petition "must be dismissed as premature due to the automatic stay that issues when a first petition is filed." If again presented to the district court once the claim becomes ripe for review, it will not be treated as a second or successive petition. *See id.* at 643–44; *Panetti v. Quarterman*, 551 U.S. 930, 947 (2007). Therefore, the Court will dismiss Claim 16, without prejudice, as premature.

**M.    Claim 17**

Dixon alleges that he was tried and convicted under a constitutionally infirm statute, and sentenced under the State's new aggravating factors, in violation of the *Ex*

1
2
3
4
5
6

*Post Facto* Clause. (Doc. 27 at 223.) Dixon did not present this claim in state court. (*Id.*) He contends that under *Martinez* its default can be excused by the ineffective assistance of appellate and PCR counsel. (*Id.*) As discussed above, *Martinez* is available only to excuse the default ineffective assistance of counsel claims. *Pizzuto*, 783 F.3d at 1177. Claim 17 is barred from federal review. Therefore, this claim is also without merit.

**N.     Claims 18–29**

7
8
9
10
11

On direct appeal Dixon raised, and the Arizona Supreme Court denied, a series of challenges to his death sentence and to the constitutionality of Arizona's death penalty scheme. *Dixon*, 226 Ariz. at 556–59, 250 P.3d at 1185–88. The Arizona Supreme Court's rejection of the claims was neither contrary to nor an unreasonable application of clearly established federal law. The claims will be denied.

12

     1.     Claim 18

13
14
15

Petitioner alleges that Arizona's requirement that mitigating factors be proven by a preponderance of the evidence unconstitutionally prevents the jury from considering all mitigating evidence. (Doc. 27 at 228.)

16
17
18
19

In *Walton v. Arizona,* 497 U.S. 639, 651 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002), the Supreme Court rejected the argument that "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution." 497 U.S. at 651. Claim 18 is denied.

20

     2.     Claim 19

21
22
23
24
25
26

Dixon alleges that Arizona's "especially heinous, cruel, or depraved" aggravating circumstance is unconstitutionally vague because it does not narrow the class of death-eligible offenders. (Doc. 27 at 230.) Rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors, including the (F)(6) factor, do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 652–56.

27
28

In *Walton* the Supreme Court held that the "especially heinous, cruel or depraved" aggravating circumstance was facially vague but the vagueness was remedied by the

Arizona Supreme Court's clarification of the factor's meaning. 497 U.S. at 654. Dixon contends, however, that *Walton* was premised on the fact that at the time of the decision Arizona judges, rather than juries, made the finding that a defendant was eligible for the death sentence, and judges are presumed to know and apply the law. *Id.* at 653.

Dixon argues that under jury sentencing the (F)(6) factor becomes unconstitutionally vague both facially and as applied. (Doc. 27 at 233.) Respondents contend that the jury instruction provided by the court cured any vagueness in the statutory language. (Doc. 36 at 106.) The Court agrees.

The trial court provided the following instruction on the especially cruel prong of the (F)(6) factor.

> The second aggravating factor the State alleges is that the defendant committed the offense in an especially heinous, cruel or depraved manner. All first degree murders are to some extent heinous, cruel or depraved. However, this aggravating circumstance cannot be found to exist unless the State has proved beyond a reasonable doubt that the murder was especially cruel, especially heinous or especially depraved. Especially means unusually great or significant. The terms especially cruel or especially heinous or depraved are considered separately, therefore the presence of any one circumstance is sufficient to establish this aggravating circumstance. However, to find that this aggravating circumstance is proven you must find that especially cruel has been proven unanimously beyond a reasonable doubt.
>
> The term cruel focuses on the victim's pain and suffering. To find that the murder was committed in an especially cruel manner you must find that the victim consciously suffered extreme physical or mental pain, distress or anguish prior to death. The defendant must know or should have known that the victim would suffer.

(RT 1/17/08 at 26–27.)

There is no clearly established federal law holding that jury instructions based on the Arizona Supreme Court's narrowing construction are inadequate, and Dixon does not challenge the adequacy of the trial court's instruction. *Cf. State v. Anderson*, 210 Ariz. 327, 352, 111 P.3d 369, 394 (2005) (explaining that jury instructions were not

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

unconstitutionally vague, but provided a sufficiently narrow construction to the facially vague statutory terms). The Arizona Supreme Court's rejection of this claim does not entitle Dixon to habeas relief. Claim 19 is denied.

     3.    Claim 20

Dixon alleges that the trial court's failure to require a special verdict form violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 27 at 235.) Dixon concedes the claim is not supported by clearly established federal law. (Doc. 39 at 95.) Claim 20 is denied.

     4.    Claim 21

Dixon alleges that the death penalty is categorically cruel and unusual punishment. (Doc. 27 at 236.) There is no clearly established federal law supporting this claim. *See Gregg v. Georgia,* 428 U.S. 153, 187 (1976). Dixon asserts that empirical evidence has eroded the death penalty's justifications of deterrence and retribution, so that at the time of his sentencing these goals were not met by the Arizona statute. (Doc. 27 at 237.) The Supreme Court has not accepted Dixon's argument or overruled *Gregg*. *See, e.g.*, *Hall v. Florida*, 134 S. Ct. 1986, 1992–93 (2014).

     5.    Claim 22

Dixon alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it does not sufficiently channel the discretion of the sentencing authority. (Doc. 27 at 237.) The Ninth Circuit has rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith v. Stewart,* 140 F.3d 1263, 1272 (9th Cir. 1998).

     6.    Claim 23

Dixon alleges that the trial court's instructions unconstitutionally limited the mitigation the jury could consider in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. (Doc. 27 at 238.)  The claim is without merit.

At the beginning of the mitigation phase of trial, the court gave the jurors

preliminary instructions, including the following: "You must not be influenced at any point in these proceedings by sentiment, conjecture, passion, sympathy, prejudice, public opinion or public feeling." (RT 1/22/08 at 41.)

The court then instructed the jurors that:

> Mitigating circumstances may be any factors presented by the defendant or the State at any phase of the trial that are relevant in determining whether to impose life imprisonment, including any aspect of the defendant's character, propensities, tendencies or inclinations, or record, and any of the circumstances of the offense and any other factor you find relevant to your individual consideration.

(*Id.* at 42–43.)

The jury was further instructed that mitigation may be "any relevant factor you individually determine is sufficiently substantial to call for life imprisonment." (*Id.* at 45–46.) The court continued, "Mitigating circumstances are factors that in fairness or mercy may reduce the defendant's culpability and blameworthiness and suggest that life in prison is the appropriate punishment." (*Id.* at 46.) At the close of the mitigation phase, the court again instructed the jury "to decide the case without sympathy, bias, or prejudice." (RT 1/24/08 at 77.)

Dixon contends that these instructions violated the principle that the sentencer in a capital case must "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense." *Lockett*, 438 U.S. at 604–05; *see Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (explaining that sentencer must be allowed to "give effect to" proffered mitigation), *overruled on other grounds by Atkins v. Virgin*ia, 536 U.S. 304 (2002). The Court disagrees.

According to Dixon, the trial court's instructions, by directing the jurors not to be influenced by sympathy, "limit[ed] the mitigating evidence considered by the jury." (Doc. 27 at 240.) The reference to sympathy, bias, and prejudice, taken in context with the rest of the instructions, did not prevent the jury from considering or giving effect to any proffered mitigating evidence. The court properly defined mitigating circumstances,

1
2
3
4
5
6

without placing any limits on the jury's assessment of the evidence. *See Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("[O]ur precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here."). Claim 23 is denied.

7.     Claim 24

7
8
9
10
11
12
13

Dixon alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it does not set forth objective standards to guide the sentencer in weighing the aggravating factors against the mitigating circumstances and therefore no meaningful distinction exists between capital and non-capital cases. (Doc. 27 at 240.)  The Supreme Court has held that a capital sentencer "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 979 (1994). Claim 24 is denied.

8.     Claim 25

14
15
16
17
18
19
20

Dixon alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence whenever an aggravating circumstance and no mitigating circumstances are found. The Supreme Court has rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty. *Walton*, 497 at 651–52; *see also Kansas v. Marsh*, 548 U.S. at 173–74. Claim 25 is denied.

9.     Claim 26

21
22
23
24
25
26
27
28

Dixon alleges that Arizona's capital sentencing scheme violates the Eighth Amendment because it denies capital defendants the benefit of proportionality review. (Doc. 27 at 242.) There is no federal constitutional right to proportionality review of a death sentence. *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris*, 465 U.S. 37, 43–44 (1984)). The Ninth Circuit has explained that the interest implicated by proportionality review—the "substantive right to be free from a disproportionate sentence"—is protected by the application of "adequately narrowed aggravating

1    circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996). Claim 26 is

2    denied.

3           10.    Claim 27

4           Dixon alleges that Arizona's capital sentencing scheme violates the Sixth, Eighth,

5    and Fourteenth Amendments because it does not require the prosecution to prove that

6    aggravating circumstances outweigh mitigating circumstances beyond a reasonable

7    doubt. (Doc. 27 at 243.) The Court disagrees. The State has the burden of proving the

8    existence of aggravating circumstances beyond a reasonable doubt. *See State v. Jordan*,

9    126 Ariz. 283, 286, 614 P.2d 825, 828 (1980). However, the Constitution does not

10   require that a death penalty statute set forth specific standards for a capital sentencer to

11   follow in their consideration of aggravating and mitigating circumstances. *See Zant v.

12   Stephens*, 462 U.S. 862, 875 (1983); *see also Tuilaepa*, 512 U.S. at 979–80 750 (1994)

13   (stating that the Constitution does not require that a capital sentencer be instructed in how

14   to weigh any particular fact in the capital sentencing decision); *Franklin v. Lynaugh*, 487

15   U.S. 164, 179 (1988) (rejecting the notion that a specific method for balancing

16   aggravating and mitigating factors is constitutionally required). Nor does the Constitution

17   require that a specific weight be given to any particular mitigating factor. *See Harris v.

18   Alabama*, 513 U.S. 504, 512 (1995). Thus, the Constitution does not require the capital

19   sentencer to find that the aggravating circumstances outweigh mitigation beyond a

20   reasonable doubt. Claim 27 is denied. Claim 32 (Doc. 27 at 250–51), which is identical to

21   Claim 27 (*see* Doc. 39 at 106), is also denied.

22          11.    Claim 28

23          Dixon alleges that Arizona's capital sentencing scheme violates the Eighth and

24   Fourteenth Amendments because it affords the prosecutor unbridled discretion to seek the

25   death penalty. (Doc. 27 at 245.) Prosecutors have wide discretion in deciding whether to

26   seek the death penalty. *See McCleskey*, 481 U.S. at 296–97; *Gregg*, 428 U.S. at 199

27   (explaining that pre-sentencing decisions by actors in the criminal justice system that may

28   remove an accused from consideration for the death penalty are not unconstitutional).

The Ninth Circuit has rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." *Smith*, 140 F.3d at 1272. Claim 28 is denied.

12.   Claim 29

Dixon alleges that Arizona's death penalty scheme discriminates against poor young males. (Doc. 27 at 246.) Clearly established federal law holds that "a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)). Therefore, to prevail on this claim, Dixon "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* Dixon does not attempt to meet this burden. He offers no evidence specific to his case that would support an inference that his sex, age, or economic status played a part in his sentence. *See Richmond v. Lewis*, 948 F.2d 1473, 1490–91 (1990), *vacated on other grounds,* 986 F.2d 1583 (9th Cir. 1993) (holding statistical evidence that Arizona's death penalty is discriminatorily imposed based on race, sex, and socioeconomic background is insufficient to prove that decision-makers in petitioner's case acted with discriminatory purpose). Claim 29 is denied.

**O.    Claims 30–31, 33–36**

Dixon's remaining claims were not presented in state court. Their default is not excused under *Martinez*. *Pizzuto*, 783 F.3d at 1177. They are also plainly meritless. 28 U.S.C. § 2254(b)(2).

1.   Claim 30

Dixon alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated because the aggravating factors alleged by the State were not supported by findings of probable cause at the indictment stage. (Doc. 27 at 247.)

While the Due Process Clause guarantees defendants a fair trial, it does not require states to observe the Fifth Amendment's provision for presentment or indictment by a

1
2
3
4
5

grand jury. *Hurtado v. California*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408 U.S. 665, 688 n. 25 (1972). The Arizona Supreme Court has expressly rejected the argument that *Ring* requires that aggravating factors be alleged in an indictment and supported by probable cause. *McKaney v. Foreman*, 209 Ariz. 268, 270, 100 P.3d 18, 20 (2004). Dixon cites no authority to the contrary.

6
7

    2.    Claim 31

8
9
10
11

    Dixon alleges that his constitutional rights will be violated because he will not receive a fair clemency proceeding. (Doc. 27 at 249.) He contends the proceeding will not be fair and impartial based on the Clemency Board's selection process, composition, training and procedures, and because the Attorney General will act as the Board's legal advisor and as an advocate against him. (*Id.* at 259–50.)

12
13
14
15
16
17
18
19

    This claim is not cognizable on federal habeas review. Habeas relief can only be granted on claims that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner's challenge to state clemency procedures and proceedings does not represent an attack on his detention and thus does not constitute a proper ground for relief. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997) (per curiam) (explaining that clemency claims are not cognizable under federal habeas law).

20

    3.    Claim 33

21
22
23

    Dixon alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a defendant to affirmatively prove that the sentencing body should spare his life.

24
25
26
27
28

    In *Walton*, 497 U.S. at 651, the Supreme Court rejected the argument that "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution." *See also Delo v. Lashley*, 507 U.S. 272, 275–76 (1993) (referring to *Walton* and stating that the Court had "made clear that a State may require the defendant 'to bear the risk of nonpersuasion as to the existence of mitigating circumstances'").

1

2

### 4.     Claim 34

Dixon alleges that execution after more than five years on Arizona's death row, and almost thirty years in prison, constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. (Doc. 27 at 252.)

The United States Supreme Court has never held that lengthy incarceration prior to execution amounts to cruel and unusual punishment. *See Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 556 U.S. 1114 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas, J., concurring, discussing *Lackey* issue). Circuit courts, including the Ninth Circuit, have also held that prolonged incarceration under a sentence of death does not violate the Eighth Amendment. *See McKenzie v. Day*, 57 F.3d 1493, 1493–94 (9th Cir. 1995) (*en banc*); *White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995).

### 5.     Claim 35

Dixon alleges that the trial court improperly permitted the introduction of victim impact evidence in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 27 at 263.) Dixon claims that the victims' statements violated both *Payne v. Tennessee*, 501 U.S. 808 (1991), and *Crawford v. Washington*, 541 U.S. 36 (2004).

In the penalty phase of Dixon's trial, Deana's mother, father, and sister made statements to the jury. (RT 1/23/08 at 14–23.) Before they made their statements the trial court instructed them that they were allowed only "to comment about the impact this tragedy has had on their lives" and about the victim's character, but they were not allowed "to make a recommendation or request any kind of specific punishment." (*Id.* at 13–14). The statements comported with the judge's instructions, with the family members focusing on the character of the victim and the effect of her loss. (*Id.* at 14–23.) This type of victim impact statement is not prohibited by *Payne*, which bars only

- 82 -

characterizations and opinions about the crime, the defendant, or the appropriate sentence. 501 U.S. at 830 n.2.

Dixon also argues that his confrontation rights under *Crawford* were violated because he was not allowed to cross-examine the family members. (Doc. 27 at 266.) As previously noted, *Crawford* held that that the government cannot introduce out-of-court testimonial evidence against a defendant in a criminal trial unless the declarant is unavailable at trial and the defendant had a prior opportunity for cross-examination. 541 U.S. at 68. There is no clearly established federal law holding that *Crawford* applies at sentencing, and the circuit courts have rejected the argument. *See, e.g.*, *United States v. Monteiro*, 417 F.3d 208, 215 (1st Cir. 2005) ("*Crawford* does not apply to sentencing"); *United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005) (explaining *Crawford* provides no basis to reconsider Supreme Court precedent establishing the permissibility "of out-of-court statements at sentencing"); *United States v. Kirby*, 418 F.3d 621, 627–28 (6th Cir.2005); *United States v. Fleck*, 413 F.3d 883, 894 (8th Cir.2005); *United States v. Cantellano*, 430 F.3d 1142, 1146 (11th Cir. 2005).

### 6.    Claim 36

Dixon alleges that his conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case. (Doc. 27 at 267.) "Because there is no single constitutional error in this case, there is nothing to accumulate to the level of a constitutional violation." *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir.2002).

### IV.  EVIDENTIARY DEVELOPMENT

Dixon's requests for evidentiary development encompass each of the 36 claims raised in his habeas petition. (Doc. 49; *see* Doc. 27.) The scope of the requests, which suggests an attempt to relitigate Dixon's trial and sentencing, is not consonant with the purpose of habeas review. "Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." *Pinholster*, 563 U.S. at 186. A federal court in habeas review is "not an alternative forum for trying facts and issues which a prisoner made insufficient

1
2
3
4
5
6
7
8

effort to pursue in state proceedings." *(Michael) Williams*, 529 U.S. 420, 437 (2000); *see Richter*, 562 U.S. at 103 ("Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions"); *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing"). The Court assesses the requested evidentiary development with these principles in mind.

9
10
11
12
13

Dixon asserts that *Pinholster* only limits the Court's ability to allow evidentiary development of claims that were "fully developed" in state court. (Doc. 49 at 1–2.) He also argues that "*Pinholster* said nothing about federal habeas litigation under § 2254(d)(2), or fact development under § 2254(e)." (*Id.* at 2–3.) Dixon's arguments are not supported by *Pinholster* or subsequent cases.

14
15
16

First, the Ninth Circuit has held that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson*, 738 F.3d at 993 n.6.

17
18
19

Next, Dixon attempts to bolster his argument by inaccurately quoting *Pinholster* itself, inserting the qualifying phrase "fully developed," which does not appear in the opinion.[16] (Doc. 49 at 1.)

20
21
22
23
24
25
26
27
28

---

[16] In his motion for evidentiary development, Dixon writes:
> In *Pinholster*, the Court held that "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a *fully developed claim* has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court."

(Doc. 49 at 1) (emphasis added).

The misquoted passage actually reads, "evidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." 563 U.S. at 185.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

To the extent it does not rest on a manufactured quotation, Dixon's interpretation of *Pinholster* has been rejected by the courts. "While allowing a petitioner to supplement an otherwise sparse trial court record may be appealing, especially where he diligently sought to do so in state court, the plain language of *Pinholster* and *Harrington* precludes it." *Ballinger v. Prelesnik*, 709 F.3d 558, 562 (6th Cir. 2013); *see Atkins v. Clarke*, 642 F.3d 47, 49 (1st Cir. 2011) (rejecting argument that a state court did not adjudicate claim on the merits unless petitioner was afforded a "full and fair evidentiary hearing"); *see also Donaldson v. Booker*, 505 Fed.Appx. 488, 493 (6th Cir. 2012) (finding *Pinholster* applies in cases where "petitioner requested an evidentiary hearing in state court and was thereby not at fault for failure to develop the factual record in state court"); *Taylor v. Simpson*, No. 06-CV-181-JBC, 2012 WL 404929, at *3 (E.D.Ky. February 6, 2012) ("Notwithstanding Taylor's argument that *Pinholster* addressed only a fully developed claim, adjudicated on the merits in state court, and decided in federal court under § 2254(d)(1) and that *Pinholster* did not concern habeas litigation under § 2254(d)(2), he is not entitled to discovery on his *Batson* claim under 2254(d)(2)."); *Lewis v. Ayers*, No. 02-13-KJM-GGH-DP, 2011 WL 2260784, at *5–6 (E.D.Cal. June 7, 2011) ("Nor will an assertion—that because the state record was incomplete, there was no adjudication on the merits—operate to avoid the [*Pinholster*] holding. An adjudication on the merits is just that regardless of one's view on the completeness of the record on which the ruling was made.").

As discussed next, evidentiary development of Dixon's claims is foreclosed under *Pinholster* and the applicable rules.

**A.    Discovery**

A habeas petitioner is not entitled to discovery "as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see Campbell v. Blodgett*, 982 F.2d 1356, 1358 (9th Cir. 1993). Rule 6 of the Rules Governing Section 2254 Cases provides that:

> A judge may, for *good cause*, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery.
> . . . A party requesting discovery must provide reasons for the request. The

request must also include any proposed interrogatories and requests for admission, and must specify any requested documents.

Rule 6(a) and (b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (emphasis added).

"[A] district court abuse[s] its discretion in not ordering Rule 6(a) discovery when discovery [i]s 'essential' for the habeas petitioner to 'develop fully' his underlying claim." *Dung The Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (quoting *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997)). However, courts should not allow a petitioner to "use federal discovery for fishing expeditions to investigate mere speculation." *Calderon v. United States Dist. Ct. for the N. Dist. of Cal. (Nicolaus)*, 98 F.3d 1102, 1106 (9th Cir. 1996); *see also Rich v. Calderon,* 187 F.3d 1064, 1067 (9th Cir. 1999) (habeas corpus is not a fishing expedition for petitioners to "explore their case in search of its existence") (quoting *Aubut v. State of Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

Whether a petitioner has established "good cause" for discovery under Rule 6(a) requires a court to determine the essential elements of the petitioner's substantive claim and evaluate whether "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

Dixon seeks an order directing the disclosure of "all documents, electronically stored information, files and records" or "all files and reports" from seventeen different institutions and agencies. (Doc. 49 at 18.) He also seeks to depose more than ninety witnesses. (*Id.* at 19–23.) The scope of the discovery appears to encompass any entity or individual with any connection to or knowledge of Dixon or his family. Dixon also seeks to depose several of the jurors from his trial. (*Id.* at 23.) Dixon contends that the information is "relevant to a clear picture of [his] personal history, mental health, and the relevant mitigation that should have been gathered and presented, the composition of the

1  jury, Dixon's and the overall effects of the acts or omissions of advisory counsel and

2  appointed mitigation specialist, direct appeal, and post-conviction counsel." (*Id.*)

3      Dixon fails to show good cause for the discovery. Not surprisingly, given their

4  scope, Dixon's discovery requests lack the specificity required by Rule 6. Dixon

5  essentially seeks to reinvestigate his case and relitigate the penalty phase of his trial. He

6  does not allege specific, relevant facts that might be found in the requested discovery or

7  obtained from the requested depositions. The discovery requests constitute the type of

8  "fishing expedition" Rule 6 does not sanction. *See Kemp v. Ryan*, 638 F.3d 1245, 1260

9  (9th Cir. 2011) ("[T]he desire to engage in [an improper fishing] expedition cannot

10  supply 'good cause' sufficient to justify discovery."); *Rector v. Johnson*, 120 F.3d 551,

11  562 (5th Cir. 1997) ("Rule 6 does not, however, sanction fishing expeditions based on a

12  petitioner's conclusory allegations."); *Teti v. Bender*,  507 F.3d 50, 60 (1st Cir. 2007)

13  (denying discovery request because petitioner "did not comply with the specific

14  requirements of Rule (6)(b); his request for discovery is generalized and does not indicate

15  exactly what information he seeks to obtain. A habeas proceeding is not a fishing

16  expedition"). Dixon's generalized statements regarding the potential existence of

17  discoverable material does not constitute "good cause."

18      Other factors preclude discovery. Dixon asserts that the requested discovery is

19  relevant to Claims 1–12, 14–16, and 36. (Doc. 49 at 23.) Claims 1, 3, 4, 6, 7, 8, 9, 12, and

20  14 were denied on the merits by the state courts. Therefore, under *Pinholster*, this Court's

21  review of the state court's decision is limited to the record before the state court, and

22  Petitioner is not entitled to evidentiary development. *Pinholster*, 563 U.S. at 181; *see*

23  *State v. Runningeagle*, 686 F.3d 758, 773 (9th Cir. 2012) (explaining that the petitioner

24  was "not entitled to an evidentiary hearing or additional discovery in federal court

25  because his claim is governed by 28 U.S.C. § 2254(d)(1)").

26      The remaining claims for which Dixon seeks discovery were not presented in state

27  court. (Claims 2, 5, 10, 11, 12, 15, and 36). Dixon is not entitled to evidentiary

28  development, s*ee Runningeagle*, 686 F.3d at 773–74, and no additional information is

1
2
3
4
5
6

necessary to resolve the claims on the merits. The claims either involve purely legal issues or are resolvable on the state court record. Claim 15, the defaulted claim alleging several instances of ineffective assistance of appellate counsel, is also resolvable on the record, so evidentiary development is unnecessary. *See Gray v. Greer*, 800 F.2d 644, 647 (7th Cir. 1986) (explaining "it is the exceptional case" where a claim of appellate ineffective assistance "could not be resolved on an examination of the record alone").

7
8
9
10
11
12
13
14
15

Finally, the Court will deny Dixon's request to depose jurors "regarding their experiences related to Dixon's trial." (Doc. 49 at 23.) Dixon offers no suggestion as to what information he would seek in such depositions, and the Federal Rules of Evidence place significant limitations on the admissibility of testimony about a jury's deliberations. Fed. R. Evid. 606(b); *see Tanner v. United States*, 483 U.S. 107, 117 (1987) (noting firmly established common-law rule that juror testimony is inadmissible to impeach a jury verdict); *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000) (explaining that "juror testimony about the subjective effect of evidence on the particular juror" is not admissible).

16

**B.     Evidentiary hearing and expansion of the record**

17
18
19
20
21
22

While historically the district court had considerable discretion to hold an evidentiary hearing to resolve disputed issues of material fact, *see Townsend v. Sain*, 372 U.S. 293, 312, 318 (1963), *overruled in part by Keeney v. Tamayo–Reyes*, 504 U.S. 1 (1992), *and limited by* § 2254(e)(2); *Baja v. Ducharme*, 187 F.3d 1075, 1077–78 (9th Cir. 1999), that discretion is circumscribed by § 2254(e)(2) of the AEDPA. *See Baja*, 187 F.3d at 1077–78. Section 2254 provides that:

23
24

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

25
26

(A) the claim relies on—

27
28

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

- 88 -

1

2

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

3

4

5

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

6

7

8

9

28 U.S.C. § 2254(e)(2); *see Williams*, 529 U.S. at 437 ("If there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements.").

10

11

12

13

14

15

An evidentiary hearing in federal court is precluded if the petitioner's failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432. A hearing is not barred when a petitioner diligently attempts to develop the factual basis of a claim in state court and is "thwarted, for example, by the conduct of another or by happenstance was denied the opportunity to do so." *Id.*; *see Baja*, 187 F.3d at 1078–79.

16

17

18

19

20

21

22

23

24

When the factual basis for a particular claim has not been fully developed in state court, a district court first determines whether the petitioner was diligent in attempting to develop the factual record. *See Baja*, 187 F.3d at 1078. The diligence assessment is an objective one, requiring a determination of whether a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435. For example, when there is information in the record that would alert a reasonable attorney to the existence of certain evidence, the attorney "fails" to develop the factual record if he does not make reasonable efforts to sufficiently investigate and present the evidence to the state court. *Id.* at 438–39, 442.

25

26

27

28

Absent unusual circumstances, diligence requires that a petitioner "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437. The mere request for an evidentiary hearing, however, may not be sufficient to establish diligence if a reasonable person would have taken additional

1
2   steps. *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (finding lack of
3   diligence where petitioner failed to present affidavits of family members that were easily
4   obtained without court order and with minimal expense); *Alley v. Bell*, 307 F.3d 380,
5   390–91 (6th Cir. 2002) (finding lack of diligence where petitioner knew of and raised
6   claims in state court but failed to investigate all factual grounds in support of the claims);
7   *Koste v. Dormire*, 345 F.3d 974, 985–86 (8th Cir. 2003) (finding lack of diligence where
8   there was no effort to develop the record or assert any facts to support claim); *McNair v.*
9   *Campbell*, 416 F.3d 1291, 1299–1300 (11th Cir. 2005) (finding lack of diligence where
10  petitioner did not develop evidence available through petitioner, family members, and
    literature, and did not appeal of denial of funds and hearing)
11          In sum, if a court determines that a petitioner has not been diligent in establishing
12  the factual basis for his claims in state court, it may not conduct a hearing unless the
13  petitioner satisfies one of § 2254(e)(2)'s narrow exceptions. If, however, the petitioner
14  has not failed to develop the factual basis of a claim in state court, the court considers
15  whether a hearing is appropriate or required under the criteria set forth in *Townsend.* 372
16  U.S. 293; *see Baja*, 187 F.3d at 1078.
17          Pursuant to *Townsend*, a federal district court must hold an evidentiary hearing in
18  a § 2254 case when the facts are in dispute, the petitioner "alleges facts which, if proved,
19  would entitle him to relief," and the state court has not "reliably found the relevant facts"
20  after a "full and fair evidentiary hearing" at trial or in a collateral proceeding. *Id.* at 312–
21  13; *cf. Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) (explaining that "an
22  evidentiary hearing is not required on issues that can be resolved by reference to the state
23  court record"); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). In any other case in
24  which diligence has been established, the district court "has the power, constrained only
25  by his sound discretion, to receive evidence bearing upon the applicant's constitutional
26  claim." *Id.* at 318.
27          Under Rule 7 of the Rules Governing Section 2254 Cases, a federal habeas court
28  is authorized to expand the record to include additional material relevant to the petition.

1

2

3    Section 2254(e) (2), as amended by the AEDPA, limits a petitioner's ability to present

4    new evidence through a Rule 7 motion to the same extent that it limits the availability of

5    an evidentiary hearing. *See Cooper–Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir.

6    2005) (applying § 2254(e)(2) to expansion of the record when intent is to bolster the

7    merits of a claim with new evidence) (citing *Holland v. Jackson*, 542 U.S. 649, 652–53

8    (2004) (per curiam)). Accordingly, when a petitioner seeks to introduce new affidavits

9    and other documents never presented in state court, he must either demonstrate diligence

     in developing the factual basis in state court or satisfy the requirements of §

10   2254(e)(2)(A) & (B).

11        Petitioner seeks to expand the record with eighty-four separate exhibits. (Doc. 49

12   at 23–53; *id.*, Ex's 1–84.) The exhibits are offered in support of Claims 1–6, 8–10, 12,

13   15–17, 30, 32, 33, 35, and 36. They include social history records and documents

14   reflecting the activities of the defense team, including correspondence and billing

     records. Dixon seeks an evidentiary hearing on Claims 1–17, 19, and 36. (*Id.* at 49.)

15        Claims 1, 3 (in part), 4, 8, 9, and 12 (in part) were denied on the merits in state

16   court. Again, evidentiary development of those claims is foreclosed by *Pinholster*.

17        Claims 2, 5, 10, 15, 17, 30, 32, 33, 35, and 36 were not presented in state court,

18   nor were certain allegations in Claim 3 and 12. Of these defaulted claims, *Martinez* is

19   applicable only to Claim 15, alleging ineffective assistance of appellate counsel.

20        As discussed above, Dixon cannot demonstrate that his claims of ineffective

21   assistance of appellate counsel are substantial because the claims appellate counsel failed

22   to raise were without merit. Appellate counsel therefore did not perform incompetently

23   by failing to raise the claims, and Dixon suffered no prejudice from counsel's

24   performance.

25        The Court has reviewed the materials with which Dixon seeks to expand the

26   record and determined that their contents do not affect the Court's analysis of Petitioner's

27   habeas claims. As detailed above, appellate counsel did not perform at a constitutionally

28   ineffective level. Dixon's attempt to excuse the default of these claims under *Martinez*

1
2
fails because the underlying ineffectiveness claims are not substantial. Because the claims are both defaulted and meritless, expansion of the record will be denied.

3
4
5
6
7
8
9
10
11
12
For the same reason, Dixon is not entitled to an evidentiary hearing. Having reviewed the entire record, including the evidence presented by Dixon in the PCR proceedings and in his motion to expand the record, the Court concludes that an evidentiary hearing is not warranted. *See* Rule 8(a) of the Rules Governing Section 2254 Cases. Whether Dixon's allegations of ineffective assistance of trial and appellate counsel are "substantial" under *Martinez* is resolvable on the record. *See Dickens v. Ryan,* 740 F.3d 1302, 1321 (9th Cir. 2014) (*en banc*) (explaining that "a district court *may take evidence to the extent necessary* to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*") (emphasis added); *see also Gray v. Greer*, 800 F.2d at 647.

13
14
15
16
17
18
19
20
Finally, Petitioner has failed to develop the factual basis of his claims in state court. Dixon maintains that he "demonstrated diligence." (Doc. 49 at 16.) He requested, and the state court denied, an evidentiary hearing on the three claims raised in his PCR petition. Dixon was not diligent, however, "in developing the record and presenting, if possible, all claims of constitutional error," *Williams v. Taylor*, 529 U.S. at 437, and he does not that contend the state interfered with his ability to gather the evidence he now seeks to present. *See Dowthitt*, 230 F.3d 758; *Alley*, 307 F.3d at 390–91; *Koste*, 345 F.3d at 985–86; *McNair*, 416 F.3d at 1299–1300.

21
22
23
Petitioner does not argue that he can meet the exceptions to the § 2254(e)(2) diligence requirement. Therefore, he is not entitled to expand the record or to an evidentiary hearing.

24
### V.  CERTIFICATE OF APPEALABILITY

25
26
27
28
Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability

1
2
when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

3
4
5
6
7
8
9
10
11
Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

12
13
14
15
16
17
18
19
The Court finds that reasonable jurists could debate its resolution of Claim 1, alleging ineffective assistance of counsel based on trial counsel's failure to challenge Dixon's competence; Claim 3(A), alleging the trial court erred when it found Dixon competent to waive counsel and represent himself; and Claim 9, alleging that the trial court violated Dixon's Eighth and Fourteenth Amendment rights by denying him the opportunity to adequately develop relevant mitigation evidence. For the reasons stated in this order, the Court finds that reasonable jurists could not debate its resolution of the remaining claims.

20
## VI.  CONCLUSION

21
Based on the foregoing,

22
23
**IT IS HEREBY ORDERED** that Petitioner's Petition for Writ of Habeas Corpus (Doc. 27) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

24
25
**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on February 12, 2014 (Doc 5), is **VACATED.**

26
27
**IT IS FURTHER ORDERED** that Petitioner's motion for evidentiary development (Doc. 49) is **DENIED.**

28
**IT IS FURTHER ORDERED** granting a certificate of appealability with respect

to Claims 1, 3(A), and 9.

   **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

   **Dated** this 16th day of March, 2016.

Honorable Diane J. Humetewa
United States District Judge