MARK BRNOVICH
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

JEFFREY L. SPARKS (AZ BAR NO. 027536)
J.D. NIELSEN (AZ BAR NO. 007715)
GINGER JARVIS (AZ BAR NO. 014487)
JASON EASTERDAY (AZ BAR NO. 023191)
ASSISTANT ATTORNEYS GENERAL
CAPITAL LITIGATION SECTION
2005 N. CENTRAL AVENUE
PHOENIX, ARIZONA 85004
TELEPHONE: (602) 542-4686
CLDOCKET@AZAG.GOV

ATTORNEYS FOR RESPONDENTS

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Clarence Wayne Dixon, | CV 14–258–PHX–DJH |
| Petitioner, | |
| -vs- | **RESPONSE TO MOTION TO STAY EXECUTION AND ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS** |
| David Shinn, et al., | |
| Respondents. | |
| | **[CAPITAL CASE]** |

Respondents, pursuant to the Court's order of May 9, 2022 (Document Number [Doc.] 88), hereby respond to Petitioner Clarence Wayne Dixon's May 9, 2022 motion to stay execution and to his May 9, 2022 petition for writ of habeas corpus. Docs. 86, 87. For the reasons set forth in the following memorandum of points and authorities, Respondents respectfully request that the Court deny Dixon's stay motion, and deny and dismiss his pending petition with prejudice.

# TABLE OF CONTENTS

I.      BRIEF FACTUAL AND PROCEDURAL BACKGROUND.........................................3

II.     THE COURT SHOULD DENY DIXON'S STAY MOTION................................7

III.    THE COURT SHOULD DENY AND DISMISS DIXON'S HABEAS PETITION...........9

        A.      AEDPA standards of review of claims that have been adjudicated on their merits in state courts ...........................................9

        B.      Dixon is competent to be executed .....................................15

IV.     CONCLUSION .................................................................................20

CERTIFICATE OF SERVICE ...................................................................21

EXHIBIT LIST.....................................................................................22

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.  **BRIEF FACTUAL AND PROCEDURAL BACKGROUND.**

In June 1977, Dixon struck a teenage girl with a metal pipe and was charged with assault with a deadly weapon. *Dixon v. Ryan (Dixon IV)*, 932 F.3d 789, 796 (9th Cir. 2019). Two court-appointed psychiatrists determined that Dixon was not competent to stand trial under Rule 11, noting his schizophrenia and depression. *Id.* After restoration proceedings, Dixon waived his right to a jury trial, and the trial court found him not guilty by reason of insanity. *Id.* Dixon was released pending civil proceedings on January 5, 1978. *Id.*

The next day, Deana Bowdoin, a 21-year-old ASU student, was found dead in her apartment. *State v. Dixon (Dixon II)*, 226 Ariz. 545, 548, ¶¶ 2–3 (2011). She had been strangled with a belt and stabbed. *Id.* Investigators found semen on Deana's underwear but were unable to match the resulting DNA profile to any suspect. *Id.*

In 1985, Dixon violently sexually assaulted a 20-year-old student near the NAU campus in Flagstaff. *State v. Dixon (Dixon I)*, 153 Ariz. 151, 152 (1987). The NAU police played a significant role in developing the evidence that resulted in Dixon's arrest and conviction for that crime. The NAU police were called when the victim returned to her dorm after the assault. *Id.* The victim gave a statement to an NAU police officer, and the NAU police broadcast an "attempt to locate" call based on the description of Dixon the victim provided. *Id.* Dixon was ultimately arrested by a Flagstaff Police Officer who heard the attempt to locate call. *Id.*

Following Dixon's arrest, Officer Bolson of the NAU Police Department showed the victim a photographic lineup in which she identified Dixon. *Id.* at 153. The NAU officer then allowed the victim to view Dixon through a window, and she once again identified him as her assailant. *Id.* at 153–54. Dixon was convicted of seven felony offenses and sentenced to multiple life sentences. *Id.* at 152.

In 2001, a Tempe Police detective checked the DNA profile from the semen on Deana Bowdoin's underwear and found that it matched that of Dixon, whose DNA profile was in a national database as a result of his 1985 convictions. *Dixon II*, 226 Ariz. at 548, ¶ 4; *Dixon IV*, 932 F.3d at 796. Dixon had lived across the street from Deana at the time of the murder, and her friends and family knew of no previous contact between them. *Dixon II*, 226 Ariz. at 548–49, ¶ 4.

Dixon was charged with first degree murder. *Dixon II*, 226 Ariz. at 549, ¶ 5. Before trial, Dixon sought to represent himself because his appointed counsel would not file a motion he requested them to file. *Dixon IV*, 932 F.3d at 797. The legal theory Dixon sought to pursue was that "the DNA evidence linking Dixon to [Deana's] murder should be suppressed as fruit of the poisonous tree because it was obtained in connection with his 1985 assault conviction. The 1985 conviction itself was invalid, Dixon believed, because the campus police lacked the authority to investigate." *Id.*; *see also Dixon v. Ryan (Dixon III)*, 2016 WL 1045355, *5 (D. Ariz. March 16, 2016) ("This issue involved Dixon's theory that NAU officers lacked the statutory authority to investigate the case; therefore, according to Dixon, his prior conviction was 'fundamentally flawed' and the DNA comparison made pursuant to his invalid conviction should be suppressed."). After conducting a colloquy with Dixon, the trial court found that Dixon "knowingly, intelligently, and voluntarily waived" his right to counsel, and Dixon represented himself at trial. *Dixon IV*, 932 F.3d at 797–98.

Dixon was convicted of first-degree murder and sentenced to death. *Dixon II*, 226 Ariz. at 549, ¶ 5. Throughout the ensuing years, Dixon argued that his "perseveration" on the DNA suppression issue regarding the NAU police, in addition to his 1977 Rule 11 proceedings and 1978 not guilty by reason of insanity verdict, showed his lack of competency to waive counsel. The state and federal courts uniformly rejected these challenges. In Dixon's post-conviction proceeding, the postconviction judge, who had presided over Dixon's trial, noted that Dixon's

"thoughts and actions" throughout the trial proceedings "demonstrated coherent and rational behavior." *Dixon III*, 2016 WL 1045355, at *12. The Arizona Supreme Court denied review of that decision.

In its 2019 opinion, the Ninth Circuit found that because Dixon's competency and mental health were not at issue with respect to the 1985 assault and resulting conviction, "[t]he 1977 evaluations and the 1978 not guilty by reason of insanity verdict thus shed little light on Dixon's competence at the time he chose to waive counsel in 2006." *Dixon IV*, 932 F.3d at 803. The court noted that the record in his capital case contained "no evidence of competency issues at any time throughout the course of these proceedings," and that the record demonstrated that at the time Dixon sought to represent himself he "understood the charges against him and the potential sentences, he was able to articulate his legal positions and respond to questions with appropriate answers, and that Dixon demonstrated rational behavior." *Id.* Significantly, the court stated that Dixon's interest in the DNA suppression issue "was not so bizarre or obscure as to suggest that Dixon lacked competence." *Id.*

This Court had likewise concluded that "Dixon's obsession with the NAU suppression motion was not so bizarre as to suggest incompetence," citing numerous decisions reaching that same conclusion with regard to other criminal defendants:

> "Criminal defendants often insist on asserting defenses with little basis in the law, particularly where, as here, there is substantial evidence of their guilt," but "adherence to bizarre legal theories" does not imply incompetence. *United States v. Jonassen*, 759 F.3d 653, 660 (7th Cir. 2014) (noting defendant's "persistent assertion of a sovereign-citizen defense"); *see United States v. Kerr*, 752 F.3d 206, 217–18 (2d Cir.), *as amended* (June 18, 2014) ("Kerr's obsession with his defensive theories, his distrust of his attorneys, and his belligerent attitude were also not so bizarre as to require the district court to question his competency for a second time."). "[P]ersons of unquestioned competence have espoused ludicrous legal positions," *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003), "but the

5

articulation of unusual legal beliefs is a far cry from incompetence."
*United States v. Alden*, 527 F.3d 653, 659–60 (7th Cir. 2008)
(explaining that defendant's "obsession with irrelevant issues and his
paranoia and distrust of the criminal justice system" did not imply
mental shortcomings requiring a competence hearing).

*Dixon III*, 2016 WL 1045355 at *9.

On April 5, 2022, upon the State's motion and after Dixon concluded his direct appeal, first postconviction relief, and federal habeas corpus proceedings, the Arizona Supreme Court issued a warrant of execution setting an execution date of May 11, 2022. On April 9, 2022, Dixon filed a motion for determination of competency under A.R.S. § 13–4022 with the state court. The court granted his request on the same day, finding that Dixon's motion "satisfies the minimum required showing that reasonable grounds exist for the requested examination and hearing, within the meaning of A.R.S. § 13–4022(C) and as otherwise required by *Ford v. Wainwright*," and set an evidentiary hearing. Respondents petitioned the Arizona Supreme Court for special action relief from the superior court's grant of an evidentiary hearing, and, after the matter was fully briefed by the parties, the Arizona Supreme Court remanded the matter to the superior court with instructions to "reconsider its ruling in light of the response and reply" filed by the parties. Order, No. CV-22-0092-SA, *State v. Hon. Robert Carter Olson* (Ariz. April 25, 2022), Doc. 10. On April 27, 2022, the Superior Court affirmed its grant of an evidentiary hearing.

The superior court conducted an evidentiary hearing on the matter on May 3, 2022;[1] that same day the court issued its ruling, finding that Dixon was competent

---

[1] Exhibit A is a copy of the State's response to Dixon's special action petition. Pages 9–12 contain a summary of the evidence presented at the hearing; because of time constraints, Respondents were unable to include a summary of the hearing in this response.

to be executed. *See* Doc. 89–1 On May 9, 2022 the Arizona Supreme Court declined to accept jurisdiction of Dixon's petition for special action relief of the trial court's ruling, and Dixon subsequently filed his pending motion to stay his execution, as well as his habeas petition, with this Court.

## II.   THE COURT SHOULD DENY DIXON'S STAY MOTION.

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 129 S. Ct. 1749, 1760 (2009) (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672 (1926)). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id*. at 1761 (citing cases). While a stay involves the exercise of judicial discretion, it is not unbridled discretion; legal principles govern the exercise of discretion. *Id*. Moreover, "a stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments[.]" *Hill v. McDonough*, 547 U.S. 573, 584 (2006). "Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Id*. (citing *Calderon v. Thompson*, 523 U.S. 538, 556 (1998)). Equity does not tolerate last-minute abusive delays "in an attempt to manipulate the judicial process." *Nelson*, 541 U.S. at 649 (quoting *Gomez*). "Repetitive or piecemeal litigation presumably raises similar concerns" as litigation that is "speculative or filed too late in the day." *Hill*, 547 U.S. at 585. *See also Gomez v. United States Dist. Court for Northern Dist. of Cal.*, 503 U.S. 653, 654 (1992) (per curiam) (noting that the "last-minute nature of an application" or an applicant's "attempt at manipulation" of the judicial process may be grounds for denial of a stay).

To be entitled to relief, a movant must demonstrate (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Ramirez v. Collier*, ___ U.S. ___, 142 S. Ct. 1264, 1275 (2022) (citing

*Winter v. Natural Res. Def. Council, Inc*, 129 S. Ct. 365, 374, 376 (2008));
*McDonough*, 547 U.S. at 584; *Beardslee v. Woodford*, 395 F.3d 1064, 1067 (9th Cir. 2005). The burden of persuasion is on the movant, who must make a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997 (per curiam).

These principles apply when a capital defendant asks a federal court to stay his pending execution. *Hill*, 547 U.S. at 584. A stay of execution is an equitable remedy and "equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id*. A court can consider "the last-minute nature of an application to stay execution in deciding whether to grant equitable relief." *Beardslee*, 395 F.3d at 1068 (quoting *Gomez v. United States District Court*, 503 U.S. 653, 654 (1991)). Thus, courts "must consider not only the likelihood of success on the merits and the relative harm to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim." *Id*. (quoting *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004)).

Moreover, last minute stays of execution are particularly disfavored, as well-worn principles of equity attest. Late-breaking changes in position, last-minute claims arising from long-known facts, and other "attempt[s] at manipulation" can provide a sound basis for denying equitable relief in capital cases. *Ramirez*, ___ U.S. ___, 142 S. Ct. at 1282 (citing *Gomez v. United States Dist. Court for Northern Dist. of Cal.*, 503 U.S. 653, 654 (1992) (*per curiam*) ("A court may consider the last-minute nature of an application to stay execution in deciding whether to grant equitable relief."); see also *Hill*, 547 U.S. at 584 ("A court considering a stay must also apply a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." (cleaned up)).

Dixon cannot meet the high standard for a stay of execution. Although the Arizona Supreme Court issued its warrant of execution on April 5, 2022, Dixon

waited until May 9, 2022 to request his last-minute stay of execution. And more importantly, as discussed below, a stay is not appropriate here, because Dixon's pending habeas claim has no merit.

**III.   THE COURT SHOULD DENY AND DISMISS DIXON'S HABEAS PETITION.**

Because Dixon filed his timely[2] habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA] governs this Court's review of his claim. *Lindh v. Murphy*, 521 U.S. 320, 322–24 (1997).

### A.   AEDPA STANDARDS OF REVIEW OF CLAIMS THAT HAVE BEEN ADJUDICATED ON THEIR MERITS IN STATE COURTS.

AEDPA imposes a "highly deferential standard for evaluating state-court rulings" on constitutional claims. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*); *see also Patterson v. Stewart*, 251 F.3d 1243, 1245 (9th Cir. 2001) (citing *Smith v. Robbins*, 528 U.S. 259, 268 n.3 (2000)). This standard ensures that federal habeas relief acts only "as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (2011).

Congress intended AEDPA to foster federal-state comity and further society's interest in the finality of criminal convictions. *See Pinholster*, 563 U.S. at 181−82 (recognizing congressional "intent to channel prisoners' claims first to the state courts"); *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007) ("[AEDPA's] design is to 'further the principles of comity, finality, and federalism.'") (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003)); *Rhines*, 544 U.S. at 276 ("One of

---

[2] A claim challenging a petitioner's competency to be executed that, as here, is filed "as soon as [the] claim is ripe," is timely, and the provisions of AEDPA that govern the filing of "second or successive" petitions are not applicable. *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007).

[AEDPA's] purposes is to 'reduce delays in the execution of state and federal criminal sentences, particularly in capital cases.'") (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). AEDPA "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). A prisoner bears the burden of proving his habeas claims. *See Pinholster*, 563 U.S. at 181; *Lambert v. Blodgett*, 393 F.3d 943, 970 n.16 (9th Cir. 2004).

Consistent with this intent, Congress set forth in AEDPA "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 563 U.S. at 181 (quotations and citations omitted); *see also Richter*, 562 U.S. at 102 ("If [AEDPA's] standard is difficult to meet, that is because it was meant to be."). This deferential standard is codified in 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Even when a state court decision "is unaccompanied by an explanation," it nonetheless constitutes a decision on the merits under § 2254(d) and, to prevail on habeas, a prisoner must show that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *id.* at 100 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"); *see also*

*Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.").

Further, under § 2254(d), evidence presented for the first time in federal court is irrelevant to this Court's review. Under its plain terms, 28 U.S.C. § 2254(d)(2) limits this Court's review to evidence "presented in the State court proceeding." Likewise, when "a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 563 U.S. at 184−85. Evidence presented in federal court, but not considered by the state court that issued the merits decision, has "no bearing" on the analysis. *Id.*

Section 2254(d)(1)'s phrase "clearly established federal law" "'refers to the holdings, as opposed to the dicta of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). When the Supreme Court has not ruled on a particular legal issue, no "clearly established federal law" exists, and the state court decision cannot be "contrary to, or involve[] an unreasonable application of," such law under 28 U.S.C. § 2254(d)(1). *See Woods v. Donald*, 575 U.S. 312, 317 (2015) (per curiam) ("Because none of our cases confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from this Court.") (quoting *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam); *Thaler v. Haynes*, 559 U.S. 43, 49 (2010) (reversing court of appeals' grant of habeas relief because "no decision of this Court clearly establishes the categorical rule on which the Court of Appeals appears to have relied to grant relief"); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the prisoner's] favor, it cannot be said that the state court

unreasonably applied clearly established federal law. Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized.") (quotations, alterations, and citations omitted); *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law."); *accord Richter*, 562 U.S. at 102; *Musladin*, 549 U.S. at 77. Furthermore, "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [the Supreme] Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (emphasis in original).

Thus, this Court cannot grant habeas relief merely because a state court decision conflicts with authority from the United States Court of Appeals. "While circuit law may be persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003) (quotations and citations omitted); *see also Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (circuit court precedent should not "be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced").

A state court decision is "contrary to" clearly established federal law when the court has applied a rule of law that contradicts the governing law set forth in Supreme Court precedent, or has encountered a set of facts that are "materially indistinguishable" from a Supreme Court decision and yet reached a different result than the Supreme Court. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see also Brown v. Payton*, 544 U.S. 133, 141 (2005); *Bell v. Cone*, 535 U.S. 685, 694 (2002). And a state court decision need not cite or discuss applicable

Supreme Court precedent, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (quotations omitted); *see also Packer*, 537 U.S. at 8.

"For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Richter*, 562 U.S. at 101 (quoting *Williams*, 529 U.S. at 410). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102; *see also White*, 572 U.S. at 419 ("even 'clear error' will not suffice"). Rather, a prisoner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. In other words, "'[i]f all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable…. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.'" *Dixon v. Ryan*, 2016 WL 1045355, at *3 (D. Ariz. Mar. 16, 2016) (quoting *Frost v. Pryor*, 749 F.3d 1212, 1225−26 (9th Cir. 2014)).

Reviewing a state court's factual findings under 28 U.S.C. § 2254(d)(2) requires this Court to "be particularly deferential to [its] state court colleagues." *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Rather, a prisoner must show that "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record [before the state court]." *Maddox*, 366

13

F.3d at 1000. "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the [state] court's . . . determination.'" *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). Along these lines, the Ninth Circuit has only identified three types of state-court factual determinations that might be considered unreasonable for purposes of § (d)(2): (1) where a state court "plainly" misapprehends or misstates the record; (2) fails to consider "key aspects" of the record; or (3) ignores "highly probative" evidence supporting a petitioner's claim. *McGill v. Shinn*, 16 F.4th 666, 685 (9th Cir. 2021) (citing *Maddox*, 366 F.3d at 1001, 1008).[3]

Thus, § 2254(d)(2) sets "a daunting standard—one that will be satisfied in relatively few cases." *Maddox*, 366 F.3d at 1000.

Finally, this Court should grant habeas relief only if the state court's error actually prejudiced a prisoner—in other words, a habeas petitioner must prove that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (quotations omitted); *see also Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000) ("[W]e now join the vast majority of our sister circuits by deciding that the *Brecht* standard should apply uniformly in all federal habeas corpus cases under [28 U.S.C.] § 2254."). This Court must apply *Brecht*'s standard even if the state court did not conduct a harmless-error analysis. *Bains*, 204 F.3d at 977. And if the state court did conduct a harmless-error analysis, a prisoner can only obtain relief only if that determination was unreasonable. *Davis v. Ayala*, 576 U.S. 257, 268–69 (2015).

Moreover, as the Supreme Court has recently held:

---

[3] *Maddox* in turn cited *Wiggins v. Smith*, 539 U.S. 510, 528 (2003) and *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003).

When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in Brecht and the one Congress prescribed in AEDPA.

*Brown v. Davenport*, ___ U.S. ___, WL 1177498, at *3 (April 21, 2022).

## B.    DIXON IS COMPETENT TO BE EXECUTED.

Dixon contends that he is entitled to habeas relief because: (1) the state court's determination that he is mentally competent to be executed was based on unreasonable factual determinations; and (2) the state court unreasonably applied *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007). Respondents disagree.

### 1.    Clearly-established federal law.

The Supreme Court has explained the clearly-established federal law governing this area:

> [*Ford v. Wainright*, 477 U.S. 399 (1986)] identifies the measures a State must provide when a prisoner alleges incompetency to be executed. The four-Justice plurality in *Ford* concluded as follows:
>
> > "Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being. Thus, the ascertainment of a prisoner's sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding." 477 U.S., at 411–412, 106 S. Ct. 2595.
>
> Justice Powell's concurrence, which also addressed the question of procedure, offered a more limited holding. When there is no majority opinion, the narrower holding controls. *See Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L.Ed.2d 260 (1977). Under this rule Justice Powell's opinion constitutes "clearly established" law for purposes of § 2254 and sets the minimum procedures a State must provide to a prisoner raising a *Ford*-based competency claim.
>
> Justice Powell's opinion states the relevant standard as follows. Once a prisoner seeking a stay of execution has made "a substantial threshold showing of insanity," the protection afforded by procedural due process includes a "fair hearing" in accord with fundamental

15

fairness. *Ford*, 477 U.S., at 426, 424, 106 S. Ct. 2595 (opinion concurring in part and concurring in judgment) (internal quotation marks omitted). This protection means a prisoner must be accorded an "opportunity to be heard," *id*., at 424, 106 S. Ct. 2595 (internal quotation marks omitted), though "a constitutionally acceptable procedure may be far less formal than a trial," *id*., at 427, 106 S. Ct. 2595. As an example of why the state procedures on review in Ford were deficient, Justice Powell explained, the determination of sanity "appear[ed] to have been made solely on the basis of the examinations performed by state-appointed psychiatrists." Id., at 424, 106 S. Ct. 2595. "Such a procedure invites arbitrariness and error by preventing the affected parties from offering contrary medical evidence or even from explaining the inadequacies of the State's examinations." *Ibid*.

Justice Powell did not set forth "the precise limits that due process imposes in this area." *Id*., at 427, 106 S. Ct. 2595. He observed that a State "should have substantial leeway to determine what process best balances the various interests at stake" once it has met the "basic requirements" required by due process. *Ibid*. These basic requirements include an opportunity to submit "evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination." *Ibid*.

*Panetti v. Quarterman*, 551 U.S. 930, 948–50. The *Panetti* Court went on to find that the scope of the inquiry focuses on whether a prisoner can "reach a rational understanding of the reason for [his] execution." *Id.* at 958. And when mental illness is involved, "[t]he critical question is whether a prisoner's mental state is so distorted by a mental illness' that he lacks a 'rational understanding' of 'the State's rationale for [his] execution.'" *Madison v. Alabama*, 139 S. Ct. 718, 723 (2019) (quoting *Panetti*, 551 U.S. at 958–959).

## 2. The state court decision is not based on unreasonable factual determinations.

Dixon's first argument, that he is entitled to relief under 28 U.S.C. §2254(d)(2) because the state court's decision was based on unreasonable factual determinations,[4] fails. In the state court decision, the judge noted:

---

[4] *See* Doc. 86 at 25–30.

The evidence presented at the hearing consisted of 39 exhibits, admitted by stipulation, and the testimony of Dr. Lauro Amezcua Patino, M.D., FAPA, and Dr. Carlos Vega, Psy.D., bot of whom were qualified as experts and without objection, pursuant to Evidence Rule 702, and the expert witnesses examined the Defendant but presented conflicting opinions. Accordingly, their opinions are judged just as any other testimony, and the Court may give any such testimony as much credibility and weight as the Court thinks it deserves, considering the witness's qualifications and experience, the reasons given for the opinions, and all the other evidence in the hearing.

Doc. 89–1 at 72.

Dixon first disputes the judge's finding that the experts offered "conflicting opinions." Dixon asserts: "[D]r. Amezcua-Patino is the only expert who assessed Dixon's mental competency under the appropriate standard, and he testified unequivocally that Dixon lacks a rational understanding of the meaning and purpose of his execution." Doc. 86 at 23. However, this is contrary to the record. Dr. Vega agreed that he conducted his evaluation under the following legal standard—"whether Clarence Dixon'[s] mental state is so distorted or his concept of reality is so impaired that he lacks a rational understanding of the state's rational for his execution...." Doc. 89–9 [RT 05/03/22, pm] at 159–60. And that is not only the legal standard the parties agreed the state court should rely upon, *see* Doc. 89–1 at 72, but it is also the controlling legal standard set by the Supreme Court. *Compare with Madison*, 139 S. Ct. at 723. And Dr. Vega further testified that in his opinion Dixon has "a rational understanding of the state's reasons for his execution", and that Dixon "make[s] a connection between the 1978 murder he was convicted of and his upcoming execution". Doc. 89–9 [RT 05/03/22, pm] at 175. Moreover, in concluding his testimony, Dr. Vega once again opined that Dixon was competent to be executed under the proper legal standard:

Q [By the State's attorney]. [A]nd then lastly, it [has] been emphasized today that Mr. Dixon has repeatedly made a number of challenges to his convictions, what does the fact that he has been for years and continues to this day to be challenging those convictions, what does that tell you about his understanding of the reasons for his execution, if anything?

17

A [Dr. Vega]. He wants to prevent it. He wants to do everything that he can in order to see whether there is a possibility that they would accept his position and not execute him.

Q. And does it say anything about his understanding of the connection between his conviction of murder and his execution?

A. It says he absolutely understands the connection.

Doc. 89–9 [RT 05/03/22, pm] at 237–38.

Dixon fails to demonstrate that the state court's decision relied upon any unreasonable factual determinations. Instead, he offers his disagreements with the court's credibility determinations, and with the court's ultimate decision finding him competent to be executed. *See* Doc. 86 at 25–30. But the court's credibility determinations are not subject to reweighing by this Court,[5] and Dixon is not entitled to relief under § (d)(2) merely because he disagrees with the state court's ruling. *See McGill v. Shinn*, 16 F.4th 666, 680 (9th Cir. 2021) (federal habeas courts may not disturb a state court's factual findings unless they are objectively unreasonable, which is a substantially higher threshold than merely believing that the state court's determinations were incorrect). In short, Dixon fails to meet the "daunting standard"[6] set by § (d)(2).

3. **The state court decision is neither contrary to, nor an unreasonable application of, controlling Supreme Court precedent.**

In his second argument, Dixon contends that the state court decision is contrary to, or an unreasonable application of *Panetti*. *See* Doc. 86 at 30–32. Specifically, Dixon contends that contrary to *Panetti*, the state court based its

---

[5] *Aiken v. Blodgett*, 921 F.2d 214, 217 (9th Cir. 1990) (concluding a habeas court may not "redetermine credibility of witnesses whose demeanor has been observed by the state trial court").

[6] *Maddox*, 366 F.3d at 1000.

decision on a finding that Dixon was aware of the State's rationale for seeking his execution, rather than on whether Dixon has a rational understanding of the State's motivation. *See id.* However, Dixon's argument ignores the plain language of the court's ruling. As previously discussed, the Court noted that it was guided by the *Panetti* standard in assessing Dixon's competency to be executed: whether his "mental state is so distorted by a mental illness that he lacks a rational understanding of the State's rationale for his execution."[7] *Compare* Doc. 89–1 at 72 *with Madison*, 139 S. Ct. at 723. And the court's order clearly indicates that it followed *Panetti*'s dictates:

> As a threshold determination ... the Court **FINDS** that the Defendant has a mental disorder or mental illness of schizophrenia, albeit that this mental disorder or illness can fall within a broad spectrum, which the Defendant has shown through the testimony of Dr. Patino and multiple exhibits. This determination, however, does not decide the question of competency. Rather, this threshold determination requires the Court to further consider whether Defendant's mental state is so distorted by this mental illness that he lacks a rational understanding of the State's rationale for his execution.

Doc. 89–1 at 72 (emphasis in original).

Thus, the state court cited the correct legal standard, and acknowledged that it applied that standard in reaching its decision. Therefore, Dixon cannot meet his burden of proving that no reasonable jurist could agree with the state court's decision that he is competent to be executed.

---

[7] This standard of competency is much lower that other standards of competency that Dixon has previously met. *See Godinez v. Moran*, 509 U.S. 389, 399 (1993) (competency standard for waiving the right to counsel is the same as the competency standard for standing trial); *Dusky v. United States*, 362 U.S. 402, 402 (1960) (defendant is competent to stand trial if he has sufficient present ability to consult with this lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him).

Dixon fails to meet his burden of proof of demonstrate that the state court decision was neither contrary to, or an unreasonable application of controlling Supreme Court case law, under *Panetti.*

**IV.  CONCLUSION.**

Based on the foregoing authorities and arguments, Respondents respectfully request that the motion for stay of execution be denied, and that the petition for writ of habeas corpus be denied and dismissed with prejudice.

RESPECTFULLY SUBMITTED this 9th day of May, 2022.

Mark Brnovich
Attorney General

Jeffrey Sparks
Acting Chief Counsel
Capital Litigation Section

s/  J.D. Nielsen
Ginger Jarvis
Jason Easterday
Assistant Attorneys General
Capital Litigation Section

Attorneys for Respondents

# CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2022, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and served the attached document using ECF on the following registered participants of the ECF System:

Cary Sandman
Amanda C. Bass
Eric Zuckerman
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
Telephone: (602) 382-2816
cary_sandman@fd.org
amanda_bass@fd.org
eric_zuckerman@fd.org

*Attorneys for Petitioner*

s/ Maria Palacios

**EXHIBIT LIST**

**Exhibit A:**  State's Response to Petition for Special Action, filed May 8, 2022, Arizona Supreme Court