**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Clarence Wayne Dixon, | No. CV-14-00258-PHX-DJH |
| Petitioner, | **ORDER** |
| v. | <u>DEATH PENALTY CASE</u> |
| David Shinn, et al., | **Execution Scheduled For:** |
| Respondents. | **May 11, 2022, at 10:00 a.m.** |

Petitioner Clarence Wayne Dixon, a state prisoner under sentence of death, is scheduled to be executed by the State of Arizona at 10:00 a.m. on May 11, 2022. Warrant of Execution, *State v. Dixon*, No. CR-08-0025-AP (Ariz. Apr. 5, 2022). Dixon has filed a petition raising one habeas claim, alleging he is incompetent to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986), (Doc. 86), together with a Notice of Filing the State Court Record (Doc. 89). Dixon has also filed a motion seeking a stay of execution to permit briefing and argument on the *Ford* claim. (Doc. 87.) Leslie James, the victim's sister, and statutory crime victim in this case, filed an Objection to Inmate Dixon's Motion for Stay of Execution. (Doc. 95.) Respondents oppose the petition and motion, arguing that Dixon's claim is without merit. (Doc. 94.) For the reasons set forth herein, the petition and the motion for a stay are denied.

# I. BACKGROUND

In 2008, Dixon was convicted of first-degree murder and sentenced to death for the 1978 murder of Deana Bowdoin. The following facts surrounding the crime are taken from

the opinion of the Arizona Supreme Court upholding the conviction and sentence. *State v. Dixon*, 226 Ariz. 545, 548–49, 250 P.3d 1174, 1177–78 (2011).

On January 6, 1978, Deana, a 21-year-old Arizona State University senior, had dinner with her parents and then went to a nearby bar to meet a female friend. The two arrived at the bar at 9:00 p.m. and stayed until approximately 12:30 a.m., when Deana told her friend she was going home. She drove away alone.

Deana and her boyfriend lived together in Tempe. He returned to their apartment at about 2:00 a.m. after spending the evening with his brother and found Deana dead on the bed. She had been strangled with a belt and stabbed several times.

Investigators found semen in Deana's vagina and on her underwear, but could not match the resulting DNA profile to any suspect until 2001, when a police detective checked the profile against a national database and found that it matched that of Clarence Dixon, an Arizona prison inmate. As discussed in more detail below, Dixon's DNA was on file due to a 1985 rape conviction.

Dixon chose to represent himself at trial, with the assistance of advisory counsel. The trial concluded when the jury convicted Dixon of both premeditated and felony murder. At sentencing, the jury found two aggravating factors: that Dixon had previously been convicted of a crime punishable by life imprisonment, A.R.S. § 13–751(F)(1), and that the murder was especially cruel and heinous, § 13–751(F)(6). The jury then determined that Dixon should be sentenced to death.

The Arizona Supreme Court affirmed Dixon's conviction and sentence on appeal. *Dixon*, 226 Ariz. 545, 250 P.3d 1174.

In his state post-conviction relief ("PCR") proceeding, Dixon, now represented by counsel, raised three claims, including an allegation that his pre-trial counsel provided constitutionally ineffective assistance by failing to challenge Dixon's competency to waive counsel. The PCR court rejected the claims and the Arizona Supreme Court denied review on February 11, 2014.

Dixon filed his federal habeas petition on December 19, 2014, and the district court denied relief on March 16, 2016. *See Dixon v. Ryan*, No. CV-14-258-PHX-DJH, 2016 WL 1045355 (D. Ariz. Mar. 16, 2016). In doing so the court rejected a number of claims related to Dixon's competence to stand trial. *Id.* at 5–13. The Court also rejected a *Ford* competency claim as premature. *Id.* at 44. The Ninth Circuit affirmed, *Dixon v. Ryan*, 932 F.3d 789 (9th Cir. 2019), and denied Dixon's petitions for panel and en banc rehearing, with no judge requesting a vote on whether to rehear the matter en banc. *See* Ninth Circuit No. 16–99006, Dkt. # 63. The United States Supreme Court denied Dixon's petition for writ of certiorari. *See Dixon v. Shinn*, 140 S. Ct. 2810 (2020) (Mem.).

## II.    APPLICABLE LAW

### A.    Successive Petition

Dixon's claim is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA generally bars second or successive habeas petitions. Section 2244(b)(1) states that "[a] claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed." 28 U.S.C. § 2244(b)(1). A subsequent petition raising the claim that the petitioner is incompetent to be executed under *Ford* provides one exception to the AEDPA limitations on successive petitions. In *Panetti v. Quarterman,* 551 U.S. 930, 945 (2007), the Supreme Court held that a ripe *Ford* claim brought for the first time in a petition filed after the federal courts have already rejected the prisoner's initial habeas application is not "successive," and thus § 2244(b) does not apply.

### B.    AEDPA

Under the AEDPA, this Court may not grant a writ of habeas corpus to a state prisoner on a claim adjudicated on the merits in state court proceedings unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).

Under the "unreasonable application" prong of § 2254(d)(1), relief is available where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor (Terry)*, 529 U.S. 362, 407 (2000).

"Clearly established federal law" refers to the holdings, as opposed to dicta, of the Supreme Court's decisions at the time of the relevant state court decision. *Id.* at 412. "[C]ircuit precedent does not constitute 'clearly established Federal law'" and "cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012); *see Carey v. Musladin*, 549 U.S. 70, 76–77 (2006). A reviewing court may, however, "look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 63 (2013).

The Supreme Court has emphasized that under § 2254(d)(1) "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams (Terry)*, 529 U.S. at 410, (O'Connor, J., concurring); *see Bell v. Cone*, 535 U.S. 685, 694 (2002). To obtain habeas relief, therefore, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see Shinn v. Kayer*, 141 S. Ct. 517, 526 (2020) (per curiam); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The burden is on the petitioner to show "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

With respect to § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340

(2003). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice v. Collins*, 546 U.S. 333, 341–342 (2006); *see Hurles v. Ryan*, 752 F.3d 768,778 (2014) (explaining that on habeas review a court "cannot find that the state court made an unreasonable determination of the facts in this case simply because [the court] would reverse in similar circumstances if th[e] case came before [it] on direct appeal"). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." § 2254(e)(1).

Significantly, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011); *see Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). The Ninth Circuit has observed that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n. 6 (2013) (citing § 2254(d)(2) and *Pinholster*, 563 U.S. at 185 n. 7).

When, as here, a state supreme court summarily denies discretionary review, we "'look through' that unexplained decision to the last state court to have provided a 'reasoned' decision." *Castellanos v. Small*, 766 F.3d 1137, 1145 (9th Cir. 2014).

### C. *Ford/Panetti*

"[T]he Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." *Ford*, 477 at 409–10. "The critical question is whether a 'prisoner's mental state is so distorted by a mental illness' that he lacks a 'rational understanding' of 'the State's rationale for [his] execution.'" *Madison v. Alabama*, 139 S. Ct. 718, 723 (2019) (quoting *Panetti*, 551 U.S. at 958–59). A rational understanding

requires more than just an awareness of the State's rationale. *Panetti*, 551 U.S. at 959. Put another way, "the issue is whether a 'prisoner's concept of reality' is 'so impair[ed]' that he cannot grasp the execution's 'meaning and purpose' or the 'link between [his] crime and its punishment'." *Id.* (quoting *Panetti*, 551 U.S. at 958, 960).

Mental illness or lack of memory of the crime do not alone establish incompetence. "What matters is whether a person has the 'rational understanding' *Panetti* requires—not whether he has any particular memory or any particular mental illness." *Madison*, 139 S. Ct. at 727. Moreover, "[p]rior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition." *Panetti,* 551 U.S. at 934. Finally, as the Court observed in *Panetti*, "The mental state requisite for competence to suffer capital punishment neither presumes nor requires a person who would be considered "normal," or even "rational," in a layperson's understanding of those terms. 551 U.S. at 959.

Once a prisoner makes a requisite threshold showing of incompetency, the protection afforded by procedural due process includes, at a minimum, a "fair hearing" and an "opportunity to be heard." *Panetti*, 551 U.S. at 949 (quoting *Ford*, 477 U.S. at 424, 426.) A state court's failure to provide these procedures constitutes an unreasonable application of clearly established Supreme Court law. *Id.* at 948.

## III.    DIXON'S MENTAL HEALTH

### A.    Past Diagnoses

In 1977 Dixon was arrested and charged with assault with a deadly weapon after striking a teenage girl with a metal pipe. Pursuant to Rule 11 of the Arizona Rules of Criminal Procedure, the trial court appointed two psychiatrists, Drs. Otto Bendheim and Maier Tuchler, to evaluate Dixon. (RT 05/03/22 a.m. at 41–44, Hearing Ex. 3, Psychiatric Examination Report by Otto Bendheim, M.D.; Hearing Ex. 4, Psychiatric Examination Report by Maier Tuchler, M.D.; Hearing Ex. 9, Min. Entry Verdict, Jan 5, 1978.)[1] On

---

[1] Citations to the morning and afternoon transcripts of the Pinal County Superior

September 2, 1977, both found he was not competent to stand trial and suggested a diagnosis of "undifferentiated schizophrenia." (Hearing Exs. 3, 4.) Based on these reports, on September 14, 1977, Maricopa County Superior Court Judge Sandra O'Connor found Dixon incompetent and committed him to the Arizona State Hospital. (PCR Pet., Appx. M.)

On October 26, 1977, psychiatrist Dr. John Marchildon reported that Dixon was now competent to stand trial. (*Id.* Appx. L.) Dr. Marchildon found that Dixon's "mental condition substantially differs at this time with that described by" Tuchler and Bendheim. (*Id.*) Dr. Marchildon's assessment noted that Dixon's affect was appropriate, his memory was satisfactory, there was no evidence of confusion or retardation, Dixon denied hallucinations and delusions, and his insight and judgment were satisfactory. (*Id.*)

Dr. Marchildon found no evidence of mental illness. He concluded that Dixon understood the charges and the nature of the legal proceedings. (*Id.*) He noted that Dixon's "hospital stay has been uneventful. He has participated in psychotherapeutic sessions, has received no neuroleptic drugs, and has displayed no behavior or ideation which would indicate mental illness." (*Id.*)

On December 5, 1977, Dixon appeared before Judge O'Connor, waived his right to a jury trial, and agreed that the case could be determined on the record. (*See id.* Appx. M.) On January 5, 1978, Judge O'Connor found Dixon "not guilty by reason of insanity." (*Id.*) The court ordered that Dixon remain released pending civil proceedings. (Hearing Ex. 9) Dixon murdered Deana less than two days later.

In 1981, a psychological evaluation of Dixon administered by the Arizona Department of Corrections described symptoms consistent with paranoid schizophrenic

_____

Court hearing that occurred on May 3, 2022, are designated "RT 05/03/2022 a.m./p.m." followed by the page number. Citations to the exhibits admitted into evidence at the hearing are designated "Hearing Ex." followed by the exhibit number. Citations attached to the Motion to Determine Competency, *State v. Dixon*, No. S1100CR202200692 (Pinal Cnty. Super. Ct. April 8, 2022) are designated "Motion Ex." followed by the exhibit number. Items from the record on appeal from the proceedings in the Pinal County Superior Court are designated "Pinal ROA" followed by the document number. (*See* Doc. 89-3 at 2-5.)

psychotic disorder, reporting that he "operates on an intuitive, feeling level, with much less regard for rationality and hard facts," and that he experiences "grossly disturbed perceptual and thought patterns, clear paranoid ideation, feelings of frustration, and moderate agitation." (Hearing Ex. 5 at 1, 2.) The evaluation reported that Mr. Dixon's mental illness was "producing inefficiency of intellectual functioning[]") and concluded that he was a "severely confused and disturbed prisoner." (*Id.*)

In 1985, while on probation for a 1978 assault and burglary, Dixon kidnapped and sexually assaulted a Northern Arizona University ("NAU") student at knifepoint. *See State v. Dixon*, 153 Ariz. 151, 152, 735 P.2d 761, 762 (1987). He was sentenced to seven consecutive 25-years-to-life sentences. *Id.*

The basis for the allegations of incompetence in these proceedings is Dixon's "perseveration" and "delusional conduct" concerning a particular legal issue arising from that case. This issue involves Dixon's theory that NAU officers lacked statutory authority to investigate the case because the NAU police force was not a legal entity in 1985. Therefore, because the NAU police lacked authority, he was wrongfully arrested, his 1985 conviction was "fundamentally flawed," and the DNA comparison made pursuant to his invalid conviction should be suppressed. (*See* ROA 143 at 8, 9; Motion Ex. 6 at 3; Ex. 7.)[2]

During his capital trial, Dixon fired his court-appointed attorneys and represented himself after counsel concluded they could not ethically move to suppress the DNA evidence based on the NAU issue. *See Dixon*, 932 F.3d at 797. After firing his counsel, Dixon filed a Motion to Suppress the DNA evidence. *Id.* at 798. When the trial court denied his motion he filed a special action in the Arizona Supreme Court, which was also denied. *Id.*

The NAU issue lacks any basis in fact. Dixon was not arrested by the NAU Police but by the Flagstaff City Police, and collection of the DNA sample by the Department of

---

[2] "ROA" refers to the record on appeal from Dixon's trial and sentencing (Case No. CR-08-0025-AP).

- 8 -

Corrections in 1995 was unrelated to Dixon's 1985 arrest. Nevertheless, as Dixon's habeas counsel write:

> For almost thirty years, Mr. Dixon has been unable to overcome his psychotically driven belief that the NAU Police lacked authority to investigate and arrest him in 1985, that therefore his 1985 conviction was illegal, and his DNA was illegally obtained, thereby voiding his murder conviction. He has obsessed over this issue . . . , preparing and submitting an unending stream of pro se filings in state and federal courts.

(Motion to Determine Competency at 7.) Dixon's perseveration on this issue for nearly three decades is well documented by Dixon's counsel in their state petition for competency hearing. (*Id.* at 7–11 and fns. 3–7.) Dixon's expert, psychiatrist Dr. Lauro Amezcua-Patiño, opines that Dixon's pro se pleadings over the NAU issue "reveal his delusional, paranoid, and conspiratorial thought content." (Hearing Ex. 2, Attachment, Patiño Report 3/31/22 at 12.)

In 2012, during state PCR proceedings, Dixon was evaluated by John Toma, Ph.D., and Dr. Amezcua-Patiño. Dr. Toma found that Dixon suffered from "mood, thought and perceptual disturbances" and that there were "significant cognitive [brain] impairments noted from his neuropsychological test scores." (Hearing Ex. 6 at 21, 22.) Further, the neuropsychological tests indicated possible brain damage meeting the diagnostic criteria for Cognitive Disorder, Not Otherwise Specified (NOS). (*Id.* at 18, 22–23, 24.) Mr. Dixon also underwent neuroimaging that evidenced brain abnormalities. (Motion Ex. 14 at 4.)

In addition to the findings of brain impairment, Dr. Toma found evidence of mental illness, including severe depression, paranoia, perceptual disturbances, and diagnosed Dixon with a psychotic disorder, schizophrenia. (Hearing Ex. 6 at 21–2, 24.) Dr. Toma also administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and corroborated a finding that Dixon suffers from "[a] psychotic disorder (such as

- 9 -

1    Schizophrenia)[.]" (*Id.* at 20.) Dr. Toma found that Dixon met the DSM-IV-TR diagnostic

2    criteria for Paranoid Schizophrenia. (*Id.* at 24.)[3]

3         In 2012, Dr. Amezcua-Patiño similarly observed that Dixon "exhibits evidence of

4    positive, negative and cognitive deficits associated with schizophrenia, with a

5    predominance of paranoid ideation and cognitive difficulties[.]" (Hearing Ex. 6 at 5.) Dr.

6    Amezcua-Patiño noted that "[s]chizophrenia is a chronic, severe, and disabling brain

7    disorder that affects about 1 percent of the world population. People with [schizophrenia]

8    may hear voices other people don't hear. They may believe other people are reading their

9    minds, controlling their thoughts, or plotting to harm them." (Hearing Ex. 7 at 4.) Dr.

10   Amezcua-Patiño also explained that hallucinations and delusions are common symptoms

11   in patients with schizophrenia.

12        Dr. Amezcua-Patiño concluded Dixon "suffers from chronic and severe

13   psychiatrically determinable thought, cognition and mood impairments that are expected

14   to continue for an indefinite period of time of a Schizophrenic nature[.]" (*Id.* at 4.)

15        **B.    Present Diagnoses**

16        On April 7, 2022, after issuance of the execution warrant, Dixon filed his Motion to

17   Determine Competency in Pinal County Superior Court. Dixon attached several reports to

18   his motion, the most recent of which was a Psychiatric Evaluation Report by Dr. Amezcua-

19   Patiño, dated March 31, 2022. (Hearing Ex. 2, Attachment, Amezcua-Patiño Report

20   3/31/22 at 12.) In the report, Dr. Amezcua-Patiño opines that "[Dixon] suffers primarily

21   from the mental disorder of schizophrenia" that "significantly affects his ability to develop

22   a rational understanding of the State's reasons for his execution." (*Id.* at 11–12.)

23        Dr. Amezcua-Patiño further states that it was highly likely that Dixon's increased

24   isolation, after being placed in the prison's "Death Watch" for the 35-day period before his

25   execution, would lead to psychiatric decompensation, with a worsening of delusional and

26

27   _____

28        [3] DSM refers to The American Psychiatric Association's Diagnostic and Statistical
     Manual of Mental Disorders.

paranoid thinking, worsening of anxiety, and "initiation of a new depressive episode." (*Id.* at 13.)

The competency court found Dixon demonstrated reasonable grounds for a mental competency examination and hearing, under A.R.S. § 13-4022, and *Ford*, 477 U.S. 399, and appointed experts to evaluate Dixon. At Dixon's request the Court appointed Dr. Amezcua-Patiño. *State v. Dixon*, No. S1100CR202200692 (Ariz. Sup. Ct. Apr. 12, 2022) At the State's request, the court appointed Dr. Carlos Vega. *Id.* The court set a hearing for May 3, 2022. *Id.* (Ariz. Sup. Ct. April 8, 2022).

The State petitioned the Arizona Supreme Court for a special action, asserting Dixon failed to establish reasonable grounds for a competency examination. *State v. Olson (Dixon)* No. CV-22-0092-SA (Ariz. Apr. 18, 2022). The court accepted jurisdiction and remanded to the competency court with instructions to reconsider its ruling in light of the response and reply. (*Id.* (Ariz. Apr. 25, 2022)). On reconsideration, the competency court affirmed its previous ruling. (*State v. Dixon*, No. S1100CR202200692 (Ariz. Sup. Ct. April 27, 2022).

Dr. Amezcua-Patiño reevaluated Dixon over three separate visits in 2021 and 2022 and concluded that Dixon is unable to form a rational understanding of the State's reasons for his execution. (Hearing Ex. 2, Attachment, Patiño Report 3/31/22 at 12–13.) Dr. Amezcua-Patiño opined that Dixon suffers from persistent delusions related to his legal case as well as visual, auditory, and tactile hallucinations. (*Id.* at 12.) Despite being legally blind, Dixon reports seeing dead children watching him. Dixon's "capacity to understand the rationality of his execution is contaminated by the schizophrenic process which results in his deluded thinking about the law, the judicial system, his own lawyers, and his ultimate execution[.]" (*Id.* at 13.) Dixon is disconnected from reality and experiences concrete thinking, which is common to those diagnosed with schizophrenia. (*Id.* at 12.) Concrete thinking causes Dixon to fixate on an issue that is unrelated to his execution, limiting his ability to abstractly consider why he is to be executed. This contributes to his inability to form a rational understanding of the State's reasons for his execution. (*Id.*, at 12–13.)

Dr. Vega, a psychologist, interviewed Dixon once by video. The meeting lasted 70 minutes. In his report, dated April 23, 2022, Dr. Vega diagnosed Dixon as "primarily suffering from an antisocial personality disorder with salient paranoid and narcissistic personality characteristics." (Hearing Ex. 31 at 5.) He further opined, noting that Dixon had not been treated for a "psychotic disorder" during his three decades in prison, that "there is no evidence [Mr. Dixon] is experiencing active symptoms of schizophrenia at this time." (*Id.*) Dr. Vega found that Dixon's fixation on the legally meritless NAU issue did not indicate he was delusional. (*Id.*) According to Dr. Vega, Dixon "is deluding himself legally, but this is likely the function of the kind of cognitive distortions that are part and parcel of personality disordered individuals." (*Id.* at 5–6.) Dr. Vega concluded "there is no evidence that [Dixon's] mental state is so disordered, or his concept of reality so impaired, that he lacks a rational understanding of the State's rationale for his execution." (*Id.* at 6.) Dr. Vega noted that Dixon "is so well aware of the State's rationale for his death that he wishes he resided in a different state, one that did not have the death penalty." (*Id.*) He also concluded that Dixon "is not suffering from any mental disease or defect, that results in making him unaware that he is to be punished for the crime of murder or unaware that the impending punishment for that crime is death." (*Id.*)

In discussing the crime with Dr. Vega, Dixon acknowledged that the DNA evidence proved he had sex with the victim. (*Id.* at 5.) He claimed not to remember the murder and stated that if he did kill the victim on purpose maybe he deserved the death penalty. (*Id.*) He told Dr. Vega that if he were somehow to remember killing the victim "he would have a sense of relief on his way to his execution." (*Id.*) He also stated that he would bring the girl back if he could. (*Id.*)

At the May 3rd hearing Drs. Amezcua-Patiño and Vega testified consistent with the opinions expressed in their reports. (RT 5/3/2022 a.m. at 18–93; RT 5/3/2022 p.m. at 27–110.) Dr. Amezcua-Patiño, a psychiatrist with 37 years of diagnosing and treating patients with schizophrenia (*id.* at 22), diagnosed Dixon with schizophrenia. (*Id.* at 36–37.) In

reaching this diagnosis, Dr. Amezcua-Patiño relied on both historical information and data gathered from the successive mental health evaluations he conducted of Dixon. (*Id.* at 40.)

Dr. Amezcua-Patiño noted that the likelihood of a schizophrenic diagnosis was first identified in two psychiatric evaluations from 1977, when Dixon was in his early 20s, the age at which schizophrenic symptoms generally start to manifest. (*Id.* at 41–44.) Dixon was treated at the Arizona State Hospital with Thorazine, an antipsychotic drug commonly used at the time to treat schizophrenia. (*Id.* at 44–46.) Dr. Amezcua-Patiño identified further symptoms of schizophrenia, and treatment for psychotic symptoms, in records from the Arizona Department of Corrections in 1981. (*Id.* at 47–51.) Dr. Amezcua-Patiño clarified that the medications Dixon was prescribed treat psychosis, a symptom of schizophrenia, but are not anti-schizophrenia medications. (*Id.* at 51.) He opined on Dr. Toma's neuropsychological assessment of Dixon in 2012, explaining its significance in establishing consistency in Dixon's symptoms—"paranoia and some behaviors that may be perceived as being asocial or antisocial"—over a long period of time. (*Id.* at 52–53.)

In discussing Dixon's apparent lack of treatment over the past 35 years, Dr. Amezcua-Patiño explained that, in a correctional setting, the "squeaky wheel gets the oil," in other words, "people who are agitated, violent, [or] a danger to themselves" get treated for purposes of sedation. (*Id.* at 56.)

Despite the lack of treatment records, Dr. Amezcua-Patiño described Dixon as "liv[ing] in a separate reality inside of his head." (*Id.* at 59.) In addition to the hallucinations described in his report, Dr. Amezcua-Patiño opined that Dixon experiences delusions, specifically a consistent delusion that "there is a plot from the judicial system to kill him . . . a plot where the judicial system has to protect themselves from his claims because his claims will be terribly embarrassing." (*Id.* at 61.) Despite all the evidence provided to Dixon about the irrationality of his requests, Dr. Amezcua-Patiño concluded, Dixon has an "unshakable" belief that, although "[t]hey say that they want to kill me because I killed someone," "I know that they want to kill me because they don't want to be embarrassed." (*Id.* at 63.) Every time Dr. Amezcua-Patiño "tried to shake his irrationality," Dixon would

"get a little upset" with him, and go back to explaining the law to him, demonstrating "circumstantial thinking, always going back to the original delusional premise." (*Id.* at 80.) Attorneys who disagree with his premise are considered "wrong," and, if Dixon is pushed too much on the issue, they "become part of the conspiracy too." (*Id.* at 81.)

Dr. Amezcua-Patiño opined that, in all the time he had spent with him, Dixon has not been able to grasp the societal interest in his execution, "always go[ing] back to the same premise" that "[t]hey want to execute [Dixon] because they don't want to be embarrassed" by admitting that he was illegally arrested by the NAU's Police Department. (*Id.* at 64.)

Dr. Amezcua-Patiño conceded, however, that in his March 10, 2022, interview with Dixon, when he asked Dixon about the judicial system's rationale for denying his claims, Dixon told him that he did not think the judges, the attorney for the state, or his own attorneys were plotting against him.[4] (RT 5/2/22 p.m., at 12.)

Dr. Amezcua-Patiño reviewed numerous pro se filings from Dixon, and concluded that they were consistent with the context of his testimony about Dixon's delusion. (RT 5/2/22 a.m. at 66–89.) He believes that the most recent filings, filed within the previous month (*see* Hearing Exs. 25–29, 33), demonstrate an "escalation of intensity" of Dixon's delusion. (*Id.* at 84.) Dixon's use of the term "extrajudicial killing" in those documents is significant because it is an "exaggeration of the paranoia and delusional thinking in terms of [Dixon] believing that the actions of the conspiracy . . . have risen to the point of him not being able to defend himself in any way, and that he is going to get killed anyway because the courts want him dead." (*Id.* at 86–87.)

Dr. Amezcua-Patiño testified that an acute diagnosis of psychosis, delusional thinking, and hallucinations does not initially include antisocial personality disorder,

---

[4] In his report of that interview, Dr. Amezcua-Patiño noted that Dixon expressed his belief that the actors in the judicial system are "[n]ot against me but have a firm and decided philosophy that the law enforcement should always be backed up." (3/31/2022 Report at 9.)

- 14 -

because the most probable causes are schizophrenia, drug-induced, depression, and mania, and other more significant possibilities. (*Id.* at 91.) Delusions are also not part of the DSM criteria for antisocial personality disorder. (*Id.*)

Dr. Amezcua-Patiño testified that Dixon "knows the fact" that his DNA was collected as a result of the 1985 conviction for sexual assault, its profile was entered into the law enforcement national database, and his DNA was then used to match his profile from the DNA collected from the victim in the murder case. (*Id.*, p.m., at 11.) Dr. Amezcua-Patiño testified that Dixon understood that the State wanted to execute him and he was aware that the State was executing him for the Bowdoin murder (*id.* at 12), however, due to his delusion and fixation on the NAU issue, Dixon was unable to make a rational link between the crime and his execution and could not contemplate the severity of the crime or society's purpose in executing him (*id.* at 24).

Dr. Amezcua-Patiño explained that, when Dixon is prompted to think about the fact that he is going to be executed in a number of days, he "goes back to the issues of why he is not going to be executed meaning that he is going to have these claims and he is . . . going to be filing more appeals and things of that sort," a very "schizophrenic like" reaction. (*Id.* at 25.)

Dr. Vega reviewed Dixon's mental health evaluations and a number of court documents and conducted a video interview with Dixon as part of his evaluation. (RT 5/3/22 p.m. at 32.) Dr. Vega acknowledged he had not previously evaluated a prisoner's mental competency for execution, does not treat patients, and has no experience treating people with schizophrenia. (*Id.* at 47–48.) Dr. Vega testified that video interviews were an accepted way to conduct an interview (*id.* at 33), but later acknowledged that guidelines published by the American Academy of Psychiatry and other professional associations reflect a strong preference for in-person examinations (*id.* at 106.) Dr. Vega recorded the interview but erased the recording when he completed his report.

Dr. Vega described Dixon as cordial, with some blunted affect due to situational depression, and of average to above average intellect. (*Id.* at 35.) Dr. Vega found that

Dixon's comments about politics during the interview demonstrated that he has a "very good grasp of reality." (*Id.* at 36.) Dr. Vega described his interaction with Dixon during the evaluation as "not the one least bit delusional." (*Id.* at 37.) Dixon discussed the DNA issue with Dr. Vega but prefaced the conversation "in a very rational way." (*Id.* at 39.) Dixon told Dr. Vega, essentially, that he was not going to deny the DNA evidence, that he knows he had sex with the victim because of that evidence, but that he didn't remember killing her. (*Id.* at 39–40.) Hypothetically, if Dixon did remember killing her, he told Dr. Vega he would "feel relief" on the way to his execution. (*Id.* at 40.)

Dr. Vega opined that Dixon is completely aware that his legal claim is a "Hail Mary pass," that it is his "only shot at this," and he is completely convinced of his belief, though perhaps misguided. (*Id.* at 41.) Dr. Vega testified that Dixon's delusional belief in the validity of the NAU issue was a manifestation of his narcissistic and antisocial personality disorder. (*Id.* at 41–42.) Relevant to this conclusion was the absence of any treatment for schizophrenia while Dixon was in prison. (*Id.* at 43.) Dr. Vega later acknowledged Dixon had been prescribed Thorazine and both doctors in 1997 suspected he had schizophrenia (*id.* at 82–83), but that information would not change his opinion in any way (*id.* at 107–108).

Dr. Vega explained that Dixon's belief cannot be a delusion because it is not an impossibility, just a "low probability proposition." (*Id.* at 42, 46, 68–69.) Dr. Vega opined that, even if Dixon holds the belief that the courts refuse to grant him relief to avoid embarrassment to the legal system, it does not prevent him from rationally understanding the reason for his execution. (*Id.* at 44.) Dr. Vega opined that although Dixon's beliefs are "definitely fixated" and unamenable to change (*id.* at 70), he has a rational understanding of the reason for his execution and is able to make the connection between the murder and his execution (*id.* at 46).

Dr. Vega acknowledged that, in looking back, specifically referring to Dixon's hallucinations, he could very well have a delusional disorder (*id.* at 66) but did not believe Dixon's notions about the NAU issue were delusional, rather, they were consistent with a

narcissist's belief that he knows more and has the "monopoly of truth" (*id*. at 68–69). Dr. Vega opined that he disagreed with the DSM-V's definition of delusions but agreed that Dixon's beliefs met the DSM criteria for a delusion. (*Id*. at 74.)

Dr. Vega acknowledged that Dixon failed to meet all the criteria for a diagnosis of antisocial personality disorder under the DSM-V. (*Id*. at 87–90.)

## IV. DISCUSSION

### A. State Court Decision

Following the hearing, the competency court issued a six-page order. As noted, the parties stipulated that the issue was whether Dixon's "mental state is so distorted by a mental illness that he lacks a rational understanding of the State's rationale for his execution." (Pinal ROA 8 at 2.) With the parties' consent, the court applied both the statutory standard, § 13-4022, which requires a defendant to show incompetence by "clear and convincing evidence," and the preponderance of the evidence. (*Id*.)

The court found, as a "threshold determination," that Dixon "has a mental disorder or mental illness of schizophrenia" but explained that such a diagnosis "does not decide the question of competency." (*Id*.) The court then discussed Dixon's argument, supported by Dr. Amezcua-Patiño's testimony, that Dixon's fixation of the NAU issue is delusional and evidence of incompetence, particularly with respect to his belief that the courts have denied his claims, not because they were legally incorrect, but as a means of protecting the State and law enforcement from embarrassment arising from their wrongful prosecution of him and what will constitute, if he is executed, an "extra-judicial killing." (*Id*. at 3.) The court noted that Dixon also told Dr. Amezcua-Patiño that the reason courts have ruled against him on the NAU issue was not that "the judges, attorneys for the state, or his own attorneys were plotting against him," but that they "have a firm and decided philosophy that the law enforcement should always be backed up." (*Id*. at 3.) The court found that the NAU issue was not dispositive but provided "insight" into Dixon's competency. (*Id*. at 3–4.)

The court also found that Dixon's statements to Dr. Vega, in particular Dixon's statement that he would feel relief on the way to his execution if he finally had a memory that he had committed the murder, provided insight into Dixon's understanding of the reasons for his execution. (*Id.* at 4.) The court stated that notwithstanding the schizophrenia diagnosis, Dixon is intelligent and has shown, in his pro se court filings, "sophistication, coherent and organized thinking, and fluent language skills." (*Id.* at 4.)[5] The court noted, however, that according to Dr. Amezcua-Patiño, such manifestations of intelligence do not preclude a finding of incompetence. (*Id.*)

The competency court then found that, although Dixon claims no memory of the murder, "there is no evidence of dementia or a related impairment that would otherwise implicate an Eighth Amendment concern." (*Id.*) Finally, finding that the record was sufficient to inform its decision, the court concluded that Dixon failed to prove by clear and convincing evidence that "his mental state is so distorted by a mental illness that he lacks a rational understanding of the State's rationale for his execution." (*Id.* at 5–6.) In addition, "although it is a much closer call," the court found that Dixon did not meet his burden under a preponderance of the evidence standard. (*Id.* at 6.)

The Arizona Supreme Court denied jurisdiction of Dixon's petition for special action review of Judge Olson's competency decision. *Dixon v. Carter ex. rel State*, No. CV-22-0117-SA (Ariz. May 9, 2022).

## B.    Analysis

Neither party disputes this Court's jurisdiction. Pursuant to the Supreme Court's declaration in *Panetti*, "[t]he statutory bar on 'second or successive' applications does not apply to a *Ford* claim brought in an application filed when the claim is first ripe." 551 U.S. at 947. The Court therefore has jurisdiction over this matter.

Dixon claims that the state court's decision that he failed to make a showing, by a preponderance of the evidence, of incompetency to be executed was based on an

---

[5] In the hearing, the court observed that Dixon had been hired out by other prisoners to act as a paralegal. (RT 5/3/2022 p.m. at 14.)

unreasonable application of clearly established law and an unreasonable determination of the facts in light of the evidence presented in state court proceedings.

In undertaking its analysis, the Court finds that Dr. Amezcua-Patiño was the more credible witness with respect to Dixon's diagnosis. As discussed below, however, a diagnosis is not dispositive of the issue of Dixon's competence to be executed. *See Madison*, 139 S. Ct. at 727 ("What matters is whether a person has the 'rational understanding' *Panetti* requires—not whether he has any particular memory or any particular mental illness."). The Court now considers Dixon's arguments.

**1.    Unreasonable Determination of Facts**

Dixon asserts that the competency court's ruling was unreasonable under 28 U.S.C. § 2254(d)(2) because it "ignored the evidence before it and made findings expressly contradicted and unsupported by the medical and record evidence." (Doc. 86 at 27.)

Dixon first argues that the court made clearly erroneous factual findings when it determined that evidence of his incompetency is "conflicting and ambiguous." (*Id.* at 23.) The evidence was conflicting, however, because the two experts disagreed about whether Dixon was competent to be executed.

Dixon also argues that the court made clearly erroneous findings when it took into account his intelligence and the coherence and organized thinking of his written pleadings. (*Id.* at 24.) The court noted, however, citing Dr. Amezcua-Patiño's testimony, that the presence of intelligence did not preclude a finding of incompetency.

Dixon argues that the superior court's rejection of his *Ford* claim amounted to an objectively unreasonable determination of the facts because the court based its decision on Dr. Vega's unreliable observations about Dixon's mental competency while acknowledging that Dr. Vega's ASPD diagnosis was invalid. (Doc. 86 at 26.) The court carefully judged Dr. Vega's credibility and made reasonable discernments between Dr. Vega's opinion and his observations.  Dr. Vega's failure to keep the recording of his interview with Dixon does not establish that his observations were faulty.  Likewise, if Dr. Vega's diagnostic approach was flawed, as Dixon argues it is, that does not suggest an

inability to accurately report his observations of Dixon.

Dixon contends that the court clearly erred when it characterized the NAU claim as "arguably delusional." (*Id.* at 26.) This argument is not persuasive. The court correctly noted that Dixon had more than one understanding of the State's rationale for his execution. (Pinal ROA 8 at 3.) Dixon also told Dr. Amezcua-Patiño that the judicial system was not biased against him but, rather, biased in favor of law enforcement—a proposition that it would be difficult to characterize as purely delusional. *Cf. Wood v. Stephens*, 619 F.App'x 304, 309 (5th Cir. 2015).

In *Panetti* the Supreme Court explained that "[g]ross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose," the touchstone of the principles first announced in *Ford*. 551 U.S. at 960. An execution has no retributive value, the Court reasoned, "when a prisoner cannot appreciate the meaning of a community's judgment." *Madison*, 139 S. Ct. at 726 (citing *Panetti*, 551 U.S. at 958). However, "delusions come in many shapes and sizes, and not all will interfere with the understanding that the Eighth Amendment requires." *Id.* at 729 (citing *Panetti*, 551 U.S. at 962).

Dixon has one delusion: that the NAU issue is meritorious and that courts have denied it out of bias for the prosecution or to avoid embarrassment from his wrongful prosecution. Yet, that delusion is not so removed from reality that his punishment can serve no proper purpose. It was not unreasonable for the competency court to find that this belief did not impair Dixon's rational understanding of the reason for his execution.

The Arizona Supreme Court did not make an unreasonable determination of facts in light of the evidence presented to it. *See Rice v. Collins*, 546 U.S. at 341–342. The Arizona Supreme Court's finding that Dixon's evidence did not rebut the presumption of competency is presumed to be correct. Dixon has not presented clear and convincing evidence to the contrary.

## 2. Unreasonable Application of *Ford/Panetti*

Dixon argues that the competency court acknowledged but failed to apply the correct standard for determining competence to be executed. He contends that the court applied the too-restrictive standard rejected by the Supreme Court in *Panetti*. (Doc. 86 at 28.) He bases this assertion on the competency court's purported reliance on Dixon's mere "awareness" that the State wanted to execute him and that the court failed to take into account the truly delusional nature of the NAU issue and to view it in the context of Dixon's mental illness where it impaired his rational understanding of the reasons for his execution. (*Id.* at 28–29.) The Court disagrees.

The competency court applied the correct standard: whether Dixon's "mental state is so distorted by a mental illness that he lacks a rational understanding of the State's rationale for his execution." (Pinal ROA 8 at 2.) The Supreme Court acknowledged in *Panetti* that "a concept like rational understanding is difficult to define." 551 U.S. at 959. The Court declined to "set down a rule governing all competency determinations," but held that the trial court should have considered the defendant's "severe, documented mental illness" before dismissing his claim of incompetence. *Id.* Here, the state court did consider Dixon's schizophrenia and delusional beliefs. *See Ferguson v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315, 1324 (11th Cir. 2013) (explaining that state court applied the correct standard by taking into account petitioner's "paranoid schizophrenia and delusional belief that he is the Prince of God" before finding him competent). The court found that Dixon suffers from schizophrenia. The court correctly noted, however, that a diagnosis of Dixon's mental condition is not dispositive of the issue of his competence. *Madison*, 139 S. Ct. at 727.

Considering the retributive purpose of capital punishment, the *Panetti* Court observed:

> [I]t might be said that capital punishment is imposed because it has the potential to make the offender recognize at last the gravity of his crime and to allow the community as a whole, including the surviving family and friends of the victim, to affirm its own judgment that the culpability of the

prisoner is so serious that the ultimate penalty must be sought and imposed. The potential for a prisoner's recognition of the severity of the offense and the objective of community vindication are called in question, however, if the prisoner's mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole.

551 U.S. at 958–59

There is no doubt that Dixon's "concept of reality," *id.* at 958, is flawed by his delusional belief that the courts have denied relief on his claimed legally valid NAU issue for reasons unrelated to its merits. The competency court could reasonably conclude, however, that this belief does not amount to the type of distortion by which Dixon's notions of crime and punishment are unrelated to those of the community as a whole.

The experts agree that Dixon knows that he was sentenced to death for the murder of Deana Bowdoin. The competency court reasonably took into account statements Dixon made to Dr. Vega which suggest that Dixon was aware that it was the crime, rather than a cover-up by the courts, that led to his sentence. His wish that he was in another state, one that did not have the death penalty, demonstrates an awareness of the nexus between the crime and the sentence, exclusive of the NAU issue. *See Ferguson*, 716 F.3d at 1340 (despite schizophrenic petitioner's expressed beliefs that "he had been anointed the Prince of God, that he would be resurrected . . . to sit at 'the right hand of God,' and that he would eventually return to Earth," state court reasonably found him competent for execution under *Panetti* where he "acknowledged that he was going to be executed because of the eight murders he committed, acknowledged that he would be the first inmate to receive Florida's new lethal-injection protocol, and acknowledged that he would physically die as an immediate result of being executed").

Other comments by Dixon show that he is aware of the gravity of the crime. For example, he stated that he would bring the victim back if he could. He also explained that if he did kill the victim on purpose maybe he deserved the death penalty. Finally, he indicated that he would feel a sense of relief on the way to his execution if he were able to remember killing her. *See Madison*, 139 S. Ct. at 727 (explaining that "a person who can

no longer remember a crime may yet recognize the retributive message society intends to convey with a death sentence)."

Dixon's statements support a finding that he has "'come to grips' with the punishment's meaning." *Id.* at 729 (citing *Panetti*, 551 U.S. at 958). They likewise show that Dixon is able to "grasp the execution's 'meaning and purpose' [and] the 'link between [his] crime and its punishment.'" *Id.* at 723 (quoting *Panetti*, 551 U.S. at 958, 960); *see Coe v. Bell*, 209 F.3d 815, 826–27 & n.4 (6th Cir. 2000) (finding petitioner "comprehended" his sentence and its implications where he chose a method of execution and refused a sedative so that he would be able to "deal with" God).

In arguing that he is incompetent, Dixon asserts that his delusions parallel those of the petitioner in *Panetti* who believed the State wanted to execute him to stop him from preaching. (Doc. 86 at 29–30.) This argument is unconvincing. The Supreme Court did not find that Panetti's delusions rendered him incompetent to be executed. Rather it remanded the case to the district court to make that determination. In fact, no court has yet found that Panetti was incompetent to be executed.[6]

Next, the nature of Dixon's delusion is less suggestive of incompetence than the delusions Panetti experienced. *Panetti*, 552 U.S. at 954 (explaining that *Panetti's* "genuine delusion" involved the reason for his execution which he viewed as "part of spiritual warfare . . . between the demons and the forces of the darkness and God and the angels and the forces of light"); *see, e.g.*, *Billiot v. Epps*, 671 F.Supp.2d 840, 882 (S.D.Miss. 2009) (finding schizophrenic petitioner incompetent based on his delusional belief that he would not be executed if he took his medication). Moreover, Dixon's belief in the legal validity

---

[6] The district court concluded that Panetti, while he suffered from a serious mental illness and experienced paranoid delusions, had a "fairly sophisticated understanding of his case" and possessed "both a factual and rational understanding of his crime, his impending death, and the causal retributive connection between the two." *Panetti v. Quarterman*, No. A-04-CA-042-SS, 2008 WL 2338498, at *35, 37 (W.D. Tex. Mar. 26, 2008). The Fifth Circuit affirmed but later reversed and remanded, holding that Panetti's competence needed to be determined "afresh" after several years had passed and his condition had worsened. *See Panetti v. Davis*, 863 F.3d 366, 378 (5th Cir. 2017).

- 23 -

of the NAU issue is the kind of "adherence to a discredited legal theory" which courts have found insufficient to merit an examination of a defendant's competence in the trial context. *United States v. Anzaldi*, 800 F.3d 872, 878 (7th Cir. 2015) (citing *United States v. Jonassen*, 759 F.3d 653, 660 (7th Cir. 2014); *United States v. Alden*, 527 F.3d 653, 659–60 (7th Cir. 2008); *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003)).

Finally, to the extent that Dixon's delusion relates to his understanding of the reason for his execution, the record is less clear than Dixon suggests. In his testimony Dr. Amezcua-Patiño insisted that Dixon always returned to his theory that he was singled out for execution to prevent embarrassment to the State and law enforcement from their refusal to accept his NAU claim. As noted above, however, Dixon also or alternatively believed that his execution could be explained by the fact that the judicial system was simply biased in favor of law enforcement.

In sum, the competency court did not improperly restrict its assessment of Dixon's competency to his mere awareness that he was to be punished by death. In finding that Dixon did not prove his incompetence by a preponderance of the evidence, the court reasonably applied *Panetti*. Its decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103; *see Ferguson*, 716 F.3d at 1340, 1342 ("Both the reasoning and outcome of the Supreme Court's decision in *Panetti* leave ample room for fair-minded jurists to conclude, as the state courts did here, that Ferguson is mentally competent to be executed despite his mental illness and the presence of a delusional belief.") (citing *Renico v. Lett*, 559 U.S. 766, 776 (2010)).

### C.    Conclusion

The competency court applied the correct standard under *Panetti* for assessing competence to be executed. It determined that Dixon did not satisfy his burden of showing, by a preponderance of the evidence, that he met that standard. Under the deferential standard of the AEDPA, this Court finds that the competency court reasonably determined

that Dixon, although he suffered from schizophrenia, did not lack a rational understanding of the State's rationale for executing him. Therefore, his claim is without merit.

## V. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. Id.

The Court finds that reasonable jurists could not debate its resolution of Dixon's competency claim.

## VI. STAY

Dixon asks the Court to stay his execution to "permit briefing and argument on his *Ford* claim." (Doc. 87.) Because the Court denies the petition in this order, it will deny the Motion to Stay as moot.

Accordingly, for the reasons set forth above,

**IT IS HEREBY ORDERED denying** Dixon's Petition for Writ of Habeas Corpus (Doc. 86).

**IT IS FURTHER ORDERED denying as moot** Dixon's Motion for Stay of Execution. (Doc. 87).

**IT IS FURTHER ORDERED denying** a certificate of appealability.

Dated this 10th day of May, 2022.

_____

Honorable Diane J. Humetewa
United States District Judge